UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:21-CV-0050-GNS

ESTATE OF JEREMY MARR,                              PLAINTIFFS
by and through its administrator,
JOANNA MARR, et al


VS            DEPOSITION FOR PLAINTIFF


CITY OF GLASGOW, et al,                             DEFENDANTS



\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*



DEPONENT:        **GUY TURCOTTE**
DATE:            January 9, 2023



\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\*



JULIE P. RITTER
COURT REPORTER
397 REDBIRD TRAIL
BOWLING GREEN, KY 42101
(270) 791-7345


1

## I N D E X

| | PAGE |
|---|---|
| Cross Examination Questions by Mr. Murley | 6 |

### E X H I B I T S

| | |
|---|---|
| Turcotte Deposition Exhibit 1<br>Turcotte Resume/CV | 10 |
| Turcotte Deposition Exhibit 2<br>Data Stick with videos shown to deponent on It | 21 |
| Turcotte Deposition Exhibits 3 and 4<br>Response to Resistance Form, 4/14/20<br>KYIBRS Report, 4/14/20 | 23 |
| Turcotte Deposition Exhibit 5<br>TASER® Training Certificate | 46 |
| Turcotte Deposition Exhibit 6<br>TASER® End-User Applicant Certification Form | 47 |
| Turcotte Deposition Exhibit 7<br>TASER® Instructor and User:  Warnings, Risk and Release Agreement | 48 |
| Turcotte Deposition Exhibit 8<br>Deponent's TASER® log | 63 |
| Turcotte Deposition Exhibit 9<br>Policy 1.11, Response to Resistance, 9/15/2016 | 86 |
| Turcotte Deposition Exhibit 10<br>Policy 1.11, Response to Resistance, 8/17/2020 | 88 |
| Turcotte Deposition Exhibit 11<br>PowerPoint Presentation from Axon re Taser | 190 |
| Turcotte Deposition Exhibit 12<br>SEALED:  Investigation Memo 4/4/2016 | 207 |
| Turcotte Deposition Exhibit 13<br>SEALED:  Investigation Memo 4/4/2016 | 209 |
| Turcotte Deposition Exhibit 14<br>SEALED:  Employee Disciplinary Notice | 214 |
| Turcotte Deposition Exhibit 15<br>SEALED:  Employee Disciplinary Notice | 219 |
| Turcotte Deposition Exhibit 16<br>SEALED:  Glasgow Police Disciplinary Action Form | 220 |
| Turcotte Deposition Exhibit 17<br>SEALED:  Administrative Report, 6/18/2019 | 223 |

### R E Q U E S T

| | |
|---|---|
| REQUEST NO. 1 | 90 |

Q.   Okay. All right.  Do you know if those written tests are retained?
A.   Yes, they are.
MR. MURLEY: I don't know if I've seen those tests.
MR. COOK: I don't know if we have or not, but I'll make a note.
MR. MURLEY: Yeah. I don't know if I've seen it.
WITNESS: Well, it's on the computer so you have to print it off.
MR. MURLEY: Right.
MR. COOK: I'll look and see.

| | |
|---|---|
| REQUEST NO. 2 | 181 |

Q.   Okay.  When were those cases disposed of?
MR. COOK: I can tell you that, but I can't tell you off the top of my head.  I can give you case numbers that'd probably --
MR. MURLEY: Yeah.  That'd speed things up.

### O B J E C T I O N S

| | |
|---|---|
| MR. COOK: I'm going to object to the form of that. | 22 |
| MR. COOK: Object to form | 54 |
| MR. COOK: Object to form | 55 |
| MR. COOK: Same objection | 55 |
| MR. COOK: Object to form | 72 |
| MR. COOK: Object to form | 94 |
| MR. COOK: Object to form | 121 |
| MR. COOK: Object to form | 121 |
| MR. COOK: Same objection | 122 |
| MR. COOK: Object to form | 122 |
| MR. COOK: Object to form | 122 |
| MR. COOK: Object to form | 123 |
| MR. COOK: Object to form | 123 |
| MR. COOK: Object to form | 124 |
| MR. COOK: Object to form | 130 |
| MR. COOK: Object to form | 139 |
| MR. COOK: Object to form | 140 |
| MR. COOK: Object to form on that | 143 |
| MR. COOK: Object to form | 146 |
| MR. COOK: Object to form | 147 |
| MR. COOK: Object to form | 149 |
| MR. COOK: Object to form | 150 |
| MR. COOK: Object to form on that | 150 |
| MR. COOK: Object to form. Speculation | 151 |
| MR. COOK: Object to form. Speculation | 151 |
| MR. COOK: Object to form | 152 |
| MR. COOK: Same objection | 153 |
| MR. COOK: Same objection | 153 |
| MR. COOK: Object to form | 200 |
| MR. COOK: Object to form | 204 |

\*\*\*\*  \*\*\*\*  \*\*\*\*  \*\*\*\*

    The deposition of **GUY TURCOTTE**, taken pursuant to notice heretofore filed, in the offices of KERRICK BACHERT, PSC, 1025 State Street, Bowling Green, Warren County, Kentucky, on Monday, January 9, 2023, beginning at 10:30 a.m. and ending at 3:17 p.m., and to be used in accordance with the Federal Rules of Civil Procedure.

\*\*\*\*  \*\*\*\*  \*\*\*\*  \*\*\*\*

### A P P E A R A N C E S

For the Plaintiffs:  Brandon T. Murley
                     Kreg Romney
                     BRODERICK & DAVENPORT
                     921 College Street
                     P. O. Box 3100
                     Bowling Green, KY  42102


For the Defendants:   Matthew P. Cook
                      KERRICK BACHERT, PSC
                      1025 State Street
                      P. O. Box 9547
                      Bowling Green, KY  42102-9547

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

**** **** **** ****

GUY TURCOTTE, called on behalf of the Plaintiff, being first duly sworn, was examined and deposed as follows:

**CROSS EXAMINATION**
**QUESTIONS BY MR. MURLEY:**

Q.   Please state your name for the record.

A.   My name is Guy J. Turcotte.

Q.   And are you employed by the Glasgow Police Department?

A.   Yes, I am.

Q.   Okay.  And what's your home address?

A.   207 Hutchison Road, Glasgow, Kentucky.  And that's a private address, right?

Q.   I'm sorry?

A.   That's a private address, right?

Q.   Well, it's on the record.

MR. MURLEY:  I mean, this isn't being filed.  I mean...

MR. COOK:  This isn't going in the court record.

WITNESS:  I've already had death threats to my house because of this.  So...

MR. MURLEY:  Okay.  Well, it's not going in the court record until we file the motion of access.  So

6

JULIE RITTER          270.791.7345

it's just between us right now.

WITNESS:  Very good.

MR. MURLEY:  But it is -- obviously, we're on the record.

WITNESS:  I understand.

BY MR. MURLEY:

Q.   Have you given a deposition before?

A.   Yes, I have.

Q.   When's the last time you gave a deposition?

MR. COOK:  The one I took was probably a couple of years ago.

WITNESS:  About two years ago.

BY MR. MURLEY:

Q.   So it's been a little while?

A.   Yes.

Q.   And I just need to know whatever you know.  So if you don't know, you can say, I don't know.  Does that make sense?

A.   Yes, it does.

Q.   Okay.  So it's been a few years since you gave a deposition.  A few things that'll make it go a little more smoothly:  I will try to keep from interrupting you if you can maybe not talk until I'm finished talking, if that makes sense.  That'll help Ms. Ritter take down my question and your answer.

7

JULIE RITTER          270.791.7345

A.   You don't have to worry about that.

Q.   Okay.  If you can answer out loud instead of shaking your head, yes or no, that'll also help her take down what your response is.

A.   I understand.

Q.   And then if you can say yes or no instead of uh-huh or huh-uh, that'll also help.  Okay?

A.   I understand that also.

Q.   Okay.  And if you answer the question I ask you, I'm going to assume you understood what I was asking.

A.   If I don't, I'll ask you.

Q.   Does that make sense?  If you don't, let me know.  'Cause sometimes this gets somewhat conversational.  But I want to make sure that you understand the question I'm trying to ask.  Okay?  Make sense?

A.   Yes.

Q.   Okay.  What is your educational background?

A.   I've got a bachelor degree in criminal justice administration.

Q.   I think in discovery I may have seen a -- I'm going to call it, like, a resumé or a C-V or something; it has some stuff on your background in it, maybe, before you came to Glasgow?  It says, Professional

8

JULIE RITTER          270.791.7345

Profile.  Let me see here.  (Reviews documents.)

For education, it says Manatee Technical Institute, Certificate of Compliance Law Enforcement Officer, State of Florida; is that right?

A.   Can I see the document you're looking at?

Q.   Sure.  (Passes document.)

A.   (Reviews documents.)  Yeah.

Q.   He's got a copy for you here.

A.   Thank you.

MR. MURLEY:  Do you have another copy?

MR. ROMNEY:  Yeah.

MR. MURLEY:  Okay.

BY MR. MURLEY:

Q.   This'll probably make it a little easier to go through your background.  So...

A.   (Reviews documents.)  Okay.  Go ahead with your question.

Q.   I was trying to get your educational background.  And I thought it might have been a little quicker just to go through the information I received in the file --

A.   Uh-huh.

Q.   -- about you.  So Education is, like, the third page in.  Just for the record purposes, I'll probably attach this as an exhibit, if I can.  I think

9

JULIE RITTER          270.791.7345

1  it's been redacted.
2      A.   It's four pages of training up to the point
3  where I took the position here in March of 2011, which
4  I've continued training since then.
5      Q.   Right.
6      MR. MURLEY:  What I'll have Ms. Ritter do is, I'll
7  mark it as an exhibit, if we can, just so anybody
8  reading this knows what we were looking at.
9          (Turcotte Deposition Exhibit 1 was duly
10         received, marked, and is filed herewith.)
11     MR. MURLEY:  And if you can refer to that for me,
12 and I'll have some questions for you.
13     WITNESS:  Okay.  Go ahead.
14 BY MR. MURLEY:
15     Q.   Education, bachelor's of science, Columbia
16 Southern University, Criminal Justice Administration.
17 It says, anticipated graduation date of December of
18 2011.  Did you actually graduate?
19     A.   Yes.
20     Q.   Okay.  Was that the time, December of 2011?
21     A.   No, it was not.
22     Q.   When did you graduate with a bachelor's?
23     A.   Last year.
24     Q.   Last year?  What school did you get it from?
25     A.   Same thing.  Columbia Southern University.

10

1      Q.   Like correspondence or something?  Was it
2  online?
3      A.   It was online class.
4      Q.   Okay.
5      A.   Classes, excuse me.
6      COURT REPORTER:  Say again.
7      WITNESS:  Online classes.
8  BY MR. MURLEY:
9      Q.   Okay.  And there is some mention here of
10 training, I think, in the last, maybe, three pages that
11 we have attached.  That was all the training you
12 received before starting with the Glasgow Police
13 Department, is that correct?
14     A.   That is correct.
15     Q.   Okay.  And if you're turning the page, it
16 looks like you have pretty extensive law enforcement
17 background before coming to Glasgow?
18     A.   Yes.
19     Q.   Walk me through that if you will as far as,
20 looks like September of '91 is the first time I have you
21 listed on here as having a law enforcement position
22 previously?
23     A.   It was in '89.
24     Q.   Okay.  Where were you working at in '89 law
25 enforcement?

11

1      A.   I was a North Port police officer in North
2  Port, Florida.
3      Q.   Okay.
4      A.   I worked there for just under a year.  From
5  there I went to, I believe it was, Holly Hill Police
6  Department for just under two years.  From there, I went
7  to the Flagler Beach Police Department.  And all these
8  are in Florida.
9      Q.   Uh-huh.
10     A.   I was just over ten years in Baldwin Police
11 Department.  Prior to Baldwin, it was Interlachen while
12 I was running for chief of police for Baldwin.
13     Q.   Baldwin is where?
14     A.   It's in Jacksonville, Florida.
15     Q.   Jacksonville.  Okay.  So looks like you had a
16 stint in Crawford, Nebraska as well?
17     A.   Yes.  I was an interim police chief in
18 Crawford, Nebraska.
19     Q.   Okay.  And that was?
20     A.   2009.
21     Q.   For about, what, seven or eight months or
22 something?
23     A.   Yes.  I was there temporarily to help them get
24 their agency back online.
25     Q.   Okay.  And then from May 2010 to at least when

12

1  you sent this to the Glasgow Police Department, you
2  would have been in Cottondale, Florida.
3      A.   Yes, as an auxiliary officer.
4      Q.   Okay.  So you've had pretty much continuous
5  employment as a law enforcement officer since 1989; is
6  that right?
7      A.   I had other jobs in-between some things to
8  make extra money.
9      Q.   Okay.  In addition to being a law enforcement
10 officer?
11     A.   Yes.
12     Q.   Okay.  So is it fair to say that in some
13 capacity you've been in law enforcement since 1989?
14     A.   Yes.  I've been in law enforcement for over 30
15 years.
16     Q.   Okay.  How many times have you served as
17 either an interim chief or a chief of police?
18     A.   Four.
19     Q.   Four years?
20     A.   Four times.
21     Q.   Okay.  And where would those locations be at?
22     A.   Chief of Police in Baldwin Police
23 Department --
24     Q.   Okay.
25     A.   -- Florida.

13

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  Q.  Uh-huh.

2  A.  **Interim chief in Crawford, Nebraska; police**
3  **chief of the Cedar Grove Police Department in Florida,**
4  **which was prior to Crawford; and then the Glasgow Police**
5  **Department.**

6  Q.  Because you were the chief in Glasgow for a
7  period of time, too?

8  A.  **Just under four years.**

9  Q.  Right.  Okay.  Now, I'm assuming as a chief,
10  you wouldn't really be out on -- like, on the road or
11  responding to calls or anything with the Glasgow Police
12  Department?

13  A.  **No.  I responded to calls and also I was a**
14  **working chief.**

15  Q.  Okay.

16  A.  **I wrote citations, I helped with traffic**
17  **crashes --**

18  Q.  Well, that was --

19  A.  **-- worked on calls.**

20  Q.  That was my next question.  So throughout the
21  course of your career, have you consistently responded
22  to calls which would include, you know, subduing or
23  arresting individuals, whatever the case may be?

24  A.  **Yes.  I was an active police chief that**
25  **responded to calls.**

14

JULIE RITTER          270.791.7345

1  Q.  Okay.

2  A.  **Not everybody was arrested or subdued.**

3  Q.  Well, I understand that.  But if there was a
4  service call, you would still respond to it even though
5  you were chief --

6  A.  **Yes.**

7  Q.  -- if it --

8  A.  **Yes, sir.**

9  Q.  Okay.

10  A.  **I believe in leadership by example.**

11  Q.  Okay.  So tell me about your tenure, I guess,
12  how it began, through the City of Glasgow at Glasgow
13  Police Department.  What year did you start?

14  A.  **Well, it was March the 28th, 2011.**

15  Q.  March 28th, 2011?

16  A.  **Yes.**

17  Q.  Okay.  What all have you reviewed in
18  anticipation for this deposition?  And I don't want to
19  know anything about speaking to your attorney about
20  anything.  I just want to know what you've looked at.

21  A.  **We reviewed the -- my body camera video --**

22  Q.  Okay.

23  A.  **-- and my written report.**

24  (Off-the-record discussion for clarification.)

25  BY MR. MURLEY:

15

JULIE RITTER          270.791.7345

1  Q.  Okay.  I expect we'll go through at least the
2  body cam video some today; so I'll have some questions
3  for you about that.  And I may have you -- want to see
4  what the written report is you're referring to, so I can
5  make sure I'm comparing apples to apples.  There's just
6  a lot of information involved.

7  MR. COOK:  There is.

8  MR. MURLEY:  All right.

9  WITNESS:  Do you have a copy of that report?

10  MR. MURLEY:  Not -- I don't know if we brought one
11  with us over here.  I've got it on the computer.  Yeah.
12  So I may want to see what you're talking about.  In
13  fact, can I look at that just to see what he looked at?
14  Is that okay?

15  MR. COOK:  (Passes documents.)

16  (Off-the-record discussion for clarification.)

17  MR. MURLEY:  Can we go off the record for a minute.

18  (Off-the-record from 10:37 a.m. to 10:38 a.m.)

19  COURT REPORTER:  All right.  We are back on the
20  record.

21  BY MR. MURLEY:

22  Q.  We took a brief break.  I understand that you
23  looked at the two reports that at least counsel
24  provided.  We'll attach those in a minute and may have
25  some questions for you about those.

16

JULIE RITTER          270.791.7345

1  A.  **Yes.**

2  Q.  Anything else you looked at besides the body
3  camera or those two reports?

4  A.  **No.**

5  Q.  Okay.  Have you had occasion to see a video
6  that was posted to social media that I think depicted
7  maybe a passerby view of some of this encounter with
8  Jeremy Marr?

9  A.  **I -- I recall a -- this was a couple of years**
10  **ago.**

11  Q.  Right.

12  A.  **I recall a -- a clip.  I think it was, like,**
13  **six to seven seconds or something like that, where from**
14  **the street side it depicted myself standing above the**
15  **two officers that were on the ground; and I believe that**
16  **was Officer Hayden delivering knee strikes to Mr. Marr's**
17  **hip.**

18  Q.  So I think I've got a copy of it.  I'm trying
19  to just figure out who's who in this video because I
20  wouldn't know that unless asking you.

21  A.  **Uh-huh.**

22  Q.  You're the first, obviously, deposition I've
23  been able take in this case.  I think we've got it on a
24  flash drive, too, that we may just attach, so that it's
25  in the record of what we're looking at.

17

JULIE RITTER          270.791.7345

1      A.   I think they have it on a -- on a loop where
2  it kept looking like --
3      Q.   Yeah.  I think you're right.
4      MR. COOK:  So do you want him to look at it and
   identify the people; is that what you --
6      MR. MURLEY:  Yeah, if you don't mind.
7      MR. COOK:  Yes.
8      MR. MURLEY:  I'd like to know when the -- 'cause
9  this was produced, I think, in discovery.  I think you
10  sent a copy of it, too.
11     MR. COOK:  Yeah.
12  BY MR. MURLEY:
13     Q.   Can you see this?
14     A.   I can barely see it.
15     Q.   All right.  That's about as big as we can make
16  it, I think.  Let me press play and then...
17               (Playing video.)
18     A.   You can see Marr kicking his feet up.  That's
19  me standing up.  That's Hayden delivering stun strikes
20  to Marr's hip.
21     Q.   I'm going to back this up, and I just want to
22  ask you who everybody is.  Okay?  All right.  So I've
23  backed this up.  There's, obviously, an officer --
24     A.   Officer Hayden's the one that's delivering the
25  knee strikes to his hip -- to Mr. Marr's hip.

                              18

        JULIE RITTER          270.791.7345

1      Q.   You were the first three to respond, correct?
2      A.   Yes.
3      Q.   Okay.  So I know we've looked at body cams,
4  and I think it was in your-all's body cams from when you
5  first encountered Mr. Marr that day?
6      MR. COOK:  Might I interrupt for just a second?
7  You said, Officer Hayden.  You mean Hayden Phillips.
8      WITNESS:  Oh, I'm sorry.  Yeah.  Hayden Phillips.
9      MR. MURLEY:  Hayden Phillips?  Okay.
10  BY MR. MURLEY:
11     Q.   So Hayden Phillips is delivering the knee
12  strikes?
13     A.   Right.  And Cameron Murrell is the sergeant.
14     Q.   Okay.  Now, it looks like Mr. Marr is on the
15  ground at this point in time -- is that right -- as far
16  as I can tell from this video.
17     A.   Yes.
18     Q.   And he's not very -- extremely visible in
19  this, but it looks like he's on the ground --
20     A.   Yes.
21     Q.   -- at that point.
22     A.   He's the one that had his knee kicking up.
23     Q.   Okay.  All right.
24     MR. COOK:  And you're going to make that Exhibit 2?
25     MR. MURLEY:  Yeah.  I think we'll make it -- we've

                              20

        JULIE RITTER          270.791.7345

1      MR. COOK:  Is he on the left or the right?
2      WITNESS:  He's on my right.
3      MR. MURLEY:  For the record purposes, this is at
4  second 25 of the clip.  And we're going to make that an
5  exhibit with the flash drive that we attach.  But...
6      WITNESS:  This is Sergeant Murrell.
7      COURT REPORTER:  Sergeant who?
8      WITNESS:  Murrell.  M-U-R-E-L-L, I believe.
9      MR. MURLEY:  Okay.
10     MR. COOK:  So as we look at the screen, Murrell is
11  on the left?
12     WITNESS:  Yes.
13  BY MR. MURLEY:
14     Q.   But Murrell's on the left and kind of
15  kneeling.  You are standing.  And the individual that is
16  delivering knee strikes would be --
17     A.   Officer Hayden.
18     Q.   -- Officer Hayden.  Okay.  And those were the
19  three -- you-all were the three Glasgow police officers
20  that responded to the encounter with Jeremy Marr on
21  April 20 --
22     A.   Three of them.
23     Q.   Three of them.  Yeah, well initially you-all
24  were the three?
25     A.   The three in that picture, yeah.

                              19

        JULIE RITTER          270.791.7345

1  got a flash drive with the body cam and this on it, I
2  think.  So we've --
3      MR. ROMNEY:  Yeah.  It's in there.
4      MR. MURLEY:  So we'll make that Exhibit 2.
5          (Turcotte Deposition Exhibit 2 was duly
6          received, marked, and is filed herewith.)
7      MR. MURLEY:  And the body cam's on it, too, so I'll
8  have questions about that in a little while.
9      MR. COOK:  So the social media video is Exhibit 2?
10     MR. MURLEY:  Yeah.
11     MR. COOK:  And his resumé is 1?
12     MR. MURLEY:  1.  Yeah.  Thank you.
13     WITNESS:  No problem.  What was your name again?
14     MR. MURLEY:  My name?
15     WITNESS:  Yeah.
16     MR. MURLEY:  Brady.
17     WITNESS:  Brady.
18     MR. MURLEY:  Yeah.
19     WITNESS:  Grady, be with a G or a B?
20     MR. MURLEY:  B.
21     WITNESS:  Okay.
22     MR. MURLEY:  Brady.
23  BY MR. MURLEY:
24     Q.   The video that we've just attached as an
25  exhibit, the social media post --

                              21

        JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  **A.  Uh-huh.**

2  Q.  -- I know that's a very limited portion of the
3  encounter that you-all had with Mr. Marr just from
looking at stuff.

**A.  Yeah.  Just a few seconds.**

6  Q.  A few seconds.  Does that few seconds look to
7  be an accurate depiction at least those few seconds that
8  occurred that day?  I know it's from the side, and I
9  know it's difficult to see.  But I'm just saying, is
10  that --

11  **A.  Well, different type of angles.**

12  Q.  Right.

13  **A.  Different kind of --**

14  Q.  But from that vantage point, does that look
15  like that's an accurate depiction of what occurred that
16  day?  It didn't seem to be doctored or anything, is what
17  I'm saying.  Does that make sense?

18  **A.  Other than it was on a loop.**

19  Q.  Right.

20  **A.  Yes.**

21  Q.  Okay.

22  MR. COOK:  I'm going to object to the form of that.
23  I understand what you're asking but...

24  MR. MURLEY:  Yeah.

25  MR. COOK:  Yeah.  Okay.

22

1  WITNESS:  Okay.

2  MR. MURLEY:  These are the two forms that we talked
3  about earlier.

4  MR. COOK:  Yes.

5  MR. MURLEY:  I'll probably go ahead and attach
6  those as 3 and 4.

7  (Turcotte Deposition Exhibits 3 and 4 were
8  duly received, marked, and are filed
9  herewith.)

10  MR. MURLEY:  I assume they've been redacted.

11  WITNESS:  I don't think those are redacted.

12  MR. MURLEY:  All right.  It doesn't look like his
13  date of birth; I don't know Mr. Marr's.  We may need to
14  take some of this out of it.  Sorry.  I hate to make
15  more work for you.

16  COURT REPORTER:  That's what I'm here for.

17  MR. COOK:  Which one is 3?  Response to Resistance
18  is 3?

19  MR. MURLEY:  3.  And then 4 is the other form, the
20  K-Y-B-R-S report.

21  MR. COOK:  Thank you.

22  BY MR. MURLEY:

23  Q.  You've been to a police academy to get
24  certified to be a law enforcement officer, correct?

25  **A.  Yes.**

23

1  Q.  And when did you actually attend the police
2  academy first to be certified?

3  **A.  January 1989 through July of 1989.**

4  Q.  You can excuse my ignorance, if you will.  I
5  don't know about transferring between states.  I
6  understand that police officers here -- at least law
7  enforcement officers -- have to be POP certified --

8  **A.  Uh-huh.**

9  Q.  -- through a program with Eastern Kentucky
10  University, it used to be.  But is that something you
11  had to recertify when you came to Kentucky, or does that
12  transfer across state lines?  Does that make sense what
13  I'm asking?

14  **A.  I received my POP certificate through the**
15  **state of Kentucky by supplying my training**
16  **information --**

17  Q.  Okay.

18  **A.  -- to them.  And I also had to attend three or**
19  **four other classes in reference to Kentucky law.  And I**
20  **believe that was it.**

21  Q.  So the initial academy that you went to would
22  have been in 1989?

23  **A.  Yes.**

24  Q.  And then based on the training you've received
25  over the years, you were able not to have to go through

24

1  the full POP certificate again whenever you came to
2  Kentucky, but you had to do some things to refresh
3  yourself on Kentucky law?  Does that sound right?

4  **A.  No.  I got a full POP certificate.**

5  Q.  Okay.

6  **A.  They counted my education and training in**
7  **Florida compared to theirs.**

8  Q.  Okay.  So you --

9  **A.  So I did not go through their entire police**
10  **academy like a new recruit --**

11  Q.  Right.

12  **A.  -- because obviously I wasn't.**

13  Q.  Okay.  So you did have to go to Eastern
14  Kentucky University for a period of time?

15  **A.  No.**

16  Q.  You were able to do that through videos or
17  what?

18  WITNESS:  Is (inaudible) a part of --

19  MR. COOK:  It's at Richmond where Eastern Kentucky
20  is.  So did you go to Richmond for classes?

21  WITNESS:  Yes.

22  MR. MURLEY:  And I'm meaning Richmond, because it's
23  just associated to me with Eastern.

24  MR. COOK:  I know.

25  WITNESS:  I don't think it's the university.

25

1  MR. COOK:  Yeah.  Just tell him where you went.
2  WITNESS:  It's the D-O-C-J-T training.
3  MR. MURLEY:  Yeah.  That's a good point.
BY MR. MURLEY:
4  Q.  So you mentioned the D-O-C-J-T training in
6  Richmond, Kentucky?
7  A.  Yes.
8  Q.  But you didn't have to do like a new recruit
9  and go through --
10  A.  Yes.
11  Q.  -- the entire training?
12  A.  No.
13  Q.  Okay.  But you received some training when you
14  came to Kentucky.  Do you remember what courses that you
15  were required to take, that you...
16  A.  I believe one was for new police chiefs.
17  Q.  Uh-huh.
18  A.  One was for Kentucky legislation and law.  And
19  I -- I can't remember the other one.
20  Q.  Okay.  When would have been the last time that
21  you would have received training on subduing a suspect?
22  A.  We train every year for that.
23  Q.  Okay.  So that's something you do annually
24  then?
25  A.  Yes.

26

JULIE RITTER          270.791.7345

1  A.  You've got police officer presence, which is
2  one; then you've got verbal commands, which is two; then
3  you have soft hand technique; then you can go to
4  chemical spray; taser; hard hand technique; and then the
5  deadly force.
6  Q.  All right.  Repeat that again.  Police officer
7  presence, verbal.  What was the third?
8  A.  Verbal command.
9  Q.  Okay.
10  A.  Soft hand technique.
11  Q.  Soft hand.  Okay.
12  A.  Possibly chemical spray, taser, electronic
13  device, hard hand, then you can use the impact weapon,
14  and then deadly force.
15  Q.  All right.
16  A.  And that's the use of force depending --
17  depending on the situation.
18  Q.  All right.  So somebody who's reading this
19  testimony that doesn't have any idea what a use of force
20  continuum is --
21  A.  Uh-huh.
22  Q.  -- is this what you're supposed to start with?
23  Is it like a degree of --
24  A.  It's a guide.
25  Q.  Okay.

28

JULIE RITTER          270.791.7345

1  Q.  Okay.
2  A.  And that should be in my -- my education file,
3  certificates.
4  Q.  Do you discuss de-escalation techniques in
5  that training?
6  A.  Yes.
7  Q.  And what are those techniques for
8  de-escalation?
9  A.  Verbal.
10  Q.  "Verbal" as in trying to do what?  Try to get
11  the person to comply with what your requests are without
12  having to use force, correct?
13  A.  Yeah.  Depending on the situation, yeah.
14  Q.  Okay.  Subduing a suspect, does that also
15  include the force that you can use on a person?
16  A.  Use of continuing force.
17  Q.  Yeah.  What type of force is supposed to be
18  used on a person?
19  A.  Depending on the situation.
20  Q.  Okay.  So if you encounter a person who is,
21  let's say, not compliant with your requests to put their
22  arms behind their back, describe for me --
23  A.  It would probably be just easier to explain
24  the force continuum.
25  Q.  Sure.

27

JULIE RITTER          270.791.7345

1  A.  'Cause say I show up and you have a gun --
2  Q.  Uh-huh.
3  A.  -- obviously, my presence doesn't matter or my
4  verbal command doesn't matter.
5  Q.  Right.  Okay.  So for an individual that
6  doesn't have a weapon --
7  A.  Uh-huh.
8  Q.  -- where does that continuum start?
9  A.  Like I said, it's all by what's presented.
10  Q.  Okay.  Where did you start on this continuum
11  as of the April of 2020 encounter with Jeremy Marr?
12  A.  Presence; I was in a marked police unit and
13  uniform.
14  Q.  Okay.
15  A.  Then I went to verbal commands.
16  Q.  Okay.
17  A.  When he was not compliant, I went to soft hand
18  technique, where I put my hand on his shoulder and I got
19  a-hold of his -- his sweater --
20  Q.  Okay.
21  A.  -- and walked him over to the front of my
22  patrol car.
23  From that point where he still did not comply
24  and attempted to escape, we went -- we wrestled him to
25  the ground -- actually, over into the grass so he

29

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1 wouldn't land on the pavement.

2         He still refused to comply, put up a fight,
3 assaulted both officers, including myself, by kicking my
4 legs, and then that went to an electronic device.

5    Q.   Did you have chemical spray on you?

6    A.   Yes.

7    Q.   Okay. And what's the reason you didn't deploy
8 that?

9    A.   It would affect the other two officers and
10 myself because we were in such close proximity.

11   Q.   Okay. Were you the only individual that
12 actually deployed an electronic device or --

13   A.   Yes.

14   Q.   -- taser? Okay. So at least the taser
15 information we've received in discovery in this case
16 would all be from the taser that you deployed on Jeremy
17 Marr that day?

18   A.   Yes.

19   Q.   So you've said it depends on the situation
20 about what type of force is supposed to be used. I
21 think you used the example of, if a person has a gun, it
22 would be a different type of force as opposed to someone
23 who's not armed that we've talked about today, right?
24 Just your presence would not be enough on the continuum
25 for someone that has a gun, correct?

30

1    A.   Correct.

2    Q.   Okay. So would you agree with me that, you
3 know, there are certain types of force that can be
4 excessive depending upon the circumstances?

5    A.   Not in this situation.

6    Q.   Well, and I'm just saying in general. I
7 didn't ask you about this situation yet.

8    A.   Well, isn't, like, speculative?

9    WITNESS: Like, can I answer that?

10   COURT REPORTER: I'm sorry. What?

11   WITNESS: Is that, like, speculative?

12 BY MR. MURLEY:

13   Q.   It is. I'm trying to establish if you believe
14 that there's any type of force that can be excessive in
15 situations first.

16   MR. COOK: Just generally?

17   MR. MURLEY: Just generally.

18 BY MR. MURLEY:

19   Q.   Would you agree with me that there can be
20 excessive force used at certain times? Not asking about
21 Jeremy Marr. I'm just asking a general question. Does
22 that make sense?

23   A.   Yeah. It makes -- obviously, you're trying to
24 say, there's times that you read in the paper or
25 anywhere that, yeah, excessive force had been used. I

31

1 know there are instances, yes. But not in this one.

2    Q.   And we'll get to that. I'm asking a general
3 question right now.

4         So force that is, I guess -- as far as the
5 continuum goes, using more force than necessary on that
6 continuum could, in fact, be dangerous or lethal
7 sometimes, correct?

8    A.   Depending on what force you're using.

9    Q.   Well, if you're using deadly force, that could
10 be lethal?

11   A.   Yeah. Well, that's the last force you'd use.

12   Q.   Right. And in some instances, the electronic
13 device can be lethal, too, can it not?

14   A.   I've never had it lethal when I used it.

15   Q.   Okay. We'll go into that a little further
16 when we talk about your training on the electronic
17 device.

18   A.   Yes, sir.

19   Q.   Were you trained on the use of nonlethal
20 force?

21   A.   (Indicating.)

22   Q.   I assume that's a yes?

23   A.   Yes.

24   Q.   What options do you have when it comes to the
25 types of force you can use on a person when trying to

32

1 subdue them? I understand that you went through
2 presence, verbal, soft hand --

3    A.   Yeah.

4    Q.   -- chemical. I think you said, impact weapon?

5    A.   No. I said electronic weapon.

6    Q.   Electronic weapon, hard hand, and then impact
7 weapon, and deadly force?

8    A.   Yes.

9    Q.   Okay. Were you trained in the use of a hobble
10 restraint device?

11   A.   Yes.

12   Q.   So you know what that is?

13   A.   Yes.

14   Q.   Have you been issued one of those?

15   A.   No.

16   Q.   Okay. Have you ever used one of those in your
17 police career?

18   A.   Yes.

19   Q.   Okay. But not through Glasgow?

20   A.   No.

21   Q.   Not during -- not during --

22   A.   I had leg restraints, if I'm not mistaken,
23 that day.

24   COURT REPORTER: You had what? I'm sorry.

25   WITNESS: Leg restraints. They're -- they're the

33

1  handcuffs for your feet, has a long chain.  That, I -- I
2  did try to put on him, yes.
3  BY MR. MURLEY:
   Q.    So you tried to --
   A.    **After he was handcuffed.**
6  Q.    Okay.  After he was actually handcuffed, you
7  tried to put leg restraints on him?
8  A.    **Yes.  So he wouldn't escape.**
9  Q.    Okay.  Is that what your understanding of what
10 a hobble restraint device is?
11 A.    **No, that's not a hobble restraint.**
12 Q.    Okay.  So you did not have a hobble restraint
13 device during the encounter with Jeremy Marr, correct?
14 A.    **No.**
15 Q.    Okay.  Did you have that issued to you from
16 the City of Glasgow at all, a hobble restraint device?
17 I think you said, no, but I want to make sure I
18 understand.
19 A.    **I actually don't recall.**
20 Q.    Okay.
21 A.    **I never used the hobble restraint --**
22 Q.    Okay?
23 A.    **-- at the Glasgow Police Department.**
24 Q.    Okay.
25 COURT REPORTER:  Are we talking hobble,

34

JULIE RITTER          270.791.7345

1  Glasgow through the police department?
2  A.    **Yes.**
3  Q.    I just wanted to make sure that was the -- it
4  says here, every regular officer having responsibility
5  for the enforcement of the criminal laws in general
6  shall annually complete at least 40 hours certified
7  inservice training.  Equivalent training will be
8  accepted, however, the agency must demonstrate that the
9  training is equal to or exceeds K-L-E-C standards.  Is
10 that what you're discussing with the annual trainings?
11 A.    **No.  It's -- annual training can be just about**
12 **anything.**
13 Q.    So would it have been each year you would have
14 had training on the use of force in the force continuum
15 then?
16 A.    **Yes.**
17 Q.    Okay.  And would that include --
18 A.    **Can I see that --**
19 Q.    Sure.
20 A.    **-- what you're looking at.**
21 MR. MURLEY:  (Passes documents.)  I'm not going to
22 make that an exhibit.  But...
23 MR. COOK:  Sure.
24 WITNESS:  (Reviews documents.)  Okay.  Thank you.
25 BY MR. MURLEY:

36

JULIE RITTER          270.791.7345

1  H-O-B-B-L-E?
2  WITNESS:  Yes, ma'am.
3  COURT REPORTER:  Thank you.
4  WITNESS:  It's a restraint that wraps around your
5  feet, keeps them tight, and then pulled up to their
6  back.
7  COURT REPORTER:  It's tight and pulled up what?
8  WITNESS:  Pulled up -- your feet pulled up to your
9  hands, so you can't kick.  A lot of peo -- a lot of
10 officers use that to keep suspects from kicking out the
11 windows in the patrol car.  Oh, I'm sorry.
12 BY MR. MURLEY:
13 Q.    Let's see.  I've got a question for you.
14 I'll just leave this here.  (Reviews documents.)  I
15 think this is the policy manual that was provided to us
16 in discovery and...
17 (Off-the-record discussion.)
18 BY MR. MURLEY:
19 Q.    I'm looking at Policy number 14.1 in
20 Chapter 14.  And it looks like the Law Enforcement Role
21 and Authority in the index page.  Look at that.  I think
22 we received it in discovery from you-all.  But it's on
23 page 177.
24 You mentioned earlier that you participate in
25 annual training, I think, each year with the City of

35

JULIE RITTER          270.791.7345

1  Q.    Do those include qualification and
2  certifications of weapons or the taser as well?
3  A.    **We qualify once a year with the taser, and we**
4  **qualify once a year with our firearms.**
5  Q.    Okay.  You were issued a gun through the
6  Glasgow Police Department, correct?
7  A.    **Yes.**
8  Q.    And you were issued a taser.  I guess do you
9  want to call it an electronic control device or a taser?
10 How would you like to refer to it?
11 A.    **Whatever.  It's fine with me whatever you want**
12 **to refer to it as.**
13 Q.    It doesn't matter to me.  I guess, do you just
14 want to pick taser for this?
15 A.    **Taser's fine.**
16 MR. COOK:  Less words.
17 MR. MURLEY:  Yeah.
18 BY MR. MURLEY:
19 Q.    E-C-D, taser, electronic control device all
20 mean the same thing?
21 A.    **Yes.**
22 Q.    It looks kind of like a smaller type
23 gun-looking thing that you deploy?
24 A.    **It's an X-26, yeah.**
25 Q.    Right.  Okay.

37

1    (Off-the-record discussion for clarification.)
2  BY MR. MURLEY:
3      Q.   You were also issued pepper spray. I think
we've talked about a chemical spray is what you said.
4      A.   Yes.
6      Q.   But is that pepper spray?
7      A.   It's considered Mace®.
8      Q.   Okay. Mace®. A baton as well?
9      A.   Yes.
10     Q.   Okay.
11     A.   I don't carry one on my duty belt.
12     Q.   So you would not have had a baton with you
13  during the encounter with Jeremy Marr?
14     A.   It's called an ASP. And, no, I didn't have it
15  on me.
16     Q.   Okay. Any other, I guess, weapons that we
17  didn't mention that you would have been issued from the
18  Glasgow Police Department as of April of 2020?
19     A.   Backup handgun.
20     Q.   Okay. Did you have that on you --
21     A.   Yes.
22     Q.   -- in your encounter with Jeremy Marr? So you
23  had two handguns?
24     A.   Yes.
25     Q.   Okay. Anything else?

38

JULIE RITTER      270.791.7345

1      A.   Pocketknife.
2      Q.   Okay. Is that it? Anything else?
3      A.   Weapon-wise, yes.
4      Q.   Okay. Where on your person do you keep your
5  gun --
6      A.   On my right side.
7      Q.   -- when you're on duty? Right side?
8      A.   Yes.
9      Q.   Okay. And your backup gun, where is it kept?
10     A.   On my chest.
11     Q.   Okay. You're wearing a --
12     A.   Bulletproof vest.
13     Q.   Yes.
14     A.   It's in a pocket in my bulletproof vest.
15     Q.   Okay. Where do you keep your taser?
16     A.   On my left side.
17     Q.   Okay. Did you have pepper spray that day?
18     A.   Yes.
19     Q.   And where was it kept?
20     A.   On the front of my belt.
21     Q.   Front of your belt?
22     A.   Yes. On my left side.
     Q.   Okay. You said you didn't have your ASP or
24  baton that day, right?
25     A.   Yes. It's an ASP. It's a collapsible.

39

JULIE RITTER      270.791.7345

1      Q.   Right. And you didn't have that with you?
2      A.   Yeah. I do not carry it on my duty belt.
3      Q.   Where would the ASP have been that day?
4      A.   Passenger side door of my patrol car.
5      Q.   Okay. Why not carry that on your duty belt?
6      A.   The weight of it. The -- I very rarely ever
7  use the ASP on anything other than breaking a window.
8      Q.   Okay. It would have been an option you could
9  have used in your encounter with Mr. Marr, correct?
10     A.   Oh, yeah. It'd have been a little severe.
11     Q.   But it was in your patrol car that was at the
12  scene?
13     A.   Yes. Left side passenger door.
14     Q.   Okay. So everything we've mentioned you had
15  access to all of that at least in April of 2020 when you
16  encountered Mr. Marr, correct?
17     A.   (No response.)
18     Q.   The guns, the pepper spray, taser, the ASP,
19  you at least had access to all of those with you at the
20  scene?
21     A.   I would have to say no to that.
22     Q.   Okay. What did you not have access to?
23     A.   The ASP.
24     Q.   Because it was in your car when you were --
25     A.   It was in my car.

40

JULIE RITTER      270.791.7345

1      Q.   -- in contact with Mr. Marr? Okay.
2         As it relates to your duty weapon, I'm going to
3  assume that's your primary handgun that you carry?
4      A.   Yes.
5      Q.   Do you keep the same firearm the entire time
6  you're employed at the Glasgow Police Department or do
7  they change?
8      A.   They have changed.
9      Q.   Why do they change?
10     A.   Change in administration.
11     Q.   Just issued different guns, I guess?
12     A.   Well, there's several reasons they can change.
13  We went from a 45 to a 9-millimeter. There's also
14  wear-and-tear on the -- on the weapon.
15     Q.   Okay.
16     A.   So...
17     Q.   How often does that change?
18     A.   Depending on...
19     Q.   Depending on individuals --
20     A.   -- wear-and-tear and whoever does it.
21     Q.   So how many different firearms have you had
22  while you've been at the Glasgow Police Department?
23     MR. COOK:   If you know.
24     WITNESS:   Yeah. Three.
25  BY MR. MURLEY:

41

JULIE RITTER      270.791.7345

1    Q.   This is your third?

2    A.   Uh-huh.  Yes, sir.

3    Q.   Backup gun, is that also issued from the
Glasgow Police Department?

     A.   Yes, it is.

6    Q.   Okay.  Has that changed as well each time?

7    A.   Twice.

8    Q.   So this is your second backup gun?

9    A.   Yes, sir.

10   Q.   Okay.  I'm assuming you received firearms
11   training for your duty weapon?

12   A.   Yearly.

13   Q.   And what did that training consist of?

14   A.   Safety checks on the weapons and shooting at
15   the firing range.

16   Q.   Okay.  And you're required to be certified
17   every year on your duty weapon?

18   A.   Yes, sir.

19   Q.   Have you ever not passed that certificate for
20   your firearm certification?

21   A.   No, sir.

22   Q.   As far as the ASP or baton, I know you
23   testified it wasn't with you at the -- I guess it was in
24   your car at the scene, the patrol car; but it wasn't
25   with you on your person at the scene of the incident

1    Glasgow Police Department?

2    A.   Several.

3    Q.   "Several" means something different --

4    A.   More than two, less than ten.

5    Q.   Okay.

6    MR. COOK:  Fair enough.

7    MR. MURLEY:  I guess that would be several.

8    BY MR. MURLEY:

9    Q.   Pepper spray, do you receive training on the
10   use of pepper spray?

11   A.   Yes.

12   Q.   Is that also ongoing training as it relates to
13   the use of pepper spray you're provided?

14   A.   No.

15   Q.   Okay.  How often have you been trained on the
16   use of pepper spray?

17   A.   Several times throughout my career.

18   Q.   What about through the City of Glasgow?

19   A.   No.

20   Q.   Any training on pepper spray from the City of
21   Glasgow?

22   A.   No.

23   Q.   Okay.

24   A.   Usually when you're certified, you're
25   certified to use it.

1    with Mr. Marr, correct?

2    A.   That is correct.

3    Q.   Would you have received training on using the
4    ASP?

5    A.   Yes.

6    Q.   Okay.  And so you go through ongoing training
7    related to the ASP as well?

8    A.   Yes.

9    Q.   Is that annual as well?

10   A.   No.

11   Q.   I'm sorry?

12   A.   No.

13   Q.   All right.  Like, when was the last time you
14   were trained on using the ASP?

15   A.   I don't recall.  But I think it was back when
16   we had physical hand-to-hand combat training.

17   Q.   Okay.  Was that through the City of Glasgow?

18   A.   Yes.

19   Q.   You don't know how long ago that was?

20   A.   I do not recall.

21   Q.   Okay.  It's at least been since you started in
22   2011, correct?

23   A.   Yes, sir.

24   Q.   And do you know how many times you've had
25   hand-to-hand training since you've been with the City of

1    Q.   Okay.  Do you remember when the last time you
2    received training on the use of pepper spray was?

3    A.   I don't recall.

4    Q.   Okay.  Now, the taser.  I know you're issued a
5    taser; we've established that.  As far as the actual
6    taser that you had on your person as of the April of
7    2020 encounter with Mr. Jeremy Marr, was that the same
8    taser that you had throughout the course of your time
9    with the Glasgow Police Department?

10   A.   No.  I believe that was my second taser.

11   Q.   Second taser?  Okay.  And what was the reason
12   for the change in tasers, do you know?

13   A.   Wear and tear.

14   Q.   Okay.

15   A.   They outfitted all officers with tasers.

16   Q.   Okay.

17   A.   Upgrade, I would say.

18   Q.   When did you get the new taser, do you know?
19   And I'm referring to your taser that day as the new
20   taser.  But I guess it would be your second taser.
21   So do you know --

22   A.   I don't really recall.

23   Q.   Okay.  Now, did you receive training on the
24   specific use of the taser you had on your person with
25   the encounter with Jeremy Marr?

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1    A.   Yes.

2    Q.   And I think I have maybe a certificate on some
3  training that you had received on that.  (Reviews
  documents.)

    A.   Yeah.

6  MR. MURLEY:  Have you got an extra copy of this?

7  MR. ROMNEY:  Yeah.

8  MR. COOK:  Are you going to attach it?

9  MR. MURLEY:  Yes.  Just getting it together.  I
10  think that would be number 2.

11  MR. ROMNEY:  Yeah.  Just -- (inaudible.)  (Reviews
12  documents.)  Just pass it.  (Passes document.)

13  MR. MURLEY:  There we go.  Yeah.

14    What number are we on?

15  COURT REPORTER:  5.

16  MR. MURLEY:  5?

17    (Off-the-record discussion for clarification.)

18    (Turcotte Deposition Exhibit 5 was duly

19    received, marked, and is filed herewith.)

20  BY MR. MURLEY:

21    Q.   I'm showing you what's marked as
22  Exhibit number 5, which I understand to be a certificate
23  from some training that you would have received on the
24  use of a taser.

25    A.   X-26.

46

JULIE RITTER          270.791.7345

1  a taser.  And it looks like it's an X-2-6.  I'll show
2  you that.  Exhibit number 6.

3    A.   (Reviews documents.)

4    Q.   Is that correct what I --

5    A.   Yes.

6    Q.   -- just recited?  Okay.

7    So Jessie Barton's with the City of Glasgow,
8  correct?

9    A.   Was.

10    Q.   Was?  At this time he was?

11    A.   Yes.

12    Q.   And so he would have been providing you
13  training on the use of the X-2-6 as of November the 1st
14  of 2016?

15    A.   Yes.

16    Q.   Okay.

17    A.   That's where it's signed on there.

18    Q.   Right.  And as part of that, it looks like
19  there was an Instructor and User:  Warning, Risk, and
20  Release Agreement.

21  MR. MURLEY:  And we'll attach that as number 7.

22    (Turcotte Deposition Exhibit 7 was duly

23    received, marked, and is filed herewith.)

24  BY MR. MURLEY:

25    Q.   Looks like to me like you would have signed that,

48

JULIE RITTER          270.791.7345

1    Q.   And that's the actual unit that was used that
2  day, right?

3    A.   It was an X-26 I used, yeah.

4    Q.   Yes.  So you received training on the unit
5  that you used in April of 2020 in your encounter with
6  Mr. Marr?

7    A.   This certificate shows -- this certificate was
8  made back in July of 2011.  I've taken at least ten
9  other training classes for that since then.

10    Q.   I understand that.  That's just an example of
11  a certificate where you received --

12    A.   Yes.

13    Q.   -- training.  I'm not going to introduce ten
14  certificates.  But that's what I understand, you have
15  received training in it.  Does that make sense?

16    A.   (Indicating.)

17    Q.   Okay.  I'll give this to you in just a second.

18  MR. MURLEY:  (Reviews documents.)  (Passes
19  documents.)

20    (Turcotte Deposition Exhibit 6 was duly

21    received, marked, and is filed herewith.)

22  BY MR. MURLEY:

23    Q.   Looks like this is from 11/1 of 2016.  And
24  Jessie Barton would have been a certifying instructor
25  that, it looks like, gave you instruction on the use of

47

JULIE RITTER          270.791.7345

1  as well, on November 1st of 2016.  You see at the bottom
2  that's your signature, correct?

3    A.   Yes.

4    Q.   And that would be through the Glasgow Police
5  Department agency that's listed, correct?

6    A.   Correct.

7    Q.   Were these safety warnings, did they go
8  through those with you as part of the instruction that
9  you received in the training with the taser?

10    A.   They submitted this paperwork for us to sign,
11  yes, when we were there.

12    Q.   Okay.  (Reviews documents.)

13  MR. COOK:  Are you done with that one?

14  MR. MURLEY:  I've got another question.

15  MR. COOK:  Okay.

16  MR. MURLEY:  I have to find the page here.

17  MR. COOK:  No problem.

18  BY MR. MURLEY:

19    Q.   If you'll take a second and just read through
20  that, then I'm going to have a question for you about a
21  couple of parts of it.

22    A.   Okay.

23    Q.   And specifically under C-E-W Effectiveness.

24    A.   (Reviews documents.)

25  MR. COOK:  Where is that?

49

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1   MR. MURLEY: It's the left column --

2   MR. COOK: Okay.

3   MR. MURLEY: -- halfway down the page.

WITNESS: (Reviews documents.) Go ahead.

BY MR. MURLEY:

6   **Q.** So when you were deploying the taser on Jeremy

7   Marr during the April of 2020 incident -- I'll go

8   through the actual taser, I guess I'll call it a log,

9   with you in a little bit. But it looks to me like it

10  was primarily in drive-stun mode --

11  **A. Yes.**

12  **Q.** -- when you were deploying it?

13  **A. Eight times.**

14  **Q.** Okay. The way I read it, it looked like it

15  was 11 deployments. But you think it was eight?

16  **A. No. It was 11 deployments, eight drive stuns.**

17  **Q.** Okay.

18  COURT REPORTER: Eight what?

19  WITNESS: Drive stuns. It's different from the

20  taser.

21  MR. MURLEY: Okay.

22  BY MR. MURLEY:

23  **Q.** So tell me what it is you understand about a

24  drive-stun mode and what is that used for when deploying

25  the taser?

50

JULIE RITTER          270.791.7345

1   **A. Drive stun is when you take the taser**

2   **cartridge off the taser itself and you push the taser**

3   **into a muscle group which has pinpoint pain compliance.**

4   **So to better show an example of it, say, to the**

5   **back of your hand, you take a drop of water and you drop**

6   **the water. Wherever that was is, that's where the**

7   **pain's being. So it's pinpoint.**

8   **Q.** Basically, that is used for pain and does not

9   really cause incapacitation, correct?

10  **A. It's, yes, pain compliance.**

11  **Q.** Right. Okay. In at least the safety

12  information here at the bottom if you see when it's

13  talking about drive-stun mode is for pain compliance

14  only. Do you see that?

15  **A. (Reviews documents.) Under Safety**

16  **Information: General Precautions?**

17  **Q.** Safety Information: C-E-W Effectiveness and

18  then like the... I'll point it to you if you want me

19  to. (Indicating.) Right here.

20  **A. Last paragraph, drive --**

21  **Q.** Yeah.

22  **A. -- stun mode?**

23  **Q.** Yeah. Take a second and read that paragraph,

24  if you will.

25  **A. (Witness complies.) Yes.**

51

JULIE RITTER          270.791.7345

1   **Q.** So it says, drive stun use may not be

2   effective on emotionally disturbed persons or others who

3   may not respond to pain due to a mind-body disconnect.

4   Avoid using repeated drive stuns on such individuals if

5   compliance is unachieved.

6   Do you see that?

7   **A. Yes.**

8   **Q.** Did you believe that Jeremy Marr was

9   emotionally disturbed when you encountered him in April

10  of 2020?

11  **A. No.**

12  **Q.** So none of this would apply then if you didn't

13  think he was emotionally disturbed, correct?

14  **A. Well, be specific with your questions. 'Cause**

15  **you're asking me to make a medical determination on --**

16  **Q.** Okay. Have you been trained on dealing with

17  people who are intoxicated --

18  **A. Yes.**

19  **Q.** -- or under the subject of any mind-altering

20  drugs?

21  **A. Yes.**

22  **Q.** Did you believe that Jeremy Marr was under the

23  influence of anything when you encountered him?

24  **A. I did not believe he was under the influence**

25  **of alcohol.**

52

JULIE RITTER          270.791.7345

1   **Q.** Okay. Did you believe he was under the

2   influence of any drugs?

3   **A. Not 'til later.**

4   **Q.** "Later" as in when?

5   **A. When I started administering NARCAN®.**

6   **Q.** So this was after he'd been tased and subdued?

7   **A. Yes.**

8   **Q.** Okay. So you didn't see anything that led you

9   to believe he was under the influence of any drugs upon

10  initially contacting Mr. Marr; is that right?

11  **A. If I'm not mistaken, I asked him if he was on**

12  **any type of medications. He told me, no. He said he**

13  **wasn't high. I didn't smell any alcohol on his person.**

14  **Q.** Okay.

15  **A. And we just caught him inside of a house that**

16  **he just burglarized, so I believed his adrenaline was**

17  **pumping.**

18  **Q.** Okay. Now, did you believe Mr. Marr was

19  responding to the drive-stun modes that were being

20  deployed?

21  **A. The -- I deployed eight -- attempted**

22  **eight drive stuns, but they all did not connect.**

23  **Q.** Okay. How many connected, do you know?

24  **A. Half, if -- if that.**

25  **Q.** So four, you think?

53

JULIE RITTER          270.791.7345

**Page 54**

1    A.  Possibly.

2    Q.  Okay.

3    A.  But each time, he was kicking.  I was trying
to bridge.  He was aggressively attempting to escape and
assault myself and the other officers.  He kicked me in
my legs several times when I was trying to hold his legs
down.

8    Q.  This statement at the bottom says, avoid using
repeated drive stuns on such individuals if compliance
is not achieved.

        Now, does that mean someone who's emotionally
disturbed and not using drive stun?  'Cause you're the
one that was trained on this stuff, so I'm just asking
you.  What does that mean?

15    MR. COOK:  Object to form.  He didn't write this.

16    MR. MURLEY:  I understand.

17    WITNESS:  Yeah.  I can tell you what I did.  That's
about it.  When I attempted to drive stun him, they were
not making connections.  I actually -- he kicked so
violently that I actually drive stunned one of the
officers by accident.

22    MR. MURLEY:  Okay.

23    WITNESS:  So at that point, I saw it was
ineffective, and that's when I -- when I ceased drive
stunning.

**Page 55**

BY MR. MURLEY:

2    Q.  Okay.  Would you agree with me that
ineffective use of a taser could increase the risk of
death in an individual?

5    MR. COOK:  Object to form.  You can answer.

6    WITNESS:  Can you repeat your question again.

7 BY MR. MURLEY:

8    Q.  Would you agree with me that ineffective use
of a taser could increase the risk of death in an
individual?

11    MR. COOK:  Same objection.

12    WITNESS:  I guess, depending on how the taser's
used.

14 BY MR. MURLEY:

15    Q.  So look at, I guess, the Safety Information:
C-E-W Effectiveness, the first paragraph there.  So you
see where it says, subject not incapacitated?

18    A.  Yes.

19    Q.  An ineffective C-E-W application could
increase the risk of death or serious injury to the
user, the subject, or others.  If a C-E-W does not
operate as intended or if the subject is not
incapacitated, disengage, redeploy the C-E-W, or use
other force options in accordance with agency guidance.

        Do you see that there?

**Page 56**

1    A.  Where are you pointing at on your --

2    Q.  I'm sorry.  I was just reading it to you.  But
the first sentence right underneath that right there.
(Indicating.)

5    A.  (Reviews documents.)

6    MR. COOK:  First and second sentence.

7    MR. MURLEY:  First and second sentence, yes.

8    WITNESS:  Yes.

9 BY MR. MURLEY:

10    Q.  So do you agree with that statement that an
ineffective C-E-W application, that would be a taser
application, could increase the risk of death or serious
injury to the user, the subject, or others?

14    A.  No, not during this incident.

15    Q.  And I'm limiting it just, do you disagree or
agree with that statement.  Then I'll ask you about this
incident.  So do you agree --

18    MR. COOK:  Generally.

19 BY MR. MURLEY:

20    Q.  -- generally that ineffective taser
application could increase the risk of death or serious
injury to the user, subject, or others?

23    A.  I will not answer that since I'm not a
scientist or the one that put the taser together.  But
for the sake of argument, in our training, we're trained

**Page 57**

not to shoot for the head area or the chest area or the
groin area, 'cause those are -- are areas that can
affect -- cause more harm.  So in regard to that, yes.

4    Q.  Okay.  So there are certain situations where,
I guess, an ineffective taser application could increase
the risk of death or serious injury?  We're in agreement
with that statement?

8    A.  If it's shot in the chest or head or the groin
area.

10    Q.  Okay.  Now, where did you actually deploy the
drive stun?  You said it probably half the time was
effective on --

13    A.  It wasn't effective.  But I made contact half
the time.

15    Q.  You made contact half the time.  Where did you
make contact with Mr. Marr on his person?

17    A.  His lower back, just above his buttocks.

18    Q.  Okay.  And that would have been the same
location all four times contact was made?

20    A.  Yes.

21    Q.  Okay.

22    A.  In that general area, yes.

23    Q.  And you were attempting to make contact at the
same location even in the four times that contact wasn't
made?

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1    A.   Yes.

2    Q.   Okay.  Does that make sense what I'm asking

3 you?  You didn't try to tase him anywhere else on his

body besides the small of his back?

4    A.   Yeah.  I did not attempt to drive stun him

6 anywhere else other than low of his back.

7    Q.   Okay.  There were three other deployments that

8 we -- like I said, there was 11, I think, by that --

9    A.   Yes.

10    Q.   What were those other three deployments?

11    A.   After the drive stun, I reattached my

12 cartridge and stepped back and I tased, which shoots two

13 electronic probes into his lower back, also.

14    Q.   Okay.  And why would that read three, I mean,

15 as far as three different deployments?

16    A.   A deployment shows the -- a trigger pull.

17    Q.   Okay.  So there were three trigger pulls then?

18    A.   Yes.

19    Q.   And --

20    A.   I believe it was four trigger pulls.

21    Q.   Four trigger pulls.  Okay.  And so the prongs

22 are deployed on the first trigger pull?

23    A.   No.  Let's see.  It was three or four.  I'm

24 sorry?

25    Q.   So were there separate prongs that would have

58

1 deployed each time?

2    A.   No.

3    Q.   Just one set?

4    A.   One set.  I only had one taser cartridge.

5    Q.   But it's the charge you're sending through the

6 prongs when you pull the trigger?

7    A.   Yes.  Five seconds.

8    Q.   So a five-second charge would have been

9 applied at least --

10    A.   Three times.

11    Q.   -- three times to Mr. Marr?

12    A.   Yes.

13    Q.   And that would have been -- where did the

14 probes -- do you call them prongs or probes?  I want to

15 make sure I use the right word.

16    A.   They're -- I guess you can call them probes.

17    Q.   Whatever you want to use.

18    A.   It's a little dart.

19    Q.   Okay.  So where did the dart make contact with

20 Mr. Marr's person?

21    A.   Two darts.  It was his lower -- lower back --

22    Q.   Okay.

    A.   -- on the left side, I believe.

24    Q.   Okay.  And this was after the drive-stun mode

25 attempts, right?

59

1    A.   Yes.  Several -- several seconds after drive-

2 stun modes.

3    Q.   My understanding was it was roughly over a

4 three --

5    A.   Minutes.

6    Q.   -- Three-and-a-half minute -- three-

7 minute-forty-second period or something that I saw.  And

8 I can show you that document if you want to see it.

9    A.   Yes.

10    Q.   But over a three-minute timeframe you

11 attempted to drive --

12    A.   (inaudible.)

13    MR. COOK:  Let him finish.

14    WITNESS:  Oh, I'm sorry.

15 BY MR. MURLEY:

16    Q.   Over a three-and-a-half to, you know,

17 three-minutes-and-forty-second timeframe, you attempted

18 to use the taser in drive-stun mode in the small of

19 Mr. Marr's back eight times?

20    A.   Yes.

21    Q.   You think you only made contact half of those?

22    A.   Yes.

23    Q.   You, then, put your cartridge back on your

24 taser --

25    A.   Yes.

60

1    Q.   -- which deploys the darts.  And you were able

2 to make contact with him by pulling the trigger.  The

3 darts deployed and went into the small of his back?

4    A.   Yes.

5    Q.   And a five-second duration electric charge

6 went into Mr. Marr at that time?

7    A.   Yes.

8    Q.   And then you repeated charges two more times

9 after that?

10    A.   Yes.

11    Q.   Through the use of the electric charge through

12 the darts in his back?

13    A.   Yes.

14    Q.   Okay.  Was there any other use of the taser by

15 you in your encounter with Mr. Marr that we've not

16 discussed in this line of questioning?

17    A.   No.

18    Q.   Okay.  (Reviews documents.)

19    MR. MURLEY:  I think we've been going about an

20 hour-and-a-half.  You want to take about a five minute

21 break?  Would this be an okay time for a break?

22    MR. COOK:  We've been going for an hour.  That's

23 fine.  Sure.

24    COURT REPORTER:  Off the record.

25    (Short break taken from 11:28 a.m. to 11:34 a.m.)

61

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  COURT REPORTER: All right. We are back on the
2  record.
3  BY MR. MURLEY:
4    Q.   Exhibit 7, I did have one more question for
5  you on this. And I will point it out to you. So this
6  paragraph right here, the last sentence.
7    A.   (Reviews documents.)
8    MR. COOK: Some of the factors?
9  BY MR. MURLEY:
10    Q.   It says, Safety Information: C-E-W
11  Deployment, Trigger Hold-Back Model Differences. And
12  then at the bottom it says, avoid repeated, prolonged,
13  or continuous C-E-W applications when practicable.
14    Do you see that?
15    A.   Yes.
16    Q.   Do you agree that there are risks associated
17  with repeated, prolonged, and continuous taser
18  applications to individuals?
19    A.   Excessive, yes.
20    Q.   Okay.
21    A.   Depending on where it was deployed at.
22    Q.   Depending on where deployed, depending on how
23  many times, depending on the duration, that kind of
24  stuff; is that right?
25    A.   Depending on the places where it was deployed,

62

JULIE RITTER        270.791.7345

1  if it was drive-stun or the taser mode, and if it was
2  over a long period of time, possibly, yes.
3    Q.   Did you believe anything that you did related
4  to your deployment or use of the taser on Mr. Marr April
5  of 2020 exposed him to any excessive risk?
6    A.   No.
7    Q.   Do you believe anything you did caused his
8  demise that day?
9    A.   No.
10    Q.   Okay. As far as the force that you used with
11  Mr. Marr that day, is that still what you would have
12  done today?
13    A.   Yes.
14    Q.   You would have handled the call the exact same
15  way?
16    A.   Yes.
17    Q.   Okay.
18    MR. MURLEY: Give me a couple of copies of that, if
19  you will. (Indicating.)
20    I'm going to make that Exhibit number 8.
21    (Turcotte Deposition Exhibit 8 was duly
22    received, marked, and is filed herewith.)
23  BY MR. MURLEY:
24    Q.   I've given you exhibit marked number 8. It
25  looks to me to be a log from your taser that you were

63

JULIE RITTER        270.791.7345

1  issued.
2    A.   Yes, sir.
3    Q.   And it would include in there the deployment
4  as of the April 14th of 2020 encounter with Mr. Marr,
5  correct?
6    A.   Yes.
7    Q.   So if we turn to the last page 4 of 4 of
8  Exhibit number 8, it looks to me like starting at log, I
9  guess, 87 and moving down, that would all be related to
10  the incident with Mr. Marr, correct?
11    A.   Yes.
12    Q.   Okay. There wasn't another time before that
13  you would have done anything with your taser, because
14  you encountered Mr. Marr around 8:00 a.m. on April 14th,
15  2020, correct?
16    A.   Yeah. It was just before 8:00 a.m.
17    Q.   It says 7:53 was when your taser was armed.
18  So I'm assuming that would be during the time you were
19  encountering Mr. Marr.
20    A.   Yes.
21    Q.   Okay. What does it mean to arm your taser?
22  What happens then?
23    A.   The taser safety was turned off.
24    Q.   You do that before you're about to potentially
25  use it?

64

JULIE RITTER        270.791.7345

1    A.   Yes.
2    Q.   Okay. Do you have to remove it to do that
3  from your belt?
4    A.   Yes. Remove it from your holster.
5    Q.   Holster. Okay. So you remove it from your
6  holster and then take the safety off so it's armed and
7  ready to go?
8    A.   Yes.
9    Q.   Okay. Did you remove the cartridge as of
10  removing it from your belt? When does that take place
11  if you know you're going to go drive stun versus the
12  dart deployment?
13    A.   You'd have to remove it from your holster to
14  remove the taser cartridge, yes.
15    Q.   Okay. Do you do that before arming the taser?
16    A.   I believe so.
17    Q.   Okay. I don't know how a taser works, so I
18  don't know if you have to --
19    A.   No. If the taser is in safe mode, took the
20  cartridge off, that's when I armed the taser.
21    Q.   Okay. And it looks like three
22  seconds later -- I'm sorry -- three tenths of a -- is
23  that -- yeah, three seconds later, the trigger was
24  deployed for five seconds; is that right?
25    A.   Yes.

65

JULIE RITTER        270.791.7345

**Page 66**

1  Q.  And on the right side it indicates -- at least
2  when it's armed it says 25 degrees Celsius.  What is
3  that measuring as far as temperature goes; do you know?
   MR. COOK:  Don't guess if you don't know.
BY MR. MURLEY:
6  Q.  Yeah.  If you don't know --
7  A.  **Don't know.**
8  Q.  I didn't know if that was the temperature
9  outside or had something to do with the taser.
10  A.  **(No response.)**
11  Q.  No idea?
12  A.  **I do not know.**
13  Q.  Have you ever seen a log like this before?
14  A.  **No.**
15  Q.  Okay.  It was produced in discovery to us.
16  And as I understand it, it would be the taser log for a
17  taser from the Glasgow Police Department, serial number
18  X1200CM7A model taser X-2-6-P, there's a device name and
19  then a report generated by Amanda Miller.  Who's Amanda
20  Miller?
21  A.  **Evidence technician.**
22  Q.  Okay.
23  (Off-the-record discussion for clarification.)
BY MR. MURLEY:
25  Q.  You don't have any reason to dispute this

66

JULIE RITTER        270.791.7345

**Page 67**

1  would be your taser log, correct?
2  A.  **No, sir.**
3  Q.  Okay.  Eighty-seven percentage on the side it
4  looks like is the battery remaining.  So in looking at
5  this, it looks like the first deployment of the drive-
6  stun mode for the taser would have been at 7:54 a.m.,
7  April 14th, 2020.  Do you see number 88 there?
8  A.  **Yes, sir.**
9  Q.  The duration is five seconds.  Do you know
10  what the duration of the five seconds would be?  Is that
11  how long the electric charge is going into Mr. Marr?
12  A.  **If it's touching him.**
13  Q.  If it's touching him.  So if you made contact,
14  that would have been --
15  A.  **It would be a drive stun -- sorry to interrupt**
16  **you.  That would be the drive stun.**
17  Q.  Right.  That's how long the actual charge is
18  activated to go into Mr. Marr in drive-stun mode --
19  A.  **Yes.**
20  Q.  -- if contact is made?
21  A.  **Once the trigger's deployed, it's a**
22  **five-second duration.**
23  Q.  Okay.  Now, the next time, in 89 at 7:54 and
24  12 seconds, that'd be 12 seconds later, there was a
25  six-second duration; do you see that?

67

JULIE RITTER        270.791.7345

**Page 68**

1  A.  **Yes.**
2  Q.  So that would be different than the five
3  seconds?
4  A.  **By one second, yes.**
5  Q.  I mean, is it set to go five seconds each
6  time, or why is that six?
7  A.  **Once the trigger's deployed and released, it's**
8  **five seconds.  You can hold the trigger down for a**
9  **longer duration.**
10  Q.  All right.  So you can deploy the taser longer
11  than five seconds with pulling the trigger?
12  A.  **Yes.**
13  Q.  Okay.
14  A.  **In the stun mode.**
15  Q.  In drive-stun mode.  Okay.
16  So each one of these would have at least -- each
17  entry.  And I'm talking entries from 88 down to 98.  And
18  I understand not all of these would -- I guess, I
19  shouldn't ask it that way.
20  I've got one, two, three, four, five, six,
21  seven, eight, nine, ten, eleven at least attempts at
22  using the taser.  But you have told me that eight of
23  these were attempts in drive-stun mode and then the last
24  three were when the darts were deployed into the small
25  of his back?

68

JULIE RITTER        270.791.7345

**Page 69**

1  A.  **Yes.**
2  Q.  Is that right?
3  A.  **(Witness nods head in the affirmative.)**
4  Q.  So at least the first eight here you said
5  you'd think about half made contact with Mr. Marr --
6  A.  **Yes.**
7  Q.  -- right?
8  A.  **At least one -- one of those contacts actually**
9  **was on Officer Phillips.**
10  Q.  Right.  I think, though, there was a mention,
11  maybe, in the body cam that you had -- one of them
12  mentioned you tased them during that or something?
13  A.  **Uh-huh.**
14  Q.  I think I heard that.  We'll watch that in a
15  minute when we get through some things.  But I wanted to
16  talk you through this first.
17  So in looking at this, the deployments of the
18  drive stun started 7:54 a.m.  There was at least an
19  attempt at deployment twelve seconds later at 7:54:12,
20  right?
21  A.  **Yes.**
22  Q.  There was an attempt at deployment 7:54:26.
23  So that's another 14 seconds, right?
24  A.  **Yes.**
25  Q.  There was another attempt at deployment again

69

JULIE RITTER        270.791.7345

1  about another 13 seconds after that?
2     A.   Yes.
3     Q.   Then an attempt at deployment ten seconds
4  after that?
5     A.   Which one are you looking at?  What line?
6     Q.   92.
7     A.   Go ahead.
8     Q.   Is that right?
9     A.   Yes.
10     Q.   And then I think we're down -- so as far as we
11  count down eight.  It looks like the drive-stun mode you
12  used was a minute and -- you attempted deployment for a
13  minute and 23 seconds total over -- I guess over a
14  minute-and-23-second timeframe, you would have attempted
15  those eight deployments; is that right?
16     A.   Yes.  But not all those made contact.
17     Q.   Not all those made contact.  But I understand
18  at least of the duration seconds that we have, of those
19  that you believe did make contact, there would have been
20  roughly 20 seconds of electric charge that you would
21  have put into Mr. Marr, if it's four contacts?
22     A.   If it's four -- four contacts, which most of
23  them weren't.
24     Q.   Okay.  So what do you mean by --
25     A.   Like I said, from him trying to bridge, kick,

70

1  and fight, I did not make the full second five --
2  five-second contact all the time.  So I'd say between
3  three to four possibly made -- possibly made full
4  contact.
5        (Off-the-record discussion for clarification.)
6  BY MR. MURLEY:
7     Q.   You think four you made full contact?
8     A.   Three or four.
9     Q.   Three or four.
10     A.   Possible.
11     Q.   And then the other ones would be partial
12  contact is what you're thinking?
13     A.   Partial contact or no contact.
14     Q.   Okay.  So at least of looking through this --
15  and I'm probably not asking that great of a question.
16  But if they are five-second durations you're pulling the
17  trigger --
18     A.   Uh-huh.
19     Q.   -- and there's eight times there was an
20  attempt at contact made, that is -- and one says six
21  seconds.  That would be 41 seconds of potential electric
22  current being passed into Mr. Marr, correct, depending
23  upon whether full contact --
24     A.   If it made contact --
25     Q.   -- was made?

71

1     A.   -- like I said.
2        MR. COOK:  Object to form.  You can answer.
3  BY MR. MURLEY:
4     Q.   Does that made sense, what I'm asking?  I'm
5  trying to add up --
6     A.   I understand what you're trying to get at,
7  yes.
8     Q.   Okay.  Is there a way to determine whether
9  contact was actually made or not based on this log?
10     A.   No.  Other than any marks on his body
11  possibly.
12     Q.   Right.  There wouldn't be any kind of
13  indication on the taser as to whether you're making
14  contact with the person or not?
15     A.   No.
16     Q.   It's just indication that you're pulling the
17  trigger?
18     A.   Yes.
19     Q.   Okay.  Then it looks like after the eighth
20  trigger pull for five seconds at 7:55:23, that's the
21  last one, it looks like roughly, what, 16 seconds later
22  you would have deployed the darts into Mr. Marr's small
23  of his back?
24     A.   After it was shown that the drive stuns were
25  ineffective, yes.

72

1     Q.   Okay.
2     A.   I reattached the taser cartridge and shot the
3  darts into Mr. Marr's lower back.
4     Q.   Okay.  And it looks to me like that starts, if
5  my numbers are correct, on number 96, that would be the
6  last three actual durational trigger pulls?
7     A.   Yes.
8     Q.   Okay.  So the darts made contact with
9  Mr. Marr's small of his back.  The first trigger pull
10  was for five seconds, 7:55:23, correct?
11     A.   That's on the form, yes.
12     Q.   And I don't mean to mislead you.  I think I
13  read that wrong.  I think it's actually 7:55:39 would be
14  the --
15     A.   I understand.  That's why I said it's on the
16  form.
17     Q.   Yeah.  I don't mean to mislead you.
18        MR. COOK:  Number 96?
19        MR. MURLEY:  Number 96.
20  BY MR. MURLEY:
21     Q.   Then number 97 was another trigger pull of
22  five seconds at 7:56:20.  Do you see that?
23     A.   Yes.
24     Q.   And then number 98 is another trigger pull at
25  7:56:44 of five seconds?

73

1  A.  Yes.
2  Q.  So all of those trigger pulls are contact with
3  continuous electric charge for that duration, right?
  A.  For five seconds a piece.
  Q.  Right.
6  A.  Total -- total would be 15 seconds.
7  Q.  No question about whether contact was made
8  because the darts were in his back when that charge was
9  deployed?
10  A.  This is correct.
11  Q.  Okay.  Then it looks like it was put in safe
12  mode 7:58:15?
13  A.  That's when I reholstered my taser.
14  Q.  Okay.  What made you reholster your taser
15  after deploying the electric charge into Mr. Marr?
16  A.  Between the last taser pull and the holstering
17  my taser, we were able to pull Mr. Marr's hands behind
18  his back and handcuff him.
19  Q.  Okay.  Looks like it was armed again.  That
20  would be later in the day.
21  A.  That was when the -- I believe that would be
22  from the evidence technician.
23  Q.  Oh, okay.  All right.  So as of after this
24  incident with Mr. Marr, the taser was taken out of
25  commission as far as use by you --

74

JULIE RITTER        270.791.7345

1  A.  No.
2  Q.  -- what the taser is?
3  A.  Yes, sir.
4  Q.  And your taser that you had on April the 14th
5  of 2020 was fully functioning and operational at the
6  time you encountered Mr. Marr?
7  A.  Yes.
8  Q.  Okay.  I don't have any more questions about
9  that.
10  How many times -- I guess I should ask this
11  question first.  Prior to your encounter with Mr. Marr
12  April the 14th of 2020  had you deployed your taser in
13  encounters with other individuals or suspects for your
14  employment with Glasgow Police Department?
15  A.  (No response.)
16  Q.  The first question is:  Had you done that
17  before in the course of being a police officer at
18  Glasgow Police Department?
19  A.  Yes.
20  Q.  And the next question is:  Is that something
21  you did often, or is it a rare occurrence to use your
22  taser?
23  A.  The -- I used the taser when it was applicable
24  to use it.  The last time, prior to that incident, I
25  believe is -- I used my taser on a armed subject with a

76

JULIE RITTER        270.791.7345

1  A.  Yes.
2  Q.  -- correct?  It wasn't used anymore by you
3  later that day?
4  A.  No.
5  Q.  Okay.  Do you know how many watts of
6  electricity are being passed by the taser?
7  A.  It's 5,000 -- it's 50,000 volts.
8  Q.  50,000 volts?
9  A.  Yes.
10  Q.  Okay.  And that's made when contact is made
11  when you're talking about 50,000 volts is passed?
12  A.  Yes.  Also has an amperage, which is
13  2 milliamps.
14  Q.  Okay.  Any issues with the operation of your
15  taser at the time that you encountered Mr. Marr as far
16  as being at full strength, any of that kind of stuff?
17  A.  No, sir.
18  Q.  So it was actually 50,000 volts then?
19  A.  As far as I understand it --
20  Q.  Right.
21  A.  -- when the taser deploys, yeah.
22  Q.  Okay.
23  A.  It doesn't say 50,000 volts.
24  Q.  I understand.  You can't set it on a lower
25  setting.  Is just the taser is --

75

JULIE RITTER        270.791.7345

1  box cutter in the -- in the emergency room entrance
2  doors.  He was threatening to cut people.
3  Q.  So as far as this evidence, this log of taser
4  use, was that taser that was assigned to you, would that
5  have been your taser with the Glasgow Police Department?
6  A.  The taser I was assigned.
7  Q.  It wouldn't have been assigned to someone else
8  for use when you're not on duty?
9  A.  No.
10  Q.  Okay.  So this log would be for usage that you
11  had, you know, over the course of the timeframe that's
12  in here.  This is all your usage of the taser?
13  A.  Yes.
14  Q.  So the first instance we have is July the 7th,
15  2019, it looks like.  And I'm sorry.  I told you I
16  didn't have any more questions about that.
17  A.  I need to look at it.  Yeah.
18  Q.  So looks like the first instance we have is
19  July the 7th of 2019?
20  A.  Uh-huh.
21  Q.  Looks like there would have been multiple
22  deployments over the course of at least that encounter.
23  Quite a few there.
24  Looks like it was again used in September -- I'm
25  sorry -- on September 4th of 2019?  So that would be a

77

JULIE RITTER        270.791.7345

1  few months after that?
2      A.   I don't recall this one.  So I'm not sure if
3  that taser was in the -- somebody else's taser, and I
4  was issued it.  Which it could have been.
5      Q.   Okay.  So of these, do you recall which of
6  these would have been your deployments of this taser?
7      A.   On the April the 14th, 2020, I can assure that
8  was mine.
9      Q.   Yeah.
10     A.   The other ones where you see it, armed/safe,
11  armed/safe, armed/safe.  That's me testing.
12     Q.   Okay.
13     A.   'Cause you can see the different timing
14  frames.  That's one second, two seconds.
15     Q.   Uh-huh.
16     A.   Once you turn the safety off, it shuts the
17  current off.
18     Q.   Correct.
19     A.   I don't recall this July 7th, 2019 of ever
20  using it for that duration.  I don't think that -- that
21  couldn't have been mine then.
22        (Off-the-record discussion for clarification.)
23     Q.   Okay.  So you think this taser was used by
24  someone else as of July of 2019 as far as you know?
25     A.   I'm saying I don't recall using it --

78

JULIE RITTER          270.791.7345

1      Q.   Okay.
2      A.   -- on that date.  I remember using a taser on
3  that subject that was armed with the box cutter.  But
4  the probe on that one, one probe went on the hand; the
5  other one ricocheted off the roof of the car.  So it did
6  not make contact with him --
7      Q.   Okay.
8      A.   -- electricity-wise.  But he did drop the
9  knife once he got hit with the prong.  And that's when
10  myself, and I think it was Officer Houchens, tackled him
11  at that time.
12     Q.   So you've at least mentioned one other time
13  that you utilized the taser in the course of your time
14  at the Glasgow Police Department.
15     A.   Yes.
16     Q.   And I think you said it was -- I don't know if
17  you gave me a timeframe.  How long before this incident
18  with Mr. Marr was that; do you know?
19     A.   It had to be -- I -- I couldn't give you an
20  exact date.
21     Q.   Okay.  Is it an uncommon occurrence or a
22  common occurrence to deploy your taser through
23  encountering individuals at the Glasgow Police
24  Department?
25     A.   I would only use the taser when it was

79

JULIE RITTER          270.791.7345

1  applicable to use a taser, is the best way to answer
2  that question.
3      Q.   Okay.  And I'm assuming you don't know how
4  many times you've deployed a taser since you've been
5  with the Glasgow Police Department on an individual?
6      A.   I don't recall how many times, I've --
7      Q.   Okay.
8      A.   -- used a taser.  But --
9      Q.   Well --
10     A.   Yes.
11     Q.   You mentioned at least one situation related
12  to that previous use, I think an individual with a
13  knife --
14     A.   Box cutter.
15     Q.   -- brandishing a knife?  Box cutter.  I'm
16  sorry.  Individual brandishing a box cutter.
17     A.   Uh-huh.  Yes, sir.  And that was at T.J.
18  Samson Emergency Room.
19     Q.   Were you given the opportunity to be tased
20  through the training you've received?
21     A.   Yes.  I've been tased three times.
22     Q.   Have you been tased since you've been with the
23  Glasgow Police Department?
24     A.   No.
25     Q.   How long ago was it you got tased?

80

JULIE RITTER          270.791.7345

1      A.   Once -- once in Baldwin and two times in Cedar
2  Grove.
3      Q.   Okay.  Do you know how many volts that were
4  being be passed?
5      A.   50,000.
6      Q.   Same as you used that day?
7      A.   Yes.  That's the standard I understand from
8  the taser.
9      Q.   Okay.  I'm assuming that's very painful?
10     A.   I wouldn't want to have it done to me.
11     Q.   Wasn't a pleasant experience?
12     A.   No, it was not a pleasant experience.
13     Q.   That's kind of the point, making something
14  painful so somebody will comply, correct?
15     A.   Every time I was tased, yes, it was a pain
16  compliance that I did not wish to have to go through.
17  But right after being tased, I was a -- I was fully
18  functional.  No -- no residual pain or anything.
19     Q.   Was it drive stun or through the darts?
20     A.   The darts were actually taped to me, not shot
21  in me.
22     Q.   Okay.
23  COURT REPORTER:  Were taped to you?
24  WITNESS:  Taped.  One was on my shoulder and one
25  was down by my lower back.

81

JULIE RITTER          270.791.7345

1  BY MR. MURLEY:
2      Q.    Not having been tased before, can you describe
3  for me how it feels to be tased.
4      A.    As you not being tased before?
5      Q.    I've never been tased, so I don't know how it
6  feels to be tased.
7      MR. COOK:  Which one?  Drive stun or --
8      MR. MURLEY:  We'll start with drive stun and then
9  we'll go to the dart mode.
10  BY MR. MURLEY:
11     Q.    The drive stun, though, do you know how that
12  feels?
13     A.    Yes.  It's -- like I said, it's pinpoint
14  compliance.  It's a -- it's a sharp shock to that area,
15  but it's pinpoint to that one area.
16     Q.    Be pinpoint for the duration --
17     A.    Like, if you touched a hot pan.
18     Q.    Okay.  So it would be a hot pan touch for
19  however many seconds contact was made?
20     A.    Well, let me rephrase that.  I was trying to
21  make a pinpoint.  When you touch a pan.  It's hot.
22  That's pinpoint.  Like the -- the drop of water, like I
23  said, wherever that's at.
24     Q.    Uh-huh.
25     A.    It's -- I don't know how to explain it other

82

JULIE RITTER          270.791.7345

1  was 2006, 2007.  I'm not --
2      Q.    Okay.  So last time you would have been tased
3  would have been 2007 you think or some time around that?
4      A.    Yes.
5      Q.    Obviously, you've described the difference in
6  the drive-stun mode tasing and the dart-mode tasing.
7      A.    Yes.
8      Q.    What was the duration of the current that was
9  being passed into you in the drive-stun mode when you
10  were tased?
11     A.    Full duration, five seconds.
12     Q.    Five seconds?
13     A.    Yeah.  All of five seconds.
14     Q.    Same for the dart mode as well?
15     A.    I believe so, yes.
16     Q.    Okay.  So is it a minimum of five seconds when
17  you pull a trigger?  That's how long a taser deploys?
18     A.    No.  You can turn the current off by turning
19  off the safety switch.  So when I'm testing it, like in
20  the rest of these here where you see it's only a
21  duration of one or two seconds --
22     Q.    Uh-huh.
23     A.    -- once I deployed the taser with the
24  cartridge off seeing there's an arc, I can turn it off
25  to save battery life.

84

JULIE RITTER          270.791.7345

1  than it's -- it was painful but not to the point it was
2  so painful that I passed out.
3      Q.    Okay.
4      A.    And that's a drive stun.
5      Q.    Drive stun.  Now, the dart mode is that a
6  different sensation?
7      A.    Yes.  The dart mode, not having a dart shot in
8  me but taped to me, it contracts your muscles so you get
9  the same type of pain you get from the drive stun but
10  now your muscles are contracting.  So -- and it's
11  involuntary.
12          Just like if you go to a chiropractor and he's
13  trying to loosen up your back and he puts those electric
14  probes on your back where your muscles react to the
15  electric probe.
16     Q.    Okay.  When this was happening, I think you
17  mentioned two times at one previous police department
18  you were with --
19     A.    Cedar Grove.
20     Q.    -- and one at another police department --
21     A.    Yeah.
22     Q.    -- how long ago was that you were tased the
23  last time?
24     A.    The one in Baldwin, I believe, was in 2004.
25  The one in Cedar Grove was two times over two years.  It

83

JULIE RITTER          270.791.7345

1      Q.    All right.
2      A.    Once it's used in a mode -- duty mode, once
3  you enact the trigger, it's five seconds before it
4  automatically turns off.
5      Q.    Okay.  When you were tased, it was one time in
6  drive stun and one time in the dart mode?
7      A.    No.  I was -- I was tased in the dart mode
8  without the darts being in me, tased me three times.
9      Q.    Okay.
10     A.    And I drive stunned myself in my thigh to see
11  how it would go.
12     Q.    Okay.
13     (Off-the-record discussion for clarification.)
14     Q.    All right.  Did somebody have to hold you up
15  because of the muscle spasms when you had the darts
16  taped to you?
17     A.    Yes.
18     Q.    Okay.
19     A.    But not with the drive stun.  I was sitting.
20     Q.    You were sitting?
21     A.    Yes.
22     Q.    Okay.  And I'm discussing this last time that
23  you were tased you think somewhere between 2006 and
24  2007.
25     A.    I believe so.

85

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1    Q.   Okay. I think it's been produced to us in
2  discovery. I think you called it an S-O-P?
3    A.   Standard operating procedure.
4    Q.   I'm going to call it a policy about Response
5  to Resistance that I believe was in force and effect as
6  of your encounter with Mr. Marr in April of 2020. But
7  I'll tell you, there's been two policies produced to us,
8  and they're a little different.
9    A.   Uh-huh.
10   Q.   I think maybe it was updated since this
11 occurrence. But I want to ask you about that.
12   A.   You said, "policies." They're actually
13 guidelines to follow.
14   Q.   Yeah.
15   MR. MURLEY: I'm going to make this one 9.
16   (Turcotte Deposition Exhibit 9 as duly
17      received, marked, and is filed herewith.)
18   WITNESS: Is that the one prior?
19   MR. COOK: Yeah. There should be a date.
20   MR. MURLEY: I'll let you look at it in just a
21 second.
22 BY MR. MURLEY:
23   Q.   This is Policy number 1.11, Response to
24 Resistance. It says, Date Implemented:  9/15 of 2016.
25 This is what I understand to be the policy that was in

86

JULIE RITTER          270.791.7345

1    (Turcotte Deposition Exhibit 10 was duly
2      received, marked, and is filed herewith.)
3  BY MR. MURLEY:
4    Q.   So between those two, there weren't any other
5  policies I don't have, is what I'm asking about, you
6  know, versions of 1.11.
7    A.   I don't know if you have them. But I don't
8  believe there's any other ones in our standard operating
9  procedure.
10   Q.   Yeah. That's all I've seen. So I wanted to
11 make sure that's all you have.
12   MR. COOK: That's all I have.
13   MR. MURLEY: I don't know the answer if I don't ask
14 it. So...
15   MR. COOK: Okay.
16   MR. MURLEY: All right. Have you got one more of
17 the first one?
18   MR. ROMNEY: (Reviews documents.)
19   WITNESS: You're talking about the 2016 one?
20   MR. MURLEY: Yeah. I think I gave you -- made an
21 exhibit the one I was using. But it's no big deal.
22   WITNESS: Okay.
23      (Inaudible conversation between
24        Mr. Murley and Mr. Romney.)
25   MR. MURLEY: Would you mind if I look off yours for

88

JULIE RITTER          270.791.7345

1  force and effect concerning response to resistance as of
2  the encounter with Mr. Marr in April of 2020.
3    A.   Yes.
4    Q.   I'm just making sure that's correct. I've not
5  found an update from this timeframe in 2016 until the
6  one that was, looks like, implemented August the 17th of
7  2020.
8    A.   Yes. There was an update in 2020.
9    Q.   So was there wasn't any other policies in
10 effect or differing versions of 1.11 between 2016 and
11 2020 until this was updated in 2020?  Does that make
12 sense? It's probably a bad question.
13      Here's what I'm asking:  I want to know if
14 that's the policy that was in effect as far as the
15 response to resistance when you encountered Mr. Marr in
16 April of 2020?
17   MR. COOK: Exhibit 9?
18 BY MR. MURLEY:
19   Q.   Exhibit 9.
20   A.   Yes.
21   Q.   And Exhibit 10 is going to be the updated
22 policy.
23   MR. COOK: 8/17/20.
24   MR. MURLEY: Which would have been implemented in
25 August 17th, 2020.

87

JULIE RITTER          270.791.7345

1  a second?
2    MR. COOK: No. I'll look over his shoulder.
3    MR. MURLEY: I'm sorry.
4    MR. COOK: No problem.
5  BY MR. MURLEY:
6    Q.   Exhibit 9 here is what we're looking at,
7  right, the 2016 Policy number 1.11?
8    A.   Yes. It's what's labeled on the one I'm
9  looking at.
10   Q.   Okay. Now, this is a policy of the Glasgow
11 Police Department concerning response to resistance as
12 of that time, correct?
13   A.   Yes.
14   Q.   And you would have received training on this
15 policy?
16   A.   Yes.
17   Q.   And I'm assuming as being, you know, a
18 chief -- were you chief in 2016?
19   A.   No.
20   Q.   Okay. But you would have been familiar with
21 this policy as of the date it was implemented, correct?
22   A.   Yes.
23   Q.   How were you trained on this actual policy?
24   A.   It's submitted through a program on our
25 computer where we have to review it, take a test on it,

89

JULIE RITTER          270.791.7345

1   and submit that. I believe it's called Deer -- Deer --

2   MR. COOK:   Creek.

3   WITNESS:   I'm sorry?

4   MR. COOK:   Creek.

5   WITNESS:   Yes. Deer Creek.

6   (Off-the-record discussion for clarification.)

7   BY MR. MURLEY:

8   Q.   Deer Creek. And so that's what you use to be

9   trained on this policy?

10   A.   Yes. We review a policy. Then we take a

11   test, a written test, on the contents of the policy.

12   Q.   Okay. All right. Do you know if those

13   written tests are retained?

14   A.   Yes, they are.

15   MR. MURLEY:   I don't know if I've seen those tests.

16   MR. COOK:   I don't know if we have or not, but I'll

17   make a note.

18   MR. MURLEY:   Yeah. I don't know if I've seen it.

19   WITNESS:   Well, it's on the computer so you have to

20   print it off.

21   MR. MURLEY:   Right.

22   MR. COOK:   I'll look and see.

23   MR. MURLEY:   Yeah. Your counsel is going to look

24   and see if we have a copy if they have that. I just

25   don't remember seeing it.

90

JULIE RITTER          270.791.7345

1   BY MR. MURLEY:

2   Q.   But it goes over this policy and makes sure

3   that you understand the provisions of this policy,

4   correct?

5   A.   Yes.

6   Q.   And then their application and using force

7   with individuals?

8   A.   Yes.

9   Q.   And what is it you understand that this policy

10   indicates as far as the use of a taser goes?

11   A.   Can you be more specific about your question?

12   Q.   Sure. Is the taser listed specifically in

13   this policy that you're aware of?

14   A.   Yes.

15   Q.   I understand it as a less-than-lethal-weapon

16   tactic, in H. Do you see that on page 52?

17   A.   (Reviews documents.)

18   MR. COOK:   51.

19   WITNESS:   Yeah.

20   MR. COOK:   He's talking about right here.

21   WITNESS:   (Indicating.) Yeah. (Reviews

22   documents.)

23   BY MR. MURLEY:

24   Q.   So in looking at this -- let's see. It says

25   the "electronic control device," that's what we've been

91

JULIE RITTER          270.791.7345

1   referring to as a taser, right --

2   A.   Yes.

3   Q.   -- down here in B? It says, an electronic

4   control device as a force option is the same level of

5   force as chemical spray. Would you agree with that?

6   A.   That's what's written in the S-O-P, yes.

7   Q.   Okay. Electronic control device must be worn

8   on the weak side in either a weak-hand draw or

9   cross-draw position. So that's something that you did

10   that day, correct?

11   A.   Yes. My left side is my weak hand.

12   Q.   "That day" as in -- if I say, "that day," I'm

13   referring to your encounter with Mr. Marr, April

14   the 14th, 2020. Does that make sense?

15   A.   Yes. But it's all days.

16   Q.   I'm sorry?

17   COURT REPORTER:   Yes, but it's what?

18   WITNESS:   It's all days. I always wear it on that

19   side.

20   MR. MURLEY:   I understand. Okay.

21   BY MR. MURLEY:

22   Q.   Number 3 says, electronic control device

23   deployment shall not be considered for the passively

24   resistant subject. Active resistance or active

25   aggression shall be required.

92

JULIE RITTER          270.791.7345

1   Do you believe Mr. Marr was exhibiting active

2   resistance or active aggression as of April 14th, 2020?

3   A.   Yes.

4   Q.   Number C here, 3 part C says, multiple

5   electronic control device deployments against an

6   individual may increase the likelihood of serious injury

7   where the individual is suffering from other symptoms

8   such as cocaine intoxication. Policy and training

9   should encourage officers to minimize the successive

10   number of discharges against an individual where

11   possible.

12   Do you see that?

13   A.   Yes.

14   Q.   Now, you said you eventually used NARCAN® with

15   Mr. Marr, right?

16   A.   Yes.

17   Q.   And why is it you used NARCAN® with him?

18   A.   Because after we secured him and he showed

19   signs of shallow breathing and at one point he had

20   stopped breathing, during that time, you know, officers

21   were in type of -- any type of contact with him, other

22   than the restraint, I surmised that the only reason that

23   he would have stopped breathing was because he was under

24   some type of narcotic.

25   COURT REPORTER:   He was under some type of --

93

JULIE RITTER          270.791.7345

1  WITNESS: Narcotic or drug.
2  BY MR. MURLEY:
3  Q.  So if Mr. Marr was under the influence of some
4  type of drug or narcotic at the time the taser was
5  deployed by you against him, this here says, multiple
6  deployments may increase the likelihood of serious
7  injury.
8  Do you agree with that?
9  MR. COOK: Object to form. You can answer.
10  WITNESS: I did not see or observe that he was
11  under a drug or narcotic. Because I had asked him prior
12  if he was on a medication, and he responded, no, and
13  that he was not high.
14  BY MR. MURLEY:
15  Q.  Do people always tell you the truth when
16  you're asking questions as a police officer?
17  A.  Obviously not.
18  Q.  Okay. Are there other things you could ask?
19  Are there other cues or, I guess, signs or symptoms of
20  someone being intoxicated, you know, that you look for
21  when encountering people?
22  A.  If I had the time and position, possibly,
23  yeah.
24  Q.  Okay. And so upon your encounter with
25  Mr. Marr, you didn't notice anything that led you to

94

JULIE RITTER          270.791.7345

1  should deploy an electronic control device against a
2  single individual at the same time.
3  And, in fact, you were the only person that
4  deployed your taser at Mr. Marr, correct?
5  A.  Yes. Starting with the drive stun.
6  Q.  F says, a contributing factor to serious
7  injury or death is the level of a subject's exhaustion.
8  Studies recommend that when an officer believes the
9  control of a subject will be necessary and met with
10  resistance, deployment of the electronic control device
11  should be considered early on in the event so that the
12  person has not reached a level of exhaustion prior to
13  the electronic control device's use.
14  I guess we can watch the video. But do you know
15  how long in your encounter with Mr. Marr you actually
16  used the taser, like how far along in his active
17  resistance to you-all?
18  MR. COOK: Are you asking for a time or duration of
19  time?
20  MR. MURLEY: Yeah.
21  BY MR. MURLEY:
22  Q.  This policy here, it seems to me, says you
23  should watch for -- you know, a contributing factor to
24  serious injury or death is the level of a subject's
25  exhaustion. What does that mean to you?

96

JULIE RITTER          270.791.7345

1  believe he was under the influence of any kind of drugs
2  or narcotics?
3  A.  Like I stated before, I just found him inside
4  of a house he just burglarized. And I asked him the
5  questions in reference to being on medication and him
6  stating that he wasn't on -- high or on drugs, per se.
7  It was my belief his adrenaline was pumping.
8  Q.  So D here says, the agency recognizes,
9  however, particularly where backup officers are
10  unavailable, that multiple applications are necessary to
11  gain and maintain control of a combative individual.
12  A.  Yes.
13  Q.  Do you see that?
14  A.  Uh-huh.
15  Q.  You, in fact, had two other officers with you
16  in your encounter with Mr. Marr, correct?
17  A.  Yes.
18  Q.  But you still thought it necessary to deploy a
19  taser?
20  A.  Yes. He was actively resisting, and he was
21  aggressive and violent.
22  Q.  But three officers couldn't handle Mr. Marr
23  without deployment of your taser?
24  A.  No.
25  Q.  Okay. It says, no more than one officer

95

JULIE RITTER          270.791.7345

1  A.  He was actively resisting the entire time the
2  taser was deployed in drive stun and taser mode.
3  (Off-the-record discussion for clarification.)
4  BY MR. MURLEY:
5  Q.  So there wasn't any sign of him reaching a
6  level of exhaustion at that point ; is that what you're
7  saying?
8  A.  Not that I'm aware of.
9  Q.  What is this? I mean, you said you've been
10  trained on this. What does F mean to you as a police
11  officer and this being a standard operating procedure?
12  We're looking at 3-F on page 53 of Exhibit number 9.
13  A.  (Reviews documents.) It says, should be
14  considered early in the event that the person may not
15  reach a level of exhaustion. Once the -- Mr. Marr was
16  subdued, all actions of attempting to restrain him
17  ceased.
18  Q.  Once he was subdued. We'll watch the video in
19  a little bit. I can then have an idea of when in the
20  struggle with Mr. Marr you actually deployed the taser
21  for the first time. I understand what the timeframe
22  says here, but I'd like to know. I'm going to ask you
23  some questions about that in a minute.
24  It says the preferred targeting -- this is H --
25  is the center mass of subject's back. That's where you

97

JULIE RITTER          270.791.7345

1   tried to target this in this particular matter, correct?
2     A.   **It was his lower back.**
3     Q.   Lower back. So it would have been below the
4   center mass of the subject's back then?
5     A.   **Yes.**
6     Q.   Okay. So is that your preferred targeting
7   area where you targeted Mr. Marr?
8     A.   **The part you can get close to.**
9     Q.   Right.
10     A.   **'Cause he was kicking me with his legs at the**
11   **time.**
12     Q.   So it says here, center mass. But you got to
13   whatever part of the back you could get to; is that what
14   you're saying?
15     A.   **You're talking about a small frame. You're**
16   **talking about above the -- the belt line. I tased him**
17   **three to four inches probably that center mass, which**
18   **is -- I would assume. Dead center is another five to**
19   **six inches above that. So...**
20     Q.   G says, in cases where subject is actively
21   resisting an officer's attempt to take them into custody
22   but not threatening the officer with an assault, it is
23   recommended that the electric control device be used in
24   the "push (drive) stun mode."
25     Do you see that?

        98
    JULIE RITTER         270.791.7345

1     A.   **Yes.**
2     Q.   I thought you had told me that he was
3   assaulting the officers.
4     A.   **He did assault an officer -- well, actually**
5   **officers -- prior to going to the ground.**
6     Q.   But was he assaulting them when he was on the
7   ground kicking and stuff?
8     A.   **He -- well, when he was kicking me, obviously**
9   **he was assaulting me.**
10     Q.   Okay.
11     A.   **But the other officers were attempting to hold**
12   **his hands to pull them behind his back.**
13     Q.   So does G here not say, if a person is
14   threatening the officer with an assault, it is
15   recommended -- not threatening the officer with an
16   assault. Let me read this again. Hold on a second.
17     A.   **Well, him kicking me at the time and him**
18   **actively trying to escape and he had already assaulted**
19   **the officers prior, I would say that would be active.**
20     Q.   (Reviews documents.) You're saying he was
21   actively resisting your attempt to take -- him being
22   taken into custody, correct?
23     A.   **Yes.**
24     Q.   That's what you're saying. But you're also
25   saying he was assaulting you as well?

        99
    JULIE RITTER         270.791.7345

1     A.   **Same instance.**
2     Q.   Okay.
3     (Off-the-record discussion for clarification.)
4   BY MR. MURLEY:
5     Q.   So you don't believe G prohibits you or at
6   least recommends that you don't use drive-stun mode in
7   that instance?
8     A.   **No. I used drive-stun mode when it was**
9   **applicable.**
10     Q.   Okay. N says, a warning prior to discharge is
11   preferred but not always necessary for this type of
12   force to be considered reasonable.
13     We can watch the video. Do you remember if you
14   warned him before you used the taser?
15     A.   **I advised drive stun, if I'm not mistaken.**
16     Q.   Okay. Was he actually tased after he was
17   handcuffed?
18     A.   **No.**
19     Q.   Were you provided any information prior to
20   your encounter with Mr. Marr by any source about either
21   his state of mind or any, you know, conditions that he
22   had that day, like medical conditions, heart conditions,
23   any of that kind of stuff?
24     A.   **I have -- no, nothing about his medical**
25   **conditions or heart conditions or whatever you're**

        100
    JULIE RITTER         270.791.7345

1   saying. I remember the radio traffic stating that an
2   elderly female called and said somebody was in her house
3   and he was yelling at her. And I remember asking for
4   the correct address and if the subject was actually
5   inside the house. Which they said, yes.
6     Q.   Okay. X, on page 54. (Reviews documents.)
7   Do you know what excited delirium is?
8     A.   **Yes.**
9     Q.   What is your understanding of excited delirium
10   to be?
11     A.   **Excited delirium from my understanding is a**
12   **medical term for somebody who is suffering from effects**
13   **of drugs or a mental incapacity.**
14     Q.   Okay. Do you have any idea if Mr. Marr was
15   exhibiting or suffering from excited delirium as of
16   April the 14th of 2020?
17     A.   **Like I said prior in my statements, that he**
18   **was aggressive and seemed delusional at one point.**
19     Q.   Before making contact with him as far as
20   actual physical contact?
21     A.   **When he said there was people out to kill him.**
22     Q.   Right.
23     A.   **But he wouldn't specifically say why.**
24     Q.   Now, he did not actually brandish a weapon,
25   correct?

        101
    JULIE RITTER         270.791.7345

1    A.   No, I did not see a weapon.

2    Q.   He mentioned to you and disclosed to you that
3 he had a pocketknife, right?

4    A.   He didn't mention.  When I asked him if he had
5 any weapons, he said, no.  And then he says, I had a --
6 he had a knife and he went to reach for it in his right
7 sweatshirt pocket, and I advised him not to take that
8 out; I would take it out.

9    Q.   Yeah.  Okay.  So he told you he had a knife on
10 him but he didn't brandish it with you before you made
11 physical contact with him?

12   A.   Yeah.  He told me he was armed.

13   Q.   Correct.  That's what I'm saying.

14   A.   Okay.

15   Q.   I think we're saying the same thing.  I'm not
16 trying to talk over you, I'm just trying to make sure --

17   A.   No.  No.  I understand.  I'm just saying,
18 yeah, he said he was armed.

19   Q.   Okay.  Now, looking back at this policy, it
20 looks to me like B, on page 50, procedure IV A B --

21   A.   Uh-huh.

22   Q.   -- is this kind of the continuum you were
23 talking about earlier?

24   A.   Yes.

25   Q.   A listing of it?  And it's kind of got a

102

1 breakdown here.  But I'm assuming this is what you're
2 supposed to take into consideration when determining the
3 appropriate level of force you should apply to a person;
4 is that right?

5    A.   It has steps.  Generalized steps to use.

6    Q.   In determining that, as far as the use of
7 force continuum, you're supposed to follow a
8 three-factor test.  Do you see that?

9    A.   I'm sorry?

10   Q.   Three-factor test here, A, B, and C?

11   A.   (Reviews documents.)

12   Q.   Do you see what I'm talking about?

13   A.   Yes.

14   Q.   Okay.

15   A.   (Reviews documents.)

16   Q.   I'm sorry.  I thought you were still reading
17 that.

18   A.   No.  I'm done.

19   Q.   How serious is the offense the officer
20 suspected at the time the particular force was used.
21 That's A.  So it's the first thing you're supposed to
22 consider in this three-factor test, right?

23   A.   Yes.  And you had a felony by breaking into
24 this lady's house.

25   Q.   The information you were provided was, he was

103

1 in a person's house without permission to be there?

2    A.   Yeah.  And I observed him inside the house.

3    Q.   You observed him inside the house.  And he
4 came out of the house whenever you-all pulled up, right?

5    A.   No.

6    Q.   He was coming out of the house?

7    A.   I had to advise him several times to exit the
8 house.

9    Q.   Okay.  And he did comply and exit the house?

10   A.   Yes.

11   Q.   Okay.

12   A.   After several...

13   Q.   After several times, he complied and exited
14 the house?

15   A.   Yes.

16   Q.   And you encountered him in the driveway, at
17 first, of the individual's house that you responded to?

18   A.   Yes.

19   Q.   Okay.

20   A.   No.  I found him first when he was inside the
21 house.  And then he walked out to my patrol car.

22   Q.   That was a --

23   A.   Well, actually, he walked out and met me in
24 the driveway in front of the patrol car.

25   Q.   That was a bad question.

104

1 So you eventually encountered him in front of
2 your patrol car when you were asking him some of these
3 questions we've been talking about; when he was saying,
4 don't let him kill me and that kind of stuff, right?

5    A.   Yes.

6    Q.   All right.  We're going to watch that video
7 here in a minute, I promise you.

8        But at what point was there a physical threat to
9 the officers involved, if there was, from Mr. Marr?

10   A.   Once he said he was armed; he had just
11 committed a felony; his actions by looking around, all
12 around him, gave me the sense that he was looking for an
13 escape route to run; once I had to escort him over to my
14 patrol car; and when I attempted to search him to
15 retrieve the knife, he resisted and attempted to escape.
16 And that's when he struck Officer Phillips in the face
17 with an elbow.  I think he tried to hit Murrell, he
18 tried to punch him in the face.

19   Q.   Okay.  So he wouldn't be a physical threat to
20 you if he was attempting to run away from you, right?  I
21 mean, he's not physically -- I mean, he --

22   A.   Well, it's hard to say that, too.  Like you
23 said, not everybody tells the truth.  So maybe he had a
24 gun, too.

25   Q.   I understand.

105

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1    A.   I didn't know.

2    Q.   Okay.

3    A.   But he did say he had a knife.  So I knew he
had some -- at least some type of weapon on him.

5    Q.   He had some type of weapon, yes, that he was
6 not brandishing at the time that you encountered him.
7 We've established that, correct?

8    A.   Yes.

9    Q.   Okay.

10    A.   But he is from you to me, and it wouldn't take
11 much time to pull a knife and stab somebody.

12    Q.   Yeah.  I understand what you're saying.

13    Looking at the continuum here -- I think you
14 went through this earlier.  I want to make sure that
15 this is the, at least in writing, continuum that's
16 listed.

17    A.   Yes.

18    Q.   Pages 50 and 51, Command Presence; that is the
19 first thing that you did by appearing at the scene,
20 right?

21    A.   Being in uniform and in a patrol car, yes.

22    Q.   Yeah.  The Verbal Commands would be what you
23 did when you actually, you know, asked Mr. Marr to come
24 out of the house.  He eventually did comply and come out
25 of the house.  You were then giving him verbal commands

106

JULIE RITTER       270.791.7345

1 up until when you --

2    A.   He wasn't fully complying.  I don't mean to
3 interrupt you.  But --

4    Q.   He did comply -- I said, eventually comply.

5    A.   He complied to come out of the house.  But he
6 wouldn't comply with the rest of my orders of walking
7 over to my patrol car and sitting on the bumper.

8    Q.   Okay.  So in the continuum, the Soft Empty
9 Hand Control, tell me when was that used in this
10 encounter?

11    A.   After I advised him several times to walk over
12 to the front of my patrol car and sit on the push bumper
13 which provides a seat area, he refused to do so.  So I
14 took my left hand and placed it on top of his right
15 shoulder, and I took a-hold of his jacket and walked him
16 over to the patrol car in front of the push bumper.

17    Q.   Okay.

18    A.   That's soft hand.

19    Q.   All right.  Then there's the chemical spray
20 here.  And I think you said you didn't use chemical
21 spray because of the other officers being present?

22    A.   Close proximity.

23    Q.   Right.

24    A.   Plus it's being a liquid.  If you spray or if
25 you've ever used a chemical spray before -- Mace®,

107

JULIE RITTER       270.791.7345

1 pepper spray, whatever -- once you spray it on somebody
2 and you're still fighting with them, that transferred to
3 you.  So...

4    Q.   So you end up spraying yourself --

5    A.   Yeah.

6    Q.   -- if you spray somebody --

7    A.   Uh-huh.

8    Q.   -- that you're fighting with?

9    A.   Yes.

10    Q.   It would have been an option that would have
11 been different than the electric control device that you
12 used, though, at least in the continuum, as far as that
13 goes?

14    A.   It's the same as --

15    Q.   Okay.

16    A.   -- the electric device.

17    Q.   The electronic control device here says, where
18 subject exhibits some level of active resistance or
19 aggression, the officer may use an electronic control
20 device to temporarily incapacitate the subject.

21    Do you see that?

22    A.   Yes.

23    Q.   And that's, in fact, what you were doing while
24 the other officers were attempting to use hard-hand
25 control to subdue Mr. Marr, correct?

108

JULIE RITTER       270.791.7345

1    A.   Yes.  At that time, I had placed one handcuff
2 on his left wrist, and that's when he struggled to break
3 free and struck Officer Phillips.  So that's another
4 weapon, the handcuff itself, 'cause it's still attached
5 to his left arm -- or left wrist.

6    Q.   Okay.  Impact weapons were not used by you.
7 Do you know if any other officers used impact weapons at
8 the scene?

9    A.   No other officers used an impact weapon or
10 taser.

11    Q.   Right.  I know a taser, but I didn't ask you
12 specifically about impact weapons.  I'm assuming that's
13 also for chemical weapons, the chemical sprays; nobody
14 else used a chemical spray at the scene?

15    A.   No.

16    Q.   The other individuals were just using the hard
17 hand controls of strikes or knees or kicks during this
18 time, right?

19    A.   They were mostly trying to restrain his arms
20 to pull them behind his back.  I think Officer Phillips
21 used a knee strike to the -- to the hip area.  And I'm
22 not sure what Sergeant Murrell used, if he did use
23 anything.

24    Q.   But at least the video we watched from the
25 passerby that we looked at, there looked like there were

109

JULIE RITTER       270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  some knee strikes by, I think you said, Officer Phillips
2  at that time?
3      A.  Yeah.  That was brachial stuns.
4      Q.  Okay.  So that --
5      (Off-the-record discussion for clarification.)
6  BY MR. MURLEY:
7      Q.  Brachial?
8      A.  Yes.
9      COURT REPORTER:  Brachial.  Okay.  Thank you.
10 BY MR. MURLEY:
11     Q.  It lists here a canine.  Obviously, there was
12 not a dog on the scene.  Nobody was a canine officer
13 that was present, right?
14     A.  No, sir.
15     Q.  And then, of course, it says, deadly force.
16 And I understand you guys didn't have cause to use your
17 firearms during this --
18     A.  No, sir.
19     Q.  -- encounter?
20     A.  No deadly force was used.
21     MR. COOK:  (Passes documents.)
22     MR. MURLEY:  Thanks, man.
23     MR. COOK:  Sure.
24 BY MR. MURLEY:
25     Q.  In looking at the Exhibit number 10, looks

110

JULIE RITTER          270.791.7345

1  like there were some things that were changed in this
2  from the previous policy.  At any time was Mr. Marr's
3  airway restricted by any of the subdual techniques or
4  methods used by you or any of the other officers that
5  you're aware of?
6      A.  No, sir.
7      Q.  Okay.  You didn't see anybody restrict his
8  airway at any time?
9      A.  No, sir.
10     Q.  Did he ever indicate to you that he couldn't
11 breathe?
12     A.  I don't recall him saying anything like that,
13 no.
14     Q.  Okay.  I think I asked you this about the
15 handcuffs, but I want to make sure I'm clear on it.
16 There wasn't any force that was used at any level with
17 Mr. Marr after he was restrained, so that would be
18 post-restraint?
19     A.  Yes.  Once he was handcuffed, all active --
20 activity trying to restrain him had stopped, because
21 obviously he was restrained.
22     Q.  Right.  Okay.  How long was it after he was
23 restrained that you noticed the shallow breathing of
24 Mr. Marr?
25     A.  Actually, Officer -- well, Hayden was the one

111

JULIE RITTER          270.791.7345

1  who actually noticed he was shallow breathing several
2  seconds to -- after the incidence, once we had him
3  handcuffed and -- and secured, I advised the officer who
4  was kneeling on the ground next to Mr. Marr to make sure
5  that he was breathing and he was okay.  That's part of
6  the training when you use the taser, where you roll them
7  on their side or sit him up right away.
8      (Off-the-record discussion for clarification.)
9  BY MR. MURLEY:
10     Q.  Right away to see if they're okay?
11     A.  Yes.
12     Q.  And at that time the other officer noticed
13 shallow breathing?
14     A.  I -- I believe I -- I believe Mr. Marr stopped
15 making noises, like grunts and that.
16     Q.  When he was set up, you're saying?
17     A.  No.  That's when I advised Hayden to make sure
18 that he was breathing, he was okay, and roll him on his
19 side.  And that's when Hayden said, he's shallow
20 breathing.
21     Q.  That's when you knew he needed medical
22 attention?
23     A.  Yes.  And at that instance, we had called --
24 because of the taser deployment, we called for an E-M-S
25 unit to come by to check on him, which is standard

112

JULIE RITTER          270.791.7345

1  procedure any time that the taser is deployed.  And
2  during that timeframe, that's when we noticed that he
3  had stopped breathing.
4      Q.  Okay.  Switching gears for just a second.  I'm
5  assuming with your duties as a police officer, you have
6  to be in good physical condition to be able to perform
7  your duties, correct?
8      A.  Yes.
9      Q.  And I'm assuming you have to maintain your
10 physical condition to be active as a police officer?
11     A.  I don't believe there's a standard for that,
12 but you should personally take care of yourself.
13     Q.  You specifically, do you maintain your
14 physical condition?
15     A.  Yes.
16     Q.  Do you work out?
17     A.  Yes.
18     Q.  What kind of workouts do you do to maintain
19 your physical condition?
20     A.  Until recently, after having my shoulder
21 rebuilt, I was going to the gym three times a week.
22     Q.  Lifting weights?
23     A.  Yes.
24     Q.  Free weights?
25     A.  Mostly Nautilus.

113

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1    (Off-the-record discussion for clarification.)
2  BY MR. MURLEY:
3    Q.    Okay.  Have you lifted free weights as part of
your workout?
5    A.    Yes.
6    Q.    And as of April of 2020, is that when you were
7  still going to the gym three times a week?
8    A.    Yes.
9    Q.    Okay.
10    A.    I'll have to double check on that, 'cause it
11  was a time where -- I don't recall when I had my
12  shoulder surgery -- I wasn't able to workout for several
13  months, but I still kept in shape.
14    Q.    I understand.  When you lift weights what
15  types of weightlifting would you do, like, free weights?
16  Bench press?
17    A.    Just circuit training, upper body, lower body.
18    Q.    I know there's different types of weight
19  training.  You can max out on a particular weight.
20    A.    I don't -- I don't do heavy weights.  That's
21  how you get hurt.
22    Q.    You wouldn't know how much weight you can
23  bench press?
24    A.    No.  Like I said, heavy weights is -- you get
25  hurt.

114

JULIE RITTER          270.791.7345

1    Q.    Same for a leg press?
2    A.    Yes.
3    Q.    You said you do circuit training.  Is that
4  with dumbbells?
5    A.    Circuit training is when you go -- it's cardio
6  and weight training all at once.  So you go from one
7  machine to the next without a break.
8    Q.    Do you work out using dumbbells?
9    A.    Yes.
10    Q.    What type of weight do you use when you
11  workout using dumbbells?
12    A.    Twenty-five pounds doing arm curls, maybe ten
13  pounds for laterals.
14    Q.    You said earlier you don't use heavy weights.
15  I'm assuming that means you would not be dead-lifting.
16    A.    Yeah.  Nothing over 250 pounds.
17    Q.    Okay.
18    (Off-the-record discussion for clarification.)
19  BY MR. MURLEY:
20    Q.    Now, are those numbers consistent as of
21  April of 2020 would be the same?
22    A.    I couldn't give you a for instance on that,
'cause I didn't have a -- a set time and date for
24  working out.
25    Q.    Right.  How much did you weigh in April of

115

JULIE RITTER          270.791.7345

1  2020, before, I guess, the day of the April 14th, 2020
2  incident?  Do you know?
3    A.    I -- I'm not sure.
4    Q.    Some people --
5    A.    I wasn't massively obese if that's what
6  you're --
7    Q.    Some people maintain their weight in a certain
8  weight range.  I didn't know if you were one of those
9  people.  Some people gain weight, lose weight, gain
10  weight, lose weight.
11    A.    No.  I'm 57 years old.  Right now I weigh 220.
12    Q.    Is that consistently what you would have
13  weighed in April of 2020?
14    A.    I think I weighed just a bit more back then.
15    Q.    A little bit more?
16    A.    (Witness nods head in the affirmative.)
17    Q.    Okay.  As far as the April 14th, 2020 incident,
18  you told me earlier, I think, what information was
19  relayed to you.  It was something about being -- he
20  was in -- somebody was in somebody's house, right?
21  Somebody had broken into somebody's house, I think.  Can
22  you tell me again what that was?  As of you getting the
23  call, do you recall what information was relayed to you
24  about --
25    A.    Well, we have a radio log (inaudible)

116

JULIE RITTER          270.791.7345

1  conversations.  I recall being told that a person had
2  broke into an elderly lady's house.  She said that he
3  was yelling and --
4    (Off-the-record discussion for clarification.)
5    WITNESS:  And that I conf -- I remember confirming
6  the address because the -- I remember her -- her saying
7  it was the second driveway on the corner, and it wasn't.
8  I didn't see the number of the house.
9    It took me several, several moments to actually
10  find the -- the residence.  And I -- I remember asking
11  if the subject was actually inside the house and not
12  outside the house.  And they said he was actively inside
13  the house.
14  BY MR. MURLEY:
15    Q.    Okay.  Who was giving these updates to you?
16  Dispatch?
17    A.    It was dispatch.
18    Q.    Okay.  So those were other updates you
19  received on your way to the incident when you were
20  trying to find the house and that kind of stuff?
21    A.    There was a -- I remember there was a period
22  of radio silence in reference to the address.  And I
23  think the sergeant had to say something to dispatch in
24  reference to that.  But I had already turned around, and
25  I was waiting for better directions, and I was trying to

117

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  see house numbers on that corner.

2      And I think -- I think dispatch gave me

3  another -- the description of the house.  I remember her

4  saying it was, I think, like, a red brick -- red brick

5  house.  Which that's what her house was.  And that's

6  when I said I was -- I was 1097 on scene.

7      COURT REPORTER:  You were ten what?

8      WITNESS:  I was 1097 on scene.

9      COURT REPORTER:  97.

10     WITNESS:  I was already across the street at the

11  time.  The other two officers had drove past.  I guess

12  they were looking for the address, too.

13     MR. MURLEY:  I understand.

14  BY MR. MURLEY:

15     Q.  So the Glasgow Police Department, for lack of

16  a better term, is there like a list of individuals or

17  areas that your officers, like, maintain for the

18  officers to be aware of?  Does that make sense what I'm

19  saying?

20     A.  No.

21     Q.  Is there like a -- I'll call it a most

22  dangerous list, common knowledge among officers?  You

23  know, is there -- I'm not a police officer --

24     A.  Uh-huh.

25     Q.  -- so I can't say.  If you have somebody that

118

JULIE RITTER          270.791.7345

1  you deal with a lot through the police force, is there a

2  list of individuals --

3      A.  Are you trying to refer to, like, a wanted

4  poster --

5      Q.  Yeah.

6      A.  -- or something?

7      Q.  The usual suspects.

8      A.  No, we don't have usual suspects.

9      Q.  I'll say the usual suspects.  Does that make

10  sense?

11     A.  No.  There is a daily pass-on for active

12  situations, like, extra watches or attempted burglaries

13  to pass-on during shifts.  But, no, there's -- I don't

14  know of any blog or notification of wanted people.

15     Q.  And that makes sense.  I don't know if I don't

16  ask.

17     A.  No.  No.  I'm glad you did.

18     Q.  Sometime you see in movies with briefings

19  where they tell everybody stuff.

20     A.  You made me laugh, 'cause the first thing I

21  thought of was the post office with all the pictures.

22     Q.  Yeah.  Yeah.

23     A.  F-B-I's most wanted.

24     MR. COOK:  Top ten.

25  BY MR. MURLEY:

119

JULIE RITTER          270.791.7345

1      Q.  And my understanding was that Mr. Marr might

2  have had contact previously with the police department.

3      A.  I never had contact with him prior to that

4  incident.  After that incident, several officers have

5  advised me that they had numerous contacts with him

6  prior to that.  But I never had contact with him.

7      Q.  You didn't know who he was.  He wasn't anybody

8  that was discussed with you prior to your contact with

9  him that day?

10     A.  I had no idea who he was.

11     Q.  Okay.  That's what I was getting at, but I

12  didn't know if there was any kind of mention of that.

13  But afterwards, other officers told you that they had

14  had contact with him previously?

15     A.  Yes.

16     Q.  And who were those officers; do you recall?

17     A.  No, I don't recall.

18     Q.  Okay.  Would you agree with me that your

19  single greatest responsibility as a police officer is to

20  serve and protect the people?

21     A.  (No response.)

22     MR. COOK:  If you agree.

23  BY MR. MURLEY:

24     Q.  If you don't, that's -- I'm just asking if you

25  agree.

120

JULIE RITTER          270.791.7345

1      A.  Yes.

2      Q.  I promise you it's not a trick question.  I'm

3  just asking you that.

4      In your opinion, what is the role of the police

5  when they are called to the scene of an incident like

6  the one you responded to when you encountered Mr. Marr?

7      A.  Protect persons and property, the elderly -- I

8  think she was 88 at the time -- victim of a burglary,

9  and attempt to make a -- in reference to the suspect,

10  attempt to make a -- an arrest in reference to the crime

11  that was committed in the safest possible manner.

12     Q.  You would have had a duty to really protect,

13  you're saying, the victim, individual in the house?

14     A.  Uh-huh.

15     Q.  You would also have a duty really to protect

16  even Mr. Marr from harm if you could do so, correct?

17     MR. COOK:  Object to form.

18     MR. MURLEY:  To the extent you can.

19     MR. COOK:  Object to form.  You can answer.

20     WITNESS:  Mr. Marr, if he complied with my verbal

21  commands, this incident probably wouldn't have happened.

22  BY MR. MURLEY:

23     Q.  Well, and I understand that.  I'm just asking

24  you for really more of a yes or no.  Do you agree with

25  me that you had a duty to protect everyone at the scene,

121

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  including Mr. Marr, from harm.
2      A.   **Including the officers that were on the scene,**
3  **yes.**
   MR. COOK: Same objection.
   BY MR. MURLEY:
6      Q.   And I guess I'll limit it to Mr. Marr. Do you
7  agree with me that you had a duty that you owed Mr. Marr
8  to protect him from harm when you encountered him at the
9  scene?
10     MR. COOK: Object to form.
11     WITNESS: That doesn't make sense to me. Can you
12  re -- rephrase the question?
13     MR. MURLEY: Sure.
14  BY MR. MURLEY:
15     Q.   Do you believe the police are there to be a
16  neutral party and to protect everyone at the scene of
17  any incident?
18     MR. COOK: Object to form.
19     WITNESS: To the best of the ability. But when you
20  have Mr. Marr being aggressive and assaulting officers,
21  I mean, we -- we use the least amount of force possible
22  to try to restrain him.
23  BY MR. MURLEY:
24     Q.   To try to minimize any harm to Mr. Marr --
25     A.   Yes.

                    122
        JULIE RITTER          270.791.7345

1  I may not be asking it very well. You --
2      A.   **We were not trying to harm Mr. Marr.**
3      Q.   You weren't trying to harm Mr. Marr, because
4  you still owed him a duty really not to harm him if you
5  can, even in arresting him, correct?
6      A.   **You keep saying "owed." That's the part that**
7  **I -- in any situation --**
8      Q.   Uh-huh.
9      A.   **-- when we try to take a suspect into custody**
10  **for committing a crime, a felony or for serious crimes,**
11  **we try to always use the least amount of force necessary**
12  **to gain control of the subject and place him into**
13  **custody. Now, depending on his actions, is how much**
14  **force we use.**
15     Q.   All right. I understand what you're saying.
16     MR. MURLEY: I think we can stop your continuing
17  objection now.
18     MR. COOK: We'll stipulate.
19  BY MR. MURLEY:
20     Q.   Do you know what the proper distance is
21  supposed to be from a person before using the darts with
22  a taser?
23     MR. COOK: Object to form. You can answer if you
24  know.
25     WITNESS: The -- I believe the taser cartridge I

                    124
        JULIE RITTER          270.791.7345

1      Q.   -- to the extent possible?
2      A.   **Yes.**
3      Q.   Which would be trying to comply with the duty
4  not to create any unreasonable excessive risk of harm to
5  Mr. Marr?
6      MR. COOK: Object to form.
7  BY MR. MURLEY:
8      Q.   Is that correct?
9      A.   **Maybe I'm just not getting what you're trying**
10  **to say. Because our duty -- we're not out there to try**
11  **to -- we're not trying to hurt Mr. Marr. We're trying**
12  **to restrain him in reference to the actions that he was**
13  **doing. So my best answer to your question is: We tried**
14  **our very best to not harm him by even his -- his actions**
15  **of trying to harm us and place him into custody.**
16     Q.   And you tried to comply with the duty that you
17  believed was owed to him. And I understand that you may
18  object to that question.
19     MR. COOK: Object to form.
20     MR. MURLEY: Yeah.
21     MR. COOK: Just make it a running objection.
22     MR. MURLEY: Yes. You're fine. You can make a
   running to this particular line of questioning.
24  BY MR. MURLEY:
25     Q.   I think we're saying some of the same things.

                    123
        JULIE RITTER          270.791.7345

1  had on my taser at that date was -- the maximum range
2  was 35 feet. And I believe I discharged my taser that
3  day, I was between maybe seven to ten feet away.
4  BY MR. MURLEY:
5      Q.   Seven to ten feet away?
6      A.   **I believe that was -- I wasn't like right on**
7  **him touching him with the taser. I had to step back and**
8  **aim it and then discharged it.**
9      Q.   I think this might be a decent time to watch
10  this video. Then I'll have some questions for you.
11  I've got it on this laptop here that we can put in front
12  of you.
13     MR. COOK: I'm not sure I'm smart enough to get it
14  on that screen.
15     MR. MURLEY: We can go off the record for a minute,
16  if you want to, and figure out how to do this.
17     (Off-the-record discussion.)
18     COURT REPORTER: All right. We are back on the
19  record.
20     MR. MURLEY: So we're now going to look at least
21  one of the body cam videos that I understand was
22  produced to us in discovery. We've already discussed
23  with counsel off the record that there's no issue with
24  us disclosing this, you know, into the record. We had
25  signed some agreements not to do so, but that was prior

                    125
        JULIE RITTER          270.791.7345

1  to litigation.

2  MR. COOK: That was per the open record request and

3  it was prior to litigation. So I don't have an issue.

4  MR. MURLEY: Okay. I just wanted to put that on

5  the record.

6  MR. COOK: No. I understand.

7  MR. MURLEY: Okay. It basically required a blood

8  oath of mine to get it.

9  COURT REPORTER: Required of what?

10  MR. MURLEY: A blood oath of mine to get it.

11  (Off-the-record discussion for clarification.)

12  MR. COOK: Not by me, but the General Assembly of

13  the State of Kentucky.

14  BY MR. MURLEY:

15  Q.  So the date here is 4/14/2020 in the bottom

16  right corner. And this says one, two, an indication of

17  the time stamp or something there. I'll play it here in

18  a minute. But --

19  A.  **That's not the time of the incident.**

20  Q.  12:43:01 Z9G00320.

21  A.  **That 2232's my I-D number.**

22  Q.  223 -- 002232 is at the end. So at the end of

23  this line of numbers after the date, the end is 2232.

24  So that indicates this is your body cam?

25  A.  **That's my employment number, 2232.**

126

JULIE RITTER          270.791.7345

1  Q.  All right.

2  (Off-the-record discussion for clarification.)

3  BY MR. MURLEY:

4  Q.  Okay. So it looks like this is ten minutes.

5  I'm going to pause it when I ask a question about

6  things. But we're going to watch it --

7  A.  **This is actually -- I think this is broken up**

8  **into four or five different --**

9  Q.  It is. I wasn't going to take you through all

10  of the body cam. I think this goes up to the scene and

11  I think it's your encounter with Mr. Moore that you've

12  described already.

13  A.  **Marr?**

14  Q.  I'm sorry?

15  A.  **Marr?**

16  Q.  Did I say Mr. Moore?

17  A.  **You said Moore.**

18  MR. COOK: We knew who you meant.

19  MR. MURLEY: I gotcha.

20  (Playing video.)

21  BY MR. MURLEY:

22  Q.  Is that a mask you're putting on?

23  A.  **That's back when COVID was. I was trying to**

24  **put it on. It wasn't working out for me. So I didn't.**

25  Q.  I gotcha.

127

JULIE RITTER          270.791.7345

1  (Off-the-record discussion for clarification.)

2  (Playing video.)

3  BY MR. MURLEY:

4  Q.  You were having trouble. This is where you

5  were trying to find the house?

6  A.  **I believe dispatch told me it was the second**

7  **driveway on the right on the corner. So the street I**

8  **passed, that's the second driveway from that corner.**

9  Q.  Okay.

10  A.  **I was trying to look at street numbers on the**

11  **houses, and you can't see them because half of them**

12  **don't have numbers on the house.**

13  (Playing video.)

14  BY MR. MURLEY:

15  Q.  So those are the officers that just passed?

16  A.  **Yes. That was officer -- that was Hayden and**

17  **Murrell.**

18  (Playing video.)

19  BY MR. MURLEY:

20  Q.  So you had to ask him to come here three

21  separate times. Obviously, he was in the -- at least in

22  the doorway of the residence whenever you --

23  A.  **Yes. When I saw him, he was inside the house**

24  **behind the door.**

25  Q.  You said, come here, three times, and then he

128

JULIE RITTER          270.791.7345

1  starts moving towards you, correct?

2  A.  **Yes.**

3  (Playing video.)

4  BY MR. MURLEY:

5  Q.  All right. So here he put his shoes on. You

6  said, do you have any weapons. He said, no, sir, then

7  immediately said he had a knife.

8  A.  **Yes, and reached for it.**

9  (Off-the-record discussion for clarification.)

10  MR. MURLEY: I'm going to go back and we'll see if

11  we can see that.

12  (Playing video.)

13  WITNESS: (Inaudible.)

14  COURT REPORTER: I'm sorry?

15  WITNESS: Did you see his hand in his pocket?

16  MR. MURLEY: Well, you don't know if he was

17  reaching for it or not. You don't know what pocket it

18  was in. He just said he had a knife.

19  WITNESS: Well, he goes, I have a knife in my

20  pocket, and then he put his hand (inaudible) and that

21  was on the right side.

22  (Playing video.)

23  BY MR. MURLEY:

24  Q.  Does he look like an individual that is not

25  high or under the influence of anything to you?

129

JULIE RITTER          270.791.7345

1    MR. COOK:  Object to form.  Go ahead.
2  BY MR. MURLEY:
3    Q.    I think you said previously you thought just
his adrenalin was pumping?
5    A.    Well, his adrenalin was pumping.  I had just
6  found him inside a house he just broke into.
7    Q.    Right.  But there's not any indication to you
8  that he was on anything at the time?
9    A.    Not for the few seconds I've been with him,
10  no.
11    Q.    Okay.
12          (Playing video.)
13  BY MR. MURLEY:
14    Q.    So he said he's not high, and then you asked
15  him if he's on medication.  And he said, please don't
16  let anybody hurt me.
17    A.    Yes.
18    Q.    So why did you ask him if he was on medication
19  at that time?  Did you believe that he was on something
20  is why you were asking those questions?
21    A.    Well, he seemed paranoid, so I thought he
22  might be schizophrenic.
23    Q.    Okay.  You thought he at least had some kind
24  of condition or his mind was altered somehow, is that
25  what you're saying?

130

JULIE RITTER          270.791.7345

1    A.    I don't know if he had a condition.  The
2  actions that I was witnessing at the time, I thought he
3  might have been on some type of medication.
4    Q.    Okay.
5          (Playing video.)
6  BY MR. MURLEY:
7    Q.    So this is the soft-hand technique; is that
8  right?  You said you put your hand on him and let him to
9  your vehicle?
10    A.    I put my hand on his shoulder and grabbed
11  a-hold of his I took a-hold of his sweater and walked
12  him over to the patrol car, as the video shows.
13    Q.    Okay.
14          (Playing video.)
15    WITNESS:  During my search, I didn't find any drugs
16  on him.
17    MR. MURLEY:  (Indicating.)
18    WITNESS:  During my search, I did not find any
19  drugs on him.
20  BY MR. MURLEY:
21    Q.    Did you find a knife on him?
22    A.    By the time, I went to the search that night,
that's when he became aggressive and -- and pulled away.
24          (Playing video.)
25  BY MR. MURLEY:

131

JULIE RITTER          270.791.7345

1    Q.    So is that the first -- you said, taser.  Was
2  that the warning that you said?
3    A.    I said, drive -- I said, stun ta -- drive
4  strike.
5    Q.    Okay.  And I heard the clicking.  Is that the
6  first time it was deployed?
7    A.    When you hear it clicking loud like that, that
8  means it's not making contact.
9    Q.    Okay.
10          (Playing video.)
11    WITNESS:  Not making contact.
12    COURT REPORTER:  Not making contact?
13    WITNESS:  (Witness nods head in the affirmative.)
14          (Playing video.)
15    WITNESS:  (Inaudible.)  Lift it up and --
16    MR. MURLEY:  Looks like this time (inaudible.)
17          (Playing video.)
18    WITNESS:  Not contact.
19    COURT REPORTER:  I'm sorry?
20    WITNESS:  I did not make contact.
21          (Playing video.)
22    WITNESS:  Couldn't get a good solid hold on it.
23          (Playing video.)
24    WITNESS:  When you hear it loud like that, it's not
25  making contact at all.

132

JULIE RITTER          270.791.7345

1          (Playing video.)
2    WITNESS:  That's at the point where he kicked my
3  camera and it's swinging around my chest.
4          (Playing video.)
5  BY MR. MURLEY:
6    Q.    So that's the darts --
7    A.    That was the --
8    Q.    -- right?
9    A.    -- dart, yes.
10          (Playing video.)
11  BY MR. MURLEY:
12    Q.    Is it possible for him to put his hands behind
13  his back with him being held down the way he's being
14  held down?
15    A.    Yeah.
16    Q.    So he can still reach behind himself and put
17  his hands behind his back?
18    A.    If he would stop fighting and resisting, is
19  what I'm saying.  Yeah.  He could.  They're trying to
20  pull his hands around the back; and he's resisting,
21  pulling them forward.
22    Q.    But he's pinned to the ground at this point,
23  right?  He's, obviously, not --
24    A.    His arms aren't pinned to the ground, and his
25  legs are still flailing.

133

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  **Q.**  Okay. So it is possible for him to have
2  complied with your directive?
3  **A.  Yes.  So if he stopped resisting the forward**
4  **motion of his arms, trying to pull them under him, and**
5  **officers trying to pull them behind his back.  Is that**
6  **the question?**
7  **Q.**  Uh-huh.
8                  (Playing video.)
9  BY MR. MURLEY:
10  **Q.**  So it was after this that you-all noticed that
11  his breathing was shallow?
12  **A.  Once he was handcuffed and secured, yes.**
13  **Q.**  And you decided to call E-M-S?
14  **A.  We called E-M-S prior to that because of the**
15  **taser.**
16  **Q.**  Taser. Okay. Is that standard operating
17  procedure when the taser is deployed?
18  **A.  Yes.**
19  **Q.**  Okay. Why were you using drive-stun mode and
20  not the dart-deployment mode for the first at least
21  eight attempts?
22  **A.  I was trying -- I was trying to get him in**
23  **compliance for him to put his hands behind his back.**
24  **Q.**  It looked to me like the dart mode was -- at
25  least made contact, and there was energy going, you

134

1  know, through the darts that he was responding to.
2  **A.  The darts were ineffective, also.**
3  **Q.**  How do you -- let me ask you this.
4  COURT REPORTER: The darts -- wait a minute. The
5  darts were not effective?
6  WITNESS: The darts were ineffective, also.
7  MR. COOK: That's what Brady said, I think.
8  WITNESS: No, that's what I said.
9  COURT REPORTER: No.
10  MR. COOK: Oh, I'm sorry. Excuse me. I'm sorry.
11  BY MR. MURLEY:
12  **Q.**  How do you determine whether you're going to
13  use drive-stun or the dart-deployment modes based on the
14  circumstances that are presented to you when you're
15  using a taser?
16  **A.  The -- the amount of resistance that he was**
17  **submitting, I was doing pinpoint hand compliance, which**
18  **would be the drive stun.  Like a drop of water on the**
19  **back of your hand.**
20  **Now, with the taser deployment, take your hand**
21  **and dip it in the bucket of water.  So you've got**
22  **effectiveness (inaudible).**
23  COURT REPORTER: So you're affecting what?
24  WITNESS: Again, affecting all over the muscle
25  contractions in that area of deployment.

135

1  COURT REPORTER: Okay. Thank you.
2  MR. MURLEY: I don't think I have any more
3  questions about this right now.
4  MR. COOK: Everybody good, or do we want to take a
5  break? I don't know if you're at a good point to do
6  that or not.
7  MR. MURLEY: Yeah. We can take a few minutes.
8  Let's go off and take five minutes.
9  COURT REPORTER: We're off the record.
10       (Short break taken from 1:11 p.m. to 1:22 p.m.)
11  COURT REPORTER: All right. We are back on the
12  record.
13  BY MR. MURLEY:
14  **Q.**  Did you receive training about -- I guess, in
15  relation to dealing with individuals who have issues
16  with their mental health, like, as a police officer?
17  **A.  Could you be more specific.**
18  **Q.**  Have you received any training as it relates
19  to dealing with individuals that are having a mental
20  health episode or issue when you respond to a call
21  involving them?
22  **A.  Yes.**
23  **Q.**  Okay.
24  **A.  I believe it was through Deer Creek.**
25  COURT REPORTER: Deer what?

136

1  WITNESS: Deer Creek Training.
2  BY MR. MURLEY:
3  **Q.**  Is that the thing you talked about it being on
4  the computer?
5  **A.  Yes.**
6  **Q.**  Okay. And that would have been while you were
7  at the Glasgow Police Department?
8  **A.  Yes.  But I -- I -- I recall, also, training**
9  **classes in reference to that.**
10  **Q.**  Training classes?
11  **A.  Yes.  Required -- I think they're required**
12  **yearly.**
13  **Q.**  And that would be while you were at the
14  Glasgow Police Department?
15  **A.  I -- I believe so.**
16  **Q.**  Same question about substance abuse issues,
17  people that have drug addictions, that kind of stuff.
18  **A.  I don't understand what you're --**
19  **Q.**  Any training specifically on that?
20  **A.  My train -- in dealing with people that --**
21  **Q.**  Substance abuse issues or under the influence
22  of illicit drugs or alcohol?
23  **A.  I...**
24  WITNESS: (Indicating.)
25  MR. COOK: I don't know.

137

1   BY MR. MURLEY:
2       Q.   I'm just asking if you have specific training
3   on that.
4       A.   **I don't know if it's related to how you're**
5   **answering the question.  But, yeah, I've -- I -- I've**
6   **had training dealing with people in reference possibly.**
7       Q.   Okay.  We talked about the mental health
8   issues.  I think we talked about you've had training
9   involving dealing with people with mental health issues.
10  In the video that we watched on the computer, you asked
11  Mr. Marr if he was under the influence of any
12  medication, I think.
13      A.   **Yes.**
14      Q.   And that was in response to him basically
15  saying these -- there's people trying to kill me, right?
16      A.   **Yes.**
17      Q.   At that point, did you believe he was having
18  some kind of psychotic episode or something like that?
19      A.   **I was not aware that he was having an episode.**
20  **But that's why I was asking him questions, if he was**
21  **taking medications or anything -- if he was on any type**
22  **of medications in reference to that.**
23      Q.   You at least suspected he wasn't in his right
24  mind at that time, or you wouldn't have asked him if he
25  had any medication; is that right?
                        138
        JULIE RITTER          270.791.7345

1       A.   Well, drugs don't have a smell.
2       Q.   Okay.  How can you tell if someone's under the
3   influence of a narcotic or a drug?
4       A.   **There's several different ways; blown pupils,**
5   **body ticks.**
6       Q.   Sweating?
7       A.   **I would assume in some cases, yes.**
8       Q.   General demeanor in how they're acting or
9   reacting to things?
10      A.   **All depends.  Yes.**
11      Q.   Okay.  At any point after first coming into
12  contact with Mr. Marr and before deploying your taser,
13  did you have any reason to believe Mr. Marr was under
14  the influence of any drugs?
15      A.   **No.**
16      Q.   Do you consider each application of force --
17  which would be either, I'm speaking of a drive-stun or a
18  probe deployment -- a separate application of force that
19  you use?
20      MR. COOK:  Object to form.  You can answer.
21  BY MR. MURLEY:
22      Q.   We're talking about that force continuum.  And
23  I'm trying to figure out if each you deploy your taser,
24  is it a separate application of force, or is it one
25  continuous application of force in your mind?
                        140
        JULIE RITTER          270.791.7345

.       A.   I wouldn't say --
2       MR. COOK:  Object to form.
3       WITNESS:  -- he was not in his right mind.  I was
4   still assessing the situation during that time.
5   BY MR. MURLEY:
6       Q.   Okay.  You at least thought he might have been
7   on some medication, that's why you asked the question?
8       A.   **I didn't know if he was on medication.  That's**
9   **why I asked him if he was.**
10      Q.   Okay.  Now, I understand that the exchange
11  between you and Mr. Marr -- you know, you asked him to
12  come out of the house -- out of the doorway of the
13  house, he complied, and you had a brief conversation
14  with him when you were asking him to do certain things.
15  You were assessing the situation?
16      A.   **Yes.**
17      Q.   During your assessment of the situation, did
18  you ever believe that Mr. Marr was under the influence
19  of drugs or alcohol?
20      A.   **Not at that time.**
21      Q.   Okay.
22      A.   **I didn't smell any alcohol on the breath**
    **(inaudible.)**
24      Q.   And that would be -- and I'm talking about
25  drugs, too.
                        139
        JULIE RITTER          270.791.7345

1       A.   **Well, if there's no compliance with the -- the**
2   **force, I would be saying it's continuous.  But in**
3   **reference to the force itself, with the drive stun, that**
4   **was the less of the two taser engagements.  Drive stun,**
5   **like I said before, is a pinpoint pain compliance**
6   **compared to the tased deployment which is a wider area**
7   **of pain compliance.  So...**
8       Q.   You guessed earlier that about half of the
9   time, you said you think it was around half of the time
10  that you used the drive-stun mode and the taser actually
11  made contact?
12      A.   **Uh-huh.**
13      Q.   You probably --
14      A.   **Watching that video -- I'm sorry to interrupt**
15  **you.  Watching that video now, it seems like it might**
16  **have been even less.  Because when you hear the arc of**
17  **the taser, that's not making any contact whatsoever.**
18      Q.   Well, I didn't go back and count all the times
19  on there.  But, I mean, so it could have been half or it
20  could have been less than half, however many times it
21  was.
22      A.   **Yes.**
23      Q.   That the video -- at least there's a sound of
24  a taser when you're attempting to deploy it.  You said
25  it's louder when it doesn't make actual contact?
                        141
        JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1   A.   Yes.

2   Q.   So everything at least that sounds, the best
3   we can tell, we'd be able to hear when you're pulling
4   the trigger it's making that noise it's not making
5   contact, correct?   Clicking noise?

6   A.   Yes.

7   Q.   Loud clicking noise?   And if it's actually
8   making contact, it's a more muffled clicking noise?

9   A.   Yes.

10   Q.   Okay.   You have to be able to justify any of
11   the uses of force that you use with an individual,
12   correct --

13   A.   Yes.

14   Q.   -- in the force continuum that we talked
15   about?

16   A.   **(Witness nods head in the affirmative.)**

17   Q.   And as far as the actual attempts at
18   deployment of the taser, what is your justification for
19   the deployments each time?

20   A.   **He was actively and aggressively not complying**
21   **during the time that the tasers were used.**

22   Q.   Okay.   Looked to me like the time span for at
23   least the use of the taser -- and I'm not saying that
24   it's actually making physical contact -- but the use of
25   the taser was three minutes and 44 seconds or so, it

142

JULIE RITTER        270.791.7345

1   looked to me like, as far as from the -- from the...

2   A.   **Taser log?**

3   Q.   -- taser log.   Does that sound right to you?

4   A.   **Whatever it says in the taser log.**

5   Q.   Yeah.   It was over three minutes.   But, I
6   mean, it was less than four minutes.

7   A.   **Uh-huh.**

8   Q.   And then there's a listing there of each time
9   you actually pulled the trigger, whether contact was
10   made or not?

11   A.   **Yes.**

12   Q.   Okay.

13   MR. COOK:   Object to form on that.

14   BY MR. MURLEY:

15   Q.   I guess, maybe, I'm confused about the
16   duration on that log.   What does "duration" on that log
17   mean; do you know?

18   A.   **It's a time -- time stamp of the application**
19   **of the taser.**

20   Q.   That would be the pull of the trigger for the
21   taser?

22   A.   **Yes.**

23   Q.   Okay.   So the duration is the actual amount of
24   time --

25   A.   **So if it was drive stun or taser deployment,**

143

JULIE RITTER        270.791.7345

1   it's the same on the log.

2   Q.   Okay.   So it's showing the number of seconds
3   that you actually are pulling the trigger on the taser?

4   A.   **It's showing the cycles that it goes through.**

5   Q.   Explain that to me.

6   A.   **When you deploy the trigger, it goes through a**
7   **five-second cycle, unless you're holding down the**
8   **trigger.**

9   Q.   Okay.   So five -- let's pull out the log again
10   so I can ask you questions about it.   It's in -- I don't
11   know what number it is.

12   MR. COOK:   Exhibit 8.

13   WITNESS:   (Witness complies.)

14   BY MR. MURLEY:

15   Q.   It says, Duration (Seconds), at the top of
16   this column.   And so you said the number of cycles.   I
17   want to make sure I understand this.

18   A.   **Uh-huh.**

19   Q.   We're not saying it would be five cycles of
20   five seconds.   We're saying it would be a five-second
21   deployment?

22   A.   **Be a five-second deployment from pushing the**
23   **trigger.**

24   Q.   Okay.   There's one in here that had six
25   seconds.

144

JULIE RITTER        270.791.7345

1   A.   **That's if you're holding the trigger down.**

2   Q.   So you're holding the trigger down at least
3   once.   The other times, you're pressing it and it's
4   going through a 50,000 volt cycle for five seconds?

5   A.   **Yes.**

6   Q.   Okay.   All right.   I understand that.   I'm
7   just curious.

8   Have you received any training on the signs of a
9   subject experiencing excited delirium?

10   A.   **I believe through the Deer Creek training.**

11   Q.   So you think you had some Deer Creek training
12   on that?

13   A.   **I believe so.**

14   Q.   So you know what to look for to determine if
15   someone is experiencing excited delirium?

16   A.   **Possible signs of it, yes.**

17   Q.   What would those possible signs be?

18   A.   **I believe I already said that.**

19   Q.   I don't know.   If you have, you're going to
20   have to say it again.   I don't remember.

21   A.   **Confusion.**

22   Q.   Agitation?

23   A.   **Yes.**

24   Q.   A confusional state marked by intense
25   paranoia, hallucinations --

145

JULIE RITTER        270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  **A.   Can I see what you're reading?**

2  Q.    -- and violence towards objects and people?

3  **A.   Can I see it?**

4  Q.    This is my notes. You can't see these.

5  **A.   Oh.**

6  Q.    Would you agree with that as far as the

7  definition of excited delirium?

8  **A.   Can you read what you have wrote down again,**

9  **please, for me?**

10  Q.    Agitated or excited delirium is an acute

11  confusional state marked by intense paranoia,

12  hallucination, and violence towards objects and people.

13  MR. COOK: What's the question?

14  BY MR. MURLEY:

15  Q.    Do you agree with that definition of excited

16  delirium or not?

17  MR. COOK: Object to form. If you know, go. If

18  you don't know, that's fine.

19  WITNESS: I thought there was more to it. But is

20  that a medical terminology or is that something you came

21  up with?

22  BY MR. MURLEY:

23  Q.    Well, this is really the only time I get to

24  ask you questions. You don't get to ask me questions.

25  So I can tell you it was derived from a medical

146

JULIE RITTER        270.791.7345

1  situation the entire time. I was asking him questions

2  and trying to get input prior to him becoming --

3  attempting to escape. I didn't come to a conclusion on

4  that, no.

5  BY MR. MURLEY:

6  Q.    He was definitely agitated when you came in

7  contact with him, wasn't he?

8  **A.   I -- I'd say his adrenaline was pumping. So I**

9  **just -- I just caught him inside of a house he just**

10  **broke into.**

11  Q.    Well, he was, at least, confused; he thought

12  people were trying to kill him?

13  **A.   I don't see that as being confused.**

14  Q.    Okay.

15  **A.   Maybe paranoid.**

16  Q.    Thought you-all were trying to hurt him,

17  right, when he said, please don't let them hurt me?

18  **A.   No. He was making comments about somebody**

19  **else. I don't think he was commenting about us as law**

20  **enforcement.**

21  Q.    So you didn't think he was confused or

22  agitated when you came into contact with him?

23  **A.   I didn't think he was confused, no.**

24  Q.    Okay.

25  COURT REPORTER: Put your hand down, please, so I

148

JULIE RITTER        270.791.7345

1  website is what I can say. But I'm just looking for the

2  best definition I could find of excited delirium. And

3  as I understand it, it is a agitated or excited state

4  somebody's in where they're confused and violent. Does

5  that sound right?

6  **A.   Possibly, yeah.**

7  Q.    Okay. I'm just trying to make sure I

8  understand what excited delirium is and we're on the

9  same page as far as understanding of it.

10  Do you understand what the most common causes of

11  excited delirium are?

12  **A.   No.**

13  Q.    Do --

14  **A.   Not that I recall.**

15  Q.    You've never received any training on that?

16  **A.   I don't recall that I've received training on**

17  **that.**

18  COURT REPORTER: You don't recall what?

19  WITNESS: I don't recall that.

20  BY MR. MURLEY:

21  Q.    Okay. Was Mr. Marr, in your opinion,

22  experiencing any excited delirium on the morning of

23  4/14/20 when you encountered him?

24  MR. COOK: Object to form.

25  WITNESS: Like I said, I was assessing the

147

JULIE RITTER        270.791.7345

1  can hear you.

2  BY MR. MURLEY:

3  Q.    So you didn't have any reason to believe he

4  was paranoid or experiencing hallucinations or anything?

5  **A.   I didn't -- I didn't see anything that would**

6  **show that he was hallucinating or anything other than**

7  **the fact he said there was people out to get him.**

8  Q.    That could be a sign of paranoia, could it

9  not?

10  **A.   Depending on the situation. Like I said, I**

11  **was in -- I was assessing the situation at the time.**

12  Q.    Okay. You've said he assaulted you and the

13  other officers, so he was definitely violent towards

14  people by your own --

15  **A.   Once I tried to handcuff him and he tried to**

16  **pull away and escape, he struck the one officer in the**

17  **face, attempted to strike the other officer, and was**

18  **kicking my leg, yes.**

19  Q.    Okay. Looking back on it now, do you think he

20  was experiencing excited delirium?

21  MR. COOK: Object to form.

22  WITNESS: At the time, I couldn't make that

23  assessment.

24  BY MR. MURLEY:

25  Q.    I understand at the time. I'm asking you now,

149

JULIE RITTER        270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  do you think now he was experiencing excited delirium?
2      MR. COOK:  Object to form.
3      WITNESS:  I -- well, it's after the fact.
    MR. MURLEY:  I can ask the question.
    WITNESS:  No.  I'm just saying it's after the fact,
6  and I don't think I can answer that question.
7      MR. COOK:  Do you have an opinion?  I think that's
8  all he's asking.
9      MR. MURLEY:  Yeah.
10     WITNESS:  No.
11 BY MR. MURLEY:
12     Q.   No opinion on whether, looking back on it now,
13 he was experiencing excited delirium?
14     A.   **Possibility.  Like I said, it was after the**
15 **fact.**
16     Q.   I understand.  If he was, you didn't assess it
17 that way at the time of your encounter with him?
18     A.   **That's correct.**
19     Q.   That would be something you would have missed
20 if he, in fact, was?
21     A.   **I don't think I missed anything --**
22     MR. COOK:  Object to form on that.
23     MR. MURLEY:  I'm sorry?
24     WITNESS:  I didn't miss anything.  I was assessing.
25 BY MR. MURLEY:

                        150
        JULIE RITTER        270.791.7345

1      Q.   Okay.  Would it have changed anything you did
2  if you believed he was experiencing excited delirium at
3  the time you encountered him?
4      MR. COOK:  Object to form.  Speculation.
5      WITNESS:  Even then -- you want me to answer that?
6      MR. COOK:  You can answer.
7      WITNESS:  Even then, he had committed a felony and
8  he was violent, so he had to be restrained and arrested.
9  BY MR. MURLEY:
10     Q.   So it wouldn't have mattered, is what you're
11 saying?  Since he committed a felony and was being
12 violent, it wouldn't have mattered?
13     A.   **What wouldn't matter?**
14     Q.   If he was experiencing excited delirium at the
15 time that you encountered him, I'm saying would you have
16 done anything different?
17     A.   **He's still a danger --**
18     Q.   Okay.
19     A.   **-- if he's having excited delirium.  So, yes,**
20 **he needs to be restrained.**
21     Q.   And you would have restrained him the same way
22 you did and deployed the taser in the same manner you
   did?
24     MR. COOK:  Object to form.  Speculation.
25     WITNESS:  I can't --

                        151
        JULIE RITTER        270.791.7345

1  BY MR. MURLEY:
2      Q.   It's a yes or no.
3      A.   **Not really.**
4      Q.   I mean, yes or no, if he was experiencing
5  excited delirium and you believed he was experiencing
6  excited delirium before deploying the taser on Mr. Marr,
7  would you have still deployed the taser on Mr. Marr?
8      A.   **You're --**
9      MR. COOK:  Object to form.
10     WITNESS:  You're asking me --
11     MR. COOK:  Speculation.
12     WITNESS:  -- a question on something that -- that
13 didn't happened.
14     MR. MURLEY:  You know, I can ask this.
15     MR. COOK:  You can ask it, but I can object every
16 time you ask it.  And I am.
17     MR. MURLEY:  And you can.  But if not directing him
18 not to answer, then I would like an answer.
19     MR. COOK:  I think he's trying to.
20     MR. MURLEY:  Well, I don't know about that.
21     MR. COOK:  Okay.  Well...
22     WITNESS:  It's -- it's impossible to answer,
23 because it didn't happen.
24 BY MR. MURLEY:
25     Q.   Well, people ask hypothetical questions.  I

                        152
        JULIE RITTER        270.791.7345

1  mean, I think that's possible to answer.
2      So, hypothetically, if Mr. Marr under your
3  estimation was experiencing excited delirium at the time
4  you came into contact with him --
5      A.   **I would restrain him and place him under**
6  **arrest.**
7      Q.   Would you have deployed the taser in the same
8  manner in which you did?
9      MR. COOK:  Same objection.
10     WITNESS:  With the same events?
11     MR. MURLEY:  Uh-huh.
12     WITNESS:  I would say, yes.
13 BY MR. MURLEY:
14     Q.   Okay.  "Same events" being what?
15     A.   **The same actions that he did, refusing to**
16 **comply, being violent, assaulting the officers and**
17 **attempting to escape.**
18     Q.   It wouldn't have mattered whether he was
19 experiencing excited delirium or not, that's what I'm
20 saying.
21     A.   **He would have been placed under arrest.**
22     Q.   Okay.
23     MR. COOK:  Same objection.
24 BY MR. MURLEY:
25     Q.   Have you heard the term "positional asphyxia"?

                        153
        JULIE RITTER        270.791.7345

1   A.   **You talking about a choke hold?**

2   Q.   Well, I guess -- what does that mean to you,

3   that term "positional asphyxia"?

4   A.   **When you're choking somebody where they can't**

5   **breathe.**

6   Q.   Right.  Let's see here.  (Indicating.)

7   A.   **We don't do choke holds.**

8   Q.   You're choking somebody or you're in some way

9   restraining their ability to breathe, whether that be

10  applying force, however it's applied, that keeps

11  somebody from being able to breathe.

12  MR. COOK:  Is that a question?

13  BY MR. MURLEY:

14  Q.   Is that "positional asphyxia" to you or not?

15  A.   **Positional asphyxia to me would be either**

16  **choking somebody or kneeling on their chest or something**

17  **to the point where they can't breathe.**

18  Q.   Right.

19  A.   **Or trying to restrict their breathing.**

20  Q.   Some way of restricting somebody's ability to

21  breathe by some kind of force applied?

22  A.   **Yes.**

23  Q.   Okay.  After Jeremy Marr was handcuffed, do

24  you know how long he was left laying on his face?

25  A.   **Just several seconds.  And I believe his head**

154

JULIE RITTER          270.791.7345

1   was to the side.  He wasn't straight-faced down.

2   Q.   I'm sorry?

3   A.   **I believe his face was to the side.  He wasn't**

4   **straight-faced down.**

5   Q.   Okay.  You said you looked over some reports

6   earlier that I think we attached as exhibits...

7   WITNESS:  You're talking about --

8   MR. MURLEY:  Maybe --

9   COURT REPORTER:  2 and 3.

10  MR. MURLEY:  -- 2 and 3?

11  COURT REPORTER:  Or 3 and 4.

12  MR. MURLEY:  3 and 4?

13  WITNESS:  (Reviews documents.)  Yeah.  I think.

14  BY MR. MURLEY:

15  Q.   Response to Resistance Form, is that the first

16  one you're looking at?

17  A.   **Exhibit 3?**

18  Q.   Exhibit 3?  Okay.  So this would have been

19  something you reviewed in anticipation of the

20  deposition, correct?

21  A.   **No, I did not.**

22  Q.   Okay.  Well, have you -- let me make sure I'm

23  looking at the right form.  (Reviews documents.)  This

24  says it's a Response to Resistance Form dated 4/14 --

25  I'm sorry -- the date of the incident is 4/14 of 2020.

155

JULIE RITTER          270.791.7345

1   You see that?

2   A.   **Yes.**

3   Q.   Top right?  Time of incident was 0741 hours.

4   Incident location was 1009 Cleveland Avenue.  Is that,

5   in fact, the address where you encountered Mr. Marr?

6   A.   **Yes.**

7   Q.   So that's the same house that we watched the

8   video on, correct?

9   A.   **Yes.**

10  Q.   Okay.  Have you seen this form before?

11  A.   **I completed this form.**

12  Q.   Okay.  So this is all your completion of the

13  form?

14  A.   **Yes.**

15  Q.   Okay.  I didn't see a signature is the only

16  reason I'm asking.  I didn't know if someone other

17  than --

18  MR. COOK:  His initials are on the front page.

19  WITNESS:  Initial's on the front page by my name.

20  MR. MURLEY:  Ah.  I wouldn't have known that was

21  initials.

22  WITNESS:  I did not write on this.

23  MR. MURLEY:  Thank you.  I didn't realize that was

24  an initial.

25  MR. COOK:  I think that's right.

156

JULIE RITTER          270.791.7345

1   WITNESS:  That's correct.

2   BY MR. MURLEY:

3   Q.   You didn't require any medical treatment?

4   A.   **No.  Hayden did.**

5   COURT REPORTER:  Say again.

6   WITNESS:  Hayden did.  He had to go to the

7   hospital.

8   BY MR. MURLEY:

9   Q.   This basically says, did anyone else witness

10  the response to resistance, yes.  Statement taken, yes.

11  And it identifies Sergeant Murrell; is that right?

12  A.   **Yes.**

13  Q.   Officer Hayden Phillips?

14  A.   **Yes.**

15  Q.   And Officer Justin Claywell?

16  A.   **Claywell showed up after the initial contact.**

17  Q.   Was he part of the attempts to get Mr. Marr

18  subdued?

19  A.   **No.**

20  Q.   Okay.  So he showed up after he was already

21  handcuffed?

22  A.   **Yes.**

23  Q.   Okay.  So was Mr. Marr actually resisting at

24  the time Officer Claywell showed up?

25  A.   **I believe we had him secured at that time.**

157

JULIE RITTER          270.791.7345

1    Q.   You had him secured?
2    A.   **He was handcuffed at that time.**
3    Q.   Handcuffed.  So he wouldn't have been a
witness to any response to resistance then?
4    A.   **No.**
6    Q.   Okay.
7    A.   **That I know of.**
8    Q.   Says Suspect Factors in the middle of the
9  second page, Unknown Drug Or Alcohol, yes.  What
10  exactly -- is that because you had to administer NARCAN®
11  because you believed he was on something after the force
12  took place?  I'm trying to understand what does that
13  mean there, "Suspect Factors"?
14    A.   **After we had him secured, like I advised**
15  **before, when he started having shallow breathing, I**
16  **believe that he had lied to me and said that he was, in**
17  **fact, taking some type of drug, and that's why I issued**
18  **the NARCAN® to see if that was true.  And so that's --**
19  **I'm putting -- I was putting it on there because I**
20  **wasn't sure if he was actually under -- under influence**
21  **of a drug.**
22    Q.   Okay.  I'm going over to the summary page in
23  the back.  I believe this to be consistent with both
24  reports.
25    A.   **Yes.**

                    158
         JULIE RITTER        270.791.7345

1    Q.   But I'll make sure of that here in just a
2  second.  But I'm going kind of leaf through it for a
3  minute and see if I have any specific questions.
4    Mr. Cook:  You're on page 3?
5    MR. MURLEY:  Yeah.
6    COURT REPORTER:  Page 3?
7    MR. COOK:  Page 3.
8    WITNESS:  The -- this report might be easier to
9  read, because it's bigger, compared to that one.
10    COURT REPORTER:  Might be easier to read what?
11    WITNESS:  To read the -- the (inaudible) report
12  compared to this one.
13    MR. MURLEY:  Yeah.  That's probably a good point.
14  BY MR. MURLEY:
15    Q.   'Cause they're the same narrative, correct?
16    A.   **Exact same narrative.**
17    Q.   Okay.  So I'm going to change -- hold on one
18  second.  I may have something on the back.  (Reviews
19  documents.)  I don't have any questions about the back
20  of that.
21    I'm going to change from the narrative form to
22  the K-Y-I-B-R-S report, Exhibit number 4.  (Reviews
documents.)
24    A.   **(Reviews documents.)**
25    Q.   So the synopsis at the top --

                    159
         JULIE RITTER        270.791.7345

1    MR. COOK:  You're on page 5?
2    MR. MURLEY:  Yes, I am.  I'm sorry.  Page 5, the
3  Synopsis of the Narrative.  It literally says, Synopsis
4  on it.
5    MR. COOK:  Yeah.  I got it.
6  BY MR. MURLEY:
7    Q.   This is what you at least wrote down about --
8  or your narrative form -- is this your narrative, by the
9  way?
10    A.   **Yes, it is.**
11    Q.   Okay.  So here it says, on 4/14/2020 at
12  0741 hours -- which would be 7:41 a.m., correct?
13    A.   **Yes.**
14    Q.   -- I was dispatched to 1009 Cleveland Avenue
15  in reference to a caller that was requesting the police
16  because of an unknown male had entered her residence.
17  The caller further stated that the male was telling her
18  not to let them kill him, per dispatch.
19    So you knew from the dispatch that whoever the
20  male was -- you didn't know it was Mr. Marr at the time,
21  but you knew there was a male concerned about people
22  trying to kill him when he was in the residence of a
23  female caller.  Is that right?
24    A.   **That's what dispatch advised me.**
25    Q.   Correct.  Okay.

                    160
         JULIE RITTER        270.791.7345

1    A.   **On who was trying to kill him, I don't know if**
2  **that's the homeowner or --**
3    Q.   That's all you had.  Just let -- not let them
4  kill you.  Whoever "them," was, he's just saying, not
5  let them kill him, per dispatch, correct?  Is that
6  correct?
7    A.   **Yes, I believe you have that -- you guys have**
8  **that --**
9    Q.   Yeah.
10    A.   **-- audio?**
11    Q.   Yeah.  (Reviews documents.)  Well, here, you
12  say, during my contact with Mr. Marr, he appeared -- I'm
13  looking -- I'm sorry -- at the...
14    A.   **Fourth paragraph?**
15    Q.   -- fourth paragraph.  During my contact with
16  Mr. Marr, he appeared to be erratic, agitated, and
17  paranoid.
18    A.   **Yes.**
19    Q.   That's a little different than what you told
20  me before, right?  You said you didn't think he was
21  paranoid or --
22    A.   **No.  I said he was -- I'm pretty sure I said I**
23  **thought he was -- said he was paranoid.**
24    Q.   That still didn't lead you to -- during your
25  contact with Mr. Marr, appeared to be erratic, agitated

                    161
         JULIE RITTER        270.791.7345

1   or paranoid, didn't lead you to think he was in the
2   state of excited delirium, correct?
3       A.   No. I didn't -- yeah. I didn't use that
    verbiage, no.
5       Q.   Okay. You say here, you attempted to calm him
6   by advising him numerous times that the people he
7   believed to be after him would not be able to hurt him
8   while in your presence.
9           I don't know that I heard that on there, but
10  that's what you recall? I just didn't specifically hear
11  it. But you were trying to calm him down and
12  de-escalate is what you were doing there?
13      A.   Are we still on the fourth paragraph?
14      Q.   Yes. On the second sentence.
15      A.   I attempted to calm him by advising him
16  numerous times that the people he believed to be after
17  him would be -- yes, me explaining what I was doing.
18      Q.   Right.
19      A.   I didn't say it out loud.
20      Q.   Now, is this the statement that you reviewed
21  in anticipation of today?
22      A.   Yes.
23      Q.   Okay. Now, the injury you talked about to
24  Officer Phillips, is that described down here where
25  you're saying the right elbow -- Mr. Marr took his right

                        162
        JULIE RITTER          270.791.7345

1   elbow and struck Officer Phillips in his left eye
2   causing injury?
3       A.   Yes.
4       Q.   Okay. (Reviews documents.)
5       A.   Officer Phillips went to the hospital in
6   reference to that injury. Sergeant Murrell, he refused
7   any medical treatment at the scene.
8       Q.   (Reviews documents.) So here you mention
9   that -- I'm sorry. I'm at the top of the 6 of 7.
10  You're talking about deploying the drive stun in
11  Mr. Marr, the muscle region of his lower back, several
12  times. And you say, there was little to no effect due
13  to the fact you were unable to get a good contact on his
14  body because he was flailing his legs and body.
15          That's part of what you discussed earlier, that
16  there wasn't constant contact with the deployments, at
17  least as far as you could tell, correct?
18      A.   Well, in here, it says, I'm unable to get a
19  good constant contact.
20      Q.   That's what I mean. It's consistent with what
21  you said earlier.
22      A.   Yes.
23      Q.   Because you accidently drive stunned Officer
24  Phillips' leg, and he mentions that after the handcuffs
25  were actually placed on Mr. Marr?

                        163
        JULIE RITTER          270.791.7345

1       A.   While Mr. Marr was kicking and flailing
2   around, yes, I -- I accidently drive stunned Officer
3   Phillips' leg.
4       Q.   Down here in the third paragraph down from
5   this one, if you count the top as a paragraph, it starts
6   with, Mr. Marr still was resisting and would not comply
7   with orders to place his hands behind his back. After
8   the fourth and last activation of the taser, Officer
9   Phillips attempted several knee stun strikes to
10  Mr. Marr's left side. I was then able to get a-hold of
11  the open end of my handcuffs, pulled his arm behind his
12  back, and I was able to complete handcuffing him.
13      A.   That was with the help of Officer Phillips and
14  Sergeant Murrell.
15      Q.   You then notified communication that you had
16  deployed your taser during the incident. So it says
17  here, the fourth and last activation of the taser.
18  There was actually -- we counted 11 activations. Of
19  those that made contact, not exactly sure. But --
20      A.   Not all of them made contact.
21      Q.   I understand. But there wasn't four, right?
22      A.   I'm referring to the taser deployment.
23      Q.   Explain to me the difference --
24      A.   So we're --
25      Q.   Go ahead.

                        164
        JULIE RITTER          270.791.7345

1       A.   It says, Mr. Marr was still resisting and
2   would not comply with orders to place his hands behind
3   his back. After the fourth and last activation of my
4   taser -- actually, that should say taser deployment.
5       Q.   What's the difference in the "taser
6   deployment" and "activation of your taser"? What's the
7   difference in those? 'Cause it looks to me like here
8   it's saying it was four times you deployed your taser.
9   I understand it to be 11 attempts. I'm not saying it
10  was actual times --
11      A.   Well, I think in the first part here where it
12  says several times with little or no effect is the drive
13  stun.
14      Q.   Uh-huh.
15      A.   And then I said, four here, meaning the
16  deployment of the taser. So in retrospect, again, a
17  drive stun is with the taser cartridge separated from
18  the taser.
19      Q.   Uh-huh.
20      A.   And the taser itself is pushed to pinpoint
21  pain compliance and is activated.
22      Q.   Okay.
23      A.   So the trigger was activated 11 times, but 8
24  of those was a drive stun and the others were taser
25  deployment where the two darts were actually deployed.

                        165
        JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  Q.  Eight of the 11 were drive stun; three were
2  the dart deployments we've talked about?
3      A.  I believe so, yes.
4      Q.  So where does the four come in?  I mean,
5  there, for the fourth and last time.  I don't understand
6  what that means.  Is that just a mistake in here?
7      A.  I don't believe it's a mistake.
8      Q.  We've got three dart deployments.
9      A.  At the time I -- I -- since I didn't have the
10 records and going by memory, I thought I -- I deployed
11 the taser once with the prongs in and activated it four
12 times.  So the first shot was the one and three
13 activations after that.
14     Q.  Okay.
15     A.  Like I said, without the information that is
16 provided here now, I was going on by memory.
17     Q.  That makes more sense to me now.  So this is
18 talking about the dart deployment of the prongs in the
19 back of Mr. Marr?
20 MR. COOK:  The non-drive stun.
21 MR. MURLEY:  The non-drive stun.
22 BY MR. MURLEY:
23     Q.  You thought it was four times, and it was
24 actually three when looking at the -- from looking at
25 the...

166

1      Q.  Okay.  Back to the taser log, it doesn't say
2  one way or another whether it's drive stun or dart
3  deployment, correct?
4      A.  Uh-huh.
5      Q.  It just says, deployed, whether that be drive
6  stun or dart deployment?
7      A.  Yeah.  Just going by the video.  The video
8  showed the drive stun.
9  COURT REPORTER:  Just going by the video --
10 WITNESS:  Just going by the actual video, it would
11 show what was -- when was drive stun, when contact was
12 made, and when contact was not made during drive stun,
13 and the deployment of the taser itself.
14 BY MR. MURLEY:
15     Q.  Okay.  I don't know.  If I did suggest it was
16 eight versus three, I certainly didn't mean to.  'Cause
17 I don't know that I can tell the difference in all of
18 them.
19     A.  Uh-huh.
20     Q.  But as we sit here today, you think it was
21 three times dart deployment and eight of the drive stun;
22 is that right?
23     A.  I would say, yes.
24     Q.  Okay.  And I don't know where that came from.
25 I don't know that it --

168

1      A.  Body cam information that you have now.
2      Q.  Yeah.  How do you know it was three versus
3  four?
4      A.  From the video.
5      Q.  The video?  You counted three times from
6  watching the video?
7      A.  That's what you're telling me.  So I'm --
8      Q.  Well, I'm --
9      A.  -- assuming you counted the video, too.
10     Q.  I counted -- there's 11 times on this log.
11     A.  Uh-huh.
12     Q.  But there's no difference in drive stun
13 versus...
14     A.  In reference to the activation.  But you
15 advised me when you first started talking to me, that it
16 was three deployments of the taser.
17     Q.  Okay.
18     A.  And I said it was either -- between three and
19 four, 'cause I -- so the video will say everything about
20 that.  'Cause, like I said, I caught everything on the
21 video.
22     Q.  So you're basing that off of my question of
23 you, not that you know it was three versus four times?
24     A.  Like I said, I had not seen the taser log
25 prior to that.  So...

167

1      A.  Like I said, you can confirm with the video.
2      Q.  Yeah.  Whatever the video shows, if it shows
3  it, is what would be --
4      A.  Right.
5      Q.  -- accurate.  As far as the log goes, we can't
6  tell, really, a difference between --
7      A.  The specific time between that three minutes
8  twenty seconds over a span of time.  Could have been the
9  taser with the prongs.
10     Q.  So if the video shows it, it could be
11 consistent with what your statement was here as four
12 times?  I mean, I'm just saying.  I don't know the
13 video --
14     A.  Yes.
15     Q.  Okay.
16     A.  Yes.
17     Q.  Okay.  Of the deployed, you know --
18     A.  Like I said, I was going on by memory there.
19     Q.  Yeah.  That makes more sense to me.
20     (Reviews documents.)  Communications radioed to
21 confirm in reference to sending E-M-S to the scene.  You
22 had shackled Mr. Marr's legs.  It says, at that time you
23 noticed that Mr. Marr was not making any sounds, and you
24 asked Officer Phillips to make sure he was breathing.
25     Do you see that?  It says, Officer Phillips then

169

1  rolled Mr. Marr over onto his back and attempted to pull
2  Mr. Marr's hoodie and shirt which bunched up over the
3  top of his head during his physical resisting.
       **A.    It was on top of his head, yes.**
       **Q.**    Once Mr. Marr was rolled over on his back, it
6  was found that he was shallow breathing at the time.
7         And you, basically, advised Communications to
8  get the E-M-S there more quickly?
9      **A.    Yes.  I don't think I did that.  I think**
10 **Sergeant did that.**
11     **Q.**    And at this time, it appeared to me that
12 Mr. Marr stopped breathing?
13     **A.    Yes.**
14     **Q.**    And you started C-P-R?
15     **A.    Yeah.  I immediately started C-P-R on him.**
16 COURT REPORTER:  Say again.
17 WITNESS:  I immediately started C-P-R on Mr. Marr.
18 COURT REPORTER:  Immediately.
19 BY MR. MURLEY:
20     **Q.**    And Officer Phillips and Officer Britt started
21 to give airway -- air by airway bagging?
22     **A.    Yes.**
23     **Q.**    And that's when you advised Sergeant Murrell
24 to get you NARCAN® --
25     **A.    Yes.**

170

JULIE RITTER          270.791.7345

1      **Q.**    Did you-all get Mr. Marr to continue to
2  breathe on his own as you administered C-P-R?
3      **A.    When we were doing the C-P-R, we continued**
4  **doing C-P-R until the med unit got there; then the med**
5  **unit took over.**
6      (Off-the-record discussion for clarification.)
7  BY MR. MURLEY:
8      **Q.**    I understand the medical unit took over.  So
9  that means you weren't able to revive him via C-P-R
10 prior to the medical unit, E-M-S, arriving; is that
11 right?
12     **A.    I would say, yes.  Officer Phillips is a**
13 **certified E-M-T, and he took basically over medical**
14 **care.**
15     **Q.**    I might be confused on your answer.  So I
16 understand you-all administered C-P-R.
17     **A.    Yes.**
18     **Q.**    You just said that Officer Phillips was --
19     **A.    We're all trained first responder.**
20     **Q.**    Right.
21     **A.    He was an actual E-M-T.**
22     **Q.**    And I'm not saying anything about you
23 administering C-P-R.  But I'm asking, were you able to
24 revive Mr. Marr by administering C-P-R?
25     **A.    No.**

172

JULIE RITTER          270.791.7345

1      **Q.**    -- which you attempted to administer in
2  reference to a possible drug overdose.
3         It says the first NARCAN® was unsuccessful; the
4  second was successfully administered.  What does that
5  mean?
6      **A.    The first NARCAN® appeared to have already**
7  **been deployed.**
8      **Q.**    Uh-huh.
9      **A.    So I had to get a second NARCAN®.**
10     **Q.**    Oh, okay.  You had to get one that was ready
11 to deploy, is what you're saying?
12     **A.    No, the -- the first one, it was either a**
13 **malfunction in it or it was accidently deposed [sic] of**
14 **prior to attempting to administer to Mr. Marr.**
15     **Q.**    Uh-huh.
16     **A.    'Cause it's in a package.  I don't know why it**
17 **wasn't working.  It just wouldn't plunger.  So I asked**
18 **for Murrell to get me another one.  And that one was**
19 **successfully plunged into his left nostril.**
20     **Q.**    Okay.  But you were doing C-P-R in this time?
21     **A.    Between myself, Officer Hayden -- Hayden and**
22 **Officer Britt, yes.  So all three of us are actually...**
23 **(Indicating.)**
24     **Q.**    Doing C-P-R?
25     **A.    Yes.**

171

JULIE RITTER          270.791.7345

1      **Q.**    Okay.  So, then, when the E-M-S got there,
2  they took over those efforts?
3      **A.    Yes.**
4      **Q.**    Okay.
5      **A.    And when I administered the NARCAN®, the**
6  **NARCAN® had no effect on him.**
7      **Q.**    That was my second question.  Okay.  Thank
8  you.  I wasn't really getting there.  That's what I was
9  asking.  So...
10        You then went in to speak with...  (Reviews
11 documents.)
12     **A.    Ms. Tharp.**
13     **Q.**    -- the victim, Ms. Tharp --
14     **A.    Yes.**
15     **Q.**    -- who lives alone at 1009 Cleveland Avenue?
16     **A.    She's got to be 90 years old now.**
17     **Q.**    (Reviews documents.)  This is recounting what
18 Ms. Tharp's version of the events were that led to her
19 calling the police --
20     **A.    Uh-huh.**
21     **Q.**    -- correct?
22     **A.    Yes.  And that interview of me with her is**
23 **also on that video.**
24     **Q.**    Right.  Yeah.  You taped off and secured the
25 scene.  You were relieved by Major Flatt.  It says here

173

JULIE RITTER          270.791.7345

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  that, Officer Phillips responded to T.J. --

2      COURT REPORTER: I'm sorry. You're going to have

3  to --

4  BY MR. MURLEY:

5      Q.   Office Phillips responded to T.J. Sampson

6  Hospital Emergency Room where he was treated for his eye

7  injury. You discussed that earlier?

8      A.   Yes.

9      Q.   And Sergeant Murrell refused any medical

10 attention at the scene. And then they did other reports

11 that were attached.

12     A.   Yes.

13     Q.   Okay.

14     A.   That's when State Police was contacted, and

15 they responded to the scene.

16     Q.   Right. Okay. When you started with the

17 Glasgow Police Department and you rattled off your date

18 earlier, and I wrote it down. I don't have it --

19     A.   March 28th, 2011.

20     Q.   You're real specific about that date. Is

21 there a reason for that?

22     A.   When I first started.

23     Q.   March, what was it again?

24     A.   28th, 2011.

25     Q.   Okay. In what capacity were you first brought

174

JULIE RITTER          270.791.7345

---

1      Q.   Under four years. Three years and eight,

2  nine months, something like that?

3      A.   Yes.

4      Q.   What was the reason for your -- would you call

5  it a demotion to lieutenant colonel?

6      A.   It was voluntarily. I stepped down to vol --

7  I voluntarily stepped down to lieutenant colonel's

8  position once the -- after the election of a new mayor.

9      Q.   Is the police chief at Glasgow a --

10     A.   Works at the will of the mayor.

11     Q.   -- political position as far as that goes?

12 Whoever's in, mayor, controls who the police chief is?

13     A.   Works at the will of the mayor, yes.

14     Q.   Okay. So who was elected mayor at that time?

15     A.   Dick Doty.

16     Q.   All right. And you voluntarily stepped down

17 whenever Mayor Doty took office?

18     A.   Yes.

19     Q.   Okay. From there, it looks like -- I don't

20 know when in 2018 -- you were demoted to patrolman.

21 But --

22     A.   Yes.

23     Q.   -- at some point. When was it in 2018?

24     A.   I believe it was October.

25     Q.   October? So almost four years later, you were

176

JULIE RITTER          270.791.7345

---

1  in by the Glasgow Police Department?

2      A.   Police Chief.

3      Q.   Okay. So there was an opening that you

4  applied for, and you received a hiring for the position?

5      A.   Yes.

6      Q.   And how long was your tenure as police chief?

7      A.   'Til December 28th, 2014.

8      Q.   Okay. Now, you've remained with the

9  department since that time --

10     A.   Yes.

11     Q.   -- correct? In what capacity?

12     A.   From 2014 -- December 2014, I was a lieutenant

13 colonel. 2018, I was demoted to patrolman. And in

14 2020, I was promoted to detective.

15     Q.   So as we sit here today, you are a detective?

16     A.   Yes.

17     Q.   Were you a detective at the time -- like, when

18 was it that you were promoted?

19     A.   I believe it was in November of 2020.

20     Q.   So as of your contact with Mr. Marr in April

21 of 2020, you were a patrolman?

22     A.   Yes.

23     Q.   Okay. So as far as your tenure as police

24 chief, it would have been what?

25     A.   Just under four years.

175

JULIE RITTER          270.791.7345

---

1  demoted to patrolman from lieutenant colonel?

2      A.   Yes.

3      Q.   Why was that?

4      MR. COOK: It was the subject of litigation, and he

5  can describe it further, but...

6      WITNESS: Spite and malice.

7  BY MR. MURLEY:

8      Q.   Spite and malice. Okay. That sounds like it

9  might be the subject of litigation.

10     So you were demoted by who?

11     A.   Guy Howie. Dick Doty hired him as the new

12 police chief.

13     Q.   So you served as lieutenant colonel under Guy

14 Howie for roughly four years?

15     A.   Yes. Just before he resigned, he demoted me.

16     Q.   Okay. So he demoted you on his way out of

17 office?

18     A.   Yes.

19     Q.   Okay. And you said, spite and malice.

20 You-all just had differing views on things?

21     A.   The one thing I never got used to living here

22 in Kentucky is small town politics. I don't play small

23 town politics.

24     Q.   Okay. Where are you originally from?

25     A.   I was born in Boston, Massachusetts. Well,

177

JULIE RITTER          270.791.7345

---

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1  actually, Lawrence, Massachusetts.

2      Q.   Lawrence, Massachusetts?  And --

3      A.   That was my life in Florida.

4      Q.   As of '89 you were in Florida?

5      A.   Since in '72, I've been in Florida.

6      Q.   Okay.  What have you done besides law
7  enforcement?

8      A.   Worked with family business.

9      Q.   What's the family business?

10     A.   Turcotte and Sons Mobiles, gas stations.

11     Q.   Oh, okay.  Where are those gas stations
12 located at?

13     A.   Sarasota.  They're no longer there.  My father
14 passed away several years ago.

15     Q.   Okay.

16     (Off-the-record discussion for clarification.)

17 BY MR. MURLEY:

18     Q.   You're not from Kentucky.  The first time you
19 lived in Kentucky was when you transferred -- like you
20 said, you became the chief of police in Glasgow; is that
21 right?

22     A.   No.  Actually, I lived in Kentucky back in --
23 Henderson, Kentucky, I think it was '79 and '80.

24     Q.   Okay.  What did you do then?

25     A.   I was 12 or 13.  I was in school.

178

JULIE RITTER        270.791.7345

1  Glasgow?

2      A.   Yes.

3      MR. COOK:  There are actually two cases.

4  BY MR. MURLEY:

5      Q.   Two cases.

6      A.   Yes.

7      Q.   Okay.  Are those ongoing?

8      A.   No.

9      MR. COOK:  I defended him.  So I...

10     MR. MURLEY:  Oh.

11     WITNESS:  Supreme Court didn't think it was
12 necessary to listen to the cases.  Thought it wasn't
13 important enough.

14 BY MR. MURLEY:

15     Q.   So you --

16     COURT REPORTER:  The court didn't think what?

17     WITNESS:  It was important enough to listen to the
18 cases.

19     COURT REPORTER:  So what?  And then you said, so --

20     WITNESS:  It was dropped back down to the lower
21 courts.

22     COURT REPORTER:  Thank you.

23 BY MR. MURLEY:

24     Q.   Did you have counsel representing you?

25     A.   Yes.

180

JULIE RITTER        270.791.7345

1      Q.   Okay.  So your family lived in Kentucky for
2  about a year?  The late '70s?

3      A.   My mother, yes.

4      Q.   Okay.  Okay.  The first time as an adult you
5  resided in Kentucky was when you became the Glasgow
6  Police Chief --

7      A.   Yes.

8      Q.   -- in March 28th, 2011?

9      A.   Yes.

10     Q.   You were eventually demoted, or I guess you
11 stepped down from chief to lieutenant colonel.  And then
12 you were demoted to patrolman by Chief --

13     A.   Guy Howie.

14     Q.   Yeah -- by Guy Howie.  But have continued to
15 remain in Glasgow.  Have you sought any other positions
16 as chief anywhere else?

17     A.   Not yet.

18     Q.   Okay.

19     A.   I did run for sheriff.

20     Q.   In Barren County?

21     A.   Yes.

22     Q.   Subject of litigation.  There was litigation
23 involving your demotion to patrolman?

24     A.   Yes.

25     Q.   Litigation that you filed against the City of

179

JULIE RITTER        270.791.7345

1      Q.   Where were your attorneys out of?

2      A.   Matt Baker.

3      Q.   Oh, okay.  In both cases?

4      A.   Yes.

5      Q.   Okay.  When were those cases disposed of?

6      MR. COOK:  I can tell you that, but I can't tell
7  you off the top of my head.  I can give you case numbers
8  that'd probably --

9      MR. MURLEY:  Yeah.  That'd speed things up.

10     MR. COOK:  It would.

11     WITNESS:  He has that information.

12     MR. MURLEY:  He can just send it to me.  That's
13 fine.

14     MR. COOK:  I'll be glad to.

15     MR. MURLEY:  They're not going on -- they've been
16 not going on for a period of time?

17     MR. COOK:  They were both resolved by summary
18 judgment.

19     MR. MURLEY:  Okay.

20     (Off-the-record discussion for clarification.)

21 BY MR. MURLEY:

22     Q.   Okay.  So you were demoted from lieutenant
23 colonel to patrolman in October of 2018?

24     A.   Correct.

25     Q.   What was the reason given for your demotion?

181

JULIE RITTER        270.791.7345

1   A.   They said they did away with my lieutenant
2   colonel position.
3   Q.   They eliminated the position is what they
    said?
5   A.   Yes.
6   Q.   Okay.  Was there any other reasoning for it?
7   A.   No.
8   Q.   Okay.  You were then promoted when in 2020?  I
9   think you said earlier it may have been --
10  A.   I think was November.
11  Q.   November?
12  A.   It was either October or November.
13  Q.   Okay.  So November of 2020, you were promoted
14  to detective?
15  A.   Yes.
16  Q.   Okay.  What's the hierarchy of the police
17  department at Glasgow as far as positionally?
18  A.   It's changed several times.  But I can give
19  you a breakdown of what most agencies are.
20  Q.   I guess, tell me as of April of 2020.  Do you
21  recall that?
22  A.   They changed it again since then.
23  Q.   Okay.
24  A.   So I can tell you what it is now.
25  Q.   Let's go with that.

                    182

          JULIE RITTER          270.791.7345

1   A.   Okay.  It's -- you go to chief --
2   Q.   Uh-huh.
3   A.   -- a major, two captains, two lieutenants, six
4   to eight sergeants, five or six detectives now, the rest
5   are all patrolmen.
6   Q.   I'm trying to write them down.  A chief, a
7   major?
8   A.   Yes, sir.  Two captains.
9   Q.   Two captains.  Five or six lieutenants?
10  A.   Two lieutenants.
11  Q.   Two lieutenants.
12  A.   Or could be three.  And then there's -- no,
13  there's a -- they've got a slot open.  So it's three
14  lieutenants.
15  Q.   Okay.
16  A.   Six to eight sergeants.
17  Q.   That's what it is.  Sergeants.  Okay.
18  A.   I think there's, like, 18 patrolmen -- 18 to
19  20 patrolman maybe.
20  Q.   All right.  So you're a detective?
21  A.   Yes.
22  Q.   Is that different when I'm talking about your
    rank here then?
24  A.   Oh, did I say detective there?
25  Q.   I didn't hear it the second time.  Is it

                    183

          JULIE RITTER          270.791.7345

1   between lieutenant and sergeant, detective?
2   A.   No.  It's detective between patrolman and
3   sergeant.
4   Q.   Okay.  How many detectives are there?
5   A.   At least five now.  Wait a minute.  Me -- six.
6   Q.   Six?  Okay.  What reasoning, if any, was there
7   for a promotion for you to detective?
8   A.   Doing my job.
9   Q.   Yeah.  I mean, I didn't know if you were given
10  a reasoning for (inaudible) position.
11  A.   Experience and education.
12  Q.   Okay.  In this hierarchy you just gave me, I
13  think you mentioned earlier was that you went from
14  lieutenant colonel to patrolman.  Was lieutenant
15  colonel -- that they're saying they eliminated the
16  position.  But was it listed in the hierarchy you gave?
17  A.   Yes.
18  Q.   Okay.  Where did it fall between chief, major,
19  captain, lieutenant, sergeant?
20  A.   Lieutenant colonel is second in charge.  So
21  it's chief, lieutenant colonel, major --
22  Q.   Okay.
23  A.   -- captain, lieutenant, sergeant.
24  Q.   So you went from second in charge to bottom of
25  the totem pole?

                    184

          JULIE RITTER          270.791.7345

1   A.   Yes.
2   Q.   Okay.  (Reviews documents.)
3   A.   And that was the basis for the lawsuits.
4   Q.   Was the elimination of the position basically
5   where you were assigned --
6   A.   Yes.
7   Q.   -- is that what you're saying?  Okay.  Have
8   you ever been awarded accommodation for your service at
9   the Glasgow Police Department?
10  A.   I don't think I've ever gotten one of those.
11  COURT REPORTER:  Say again.
12  WITNESS:  I don't think I ever got one of those.
13  I've got a lot of at-a-boy letters, but not -- I don't
14  think I was ever given accommodation.
15  MR. MURLEY:  Not actually accommodation.
16  BY MR. MURLEY:
17  Q.   Have you ever had any counseling for any anger
18  management or any issues like that?
19  A.   No.
20  Q.   Prior to your employment with the Glasgow
21  Police Department, I understand looking at that you've
22  held other positions as interim chiefs and chiefs of --
23  A.   Yes.
24  Q.   -- departments?  Had you ever been demoted
25  like you were at the Glasgow Police Department in any

                    185

          JULIE RITTER          270.791.7345

1  other --
2      A.   No.
3      Q.   -- departments?  Let me finish my question.
4      A.   Oh.  I'm sorry.
5      Q.   Had you ever been demoted like you were in
6  Glasgow Police Department in any other departments
7  before you came to Glasgow?
8      A.   No.
9      Q.   Have you ever been disciplined in any other
10 departments before you came to Glasgow?
11     A.   Yes.
12     Q.   Do you know what the reasoning for any
13 disciplinary actions were?
14     A.   They were all minor, if there were.
15     Q.   I don't know what a "minor" disciplinary
16 reason would be to you.  So what does that mean?
17     A.   Being late by a few minutes or -- or not
18 finishing a report on time or something to that effect.
19     Q.   Okay.  Have you ever been accused of not
20 following policies and procedures?
21     A.   Yes.
22     Q.   When did that occur before coming to Glasgow?
23     A.   That was at Glasgow.  It wasn't anywhere else.
24     Q.   Was at Glasgow.  Okay.  That's the only
25 department you've ever been accused of not following

1  policies and procedures?
2      A.   Well, any time you get written up, it's
3  supposedly some type of violation of a policy.  So --
4      Q.   Okay.
5      A.   -- being late is a violation of a policy.
6      Q.   Do you have any physical or mental conditions
7  that would affect your fitness as a police officer?
8      A.   Did you say any method?
9      Q.   Mental or physical conditions that would
10 affect your fitness as a police officer?
11     A.   No.
12     Q.   No mental health conditions or physical
13 conditions?
14     A.   None.
15     Q.   Okay.  You've never been diagnosed with any
16 anger issues, correct?
17     A.   No.
18     Q.   Whether or not being a diagnosed officially --
19     COURT REPORTER:  Being what?
20 BY MR. MURLEY:
21     Q.   Whether or not you've been diagnosed
22 officially with something, have you ever been questioned
23 about anger issues as a police officer?
24     A.   No.  I'm a laid back kind of a guy.
25     Q.   Okay.  (Reviews documents.)

1      MR. COOK:  Let me ask a question.  Did we make the
2  video an exhibit?
3      COURT REPORTER:  Yes.
4      MR. MURLEY:  We made the flash drive an exhibit
5  that has the video on it.
6      MR. COOK:  The one we watched?  Okay.  So that's
7  part of Exhibit 1 --
8      COURT REPORTER:  2.
9      MR. COOK:  -- or 2 --
10     COURT REPORTER:  2.
11     MR. COOK:  -- is that right?  So that --
12     COURT REPORTER:  You said it was all on the one
13 that was down here on this.
14     MR. COOK:  Okay.
15     MR. MURLEY:  We'll confirm that in a second.
16     Actually, I intended for it to be so they can
17 watch --
18     MR. COOK:  So just what we watched or the whole
19 thing?
20     MR. MURLEY:  I think the -- all of the...
21     MR. COOK:  I don't care.  I just was curious.
22     MR. MURLEY:  Yeah.  What's on that hard drive?
23     MR. ROMNEY:  So there's the two videos -- the
24 two-dash cam videos -- we've only watched one of them --
25 and then there's the passerby video.

1      MR. COOK:  That's the one we watched earlier.
2      MR. ROMNEY:  Right.
3      MR. MURLEY:  So let's take off anything we haven't
4  watched today, so that we don't cloud the record up with
5  other things.
6      MR. COOK:  I think that's right.
7      MR. MURLEY:  Just have the flash drive be what's
8  been watched today.  Does that work?  Okay.
9      MR. COOK:  Let's go off the record.
10     MR. MURLEY:  Julie, just for the record purposes, I
11 think the only two things I intend to be on the flash
12 drive would be --
13     MR. COOK:  Exhibit 2.
14     MR. MURLEY:  -- Exhibit 2 Flash Drive -- would be
15 the social media posting that we watched and the
16 particular body cam video that we watched.  It was about
17 ten-minute duration, and it was one of the successive
18 videos from your person that day, your body cam.
19     WITNESS:  Yes.
20     MR. COOK:  So we're not putting in all of Officer
21 Turcotte's body cam video?  That can be brought into the
22 record at a later time?
23     MR. MURLEY:  Yes.  I didn't intend to ask questions
24 about it.
25     MR. COOK:  No.  I just wanted to make it clear for

1  the record and whoever's reading this down the line.
2  MR. MURLEY: Whoever's reading it, the only thing
3  in the record should be what he's reviewed, okay, as far
   as the flash drive --
   MR. COOK: Okay.
6  MR. MURLEY: -- within our presence.
7  MR. COOK: Thank you.
8  MR. MURLEY: All right. No. Thank you for that.
9  I'll tell you what. While he's doing that, I
10 had a question or two about this right here. What
11 exhibit is that?
12 COURT REPORTER: 11.
13 MR. MURLEY: 11.
14 (Turcotte Deposition Exhibit 11 as duly
15 received, marked, and is filed herewith.)
16 BY MR. MURLEY:
17 Q.  This, I'll tell you, is something that was
18 produced in discovery to me. And I don't think that
19 back -- probably the last page should actually be in
20 that exhibit. You can pull it out if you want to. I
21 think that's already in the record.
22 MR. MURLEY: Is that right?
23 MR. ROMNEY: I think it's different than that. But
24 it's a --
25 MR. COOK: It's a different page maybe.

190

1  MR. MURLEY: Oh, okay. Yeah. Just pull the back
2  page off. That's fine.
3  BY MR. MURLEY:
4  Q.  My understanding of what this is, it looks
5  like training materials or some kind of informational
6  material from Axon.
7  A.  From 2022?
8  Q.  For 2022. It says, Update 2022.
9  A.  All right.
10 Q.  Effective -- Axon Training Version 22,
11 effective February 1st, 2022. Do you see that?
12 A.  Yes.
13 Q.  Would there have been other Axon trainings
14 that occurred that you would have had; do you recall?
15 A.  No. The one that does the Ax -- the taser
16 training in our department is Canine Officer John
17 DuBarry --
18 COURT REPORTER: Canine officer --
19 WITNESS: John DuBarry.
20 COURT REPORTER: Thank you.
21 WITNESS: That's with an A.
22 BY MR. MURLEY:
23 Q.  So Axon, do you know if that's the parent
24 company of the manufacturer of the taser that you used?
25 A.  I believe they took over TASER®.

191

1  Q.  Okay.
2  (Off-the-record discussion for clarification.)
3  BY MR. MURLEY:
4  Q.  Okay. So there would have been trainings
5  before under possibly a different name?
6  MR. COOK: I think it would have been TASER®.
7  MR. MURLEY: Okay.
8  MR. COOK: I'm not -- don't hold me to that.
9  BY MR. MURLEY:
10 Q.  Well, this is part of what we've received in
11 discovery as far as training materials. I don't know
12 that I've seen much else. But this is really the only
13 training materials we've seen.
14 There are mentions in here, you know, as far as
15 2022 -- the second page says, do not repeat drive stuns
16 if the subject response indicates compliance is
17 unlikely.
18 Do you see that?
19 A.  (Reviews documents.) Yes, I see that.
20 Q.  So at least as of this training in 2022, this
21 is saying not to repeat drive stuns if it doesn't appear
22 the subject is going to comply?
23 A.  That's what I did.
24 Q.  That's what you did?
25 A.  Yeah. That's why I went to the -- to the

192

1  taser darts.
2  Q.  Well, you attempted to complete drive stuns
3  eight times, right?
4  A.  Attempted.
5  Q.  (Inaudible. Talked over.)
6  A.  Not contact.
7  Q.  You said earlier you think it was -- it could
8  have been up to half where actual contact was made?
9  A.  Uh-huh.
10 Q.  So at least, even if it was up to half
11 contacts were made, those would have been repeat drive
12 stuns even though Mr. Marr, you indicate compliance was
13 unlikely?
14 A.  Well, the second drive stun would have been
15 repeat, right?
16 Q.  I'm sorry?
17 A.  So you've got the first drive stun -- or
18 attempted drive stun. Then you have the second one. So
19 that would be -- so they repeat. So...
20 Q.  So let's just say four out of the eight --
21 just for the purposes of argument, let's say four out of
22 the eight drive stuns made contact with Mr. Marr.
23 A.  Yes.
24 Q.  After making contact with one drive stun, do
25 you not see successive drive stuns as repeat drive

193

1  stuns?

2      A.   It had no effect.

3      Q.   Because it says if compliance is unlikely not

4  to repeat drive stuns?

5      A.   Well, it's -- that's an open-ended question

6  too.  Unlikely.  So...

7      Q.   What indication was there to you that he was

8  going to comply when you drive stunned him?

9      A.   If he would have complied, he would have put

10 his hands behind his back and be handcuffed.

11     Q.   And you wouldn't have had to continue drive

12 stuns --

13     A.   I wouldn't have continued drive stuns, if he'd

14 complied.

15     Q.   Okay.  Note:  Pain compliance may not be

16 effective due to mind-body disconnect (psychotic

17 episode) or increased pain tolerance due to drugs or

18 alcohol.

19     A.   Yes.

20     Q.   Did it ever occur to you during the deployment

21 of the taser in drive-stun mode that it was not

22 effective because Mr. Marr was under the influence of

23 drugs?

24     A.   When it became uneffective, I stopped doing

25 it.  So in reference to the drive stun --

                    194

1      Q.   Uh-huh.

2      A.   -- when I observed that it wasn't effective, I

3  went to the taser deployment of the darts.  And after

4  two or three deployments of that one, and that was un --

5  obviously not having an effect, that's when I grabbed

6  ahold of the open handcuff and myself, Hayden, and

7  Murrell were able to pull the one hand back to handcuff

8  him.

9      Q.   So you're saying when it wasn't effective,

10 that's when you changed things up with the drive stun?

11     A.   Yes.

12     Q.   Okay.  Cardiac Risks on the next page.

13 Experts have identified the following key factors

14 related to TASER Energy Weapon cardiac risks.

15          And I can't read what's under that unless it

16 means what's over here on the side, which would be dart

17 to heart distance and duration of delivered electrical

18 charge.

19     A.   Yes.

20     Q.   So is the duration of the delivered electrical

21 charge a factor in TASER Energy Weapon cardiac risk as

22 far as your understanding?

23     A.   Depending on where the taser is deployed at

24 and the length of the overall taser charging.  I think

25 that's what that's saying.

                    195

1      Q.   Right.  So you agree with that, that that's

2  something that comes with deploys is the duration of

3  delivered electrical charge, there's a risk of -- a

4  cardiac risk there?

5      A.   Yes.

6      Q.   Okay.

7      A.   But it's -- it's very vague.

8      Q.   Well, I mean, it says it down here.  The

9  further the TASER energy weapon dart is away from the

10 heart and the shorter the exposure, the lower the risk

11 of affecting the heart.  Do you see that?

12     A.   Yes.

13     Q.   Do you agree with that as well?

14     A.   That's why I deployed it in his lower back as

15 we were trained to do.

16     Q.   Right.  As far as the next page, it says,

17 avoid repeated or extended taser energy weapon

18 durations.  It says, the TASER energy weapon exposure is

19 a physically and psychologically stressful event.  Do

20 you agree with that?

21     A.   That's the reason --

22     Q.   For using it.

23     A.   -- for using it, yes.

24     Q.   So you agree with that?

25     A.   Yes.

                    196

1      Q.   Would you agree you should use the shortest

2  duration of TASER energy weapon exposure objectively

3  reasonable to accomplish lawful objections?

4      A.   Yes.

5      Q.   I'm sorry.  Objectives.

6      A.   Yes.

7      Q.   And you would agree that you should avoid

8  continuous exposure beyond 15 seconds, absent an

9  immediate threat and increased justification.  Is that

10 right?

11     A.   Are they saying "continuous" as in 15 seconds

12 from beginning to the end?  Cause it only goes in five

13 second intervals.

14     Q.   Yeah.  I didn't write it, so I don't know.

15     A.   Then I have to disagree with that.  Because

16 the taser activates in five-second intervals.  And

17 during this incident, there was time in between each

18 activation.  So it was not continuous for 15 seconds.

19     Q.   There wasn't one duration by itself that was

20 continuous for 15 seconds is what you're saying?

21     A.   Yes.

22     Q.   The longest duration, if contact was made,

23 would have been six seconds in duration?

24     A.   That's if it was -- that was during the drive

25 stun, which is pinpoint.  And if that's -- was in full

                    197

.1   contact -- which I don't believe that one was.

2       Q.   Well, we don't really have a way of knowing

3   that specifically, I mean, but -- besides -- what the

4   video says --

5       A.   Well, watching the video.

6       Q.   -- and then matching them up to whatever the

7   log says.

8       A.   Yeah.  Because I think when we watched that

9   video during that time when he was kicking and trying to

10  bridge, and I activated (inaudible), even after my hand

11  came up this way trying to hold his leg down with the

12  taser activated upward.

13      Q.   I'm trying to understand your response.  So

14  what you're -- and I think I do, but I want to make sure

15  I do.  What you're saying is:  There wasn't any one

16  singular episode durational use of the taser in one

17  episode --

18      A.   Right.

19      Q.   -- of deployment that was 15 seconds?

20      A.   This is --

21      Q.   Correct?

22      A.   -- correct.  'Cause this says, continuous

23  exposure.

24      Q.   I understand what you're saying.  We don't

25  know whether that means, like, a combined exposure of 15

                    198

1   seconds or a continuous, as in, you know, one particular

2   durational 15 seconds.

3       A.   I think --

4   MR. COOK:  He's telling you how he --

5   MR. MURLEY:  Yeah.  I understand.

6   WITNESS:  I'm saying that's the reason it says,

7   avoid continuous exposure beyond 15 seconds.  To me,

8   that's continuous from the start to finish.

9   MR. MURLEY:  Okay.

10  BY MR. MURLEY:

11      Q.   And the longest you would have ever in one

12  direction deployed would have been six, if that made

13  contact?

14      A.   Yes.  During the drive stun.

15      Q.   Right.  Reassess the subject's behavior before

16  repeating or continuing exposure and provide time for

17  compliance?

18      A.   Yes.  And that was done.

19      Q.   There was roughly, I'll say, 15 seconds or

20  less, between different deployments, depending on when

21  we're talking.  So that would be the time for compliance

22  that was provided?

23      A.   If he had put his hands around his back like

24  he was supposed to, he would have been compliant and it

25  would have been stopped.

                    199

1       Q.   That was during the time between deployments

2   or attempts?

3       A.   Yes.  In an estimate like you're saying.

4       Q.   Yes.  I'm not going to hold you to specific 15

5   seconds.  I'm just saying there was time in between each

6   deployment.

7       A.   Yes.

8       Q.   Do you agree with this last page here about

9   the physiologic/metabolic risk involved in taser usage,

10  that TASER energy weapons may produce effects that could

11  increase the risk of sudden death, including changes

12  in -- and then those listed there?

13  MR. COOK:  Object to form.  You can answer.

14  BY MR. MURLEY:

15      Q.   Blood chemistry, blood pressure, respiration,

16  heart rate and rhythm, adrenaline, and stress hormones?

17      A.   That's not what I was trained.  If that's what

18  you're saying, I don't remember.

19      Q.   You weren't trained on this?

20      A.   I was trained on this.  But in reference to

21  this specific question --

22      Q.   Uh-huh.

23      A.   -- this is a -- from 2002 stating that TASER

24  energy weapons may produce effects.

25  MR. COOK:  You mean '22?

                    200

1   WITNESS:  Yeah.  I'm sorry.  '22.  May produce

2   effects that could increase the risk of...

3   BY MR. MURLEY:

4       Q.   What were you trained on as far as the...

5       A.   In reference to that, I would say, yes.

6       Q.   Let me finish my question before you answer.

7       A.   I'm sorry.

8       Q.   You said you weren't trained on this

9   particular information before I would assume --

10      A.   I'm not saying that as a general.  In

11  reference to the physiologic/metabolic risks, I don't

12  remember seeing it put this way.

13      Q.   Okay.  So this is news to you as far as the

14  way this -- this things is?

15      A.   This question, yes.

16      Q.   Okay.

17      A.   Not the whole thing all over.

18      Q.   So before looking at this slide here --

19      A.   Uh-huh.

20      Q.   -- that has these risks --

21      A.   Yeah.  I don't recall seeing them.

22      Q.   -- what risk -- you know, what effects were

23  you trained on that a TASER energy weapon could produce

24  that would increase the risk of sudden death?

25      A.   Shot to the chest, possible shot to the head

                    201

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

1   or the groin with the taser darts.
2       Q.   So that's the means of deployment that would
3   have the best chance of producing, I'm assuming, sudden
4   death as far as what you're trained on?  Is that what
5   what you're saying?
6       A.   I don't recall ever seeing the "sudden death"
7   part.  This is something new.
8       Q.   Okay.
9       A.   In reference to -- I understand that the use
10  of a taser deployment on somebody's heart rate and
11  respiratory and blood pressure could be affected if shot
12  in the chest or head area or the groin.
13      Q.   Let me break that down a little bit.  So prior
14  to April the 14th of 2020, in any of the training you
15  received on the use of a taser by any department
16  including the Glasgow Police Department, were you
17  trained or advised that using a TASER energy weapon may
18  change an individuals blood chemistry that could
19  increase the risk of sudden death?
20      A.   No.  Not the way you're putting it.
21      Q.   Okay.  Same question for changing blood
22  pressure, respiration, heart rate and rhythm, or
23  adrenaline and stress hormones?
24      A.   I remember the blood pressure, respirations
25  and heart rate and rhythm.

                        202
        JULIE RITTER        270.791.7345

1       Q.   But you remember that only for being tased in
2   the groin or the face?
3       A.   In the chest area.
4       Q.   Okay.  Chest area.
5            So you were trained about the blood pressure,
6   respiration, and heart rate previously that a taser
7   could cause an issue with that?
8       A.   To my best recollection, yes.
9       Q.   And that that could produce a risk of sudden
10  death?
11      A.   I still don't like the "sudden death" part,
12  'cause I don't remember hearing "sudden death".
13      Q.   Okay.
14      A.   I know it could have some type of effect on a
15  person in reference to those we just listed.
16      Q.   Were you trained that the longer the TASER
17  energy weapon exposure, the greater the potential
18  effects on a person's health?
19      A.   Yes.
20      Q.   Okay.  But you weren't trained about
21  possibility of sudden death from use of a taser prior
22  to --
23      A.   I'm saying I don't remember that part.
24      Q.   Okay.  Let me finish my question.
25      A.   Okay.  I thought you were done.

                        203
        JULIE RITTER        270.791.7345

1       Q.   No, I was not done.
2       A.   Okay.  Go ahead.
3       Q.   To the best of your recollection, you don't
4   remember any training from the City of Glasgow, the
5   Glasgow Police Department on an increase in the risk of
6   sudden death from the use of TASER energy weapons?
7       A.   I'm saying, I do not recall the terminology,
8   sudden death, in that training.
9       Q.   Right.  Okay.  So you don't recall it being
10  said, sudden death?
11      A.   Yes.
12      Q.   What about a risk of death?
13      A.   Yes, I believe so.
14      Q.   So you're --
15           (Off-the-record discussion for clarification.)
16  BY MR. MURLEY:
17      Q.   So you were trained about a risk of death that
18  could be caused by the use of a taser prior to April
19  the 14th of 2020?
20      A.   I have to say, no.
21      Q.   So you were not at least aware that a taser
22  could cause someone's death under certain circumstances
23  prior to April 14 of 2020?
24      MR. COOK:  Object to form.  You can answer.
25      WITNESS:  That's not what -- what I was trained in.

                        204
        JULIE RITTER        270.791.7345

1   The -- I know the taser could have some type of medical
2   issues with a person being tased in reference to being
3   pregnant, old, young, or striking in the head or chest
4   or groin area.
5   BY MR. MURLEY:
6       Q.   Okay.  But as far as producing either sudden
7   death or increasing the risk of death, that's not...
8       A.   I don't recall that.
9       Q.   Okay.  At least as of prior to April 14th,
10  2020, you were --
11      A.   I don't recall that now.  I'm not sure what I
12  was thinking at the time.
13      Q.   Okay.  I don't have any more questions about
14  that.
15           (Off-the-record discussion re the exhibit.)
16  BY MR. MURLEY:
17      Q.   I understand that's training materials from
18  2020.
19      A.   Uh-huh.
20      Q.   I don't have any training materials I've seen
21  of anything you were trained on prior to that.  So
22  that's why I asked you what you were trained on before
23  encountering Mr. Marr in, you know, April of 2020.  Does
24  that make sense?
25      A.   Yes.  But that was a couple of years ago, like

                        205
        JULIE RITTER        270.791.7345

1   I said.

2   Q.   And you just can't remember --

3   A.   **I just don't remembering hearing the word,**
**sudden death.**

Q.   Or death.  I think we've talked about that.
6   You said you were trained that it can affect somebody's
7   health.  But as far as the word "death" goes, you don't
8   recall being trained on that?

9   A.   **I don't recall the word, sudden death.  And in**
10  **reference to possible potential death, I believe I**
11  **already said that, elderly, pregnant, head, chest, and**
12  **groin area.**

13  Q.   Okay.

14  MR. MURLEY:  All right.  (Reviews documents.)  We
15  were produced some portions of a personnel file for you.
16  They're labeled, Confidential.  So if we attach them as
17  an exhibit -- I mean, they weren't really redacted in
18  any way.  I can show you what I'm looking at here if you
19  want to see it.  (Passes document.)

20  MR. COOK:  (Reviews documents.)  Well, before it
21  goes into the open record, maybe we could put it under
22  seal if it gets filed.

23  MR. MURLEY:  Yeah.  I don't care to do that.

24  MR. COOK:  I think that's the way to do it.

25  MR. MURLEY:  I'm just trying to make sure we don't

206

JULIE RITTER          270.791.7345

1   A.   Yes.

2   Q.   And this is actually Captain Jennifer Arbogast
3   who is now the chief, correct?

4   A.   Yes.

5   Q.   And she was in charge of actually doing, I
6   guess, an investigation into these allegations with
7   Internal Affairs?

8   A.   I'm assuming.

9   Q.   Okay.  I don't know how Internal Affairs work
10  in the police department, so I wouldn't know.  If
11  somebody has an issue with somebody or somebody has
12  allegations brought up because they've done something
13  wrong, how does that process work as far as the police
14  department goes?

15  A.   **If there's allegations of a situation**
16  **involving an officer, it's brought to the chief of**
17  **police, and at his discretion, to see if he wants to**
18  **handle it internally or do it -- open up an Internal**
19  **Affairs investigation.  And from that point, it moves on**
20  **from there.  And once you go into an Internal Affairs**
21  **investigation, the incident is investigated and the**
22  **officer is (inaudible) and questioned about the**
23  **incident.**

24  Q.   Gotcha.  Part of the comments here from, I
25  guess, Jennifer Arbogast to Chief Howie, December 23rd,

208

JULIE RITTER          270.791.7345

1   run afoul on anything.

2   MR. COOK:  If it gets filed in a motion or
3   something, let's put it under seal.

4   MR. MURLEY:  Can we do a separate -- I know it
5   would be the same number afterwards.  But I'm only going
6   to use portions of the personnel file from here on, I
7   think.  So every exhibit after this will be subject to
8   being sealed in the event they're filed of record?

9   MR. COOK:  That's fair.

10  MR. MURLEY:  Okay.

11  (Off-the-record discussion for clarification.)

12  (Turcotte Deposition Exhibit 12 was duly
13  received, marked, and is filed herewith.)

14  BY MR. MURLEY:

15  Q.   You just tell me when you're done reading, and
16  I'll ask you this question.

17  A.   **Go ahead.  I remember this.**

18  Q.   You remember this incident taking place?

19  A.   **Yes, I do.**

20  Q.   I've attached Exhibit number 12, which again
21  we've stated is subject to being sealed if produced.
22  This, I understand, is a allegation that was in your
23  personnel file concerning a juvenile -- I guess
24  confidential information about a juvenile being
25  released.  Do you see that?

207

JULIE RITTER          270.791.7345

1   2015, it says Lieutenant Colonel Turcotte was untruthful
2   and deceitful during my interview with him.

3   Do you see that?

4   A.   **Yeah, I see it.**

5   Q.   I'm assuming you disagree that you were ever
6   untruthful or deceitful during your interview with --

7   A.   **Yes.  I disagree with that statement.**

8   Q.   Okay.  Were you actually disciplined as a
9   result of this --

10  A.   **No.**

11  Q.   -- allegation?

12  A.   **It was found unfounded.**

13  Q.   Okay.  That's all I have on that one.

14  A.   **Yeah.  Not sustained.**

15  Q.   Right.  I didn't think you were disciplined,
16  but I'm asking.

17  A.   **Yeah.**

18  (Inaudible conversation between
19  Mr. Murley and Romney.)

20

21  MR. MURLEY:  Matt, you may have to look with him on
22  this one.  I'm sorry.  (Passes documents.)

23  MR. COOK:  Sure.

24  (Turcotte Deposition Exhibit 13 was duly
25  received, marked, and is filed herewith.)

209

JULIE RITTER          270.791.7345

1    WITNESS:  (Reviews documents.)
2    MR. MURLEY:  I can go ahead and ask you a question
3  if you're ready.
     MR. COOK:  Are you done?  If you're not, let him
   know.
6    WITNESS:  (Reviews documents.)  Okay.
7    MR. MURLEY:  And as I'm looking at this, I don't
8  think the second page is actually a page to the exhibit.
9  So I think we can take that off.  Looks like that's
10  where they're closing the internal affairs investigation
11  for the October 21st, 2015 thing.
12    MR. COOK:  The one we just looked at?
13    MR. MURLEY:  Yeah.  That might be the second --
14    MR. COOK:  Prior to this one?
15    MR. MURLEY:  -- one to that one, actually.  I'm
16  sorry.  It looks like that's the second page to that
17  one.
18    WITNESS:  This one here?  No, this is in reference
19  to sick leave.
20    COURT REPORTER:  In reference to what?  Sick leave?
21    MR. COOK:  Sick leave.
22    WITNESS:  This is basically saying that he wants a
23  doctor's excuse every time I call in sick.
24    MR. MURLEY:  I don't know what I gave you.  I tried
25  to give you something that talks about October 21st,

                        210

               JULIE RITTER        270.791.7345

1  2015, there being an Internal Affairs investigation
2  being conducted in reference to a complaint about
3  confidential information.  Captain Arbogast conducted
4  that investigation.  Do you see that at the top of the
5  page?
6    MR. COOK:  That's what he's got.
7    MR. MURLEY:  Okay.
8    WITNESS:  Yes.
9    MR. MURLEY:  So I only want to talk about one page
10  of this.  I don't really care about the rest of it.
11  BY MR. MURLEY:
12    Q.   It says, that investigation concluded there
13  was not enough information to substantiate the
14  violation, therefore the allegation was not sustained.
15  That's what we talked about previously?
16    A.   Yes.
17    Q.   However, during the investigation it was
18  determined that you violated Policy 147.0, Dealing With
19  Persons of Diminished Capacity specifically.
20    A.   I don't see that paperwork in reference to
21  that then.
22    Q.   I'm sorry?
23    A.   Where is the paperwork on that where it says
24  I -- I did that?
25    Q.   I'm really just asking you questions about

                        211

               JULIE RITTER        270.791.7345

1  this.
2    A.   Oh.
3    MR. COOK:  He's just asking about this page.
4    MR. MURLEY:  Yeah.
5  BY MR. MURLEY:
6    Q.   So there is at least a mention in here that
7  you violated a policy dealing with persons of diminished
8  capacity.  I talked to you earlier about dealing with
9  people who were having mental episodes or --
10    A.   Uh-huh.
11    Q.   -- mind-altering drugs, that kind of stuff.
12  There are policies about dealing with persons of
13  diminished capacity, correct?
14    A.   I think this was in reference to a suicide --
15  a mention of a suicide.  I never spoke to the girl that
16  supposedly made that comment to another person.
17    Q.   I understand that.  But --
18    MR. COOK:  He's asking you about the policy.
19  BY MR. MURLEY:
20    Q.   -- I'm just asking you about the policy.
21  There exists a policy about dealing with people who are
22  mentally ill and present a danger or threat of danger to
23  self --
24    A.   Yes.
25    Q.   -- family, or others --

                        212

               JULIE RITTER        270.791.7345

1    A.   Yes.
2    Q.   -- if not restrained?
3    A.   I believe you have the policy.
4    Q.   Okay.  And this here is talking about the fact
5  that they believe you violated that policy through
6  something.  I'm asking you if it was every sustained or
7  if they determined here that you violated policy?
8    A.   It wasn't determined.  This was the statement
9  of that -- Chief Howie.
10    Q.   Okay.  So there's never been a determination
11  that you actually violated a policy about dealing with a
12  diminished capacity person?
13    A.   No.
14    Q.   Okay.
15    A.   And right up here, this is basically just --
16  this was a gig at the end of this Internal Affairs where
17  they couldn't sustain it.
18    Q.   He says, having reviewed the investigation and
19  your statement, I have concluded that you violated the
20  policies.  However, I understand why you took the action
21  you did and I will not be taking any disciplinary
22  action.  I suggest in the future you check with the
23  shift commander before taking actions that violate our
24  policies.
25    It sounds there like there was a finding of a

                        213

               JULIE RITTER        270.791.7345

1 policy violation --
2    A.    Well, there was --
3    Q.    -- but there wasn't a disciplinary action.  So
you just disagree with whatever this --
4    A.    I totally disagree with what he said.
6    Q.    Okay.  So he didn't actually find that you
7 violated a policy?
8    A.    No.
9    Q.    Okay.
10   A.    He did not.
11   Q.    All right.  (Reviews documents.)  I don't know
12 how else to attach these other than by the date of the
13 Employee Disciplinary Notice.  And there's a bunch of
14 violations in here.  I'm only going to ask you specific
15 questions about some of these, but it looks like more
16 than there probably should be.
17   MR. COOK:  So the whole thing's going to be 14?
18   MR. MURLEY:  14.  But I'm going to ask you specific
19 questions about them.  They're just -- I don't know that
20 it makes any sense without it being a combined exhibit,
21 if that makes sense.
22   MR. COOK:  Sure.
23       (Turcotte Deposition Exhibit 14 was duly
24       received, marked, and is filed herewith.)
25   MR. MURLEY:  Like I say, it looks like more

                    214

1 paperwork than I'm actually going to ask you about is
2 what I'm trying to say.
3    MR. COOK:  Okay.
4    MR. MURLEY:  Okay.  Do you have any of these?
5    MR. COOK:  No.  Yeah, if you could.
6 BY MR. MURLEY:
7    Q.    You can take a few minutes and read through
8 these if you want to but --
9    A.    No.
10   Q.    -- you've probably lived this, I would assume,
11 as part of your personnel file --
12   A.    Yes.
13   Q.    -- and aware of at least the notices of
14 action and the findings that are in your file?
15   A.    We'll go through it together.
16   Q.    I'm sorry?
17   A.    I said, we'll go through it together.
18   Q.    Okay.  I understand these to be specific dates
19 of violations that you were found to violate certain
20 policies on the different dates here.  If you look at
21 the first page, January 5th, 6th, 7th, 14th, 15th, 16th,
22 20th, 26th, 27th, 28th.
      A.    Uh-huh.
24   Q.    There were policy violations at least found
25 and then there was a verbal reprimand.

                    215

1    A.    They were not found.
2    Q.    I'm sorry?
3    A.    They were not found.
4       (Off-the-record discussion for clarification.)
5 BY MR. MURLEY:
6    Q.    Oh, they were not found.  Okay.
7    A.    This was in reference to -- I sustained an
8 injury to my eye, and I was on sick leave during that
9 whole time.  Mr. Duff wanted me to call in every day to
10 say that I wasn't coming into work when I had a doctor's
11 note that said I wasn't going to return 'til later on
12 this time frame.  So this was basically just trying to
13 build paper on me.
14   Q.    All right.
15      (Off-the-record discussion for clarification.)
16 BY MR. MURLEY:
17   A.    Yeah.  It says, Consequences, Verbal
18 Reprimand, then Deadline.  It says, Employee Signature,
19 4/3/15 and then Chief of Police James Duff.  So he did
20 at least find -- he didn't verbally reprimand you for
21 whatever happened in this incident?
22   A.    You noticed I signed it under protest.  And
23 this was back when I first started my lawsuit.
24   Q.    Oh, okay.  I didn't know what that meant.
25 So -- okay.

                    216

1    A.    It's saying I wasn't going to fight it, I was
2 going to let my attorney fight it.
3    Q.    Okay.  So this is all about you failing to
4 report to duty, basically, it looks like.  At least
5 their allegations are a failure to report to duty,
6 correct?
7    A.    And -- yes.  And I had documented my phone
8 call and phone calls to James Duff at the time advising
9 him I would be out sick for that period of time per
10 doctor.
11   Q.    In several of these allegations -- I mean, who
12 exactly is it that files these?  It says -- I know there
13 are listings of the allegations like -- let's just take
14 January 27th, 2015 for instance.
15   A.    These were all James Duff.
16   Q.    Okay.
17   A.    He was my lieutenant colonel when I was chief.
18 He was also actively working to undermine my -- my
19 position there.  When Dick Doty took over --
20   Q.    Uh-huh.
21   A.    -- on January 2nd, he put him in as an interim
22 chief.  And this is, as you can see, started on that
23 day.  James Duff is also one of the ones that I beat out
24 of the chief's position back when I took the chief job
25 in 2011.

                    217

1  Q.  Okay.  He makes the comment here, since
2  January 2nd, 2015, Lieutenant Colonel Turcotte has
3  constantly displayed insubordination for following
4  orders, policy and procedures for the City of Glasgow
5  and the Glasgow Police Department S-O-P.
6      Do you see that comment?  And I think it's
7  throughout these, basically.
8  A.  Yeah.  He was made the interim chief on
9  January 2nd.  So I don't know how he's thinking that.
10  Q.  He took over and said you were immediately
11  insubordinate and wouldn't follow policies and
12  procedures?
13  A.  Which is false.
14  Q.  Okay.  I saw in here in the file on April
15  the 8th, 2015, looks like you were given a written
16  reprimand for violating a direct order of the interim
17  police chief to return certain property to Glasgow
18  Police Department?
19  A.  You said April 8th?
20  Q.  This says April 8th.  That's not in that file.
21  I was just asking you a question.  Do you remember being
22  given a written reprimand?
23  A.  Do you have a copy of that?
24  Q.  Yeah.  I can get you a copy.  (Reviews
25  documents.)  (Passes documents.)

218

JULIE RITTER          270.791.7345

1      (Off-the-record discussion for clarification.)
2      (Turcotte Deposition Exhibit 15 was duly
3          received, marked, and is filed herewith.)
4  MR. COOK:  And this is 15?
5  COURT REPORTER:  Yes.
6  WITNESS:  This was also on January the when he took
7  over.
8  MR. MURLEY:  Have you got a copy for him?
9  MR. ROMNEY:  Yeah.  Just a second.
10  WITNESS:  And this is the day he stripped me of all
11  of my duty equipment, car, everything.  And I did bring
12  in everything during that timeframe.  He was not at the
13  station at the time.  And I waited until 1500 hours,
14  which was an hour over my staying time.  So I left him a
15  note saying, I'm not leaving all this stuff here for you
16  to go through.  I'm off duty now.  I'll bring it back in
17  tomorrow.
18      And I talked with Major Lindsey at the time.
19  Major Lindsey wouldn't take the -- my equipment that I
20  had brought in.  He said, that's between him and -- and
21  Duff.  And I attempted to contact James several times to
22  no avail.  So I left work during my time period.
23  BY MR. MURLEY:
24  Q.  This is at least an incidence of a written
25  reprimand for violating a policy in the Glasgow Police

219

JULIE RITTER          270.791.7345

1  Department, correct?
2  A.  Yes.  He is stating that I violated a policy,
3  which I did not.
4  Q.  Okay.
5  A.  Which I also signed this under protest.
6  Q.  What does that mean, for you to sign something
7  under protest?
8  A.  When you sign something under protest, you're
9  not agreeing with the situation at all but you're not
10  going to fight it at the time.  Because, like I said, I
11  had an attorney who advised me to do this so he could
12  address it later during our lawsuit.
13  Q.  Okay.  (Passes document.)
14      (Off-the-record discussion for clarification.)
15      (Turcotte Deposition Exhibit 16 was duly
16          received, marked, and is filed herewith.)
17  MR. MURLEY:  Matt, there's not a lot to this one so
18  you may not need a copy of it.  I just really have one
19  question.
20  MR. COOK:  Sure.
21  WITNESS:  I already know it.  So...
22  MR. COOK:  Okay.  I'll give it right back.  Go
23  ahead.
24  BY MR. MURLEY:
25  Q.  Now, my understanding is that this is a verbal

220

JULIE RITTER          270.791.7345

1  warning for failure to complete an assigned training.
2  A.  Breathe test operator.  I believe I was out
3  after I had my gallbladder surgery.  So, obviously, I
4  wasn't going to take that training.  They rescheduled
5  that.  So it's not like I said I wasn't going to take
6  it.  I just couldn't take it.
7  Q.  Okay.
8  A.  And I also signed that under protest.
9  Q.  Have you ever been reprimanded or warned for
10  not completing any other assigned training besides that?
11  A.  Any assigned training, either if it was
12  supposed to be on time or not, I completed all my
13  assigned training.  There's times where you can't do it.
14  Q.  So there would have been other times when you
15  would not have completed things in the time frame
16  assigned; is that what you're saying?
17  A.  Yes.
18  Q.  Because it just didn't happen?
19  A.  Either I was out sick or there was something
20  else going on.  But they were made aware of it on any
21  type of the training, that I was not available to
22  complete.  But all training that I've received I've
23  completed.
24  Q.  That means you've not ever failed to complete
25  a training when you started it; is that what you're

221

JULIE RITTER          270.791.7345

1 saying?
2    A.   I have never failed to complete training that
3 was assigned to me.
4    Q.   Okay.  That makes sense.  All right.
5        There were some other instances in your file
6 about being late to firearms training and then failing
7 to report to the training.  You seem to be aware of what
8 I'm talking about.
9    A.   Yeah.  I'm -- I've always reported to
10 training.
11   COURT REPORTER:  You've what?
12   WITNESS:  I've always -- I've always reported to
13 training.  In reference to the firearms, they suspended
14 me for one day for supposedly being one to two minutes
15 late coming back from lunch at the firearms training.
16   MR. MURLEY:  Uh-huh.
17   WITNESS:  And on my watch, I showed the Major Flatt
18 that I was five minutes early compared to my watch.  And
19 he sets his watch two to three minutes -- he was going
20 by his watch.  So that's why I got...
21   MR. MURLEY:  Difference in the watches there?
22   WITNESS:  Yeah.
23   MR. MURLEY:  F4.
24   WITNESS:  And I was returning from lunch to a
25 firearms training which wasn't critical.

222

1    MR. MURLEY:  (Passes document.)
2        (Turcotte Deposition Exhibit 17 was duly
3        received, marked, and is filed herewith.)
4    MR. MURLEY:  I'm getting real close to being done.
5    WITNESS:  Sorry about that.  I'm getting hungry.
6        (Off-the-record discussion.)
7 BY MR. MURLEY:
8    Q.   This looks like a 6/18/2019 Administrative
9 Report involving an accidental taser discharge?
10   A.   Yes.  That's my report that I wrote and turned
11 in.  It's not a disciplinary action or nothing.
12   Q.   Yeah.  I was going to ask you what an
13 Administrative Report was.
14   A.   I was just letting them know, hey, listen...
15   COURT REPORTER:  You just --
16   WITNESS:  -- I accidentally shot the taser -- I
17 accidentally shot the taser in the floor.
18   MR. MURLEY:  Okay.
19 BY MR. MURLEY:
20   Q.   You were letting them know that you
21 accidentally shot the taser in the floor?
22   A.   Yes.
23   Q.   That would be deploying the darts of the taser
24 into the floor?
25   A.   Yes.  In reference to that incident, Officer

223

1 Britt came to me and said, do you know what's wrong with
2 the taser.  To me, it appeared that her battery was
3 depleted and not working.  So she removed her taser
4 cartridge from the taser and handed the taser to me
5 where I removed the battery, where she was unable to
6 remove the battery herself.  I took the battery out of
7 my taser and put it in her's and showed that her taser
8 was now working.  So when I took my battery pack out of
9 my taser, her cartridge was sitting on the table where I
10 was sitting and I gave her back hers.  When I took mine,
11 I didn't do the test on it thinking that the cartridge
12 on the table was mine, which I actually still had my
13 cartridge on it.  And when I tased it, it shot into the
14 floor.
15   Q.   This was just an accidental deployment of a
16 taser that you reported --
17   A.   Yes.
18   Q.   -- voluntarily --
19   A.   Voluntarily.
20   Q.   -- to the police department?
21   A.   Uh-huh.
22   Q.   Was this the same taser that you would have
23 had in April of 2020; do you know?
24   A.   I -- I believe so.
25        It wouldn't have been the first taser that

224

1 you're aware of?
2    A.   Yeah.  I -- I think it's the same taser.  If
3 it was in April of 2020, that's only eight months away,
4 ten months away.  So yes, it was probably the same
5 taser.
6    Q.   Okay.  Do you believe -- and I know you
7 attempted drive stuns eight times.  You think you maybe
8 only had half that made contact?
9    A.   All of them did not make contact.  Yes.
10   Q.   Right.  Do you think you only had half --
11 maybe half that made contact with Mr. Marr.  And then
12 you deployed your darts.  And then we think maybe three
13 times --
14   A.   Yes.
15   Q.   -- would actually -- for five-second durations
16 there would have been current passed?
17   A.   And times in -- in between, yes.
18   Q.   Do you see those deployments over three
19 minutes and roughly 30 seconds, I think's the time
20 frame --
21   A.   Whatever --
22   Q.   (Inaudible.  Talked over) deployments?
23   A.   Whatever was on that taser log.
24   Q.   Do you see those as being repeated, prolonged,
25 and continuous?

225

1    A.   They were not continuous.  Obviously, anything
2  over one is repeated.
3    Q.   Uh-huh.  And prolonged, what's your position
on prolonged?
5    A.   I would say, no, because they went through
6  the -- the normal cycle of five seconds, and there were
7  intervals in-between each activation.
8    Q.   Okay.  Now, there was an investigation into
9  this incident by Internal Affairs, I think I saw?
10    A.   Yes.  It was Special Prosecutor's Office,
11  State, and Internal Affairs.
12    Q.   Right.  And there was not a finding of any
13  wrongdoing on your part?
14    A.   On all three found no wrongdoing.
15    Q.   I should have been more specific.  There was
16  not any finding by any of the three of these on any --
17    A.   Yes.
18    Q.   -- wrongdoing?
19    A.   Special prosecutor said there was no
20  wrongdoing.  State police said there was no wrongdoing.
21  Internal affairs said there was no wrongdoing.  The
22  autopsy report showed there was no -- there was no --
23  what's the word for -- physical trauma to Mr. Marr's
24  body and that the taser was not the cause of his death,
25  but the massive amount of methamphetamine and

226

JULIE RITTER          270.791.7345

1  acetaminophen.  I could say that wrong.  But another one
2  which was -- which caused his death.
3    Q.   You're certainly not a medical examiner,
4  correct?
5    A.   No just reading the medical examiner's report.
6    Q.   And you're not an expert in medical
7  examination?
8    A.   No, sir.
9    Q.   Don't have any medical degrees?
10    A.   Not yet.
11    Q.   You going to medical school right now?
12    A.   I'm starting E-M-T this month.
13    Q.   Okay.  Well, you certainly wouldn't purport to
14  be an expert in that field?
15    A.   No.  Like I said, just reading the medical
16  examiner's report.
17    Q.   You're not offering an opinion about the
18  causation.  You're just saying what your interpretation
19  of the report results were?
20    A.   Just reading what was in the medical report
21  from the medical examiner.
22    Q.   Yes.
23    A.   Yeah.
24    Q.   Okay.
25    MR. MURLEY:  Give me just a few minutes.  I may be

227

JULIE RITTER          270.791.7345

1  done.  I'm going to step out for a second.
2    MR. COOK:  Sure.
3    COURT REPORTER:  Off the record.
4    (Short break taken from 3:15 p.m. to 3:17 p.m.)
5    MR. MURLEY:  I don't have any other questions
6  subject to, potentially, any new information coming
7  forth about trainings or anything else that I may have
8  questions for you on.  So I'm going to conclude at least
9  my portion of the examination today.
10    Again, part of these exhibits are not for public
11  consumption 'til filed under seal.
12    MR. COOK:  In terms of his personnel file.
13    MR. MURLEY:  Right.
14    COURT REPORTER:  Okay.  Off the record.
15    (WHEREUPON THE DEPOSITION WAS
CONCLUDED AT 3:17 P.M.)
16

17

18

19

20

21

22

23

24

25

228

JULIE RITTER          270.791.7345

1  STATE OF KENTUCKY  )
)  SS.
2  COUNTY OF WARREN   )
3    I, Julie P. Ritter, a Notary Public, within and
4  for the State of Kentucky, do hereby certify that the
5  foregoing deposition of **GUY TURCOTTE**, was taken before
6  me at the time and place and for the purpose in the
7  caption stated; that the said witness was first duly
8  sworn to tell the truth, the whole truth and nothing but
9  the truth; that the deposition was reduced to shorthand
10  writing by me in the presence of the witness; that the
11  foregoing is a full, true and correct transcript of the
12  said deposition so given; that there was no request that
13  the witness read and sign the deposition; that the
14  appearances were as stated in the caption; and that the
15  original in .pdf form was made available to the
16  attorneys for filing with the Court.
17    I further certify that I am neither of kin nor
18  of counsel to either of the parties to this action, and
19  am in no wise interested in the outcome of said action.
20    WITNESS MY SIGNATURE, on this the ^ day of ^,
21  2023.
22

23    s/Julie Ritter
JULIE RITTER, NOTARY PUBLIC
24    Notary Public Cert. ID# KYNP 6142
My commission expires:  05/24/24
25    Kentucky State at Large

229

JULIE RITTER          270.791.7345

**'22** [2] - 200:25, 201:1
**'70s** [1] - 179:2
**'72** [1] - 178:5
**'79** [1] - 178:23
**'80** [1] - 178:23
**'89** [3] - 11:23, 11:24, 178:4
**'91** [1] - 11:20

## 0

**002232** [1] - 126:22
**05/24/24** [1] - 229:24
**0741** [2] - 156:3, 160:12

## 1

**1** [5] - 3:6, 10:9, 21:11, 21:12, 188:7
**1.................** [1] - 2:5
**1.11** [6] - 2:17, 2:18, 86:23, 87:10, 88:6, 89:7
**10** [4] - 2:5, 87:21, 88:1, 110:25
**10.................** [1] - 2:18
**1009** [3] - 156:4, 160:14, 173:15
**1025** [2] - 5:4, 5:19
**1097** [2] - 118:6, 118:8
**10:30** [1] - 5:6
**10:37** [1] - 16:18
**10:38** [1] - 16:18
**11** [11] - 50:15, 50:16, 58:8, 164:18, 165:9, 165:23, 166:1, 167:10, 190:12, 190:13, 190:14
**11.................** [1] - 2:19
**11/1** [1] - 47:23
**11:28** [1] - 61:25
**11:34** [1] - 61:25
**12** [5] - 67:24, 178:25, 207:12, 207:20
**12.................** [1] - 2:21
**121** [2] - 4:1, 4:2
**122** [3] - 4:3, 4:4, 4:5
**123** [2] - 4:6, 4:7
**124** [1] - 4:8
**12:43:01** [1] - 126:20
**13** [3] - 70:1, 178:25, 209:24
**13.................** [1] - 2:22

**130** [1] - 4:9
**139** [1] - 4:10
**14** [6] - 35:20, 69:23, 204:23, 214:17, 214:18, 214:23
**14.................** [1] - 2:24
**14.1** [1] - 35:19
**140** [1] - 4:11
**143** [1] - 4:12
**146** [1] - 4:13
**147** [1] - 4:14
**147.0** [1] - 211:18
**149** [1] - 4:15
**14th** [15] - 64:4, 64:14, 67:7, 76:4, 76:12, 78:7, 92:14, 93:2, 101:16, 116:1, 116:17, 202:14, 204:19, 205:9, 215:21
**15** [13] - 74:6, 197:8, 197:11, 197:18, 197:20, 198:19, 198:25, 199:2, 199:7, 199:19, 200:4, 219:2, 219:4
**15.................** [1] - 2:25
**150** [2] - 4:16, 4:17
**1500** [1] - 219:13
**151** [2] - 4:18, 4:19
**152** [1] - 4:20
**153** [2] - 4:21, 4:22
**15th** [1] - 215:21
**16** [2] - 72:21, 220:15
**16.................** [1] - 3:2
**16th** [1] - 215:21
**17** [1] - 223:2
**17.................** [1] - 3:3
**177** [1] - 35:23
**17th** [2] - 87:6, 87:25
**18** [2] - 183:18
**181** [1] - 3:14
**190** [1] - 2:19
**1989** [5] - 13:5, 13:13, 24:3, 24:22
**1:11** [1] - 136:10
**1:21-CV-0050-GNS** [1] - 1:3
**1:22** [1] - 136:10
**1st** [3] - 48:13, 49:1, 191:11

## 2

**2** [14] - 3:14, 20:24, 21:4, 21:5, 21:9, 46:10, 75:13, 155:9, 155:10, 188:8, 188:9, 188:10, 189:13, 189:14

**2.................** [1] - 2:6
**20** [3] - 19:21, 70:20, 183:19
**200** [1] - 4:23
**2002** [1] - 200:23
**2004** [1] - 83:24
**2006** [2] - 84:1, 85:23
**2007** [3] - 84:1, 84:3, 85:24
**2009** [1] - 12:20
**2010** [1] - 12:25
**2011** [11] - 10:3, 10:18, 10:20, 15:14, 15:15, 43:22, 47:8, 174:19, 174:24, 179:8, 217:25
**2014** [3] - 175:7, 175:12
**2015** [6] - 209:1, 210:11, 211:1, 217:14, 218:2, 218:15
**2016** [9] - 47:23, 48:14, 49:1, 86:24, 87:5, 87:10, 88:19, 89:7, 89:18
**2018** [4] - 175:13, 176:20, 176:23, 181:23
**2019** [5] - 77:15, 77:19, 77:25, 78:19, 78:24
**2020** [46] - 29:11, 38:18, 40:15, 45:7, 47:5, 50:7, 52:10, 63:5, 64:4, 64:15, 67:7, 76:5, 76:12, 78:7, 86:6, 87:2, 87:7, 87:8, 87:11, 87:16, 87:25, 92:14, 93:2, 101:16, 114:6, 115:21, 116:1, 116:13, 116:17, 155:25, 175:14, 175:19, 175:21, 182:8, 182:13, 182:20, 202:14, 204:19, 204:23, 205:10, 205:18, 205:23, 224:23, 225:3
**2022** [6] - 191:7, 191:8, 191:11, 192:15, 192:20
**2023** [3] - 1:17, 5:5, 229:21
**204** [1] - 4:24
**207** [2] - 2:21, 6:14
**209** [1] - 2:22
**20th** [1] - 215:22
**21** [1] - 2:6
**214** [1] - 2:24
**219** [1] - 2:25

**21st** [2] - 210:11, 210:25
**22** [2] - 3:20, 191:10
**220** [2] - 3:2, 116:11
**223** [2] - 3:3, 126:22
**2232** [2] - 126:23, 126:25
**2232's** [1] - 126:21
**23** [2] - 2:8, 70:13
**23rd** [1] - 208:25
**25** [2] - 19:4, 66:2
**250** [1] - 115:16
**26th** [1] - 215:22
**270** [1] - 1:25
**27th** [2] - 215:22, 217:14
**28th** [7] - 15:14, 15:15, 174:19, 174:24, 175:7, 179:8, 215:22
**2nd** [3] - 217:21, 218:2, 218:9

## 3

**3** [17] - 2:8, 23:6, 23:7, 23:17, 23:18, 23:19, 92:22, 93:4, 155:9, 155:10, 155:11, 155:12, 155:17, 155:18, 159:4, 159:6, 159:7
**3-F** [1] - 97:12
**30** [2] - 13:14, 225:19
**3100** [1] - 5:16
**35** [1] - 125:2
**397** [1] - 1:24
**3:15** [1] - 228:4
**3:17** [3] - 5:6, 228:4, 228:15

## 4

**4** [8] - 23:6, 23:7, 23:19, 64:7, 155:11, 155:12, 159:22
**4.................** [1] - 2:8
**4/14** [2] - 155:24, 155:25
**4/14/20** [3] - 2:8, 2:9, 147:23
**4/14/2020** [2] - 126:15, 160:11
**4/3/15** [1] - 216:19
**4/4/2016** [2] - 2:21, 2:23
**40** [1] - 36:6
**41** [1] - 71:21
**42101** [1] - 1:25
**42102** [1] - 5:16
**42102-9547** [1] - 5:20
**44** [1] - 142:25

**45** [1] - 41:13
**46** [1] - 2:10
**47** [1] - 2:11
**48** [1] - 2:13
**4th** [1] - 77:25

## 5

**5** [6] - 46:15, 46:16, 46:18, 46:22, 160:1, 160:2
**5,000** [1] - 75:7
**5.................** [1] - 2:10
**50** [2] - 102:20, 106:18
**50,000** [7] - 75:7, 75:8, 75:11, 75:18, 75:23, 81:5, 145:4
**51** [2] - 91:18, 106:18
**52** [1] - 91:16
**53** [1] - 97:12
**54** [2] - 3:21, 101:6
**55** [2] - 3:22, 3:23
**57** [1] - 116:11
**5th** [1] - 215:21

## 6

**6** [4] - 2:2, 47:20, 48:2, 163:9
**6.................** [1] - 2:11
**6/18/2019** [2] - 3:4, 223:8
**6142** [1] - 229:24
**63** [1] - 2:15
**6th** [1] - 215:21

## 7

**7** [4] - 48:21, 48:22, 62:4, 163:9
**7.................** [1] - 2:13
**72** [1] - 3:24
**791-7345** [1] - 1:25
**7:41** [1] - 160:12
**7:53** [1] - 64:17
**7:54** [3] - 67:6, 67:23, 69:18
**7:54:12** [1] - 69:19
**7:54:26** [1] - 69:22
**7:55:23** [2] - 72:20, 73:10
**7:55:39** [1] - 73:13
**7:56:20** [1] - 73:22
**7:56:44** [1] - 73:25
**7:58:15** [1] - 74:12
**7th** [4] - 77:14, 77:19, 78:19, 215:21

**8**

**8** [6] - 63:20, 63:21, 63:24, 64:8, 144:12, 165:23
**8...................** [1] - 2:15
**8/17/20** [1] - 87:23
**8/17/2020** [1] - 2:18
**86** [1] - 2:16
**87** [1] - 64:9
**88** [4] - 2:18, 67:7, 68:17, 121:8
**89** [1] - 67:23
**8:00** [2] - 64:14, 64:16
**8th** [2] - 218:15, 218:20

**9**

**9** [8] - 1:17, 5:5, 86:15, 86:16, 87:17, 87:19, 89:6, 97:12
**9-millimeter** [1] - 41:13
**9...................** [1] - 2:16
**9/15** [1] - 86:24
**9/15/2016** [1] - 2:17
**90** [2] - 3:6, 173:16
**92** [1] - 70:6
**921** [1] - 5:15
**94** [1] - 3:25
**9547** [1] - 5:20
**96** [3] - 73:5, 73:18, 73:19
**97** [2] - 73:21, 118:9
**98** [2] - 68:17, 73:24

**A**

**a-hold** [5] - 29:19, 107:15, 131:11, 164:10
**a.m** [10] - 5:6, 16:18, 61:25, 64:14, 64:16, 67:6, 69:18, 160:12
**ability** [3] - 122:19, 154:9, 154:20
**able** [16] - 17:23, 24:25, 25:16, 61:1, 74:17, 113:6, 114:12, 142:3, 142:10, 154:11, 162:7, 164:10, 164:12, 172:9, 172:23, 195:7
**absent** [1] - 197:8
**abuse** [2] - 137:16, 137:21
**academy** [4] - 23:23, 24:2, 24:21, 25:10

**accepted** [1] - 36:8
**access** [4] - 6:25, 40:15, 40:19, 40:22
**accident** [1] - 54:21
**accidental** [2] - 223:9, 224:15
**accidentally** [3] - 223:16, 223:17, 223:21
**accidently** [3] - 163:23, 164:2, 171:13
**accommodation** [3] - 185:8, 185:14, 185:15
**accomplish** [1] - 197:3
**accordance** [2] - 5:7, 55:24
**accurate** [3] - 22:7, 22:15, 169:5
**accused** [2] - 186:19, 186:25
**acetaminophen** [1] - 227:1
**achieved** [1] - 54:10
**acting** [1] - 140:8
**action** [7] - 213:20, 213:22, 214:3, 215:14, 223:11, 229:18, 229:19
**ACTION** [1] - 1:3
**Action** [1] - 3:2
**actions** [9] - 97:16, 105:11, 123:12, 123:14, 124:13, 131:2, 153:15, 186:13, 213:23
**activated** [6] - 67:18, 165:21, 165:23, 166:11, 198:10, 198:12
**activates** [1] - 197:16
**activation** [7] - 164:8, 164:17, 165:3, 165:6, 167:14, 197:18, 226:7
**activations** [2] - 164:18, 166:13
**active** [11] - 14:24, 92:24, 93:1, 93:2, 96:16, 99:19, 108:18, 111:19, 113:10, 119:11
**actively** [8] - 95:20, 97:1, 98:20, 99:18, 99:21, 117:12, 142:20, 217:18
**activity** [1] - 111:20
**actual** [14] - 45:5, 47:1, 50:8, 67:17, 73:6, 89:23, 101:20, 141:25, 142:17,

143:23, 165:10, 168:10, 172:21, 193:8
**actually..** [1] - 171:22
**acute** [1] - 146:10
**add** [1] - 72:5
**addictions** [1] - 137:17
**addition** [1] - 13:9
**address** [9] - 6:13, 6:15, 6:17, 101:4, 117:6, 117:22, 118:12, 156:5, 220:12
**administer** [3] - 158:10, 171:1, 171:14
**administered** [4] - 171:4, 172:2, 172:16, 173:5
**administering** [3] - 53:5, 172:23, 172:24
**Administration** [1] - 10:16
**administration** [2] - 8:21, 41:10
**Administrative** [3] - 3:4, 223:8, 223:13
**administrator** [1] - 1:6
**adrenalin** [2] - 130:4, 130:5
**adrenaline** [6] - 53:16, 95:7, 148:8, 200:16, 202:23
**adult** [1] - 179:4
**advise** [1] - 104:7
**advised** [13] - 100:15, 102:7, 107:11, 112:3, 112:17, 120:5, 158:14, 160:24, 167:15, 170:7, 170:23, 202:17, 220:11
**advising** [3] - 162:6, 162:15, 217:8
**Affairs** [8] - 208:7, 208:9, 208:19, 208:20, 211:1, 213:16, 226:9, 226:11
**affairs** [2] - 210:10, 226:21
**affect** [5] - 30:9, 57:3, 187:7, 187:10, 206:6
**affected** [1] - 202:11
**affecting** [3] - 135:23, 135:24, 196:11
**aful** [1] - 207:1
**afterwards** [2] - 120:13, 207:5
**agencies** [1] - 182:19
**agency** [5] - 12:24, 36:8, 49:5, 55:24,

95:8
**aggression** [3] - 92:25, 93:2, 108:19
**aggressive** [4] - 95:21, 101:18, 122:20, 131:23
**aggressively** [2] - 54:4, 142:20
**agitated** [6] - 146:10, 147:3, 148:6, 148:22, 161:16, 161:25
**agitation** [1] - 145:22
**ago** [6] - 7:11, 7:12, 17:10, 43:19, 80:25, 83:22, 178:14, 205:25
**agree** [24] - 31:2, 31:19, 55:2, 55:8, 56:10, 56:16, 56:17, 62:16, 92:5, 94:8, 120:18, 120:22, 120:25, 121:24, 122:7, 146:6, 146:15, 196:1, 196:13, 196:20, 196:24, 197:1, 197:7, 200:8
**agreeing** [1] - 220:9
**agreement** [1] - 57:6
**Agreement** [2] - 2:14, 48:20
**agreements** [1] - 125:25
**ahead** [11] - 9:16, 10:13, 23:5, 50:4, 70:7, 130:1, 164:25, 204:2, 207:17, 210:2, 220:23
**ahold** [1] - 195:6
**aim** [1] - 125:8
**air** [1] - 170:21
**airway** [4] - 111:3, 111:8, 170:21
**al** [2] - 1:7, 1:11
**alcohol** [6] - 52:25, 53:13, 137:22, 139:19, 139:22, 194:18
**Alcohol** [1] - 158:9
**all's** [1] - 20:4
**allegation** [3] - 207:22, 209:11, 211:14
**allegations** [6] - 208:6, 208:12, 208:15, 217:5, 217:11, 217:13
**almost** [1] - 176:25
**alone** [1] - 173:15
**altered** [1] - 130:24
**altering** [2] - 52:19, 212:11

**Amanda** [2] - 66:19
**amount** [5] - 122:21, 124:11, 135:16, 143:23, 226:25
**amperage** [1] - 75:12
**and..** [1] - 35:16
**anger** [3] - 185:17, 187:16, 187:23
**angles** [1] - 22:11
**annual** [4] - 35:25, 36:10, 36:11, 43:9
**annually** [2] - 26:23, 36:6
**answer** [25] - 7:25, 8:2, 8:9, 31:9, 55:5, 56:23, 72:2, 80:1, 88:13, 94:9, 121:19, 123:13, 124:23, 140:20, 150:6, 151:5, 151:6, 152:18, 152:22, 153:1, 172:15, 200:13, 201:6, 204:24
**answering** [1] - 138:5
**anticipated** [1] - 10:17
**anticipation** [3] - 15:18, 155:19, 162:21
**appear** [1] - 192:21
**appearances** [1] - 229:14
**APPEARANCES** [1] - 5:12
**appeared** [6] - 161:12, 161:16, 161:25, 170:11, 171:6, 224:2
**appearing** [1] - 106:19
**apples** [1] - 16:5
**applicable** [3] - 76:23, 80:1, 100:9
**Applicant** [1] - 2:12
**application** [11] - 55:19, 56:11, 56:12, 56:21, 57:5, 91:6, 140:16, 140:18, 140:24, 140:25, 143:18
**applications** [3] - 62:13, 62:18, 95:10
**applied** [4] - 59:9, 154:10, 154:21, 175:4
**apply** [2] - 52:12, 103:3
**applying** [1] - 154:10
**appropriate** [1] - 103:3
**April** [39] - 19:21, 29:11, 38:18, 40:15, 45:6, 47:5, 50:7, 52:9, 63:4, 64:4, 64:14, 67:7, 76:4,

76:12, 78:7, 86:6,
87:2, 87:16, 92:13,
93:2, 101:16, 114:6,
115:21, 115:25,
116:1, 116:13,
116:17, 175:20,
182:20, 202:14,
204:18, 204:23,
205:9, 205:23,
218:14, 218:19,
218:20, 224:23,
225:3

**Arbogast** [3] - 208:2,
208:25, 211:3
**arc** [2] - 84:24, 141:16
**area** [17] - 57:1, 57:2,
57:9, 57:22, 82:14,
82:15, 98:7, 107:13,
109:21, 135:25,
141:6, 202:12,
203:3, 203:4, 205:4,
206:12
**areas** [2] - 57:2,
118:17
**argument** [2] - 56:25,
193:21
**arm** [4] - 64:21, 109:5,
115:12, 164:11
**armed** [11] - 30:23,
64:17, 65:6, 65:20,
66:2, 74:19, 76:25,
79:3, 102:12,
102:18, 105:10
**armed/safe** [3] -
78:10, 78:11
**arming** [1] - 65:15
**arms** [4] - 27:22,
109:19, 133:24,
134:4
**arrest** [3] - 121:10,
153:6, 153:21
**arrested** [2] - 15:2,
151:8
**arresting** [1] - 14:23,
124:5
**arriving** [1] - 172:10
**ASP** [11] - 38:14,
39:23, 39:25, 40:3,
40:7, 40:18, 40:23,
42:22, 43:4, 43:7,
43:14
**asphyxia** [4] - 153:25,
154:3, 154:14,
154:15
**assault** [5] - 54:5,
98:22, 99:4, 99:14,
99:16
**assaulted** [3] - 30:3,
99:18, 149:12
**assaulting** [6] - 99:3,
99:6, 99:9, 99:25,
122:20, 153:16
**Assembly** [1] - 126:12

**assess** [1] - 150:16
**assessing** [5] - 139:4,
139:15, 147:25,
149:11, 150:24
**assessment** [2] -
139:17, 149:23
**assigned** [10] - 77:4,
77:6, 77:7, 185:5,
221:1, 221:10,
221:11, 221:13,
221:16, 222:3
**associated** [2] -
25:23, 62:16
**assume** [8] - 8:10,
23:10, 32:22, 41:3,
98:18, 140:7, 201:9,
215:10
**assuming** [15] - 14:9,
42:10, 64:18, 80:3,
81:9, 89:17, 103:1,
109:12, 113:5,
113:9, 115:15,
167:9, 202:3, 208:8,
209:5
**assure** [1] - 78:7
**AT** [2] - 1:2, 228:15
**at-a-boy** [1] - 185:13
**attach** [9] - 9:25,
16:24, 17:24, 19:5,
23:5, 46:8, 48:21,
206:16, 214:12
**attached** [6] - 11:11,
21:24, 109:4, 155:6,
174:11, 207:20
**attempt** [10] - 58:5,
69:19, 69:22, 69:25,
70:3, 71:20, 98:21,
99:21, 121:9, 121:10
**attempted** [21] -
29:24, 53:21, 54:18,
60:11, 60:17, 70:12,
70:14, 105:14,
105:15, 119:12,
149:17, 162:5,
162:15, 164:9,
170:1, 171:1, 193:2,
193:4, 193:18,
219:21, 225:7
**attempting** [10] - 54:4,
57:23, 97:16, 99:11,
105:20, 108:24,
141:24, 148:3,
153:17, 171:14
**attempts** [8] - 59:25,
68:21, 68:23,
134:21, 142:17,
157:17, 165:9, 200:2
**attend** [2] - 24:1,
24:18
**attention** - 112:22,
174:10
**attorney** [3] - 15:19,
217:2, 220:11

**attorneys** [2] - 181:1,
229:16
**audio** [1] - 161:10
**August** [2] - 87:6,
87:25
**Authority** [1] - 35:21
**automatically** [1] -
85:4
**autopsy** [1] - 226:22
**auxiliary** [1] - 13:3
**avail** [1] - 219:22
**available** [2] - 221:21,
229:15
**Avenue** [3] - 156:4,
160:14, 173:15
**avoid** [8] - 52:4, 54:8,
62:12, 196:17,
197:7, 199:7
**awarded** [1] - 185:8
**aware** [10] - 91:13,
97:8, 111:5, 118:18,
138:19, 204:21,
215:13, 221:20,
222:7, 225:1
**Ax** [1] - 191:15
**Axon** [5] - 2:20, 191:6,
191:10, 191:13,
191:23

**B**

**bachelor** [1] - 8:20
**bachelor's** [2] - 10:15,
10:22
**BACHERT** [2] - 5:4,
5:19
**backed** [1] - 18:23
**background** [5] -
8:19, 8:24, 9:15,
9:19, 11:17
**backup** [5] - 38:19,
39:9, 42:3, 42:8,
95:9
**bad** [2] - 87:12, 104:25
**bagging** [1] - 170:21
**Baker** [1] - 181:2
**Baldwin** [7] - 12:10,
12:11, 12:12, 12:13,
13:22, 81:1, 83:24
**barely** [1] - 18:14
**Barren** [1] - 179:20
**Barton** [1] - 47:24
**Barton's** [1] - 48:7
**based** [3] - 24:24,
72:9, 135:13
**basing** [1] - 167:22
**basis** [1] - 185:3
**baton** [4] - 38:8,
38:12, 39:24, 42:22
**battery** [7] - 67:4,
84:25, 224:2, 224:5,
224:6, 224:8

**Beach** [1] - 12:7
**beat** [1] - 217:23
**became** [4] - 131:23,
178:20, 179:5,
194:24
**becoming** [1] - 148:2
**began** [1] - 15:12
**beginning** [2] - 5:5,
197:12
**behalf** [1] - 6:2
**behavior** [1] - 199:15
**behind** [14] - 27:22,
74:17, 99:12,
109:20, 128:24,
133:12, 133:16,
133:17, 134:5,
134:23, 164:7,
164:11, 165:2,
194:10
**belief** [1] - 95:7
**believes** [1] - 96:8
**below** [1] - 98:3
**belt** [8] - 38:11, 39:20,
39:21, 40:2, 40:5,
65:3, 65:10, 98:16
**Bench** [1] - 114:16
**bench** [1] - 114:23
**best** [9] - 80:1, 122:19,
123:13, 123:14,
142:2, 147:2, 202:3,
203:8, 204:3
**better** [3] - 51:4,
117:25, 118:16
**between** [26] - 7:1,
13:7, 24:5, 71:2,
74:16, 85:23, 87:10,
88:4, 88:23, 125:3,
139:11, 167:18,
169:6, 169:7,
171:21, 184:1,
184:2, 184:18,
197:17, 199:20,
200:1, 200:5,
209:18, 219:20,
225:17, 226:7
**beyond** [2] - 197:8,
199:7
**big** [2] - 18:15, 88:21
**bigger** [1] - 159:9
**birth** [1] - 23:13
**bit** [5] - 50:9, 97:19,
116:14, 116:15,
202:13
**blog** [1] - 119:14
**blood** [9] - 126:7,
126:10, 200:15,
202:11, 202:18,
202:21, 202:24,
203:5
**blown** [1] - 140:4
**body** [25] - 15:21,
16:2, 17:2, 20:3,
20:4, 21:1, 21:7,

52:3, 58:4, 69:11,
72:10, 114:17,
125:21, 126:24,
127:10, 140:5,
163:14, 167:1,
189:16, 189:18,
189:21, 194:16,
226:24
**born** [1] - 177:25
**Boston** [1] - 177:25
**bottom** [6] - 49:1,
51:12, 54:8, 62:12,
126:15, 184:24
**Bowling** [3] - 5:4,
5:16, 5:20
**BOWLING** [2] - 1:2,
1:25
**Box** [2] - 5:16, 5:20
**box** [5] - 77:1, 79:3,
80:14, 80:15, 80:16
**boy** [1] - 185:13
**brachial** [1] - 110:3
**Brachial** [2] - 110:7,
110:9
**Brady** [3] - 21:16,
21:22, 135:7
**brady** [1] - 21:17
**brandish** [2] - 101:24,
102:10
**brandishing** [3] -
80:15, 80:16, 106:6
**Brandon** [1] - 5:14
**break** [16] - 16:22,
61:21, 61:25, 109:2,
115:7, 136:5,
136:10, 202:13,
228:4
**breakdown** [2] -
103:1, 182:19
**breaking** [2] - 40:7,
103:23
**breath** [1] - 139:22
**breathe** [8] - 111:11,
154:5, 154:9,
154:11, 154:17,
154:21, 172:2, 221:2
**breathing** [16] - 93:19,
93:20, 93:23,
111:23, 112:1,
112:5, 112:13,
112:18, 112:20,
113:3, 134:11,
154:19, 158:15,
169:24, 170:6,
170:12
**brick** [2] - 118:4
**bridge** [3] - 54:4,
70:25, 198:10
**brief** [2] - 16:22,
139:13
**briefings** [1] - 119:18
**bring** [2] - 219:11,
219:16

**Britt** [3] - 170:20, 171:22, 224:1
**BRODERICK** [1] - 5:15
**broke** [3] - 117:2, 130:6, 148:10
**broken** [2] - 116:21, 127:7
**brought** [6] - 16:10, 174:25, 189:21, 208:12, 208:16, 219:20
**bucket** [1] - 135:21
**build** [1] - 216:13
**bulletproof** [2] - 39:12, 39:14
**bumper** [3] - 107:7, 107:12, 107:16
**bunch** [1] - 214:13
**bunched** [1] - 170:2
**burglaries** [1] - 119:12
**burglarized** [2] - 53:16, 95:4
**burglary** [1] - 121:8
**business** [2] - 178:8, 178:9
**but..** [4] - 19:5, 22:23, 36:22, 177:5
**buttocks** [1] - 57:17
**BY** [155] - 6:7, 7:6, 7:13, 9:13, 10:14, 11:8, 15:25, 16:21, 18:12, 19:13, 20:10, 21:23, 23:22, 26:4, 31:12, 31:18, 34:3, 35:12, 35:18, 36:25, 37:18, 38:2, 41:25, 44:8, 46:20, 47:22, 48:24, 49:18, 50:5, 50:22, 55:1, 55:7, 55:14, 56:9, 56:19, 60:15, 62:3, 62:9, 63:23, 66:5, 66:24, 71:6, 72:3, 73:20, 82:1, 82:10, 86:22, 87:18, 88:3, 89:5, 90:7, 91:1, 91:23, 92:21, 94:2, 94:14, 96:21, 97:4, 100:4, 110:6, 110:10, 110:24, 112:9, 114:2, 115:19, 117:14, 118:14, 119:25, 120:23, 121:22, 122:5, 122:14, 122:23, 123:7, 123:24, 124:19, 125:4, 126:14, 127:3, 127:21, 128:3, 128:14, 128:19, 129:4, 129:23, 130:2, 130:13,

131:6, 131:20, 131:25, 133:5, 133:11, 134:9, 135:11, 136:13, 137:2, 138:1, 139:5, 140:21, 143:14, 144:14, 146:14, 146:22, 147:20, 148:5, 149:2, 149:24, 150:11, 150:25, 151:9, 152:1, 152:24, 153:13, 153:24, 154:13, 155:14, 157:2, 157:8, 159:14, 160:6, 166:22, 168:14, 170:19, 172:7, 174:4, 177:7, 178:17, 180:4, 180:14, 180:23, 181:21, 185:16, 187:20, 190:16, 191:3, 191:22, 192:3, 192:9, 199:10, 200:14, 201:3, 204:16, 205:5, 205:16, 207:14, 211:11, 212:5, 212:19, 215:6, 216:5, 216:16, 219:23, 220:24, 223:7, 223:19

**C**

**C-P-R** [2] - 172:16, 172:23
**caller** [3] - 160:15, 160:17, 160:23
**calm** [3] - 162:5, 162:11, 162:15
**cam** [11] - 16:2, 21:1, 69:11, 125:21, 126:24, 127:10, 167:1, 188:24, 189:16, 189:18, 189:21
**cam's** [1] - 21:7
**camera** [3] - 15:21, 17:3, 133:3
**Cameron** [1] - 20:13
**cams** [2] - 20:3, 20:4
**Canine** [1] - 191:16
**canine** [3] - 110:11, 110:12, 191:18
**capacity** [6] - 13:13, 174:25, 175:11, 212:8, 212:13, 213:12
**Capacity** [1] - 211:19

**captain** [3] - 184:19, 184:23, 211:3
**Captain** [1] - 208:2
**captains** [3] - 183:3, 183:8, 183:9
**caption** [2] - 229:7, 229:14
**car** [19] - 29:22, 35:11, 40:4, 40:11, 40:24, 40:25, 42:24, 79:5, 104:21, 104:24, 105:2, 105:14, 106:21, 107:7, 107:12, 107:16, 131:12, 219:11
**cardiac** [4] - 195:12, 195:14, 195:21, 196:4
**cardio** [1] - 115:5
**care** [5] - 113:12, 172:14, 188:21, 206:23, 211:10
**career** [3] - 14:21, 33:17, 44:17
**carry** [4] - 38:11, 40:2, 40:5, 41:3
**cartridge** [15] - 51:2, 58:12, 59:4, 60:23, 65:9, 65:14, 65:20, 73:2, 84:24, 124:25, 165:17, 224:4, 224:9, 224:11, 224:13
**case** [5] - 3:16, 14:23, 17:23, 30:15, 181:7
**cases** [3] - 3:15, 98:20, 140:7, 180:3, 180:5, 180:12, 180:18, 181:3, 181:5
**caught** [3] - 53:15, 148:9, 167:20
**causation** [1] - 227:18
**caused** [3] - 63:7, 204:18, 227:2
**causes** [1] - 147:10
**causing** [1] - 163:2
**ceased** [2] - 54:24, 97:17
**Cedar** [4] - 14:3, 81:1, 83:19, 83:25
**Celsius** [1] - 66:2
**center** [5] - 97:25, 98:4, 98:12, 98:17, 98:18
**Cert** [1] - 229:24
**certain** [8] - 31:3, 31:20, 57:4, 116:7, 139:14, 204:22, 215:19, 218:17
**certainly** [3] - 168:16, 227:3, 227:13
**certificate** [9] - 24:14, 24:22, 24:25, 42:19,

46:2, 46:22, 47:7, 47:11
**Certificate** [2] - 2:10, 9:3
**certificates** [2] - 27:3, 47:14
**certification** [1] - 42:20
**Certification** [1] - 2:12
**certifications** [1] - 37:2
**certified** [8] - 23:24, 24:2, 24:7, 36:6, 42:16, 44:24, 44:25, 172:13
**certify** [2] - 229:4, 229:17
**certifying** [1] - 47:24
**CEW** [9] - 49:23, 51:17, 55:16, 55:19, 55:21, 55:23, 56:11, 62:10, 62:13
**chain** [1] - 34:1
**chance** [1] - 202:3
**change** [9] - 41:7, 41:9, 41:10, 41:12, 41:17, 45:12, 159:17, 159:21, 202:18
**changed** [7] - 41:8, 42:6, 111:1, 151:1, 182:18, 182:22, 195:10
**changes** [1] - 200:11
**changing** [1] - 202:21
**Chapter** [1] - 35:20
**charge** [16] - 59:5, 59:8, 61:5, 61:11, 67:11, 67:17, 70:20, 74:3, 74:8, 74:15, 184:20, 184:24, 195:18, 195:21, 196:3, 208:5
**charges** [1] - 61:8
**charging** [1] - 195:24
**check** [3] - 112:25, 114:10, 213:22
**checks** [1] - 42:14
**chemical** [12] - 28:4, 28:12, 30:5, 33:4, 38:4, 92:5, 107:19, 107:20, 107:25, 109:13, 109:14
**chemistry** [2] - 200:15, 202:18
**chest** [11] - 39:10, 57:1, 57:8, 133:3, 154:16, 201:25, 202:12, 203:3, 203:4, 205:3, 206:11
**Chief** [6] - 175:2, 179:6, 179:12, 208:25, 213:9,

216:19
**chief** [33] - 12:12, 12:17, 13:17, 13:22, 14:2, 14:3, 14:6, 14:9, 14:14, 14:24, 15:5, 89:18, 175:6, 175:24, 176:9, 176:12, 177:12, 178:20, 179:11, 179:16, 183:1, 183:6, 184:18, 184:21, 208:3, 208:16, 217:17, 217:22, 217:24, 218:8, 218:17
**chief's** [1] - 217:24
**chiefs** [3] - 26:16, 185:22
**chiropractor** [1] - 83:12
**choke** [2] - 154:1, 154:7
**choking** [3] - 154:4, 154:8, 154:16
**circuit** [3] - 114:17, 115:3, 115:5
**circumstances** [3] - 31:4, 135:14, 204:22
**citations** [1] - 14:16
**CITY** [1] - 1:11
**City** [11] - 15:12, 34:16, 35:25, 43:17, 43:25, 44:18, 44:20, 48:7, 179:25, 204:4, 218:4
**Civil** [1] - 5:7
**CIVIL** [1] - 1:3
**clarification** [30] - 15:24, 16:16, 38:1, 46:17, 66:23, 71:5, 78:22, 85:13, 90:6, 97:3, 100:3, 110:5, 112:8, 114:1, 115:18, 117:4, 126:11, 127:2, 128:1, 129:9, 172:6, 178:16, 181:20, 192:2, 204:15, 207:11, 216:4, 216:15, 219:1, 220:14
**class** [1] - 11:3
**classes** [7] - 11:5, 11:7, 24:19, 25:20, 47:9, 137:9, 137:10
**Claywell** [2] - 157:15, 157:24
**claywell** [1] - 157:16
**clear** [2] - 111:15, 189:25
**Cleveland** [3] - 156:4, 160:14, 173:15
**clicking** [5] - 132:5,

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

132:7, 142:5, 142:7, 142:8
**clip** [2] - 17:12, 19:4
**close** [4] - 30:10, 98:8, 107:22, 223:4
**closing** [1] - 210:10
**cloud** [1] - 189:4
**cocaine** [1] - 93:8
**collapsible** [1] - 39:25
**College** [1] - 5:15
**Colonel** [2] - 209:1, 218:2
**colonel** [12] - 175:13, 176:5, 177:1, 177:13, 179:11, 181:23, 182:2, 184:14, 184:15, 184:20, 184:21, 217:17
**colonel's** [1] - 176:7
**Columbia** [2] - 10:15, 10:25
**column** [2] - 50:1, 144:16
**combat** [1] - 43:16
**combative** [1] - 95:11
**combined** [2] - 198:25, 214:20
**coming** [7] - 11:17, 104:6, 140:11, 186:22, 216:10, 222:15, 228:6
**command** [2] - 28:8, 29:4
**Command** [1] - 106:18
**commander** [1] - 213:23
**Commands** [1] - 106:22
**commands** [4] - 28:2, 29:15, 106:25, 121:21
**comment** [3] - 212:16, 218:1, 218:6
**commenting** [1] - 148:19
**comments** [2] - 148:18, 208:24
**commission** [2] - 74:25, 229:24
**committed** [4] - 105:11, 121:11, 151:7, 151:11
**committing** [1] - 124:10
**common** [3] - 79:22, 118:22, 147:10
**communication** [1] - 164:15
**communications** [1] - 169:20
**Communications** [1] -

170:7
**company** [1] - 191:24
**compared** [5] - 25:7, 141:6, 159:9, 159:12, 222:18
**comparing** [1] - 16:5
**complaint** [1] - 211:2
**complete** [7] - 36:6, 164:12, 193:2, 221:1, 221:22, 221:24, 222:2
**completed** [4] - 156:11, 221:12, 221:15, 221:23
**completing** [1] - 221:10
**completion** [1] - 156:12
**compliance** [19] - 51:3, 51:10, 51:13, 52:5, 54:9, 81:16, 82:14, 134:23, 135:17, 141:1, 141:5, 141:7, 165:21, 192:16, 193:12, 194:3, 194:15, 199:17, 199:21
**Compliance** [1] - 9:3
**compliant** [3] - 27:21, 29:17, 199:24
**complied** [7] - 104:13, 107:5, 121:20, 134:2, 139:13, 194:9, 194:14
**complies** [2] - 51:25, 144:13
**comply** [16] - 27:11, 29:23, 30:2, 81:14, 104:9, 106:24, 107:4, 107:6, 123:3, 123:16, 153:16, 164:6, 165:2, 192:22, 194:8
**complying** [2] - 107:2, 142:20
**computer** [6] - 3:11, 16:11, 89:25, 90:19, 137:4, 138:10
**concerned** [1] - 160:21
**concerning** [3] - 87:1, 89:11, 207:23
**conclude** [1] - 228:8
**concluded** [2] - 211:12, 213:19
**CONCLUDED** [1] - 228:15
**conclusion** [1] - 148:3
**condition** [6] - 113:6, 113:10, 113:14, 113:19, 130:24, 131:1

**conditions** [9] - 100:21, 100:22, 100:25, 187:6, 187:9, 187:12, 187:13
**conducted** [2] - 211:2, 211:3
**conf** [1] - 117:5
**Confidential** [1] - 206:16
**confidential** [2] - 207:24, 211:3
**confirm** [3] - 169:1, 169:21, 188:15
**confirming** [1] - 117:5
**confused** [7] - 143:15, 147:4, 148:11, 148:13, 148:21, 148:23, 172:15
**confusion** [1] - 145:21
**confusional** [2] - 145:24, 146:11
**connect** [1] - 53:22
**connected** [1] - 53:23
**connections** [1] - 54:19
**Consequences** [1] - 216:17
**consider** [2] - 103:22, 140:16
**consideration** [1] - 103:2
**considered** [5] - 38:7, 92:23, 96:11, 97:14, 100:12
**consist** [1] - 42:13
**consistent** [4] - 115:20, 158:23, 163:20, 169:11
**consistently** [2] - 14:21, 116:12
**constant** [2] - 163:16, 163:19
**constantly** [1] - 218:3
**consumption** [1] - 228:11
**contact** [83] - 41:1, 57:13, 57:15, 57:16, 57:19, 57:23, 57:24, 59:19, 60:21, 61:2, 67:13, 67:20, 69:5, 70:16, 70:17, 70:19, 71:2, 71:4, 71:7, 71:12, 71:13, 71:20, 71:23, 71:24, 72:9, 72:14, 73:8, 74:2, 74:7, 75:10, 79:6, 82:19, 93:21, 101:19, 101:20, 102:11, 120:2, 120:3, 120:6, 120:8, 120:14, 132:8, 132:11, 132:12,

132:18, 132:20, 132:25, 134:25, 140:12, 141:11, 141:17, 141:25, 142:5, 142:8, 142:24, 143:9, 148:7, 148:22, 153:4, 157:16, 161:12, 161:15, 161:25, 163:13, 163:16, 163:19, 164:19, 164:20, 168:11, 168:12, 175:20, 193:6, 193:8, 193:22, 193:24, 197:22, 198:1, 199:13, 219:21, 225:8, 225:9, 225:11
**contacted** [1] - 174:14
**contacting** [1] - 53:10
**contacts** [5] - 69:8, 70:21, 70:22, 120:5, 193:11
**contents** [1] - 90:11
**continue** [2] - 172:1, 194:11
**continued** [4] - 10:4, 172:3, 179:14, 194:13
**continuing** [3] - 27:16, 124:16, 199:16
**continuous** [16] - 13:4, 62:13, 62:17, 74:3, 140:25, 141:2, 197:8, 197:11, 197:18, 197:20, 198:22, 199:1, 199:7, 199:8, 225:25, 226:1
**continuum** [16] - 27:24, 28:20, 29:8, 29:10, 30:24, 32:5, 32:6, 36:14, 102:22, 103:7, 106:13, 106:15, 107:8, 108:12, 140:22, 142:14
**contracting** [1] - 83:10
**contractions** [1] - 135:25
**contracts** [1] - 83:8
**contributing** [2] - 96:6, 96:23
**control** [18] - 37:9, 37:19, 91:25, 92:4, 92:7, 92:22, 93:5, 95:11, 96:1, 96:9, 96:10, 96:13, 98:23, 108:11, 108:17, 108:19, 108:25, 124:12

**Control** [1] - 107:9
**controls** [2] - 109:17, 176:12
**conversation** [3] - 88:23, 139:13, 209:18
**conversational** [1] - 8:15
**conversations** [1] - 117:1
**Cook** [2] - 5:18, 159:4
**COOK** [194] - 3:10, 3:13, 3:16, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22, 4:23, 4:24, 6:21, 7:10, 16:7, 16:15, 18:4, 18:7, 18:11, 19:1, 19:10, 20:6, 20:24, 21:9, 21:11, 22:22, 22:25, 23:4, 23:17, 23:21, 25:19, 25:24, 26:1, 31:16, 36:23, 37:16, 41:23, 44:6, 46:8, 49:13, 49:15, 49:17, 49:25, 50:2, 54:15, 55:5, 55:11, 56:6, 56:18, 60:13, 61:22, 62:8, 66:4, 72:2, 73:18, 82:7, 86:19, 87:17, 87:23, 88:12, 88:15, 89:2, 89:4, 90:2, 90:4, 90:16, 90:22, 91:18, 91:20, 94:9, 96:18, 110:21, 110:23, 119:24, 120:22, 121:17, 121:19, 122:4, 122:10, 122:18, 123:6, 123:19, 123:21, 124:18, 124:23, 125:13, 126:2, 126:6, 126:12, 127:18, 130:1, 135:7, 135:10, 136:4, 137:25, 139:2, 140:20, 143:13, 144:12, 146:13, 146:17, 147:24, 149:21, 150:2, 150:7, 150:22, 151:4, 151:6, 151:24, 152:9, 152:11, 152:15, 152:19, 152:21,

153:9, 153:23, 154:12, 156:18, 156:25, 159:7, 160:1, 160:5, 166:20, 177:4, 180:3, 180:9, 181:6, 181:10, 181:14, 181:17, 188:1, 188:6, 188:9, 188:11, 188:14, 188:18, 188:21, 189:1, 189:6, 189:9, 189:13, 189:20, 189:25, 190:5, 190:7, 190:25, 192:6, 192:8, 199:4, 200:13, 200:25, 204:24, 206:20, 206:24, 207:2, 207:9, 209:23, 210:4, 210:12, 210:14, 210:21, 211:6, 212:3, 212:18, 214:17, 214:22, 215:3, 215:5, 219:4, 220:20, 220:22, 228:2, 228:12

copies [1] - 63:18
copy [11] - 9:8, 9:10, 16:9, 17:18, 18:10, 46:6, 90:24, 218:23, 218:24, 219:8, 220:18
corner [5] - 117:7, 118:1, 126:16, 128:7, 128:8
correct [78] - 11:13, 11:14, 20:1, 23:24, 27:12, 30:25, 31:1, 32:7, 34:13, 37:6, 40:9, 40:16, 43:1, 43:2, 43:22, 48:4, 48:8, 49:2, 49:5, 49:6, 51:9, 52:13, 64:5, 64:10, 64:15, 67:1, 71:22, 73:5, 73:10, 74:10, 75:2, 78:18, 81:14, 87:4, 89:12, 89:21, 91:4, 92:10, 95:16, 96:4, 98:1, 99:22, 101:4, 101:25, 102:13, 106:7, 108:25, 113:7, 121:16, 123:8, 124:5, 129:1, 142:5, 142:12, 150:18, 155:20, 156:8, 157:1, 159:15, 160:12, 160:25, 161:5, 161:6, 162:2, 163:17, 168:3,

173:21, 175:11, 181:24, 187:16, 198:21, 198:22, 208:3, 212:13, 217:6, 220:1, 227:4, 229:11
correspondence [1] - 11:1
Cottondale [1] - 13:2
counsel [5] - 16:23, 90:23, 125:23, 180:24, 229:18
counseling [1] - 185:17
count [3] - 70:11, 141:18, 164:5
counted [5] - 25:6, 164:18, 167:5, 167:9, 167:10
COUNTY [1] - 229:2
County [2] - 5:5, 179:20
couple [5] - 7:10, 17:9, 49:21, 63:18, 205:25
course [7] - 14:21, 45:8, 76:17, 77:11, 77:22, 79:13, 110:15
courses [1] - 26:14
COURT [62] - 1:1, 1:24, 11:6, 16:19, 19:7, 23:16, 31:10, 33:24, 34:25, 35:3, 35:7, 46:15, 50:18, 61:24, 62:1, 81:23, 92:17, 93:25, 110:9, 118:7, 118:9, 125:18, 126:9, 129:14, 132:12, 132:19, 135:4, 135:9, 135:23, 136:1, 136:9, 136:11, 136:25, 147:18, 148:25, 155:9, 155:11, 157:5, 159:6, 159:10, 168:9, 170:16, 170:18, 174:2, 180:16, 180:19, 180:22, 185:11, 187:19, 188:3, 188:8, 188:10, 188:12, 190:12, 191:18, 191:20, 210:20, 219:5, 222:11, 223:15, 228:3, 228:14
Court [2] - 180:11, 229:16
court [3] - 6:21, 6:25, 180:16
courts [1] - 180:21

COVID [1] - 127:23
CPR [10] - 170:14, 170:15, 170:17, 171:20, 171:24, 172:2, 172:3, 172:4, 172:9, 172:24
crashes [1] - 14:17
Crawford [4] - 12:16, 12:18, 14:2, 14:4
create [1] - 123:4
Creek [8] - 90:2, 90:4, 90:5, 90:8, 136:24, 137:1, 145:10, 145:11
crime [2] - 121:10, 124:10
crimes [1] - 124:10
criminal [2] - 8:20, 36:5
Criminal [1] - 10:16
critical [1] - 222:25
Cross [1] - 2:2
CROSS [1] - 6:6
cross [1] - 92:9
cross-draw [1] - 92:9
cues [1] - 94:19
curious [2] - 145:7, 188:21
curls [1] - 115:12
current [5] - 71:22, 78:17, 84:8, 84:18, 225:16
custody [5] - 98:21, 99:22, 123:15, 124:9, 124:13
cut [1] - 77:2
cutter [5] - 77:1, 79:3, 80:14, 80:15, 80:16
CV [1] - 8:23
cycle [3] - 144:7, 145:4, 226:6
cycles [3] - 144:4, 144:16, 144:19

**D**

daily [1] - 119:11
danger [3] - 151:17, 212:22
dangerous [2] - 32:6, 118:22
dart [23] - 59:18, 59:19, 65:12, 82:9, 83:5, 83:7, 84:6, 84:14, 85:6, 85:7, 133:9, 134:20, 134:24, 135:13, 166:2, 166:8, 166:18, 168:2, 168:6, 168:21, 195:16, 196:9
dart-deployment [2] -

134:20, 135:13
dart-mode [1] - 84:6
darts [26] - 59:21, 61:1, 61:3, 61:12, 68:24, 72:22, 73:3, 73:8, 74:8, 81:19, 81:20, 85:8, 85:15, 124:21, 133:6, 135:1, 135:2, 135:4, 135:5, 135:6, 165:25, 193:1, 195:3, 202:1, 223:23, 225:12
dash [1] - 188:24
Data [1] - 2:7
date [14] - 10:17, 23:13, 79:2, 79:20, 86:19, 89:21, 115:23, 125:1, 126:15, 126:23, 155:25, 174:17, 174:20, 214:12
Date [1] - 86:24
DATE [1] - 1:17
dated [1] - 155:24
dates [2] - 215:18, 215:20
DAVENPORT [1] - 5:15
days [2] - 92:15, 92:18
de [3] - 27:4, 27:8, 162:12
de-escalate [1] - 162:12
de-escalation [2] - 27:4, 27:8
dead [2] - 98:18, 115:15
dead-lifting [1] - 115:15
Deadline [1] - 216:18
deadly [6] - 28:5, 28:14, 32:9, 33:7, 110:15, 110:20
deal [2] - 88:21, 119:1
Dealing [1] - 211:18
dealing [11] - 52:16, 136:15, 136:19, 137:20, 138:6, 138:9, 212:7, 212:8, 212:12, 212:21, 213:11
death [32] - 6:22, 55:4, 55:9, 55:20, 56:12, 56:21, 57:6, 96:7, 96:24, 200:11, 201:24, 202:4, 202:6, 202:19, 203:10, 203:11, 203:21, 204:6, 204:8, 204:10, 204:12, 204:17, 204:22, 205:7,

206:4, 206:5, 206:7, 206:9, 206:10, 226:24, 227:2
death" [1] - 203:12
deceitful [2] - 209:2, 209:6
December [5] - 10:17, 10:20, 175:7, 175:12, 208:25
decent [1] - 125:9
decided [1] - 134:13
Deer [7] - 90:1, 90:5, 136:24, 137:1, 145:10, 145:11
deer [2] - 90:8, 136:25
Defendants [1] - 5:18
DEFENDANTS [1] - 1:11
defended [1] - 180:9
definitely [2] - 148:6, 149:13
definition [3] - 146:7, 146:15, 147:2
degree [2] - 8:20, 28:23
degrees [2] - 66:2, 227:9
delirium [24] - 101:7, 101:9, 101:11, 101:15, 145:9, 145:15, 146:7, 146:10, 146:16, 147:2, 147:8, 147:11, 147:22, 149:20, 150:1, 150:13, 151:2, 151:14, 151:19, 152:5, 152:6, 153:3, 153:19, 162:2
delivered [2] - 195:17, 195:20, 196:3
delivering [5] - 17:16, 18:19, 18:24, 19:16, 20:11
delusional [1] - 101:18
demeanor [1] - 140:8
demise [1] - 63:8
demonstrate [1] - 36:8
demoted [11] - 175:13, 176:20, 177:1, 177:10, 177:15, 177:16, 179:10, 179:12, 181:22, 185:24, 186:5
demotion [3] - 176:5, 179:23, 181:25
Department [43] - 6:11, 11:13, 12:6, 12:7, 12:11, 13:1, 13:23, 14:3, 14:5, 14:12, 15:13, 34:23, 37:6, 38:18, 41:6,

41:22, 42:4, 44:1, 45:9, 49:5, 66:17, 76:14, 76:18, 77:5, 79:14, 79:24, 80:5, 80:23, 89:11, 118:15, 137:7, 137:14, 174:17, 175:1, 185:9, 185:21, 185:25, 186:6, 202:16, 204:5, 218:5, 218:18, 220:1

**department** [12] - 36:1, 83:17, 83:20, 120:2, 175:9, 182:17, 186:25, 191:16, 202:15, 208:10, 208:14, 224:20

**departments** [4] - 185:24, 186:3, 186:6, 186:10

**depicted** [2] - 17:6, 17:14

**depiction** [2] - 22:7, 22:15

**depleted** [1] - 224:3

**deploy** [11] - 30:7, 37:23, 57:10, 68:10, 79:22, 95:18, 96:1, 140:23, 141:24, 144:6, 171:11

**deployed** [40] - 30:12, 30:16, 53:20, 53:21, 58:22, 59:1, 61:3, 62:21, 62:22, 62:25, 65:24, 67:21, 68:7, 68:24, 72:22, 74:9, 76:12, 80:4, 84:23, 94:5, 96:4, 97:2, 97:20, 113:1, 132:6, 134:17, 151:22, 152:7, 153:7, 164:16, 165:8, 165:25, 166:10, 168:5, 169:17, 171:7, 195:23, 196:14, 199:12, 225:12

**deploying** [8] - 50:6, 50:12, 50:24, 74:15, 140:12, 152:6, 163:10, 223:23

**Deployment** [1] - 62:11

**deployment** [41] - 58:16, 63:4, 64:3, 65:12, 67:5, 69:19, 69:22, 69:25, 70:3, 70:12, 92:23, 95:23, 96:10, 112:24, 134:20, 135:13, 135:20, 135:25,

140:18, 141:6, 142:18, 143:25, 144:21, 144:22, 164:22, 165:4, 165:6, 165:16, 165:25, 166:18, 168:3, 168:6, 168:13, 168:21, 194:20, 195:3, 198:19, 200:6, 202:2, 202:10, 224:15

**deployments** [21] - 50:15, 50:16, 58:7, 58:10, 58:15, 69:17, 70:15, 77:22, 78:6, 93:5, 94:6, 142:19, 163:16, 166:2, 166:8, 167:16, 195:4, 199:20, 200:1, 225:18, 225:22

**deploys** [4] - 61:1, 75:21, 84:17, 196:2

**deponent** [1] - 2:7

**DEPONENT** [1] - 1:16

**Deponent's** [1] - 2:15

**deposed** [2] - 6:3, 171:13

**DEPOSITION** [2] - 1:9, 228:15

**deposition** [11] - 5:2, 7:7, 7:9, 7:21, 15:18, 17:22, 155:20, 229:5, 229:9, 229:12, 229:13

**Deposition** [32] - 2:5, 2:6, 2:8, 2:10, 2:11, 2:13, 2:15, 2:16, 2:18, 2:19, 2:21, 2:22, 2:24, 2:25, 3:2, 3:3, 10:9, 21:5, 23:7, 46:18, 47:20, 48:22, 63:21, 86:16, 88:1, 190:14, 207:12, 209:24, 214:23, 219:2, 220:15, 223:2

**derived** [1] - 146:25

**describe** [3] - 27:22, 82:2, 177:5

**described** [3] - 84:5, 127:12, 162:24

**description** [1] - 118:3

**detective** [9] - 175:14, 175:15, 175:17, 182:14, 183:20, 183:24, 184:1, 184:2, 184:7

**detectives** [2] - 183:4, 184:4

**determination** [2] - 52:15, 213:10

**determine** [3] - 72:8,

135:12, 145:14

**determined** [3] - 211:18, 213:7, 213:8

**determining** [2] - 103:2, 103:6

**device** [24] - 28:13, 30:4, 30:12, 32:13, 32:17, 33:10, 34:10, 34:13, 34:16, 37:9, 37:19, 66:18, 91:25, 92:4, 92:7, 92:22, 93:5, 96:1, 96:10, 98:23, 108:11, 108:16, 108:17, 108:20

**device's** [1] - 96:13

**diagnosed** [3] - 187:15, 187:18, 187:21

**Dick** [1] - 217:19

**dick** [2] - 176:15, 177:11

**difference** [8] - 84:5, 164:23, 165:5, 165:7, 167:12, 168:17, 169:6, 222:21

**Differences** [1] - 62:11

**different** [24] - 22:11, 22:13, 30:22, 41:11, 41:21, 44:3, 50:19, 58:15, 68:2, 78:13, 83:6, 86:8, 108:11, 114:18, 127:8, 140:4, 151:16, 161:19, 183:22, 190:23, 190:25, 192:5, 199:20, 215:20

**differing** [2] - 87:10, 177:20

**difficult** [1] - 22:9

**Diminished** [1] - 211:19

**diminished** [3] - 212:7, 212:13, 213:12

**dip** [1] - 135:21

**direct** [1] - 218:16

**directing** [1] - 152:17

**direction** [1] - 199:12

**directions** [1] - 117:25

**directive** [1] - 134:2

**disagree** [6] - 56:15, 197:15, 209:5, 209:7, 214:4, 214:5

**discharge** [2] - 100:10, 223:9

**discharged** [2] - 125:2, 125:8

**discharges** [1] - 93:10

**disciplinary** [5] - 186:13, 186:15,

213:21, 214:3, 223:11

**Disciplinary** [4] - 2:24, 3:1, 3:2, 214:13

**disciplined** [3] - 186:9, 209:8, 209:15

**disclosed** [1] - 102:2

**disclosing** [1] - 125:24

**disconnect** [2] - 52:3, 194:16

**discovery** [10] - 8:22, 18:9, 30:15, 35:16, 35:22, 66:15, 86:2, 125:22, 190:18, 192:11

**discretion** [1] - 208:17

**discuss** [1] - 27:4

**discussed** [5] - 61:16, 120:8, 125:22, 163:15, 174:7

**discussing** [2] - 36:10, 85:22

**discussion** [34] - 15:24, 16:16, 35:17, 38:1, 46:17, 66:23, 71:5, 78:22, 85:13, 90:6, 97:3, 100:3, 110:5, 112:8, 114:1, 115:18, 117:4, 125:17, 126:11, 127:2, 128:1, 129:9, 172:6, 178:16, 181:20, 192:2, 204:15, 205:15, 207:11, 216:4, 216:15, 219:1, 220:14, 223:6

**disengage** [1] - 55:23

**dispatch** [9] - 117:16, 117:17, 117:23, 118:2, 128:6, 160:18, 160:19, 160:24, 161:5

**dispatched** [1] - 160:14

**displayed** [1] - 218:3

**disposed** [2] - 3:15, 181:5

**dispute** [1] - 66:25

**distance** [2] - 124:20, 195:17

**DISTRICT** [2] - 1:1, 1:1

**disturbed** [4] - 52:2, 52:9, 52:13, 54:12

**DIVISION** [1] - 1:2

**DOCJT** [2] - 26:2, 26:5

**doctor** [1] - 217:10

**doctor's** [2] - 210:23, 216:10

**doctored** [1] - 22:16

**document** [7] - 9:5, 9:6, 46:12, 60:8,

206:19, 220:13, 223:1

**documented** [1] - 217:7

**documents** [50] - 9:1, 9:7, 9:16, 16:15, 35:14, 36:21, 36:24, 46:4, 46:12, 47:18, 47:19, 48:3, 49:12, 49:24, 50:4, 51:15, 56:5, 61:18, 62:7, 88:18, 91:17, 91:22, 97:13, 99:20, 101:6, 103:11, 103:15, 110:21, 155:13, 155:23, 159:19, 159:23, 159:24, 161:11, 163:4, 163:8, 169:20, 173:11, 173:17, 185:2, 187:25, 192:19, 206:14, 206:20, 209:22, 210:1, 210:6, 214:11, 218:25

**dog** [1] - 110:12

**done** [16] - 49:13, 63:12, 64:13, 76:16, 81:10, 103:18, 151:16, 178:6, 199:18, 203:25, 204:1, 207:15, 208:12, 210:4, 223:4, 228:1

**door** [3] - 40:4, 40:13, 128:24

**doors** [1] - 77:2

**doorway** [2] - 128:22, 139:12

**Doty** [4] - 176:15, 176:17, 177:11, 217:19

**double** [1] - 114:10

**down** [37] - 7:24, 8:4, 50:3, 54:7, 64:9, 68:8, 68:17, 70:10, 70:11, 81:25, 92:3, 133:13, 133:14, 144:7, 145:1, 145:2, 146:8, 148:25, 155:1, 155:4, 160:7, 162:11, 162:24, 164:4, 174:18, 176:6, 176:7, 176:16, 179:11, 180:20, 183:6, 188:13, 190:1, 196:8, 198:11, 202:13

**draw** [2] - 92:8, 92:9

**Drive** [2] - 50:19, 189:14

**drive** [106] - 17:24,

19:5, 21:1, 50:10, 50:16, 50:24, 51:1, 51:13, 51:20, 52:1, 52:4, 53:19, 53:22, 54:9, 54:12, 54:18, 54:20, 54:24, 57:11, 58:5, 58:11, 59:24, 60:1, 60:11, 60:18, 63:1, 65:11, 67:5, 67:15, 67:16, 67:18, 68:15, 68:23, 69:18, 70:11, 72:24, 81:19, 82:7, 82:8, 82:11, 83:4, 83:5, 83:9, 84:6, 84:9, 85:6, 85:10, 85:19, 96:5, 97:2, 98:24, 100:6, 100:8, 100:15, 132:3, 134:19, 135:13, 135:18, 140:17, 141:3, 141:4, 141:10, 143:25, 163:10, 163:23, 164:2, 165:12, 165:17, 165:24, 166:1, 166:20, 166:21, 167:12, 168:2, 168:5, 168:8, 168:11, 168:12, 168:21, 188:4, 188:22, 189:7, 189:12, 190:4, 192:15, 192:21, 193:2, 193:11, 193:14, 193:17, 193:18, 193:22, 193:24, 193:25, 194:4, 194:8, 194:11, 194:13, 194:21, 194:25, 195:10, 197:24, 199:14, 225:7

**drive-stun** [20] - 50:10, 50:24, 51:13, 53:19, 59:24, 60:18, 63:1, 67:18, 68:15, 68:23, 70:11, 84:6, 84:9, 100:6, 100:8, 134:19, 135:13, 140:17, 141:10, 194:21

**driveway** [5] - 104:16, 104:24, 117:7, 128:7, 128:8

**drop** [5] - 51:5, 79:8, 82:22, 135:18

**dropped** [1] - 180:20

**drove** [1] - 118:11

**drug** [8] - 94:1, 94:4, 94:11, 137:17, 140:3, 158:17, 158:21, 171:2

**Drug** [1] - 158:9

**drugs** [16] - 52:20, 53:2, 53:9, 95:1, 95:6, 101:13, 131:15, 131:19, 137:22, 139:19, 139:25, 140:1, 140:14, 194:17, 194:23, 212:11

**DuBarry** [2] - 191:17, 191:19

**due** [4] - 52:3, 163:12, 194:16, 194:17

**Duff** [6] - 216:9, 216:19, 217:8, 217:15, 217:23, 219:21

**duly** [18] - 6:3, 10:9, 21:5, 23:8, 46:18, 47:20, 48:22, 63:21, 86:16, 88:1, 190:14, 207:12, 209:24, 214:23, 219:2, 220:15, 223:2, 229:7

**dumbbells** [3] - 115:4, 115:8, 115:11

**Duration** [1] - 144:15

**duration** [26] - 61:5, 62:23, 67:9, 67:10, 67:22, 67:25, 68:9, 70:18, 74:3, 78:20, 82:16, 84:8, 84:11, 84:21, 96:18, 143:16, 143:23, 189:17, 195:17, 195:20, 196:2, 197:2, 197:19, 197:22, 197:23

**durational** [3] - 73:6, 198:16, 199:2

**durations** [3] - 71:16, 196:18, 225:15

**during** [37] - 33:21, 34:13, 38:13, 50:7, 56:14, 64:18, 69:12, 93:20, 109:17, 110:17, 113:2, 119:13, 131:15, 131:18, 139:4, 139:17, 142:21, 161:12, 161:15, 161:24, 164:16, 168:12, 170:3, 194:20, 197:17, 197:24, 198:9, 199:14, 200:1, 209:2, 209:6, 211:17, 216:8, 219:12, 219:22, 220:12

**duties** [2] - 113:5, 113:7

**duty** [21] - 38:11, 39:7,

40:2, 40:5, 41:2, 42:11, 42:17, 77:8, 85:2, 121:12, 121:15, 121:25, 122:7, 123:3, 123:10, 123:16, 124:4, 217:4, 217:5, 219:11, 219:16

# E

**E-M-T** [1] - 172:21

**early** [3] - 96:11, 97:14, 222:18

**easier** [4] - 9:14, 27:23, 159:8, 159:10

**Eastern** [4] - 24:9, 25:13, 25:19, 25:23

**ECD** [1] - 37:19

**education** [5] - 9:2, 10:15, 25:6, 27:2, 184:11

**Education** [1] - 9:23

**educational** [2] - 8:19, 9:18

**effect** [11] - 86:5, 87:1, 87:10, 87:14, 163:12, 165:12, 173:6, 186:18, 194:2, 195:5, 203:14

**effective** [9] - 52:2, 57:12, 57:13, 135:5, 191:11, 194:16, 194:22, 195:2, 195:9

**Effective** [1] - 191:10

**Effectiveness** [3] - 49:23, 51:17, 55:16

**effectiveness** [1] - 135:22

**effects** [6] - 101:12, 200:10, 200:24, 201:2, 201:22, 203:18

**efforts** [1] - 173:2

**eight** [26] - 12:21, 50:13, 50:15, 50:16, 50:18, 53:21, 53:22, 60:19, 68:21, 68:22, 69:4, 70:11, 70:15, 71:19, 134:21, 166:1, 168:16, 168:21, 176:1, 183:4, 183:16, 193:3, 193:20, 193:22, 225:3, 225:7

**eighth** [1] - 72:19

**eighty** [1] - 67:3

**eighty-seven** [1] - 67:3

**either** [12] - 13:17, 92:8, 100:20, 140:17, 154:15,

167:18, 171:12, 182:12, 205:6, 221:11, 221:19, 229:18

**elbow** [3] - 105:17, 162:25, 163:1

**elderly** [4] - 101:2, 117:2, 121:7, 206:11

**elected** [1] - 176:14

**election** [1] - 176:8

**electric** [12] - 61:5, 61:11, 67:11, 70:20, 71:21, 74:3, 74:15, 83:13, 83:15, 98:23, 108:11, 108:16

**electrical** [3] - 195:17, 195:20, 196:3

**electricity** [2] - 75:6, 79:8

**electricity-wise** [1] - 79:8

**electronic** [20] - 28:12, 30:4, 30:12, 32:12, 32:16, 33:5, 33:6, 37:9, 37:19, 58:13, 91:25, 92:3, 92:7, 92:22, 93:5, 96:1, 96:10, 96:13, 108:17, 108:19

**eleven** [1] - 68:21

**eliminated** [2] - 182:3, 184:15

**elimination** [1] - 185:4

**emergency** [1] - 77:1

**Emergency** [2] - 80:18, 174:6

**emotionally** [4] - 52:2, 52:9, 52:13, 54:11

**employed** [2] - 6:10, 41:6

**Employee** [4] - 2:24, 3:1, 214:13, 216:18

**employment** [4] - 13:5, 76:14, 126:25, 185:20

**Empty** [1] - 107:8

**EMS** [7] - 112:24, 134:13, 134:14, 169:21, 170:8, 172:10, 173:1

**EMT** [2] - 172:13, 227:12

**enact** [1] - 85:3

**encounter** [27] - 17:7, 19:20, 22:3, 27:20, 29:11, 34:13, 38:13, 38:22, 40:9, 45:7, 45:25, 47:5, 61:15, 64:4, 76:11, 77:22, 86:6, 87:2, 92:13, 94:24, 95:16, 96:15, 100:20, 107:10, 110:19, 127:11,

150:17

**encountered** [17] - 20:5, 40:16, 52:9, 52:23, 64:14, 75:15, 76:6, 87:15, 104:16, 105:1, 106:6, 121:6, 122:8, 147:23, 151:3, 151:15, 156:5

**encountering** [4] - 64:19, 79:23, 94:21, 205:23

**encounters** [1] - 76:13

**encourage** [1] - 93:9

**end** [7] - 108:4, 126:22, 126:23, 164:11, 197:12, 213:16

**End** [1] - 2:12

**End-User** [1] - 2:12

**ended** [1] - 194:5

**ending** [1] - 5:6

**energy** [11] - 134:25, 196:9, 196:17, 196:18, 197:2, 200:10, 200:24, 201:23, 202:17, 203:17, 204:6

**Energy** [2] - 195:14, 195:21

**Enforcement** [2] - 9:3, 35:20

**enforcement** [12] - 11:16, 11:21, 11:25, 13:5, 13:9, 13:13, 13:14, 23:24, 24:7, 36:5, 148:20, 178:7

**engagements** [1] - 141:4

**entered** [1] - 160:16

**entire** [5] - 25:9, 26:11, 41:5, 97:1, 148:1

**entrance** [1] - 77:1

**entries** [1] - 68:17

**entry** [1] - 68:17

**episode** [6] - 136:20, 138:18, 138:19, 194:17, 198:16, 198:17

**episodes** [1] - 212:9

**equal** [1] - 36:9

**equipment** [2] - 219:11, 219:19

**equivalent** [1] - 36:7

**erratic** [2] - 161:16, 161:25

**escalate** [1] - 162:12

**escalation** [2] - 27:4, 27:8

**escape** [9] - 29:24, 34:8, 54:4, 99:18, 105:13, 105:15, 148:3, 149:16,

153:17
**escort** [1] - 105:13
**establish** [1] - 31:13
**established** [2] - 45:5, 106:7
**ESTATE** [1] - 1:6
**estimate** [1] - 200:3
**estimation** [1] - 153:3
**et** [2] - 1:7, 1:11
**event** [4] - 96:11, 97:14, 196:19, 207:8
**events** [3] - 153:10, 153:14, 173:18
**eventually** [5] - 93:14, 105:1, 106:24, 107:4, 179:10
**evidence** [3] - 66:21, 74:22, 77:3
**exact** [3] - 63:14, 79:20, 159:16
**exactly** [3] - 158:10, 164:19, 217:12
**EXAMINATION** [1] - 6:6
**examination** [2] - 227:7, 228:9
**Examination** [1] - 2:2
**examined** [1] - 6:3
**examiner** [2] - 227:3, 227:21
**examiner's** [2] - 227:5, 227:16
**example** [4] - 15:10, 30:21, 47:10, 51:4
**exceeds** [1] - 36:9
**excessive** [7] - 31:4, 31:14, 31:20, 31:25, 62:19, 63:5, 123:4
**exchange** [1] - 139:10
**excited** [25] - 101:7, 101:9, 101:11, 101:15, 145:9, 145:15, 146:7, 146:10, 146:15, 147:2, 147:3, 147:8, 147:11, 147:22, 149:20, 150:1, 150:13, 151:2, 151:14, 151:19, 152:5, 152:6, 153:3, 153:19, 162:2
**excuse** [4] - 11:5, 24:4, 135:10, 210:23
**exhaustion** [5] - 96:7, 96:12, 96:25, 97:6, 97:15
**exhibit** [18] - 9:25, 10:7, 19:5, 21:25, 36:22, 62:4, 63:24, 87:19, 88:21, 188:2, 188:4, 190:11, 190:20, 205:15, 206:17, 207:7,

210:8, 214:20
**Exhibit** [50] - 2:5, 2:6, 2:10, 2:11, 2:13, 2:15, 2:16, 2:18, 2:19, 2:21, 2:22, 2:24, 2:25, 3:2, 3:3, 10:9, 20:24, 21:4, 21:5, 21:9, 46:18, 46:22, 47:20, 48:2, 48:22, 63:20, 63:21, 64:8, 86:16, 87:17, 87:21, 88:1, 89:6, 97:12, 110:25, 144:12, 155:17, 155:18, 159:22, 188:7, 189:13, 189:14, 190:14, 207:12, 207:20, 209:24, 214:23, 219:2, 220:15, 223:2
**exhibiting** [2] - 93:1, 101:15
**exhibits** [2] - 108:18, 228:10
**Exhibits** [2] - 2:8, 23:7
**exhibits..** [1] - 155:6
**exists** [1] - 212:21
**exit** [2] - 104:7, 104:9
**exited** [1] - 104:13
**expect** [1] - 16:1
**experience** [3] - 81:11, 81:12, 184:11
**experiencing** [13] - 145:9, 145:15, 147:22, 149:4, 149:20, 150:1, 150:13, 151:2, 151:14, 152:4, 152:5, 153:3, 153:19
**expert** [2] - 227:6, 227:14
**Experts** [1] - 195:13
**expires** [1] - 229:24
**explain** [4] - 27:23, 82:25, 144:5, 164:23
**explaining** [1] - 162:17
**exposed** [1] - 63:5
**exposure** [9] - 196:10, 196:18, 197:2, 197:8, 198:23, 198:25, 199:7, 199:16, 203:17
**extended** [1] - 196:17
**extensive** [1] - 11:16
**extent** [2] - 121:18, 123:1
**extra** [3] - 13:8, 46:6, 119:12
**extremely** [1] - 20:18
**eye** [3] - 163:1, 174:6, 216:8

# F

**F-B-I's** [1] - 119:23
**F4** [1] - 222:23
**face** [6] - 105:16, 105:18, 149:17, 154:24, 155:3, 203:2
**faced** [2] - 155:1, 155:4
**fact** [14] - 16:13, 32:6, 95:15, 96:3, 108:23, 149:7, 150:3, 150:5, 150:15, 150:20, 156:5, 158:17, 163:13, 213:4
**factor** [6] - 96:6, 96:23, 103:8, 103:10, 103:22, 195:21
**Factors** [2] - 158:8, 158:13
**factors** [2] - 62:8, 195:13
**failed** [2] - 221:24, 222:2
**failing** [2] - 217:3, 222:6
**failure** [2] - 217:5, 221:1
**fair** [3] - 13:12, 44:6, 207:9
**fall** [1] - 184:18
**false** [1] - 218:13
**familiar** [1] - 89:20
**family** [4] - 178:8, 178:9, 179:1, 212:25
**far** [41] - 11:19, 20:15, 32:4, 42:22, 45:5, 58:15, 63:10, 66:3, 70:10, 74:25, 75:15, 75:19, 77:3, 78:24, 87:14, 91:10, 96:16, 101:19, 103:6, 108:12, 116:17, 142:17, 143:1, 146:6, 147:9, 163:17, 169:5, 175:23, 176:11, 182:17, 190:3, 192:11, 192:14, 195:22, 196:16, 201:4, 201:13, 202:4, 205:6, 206:7, 208:13
**father** [1] - 178:13
**February** [1] - 191:11
**Federal** [1] - 5:7
**feet** [7] - 18:18, 34:1, 35:5, 35:8, 125:2, 125:3, 125:5
**felony** [5] - 103:23, 105:11, 124:10,

151:7, 151:11
**female** [2] - 101:2, 160:23
**few** [13] - 7:20, 7:21, 22:5, 22:6, 22:7, 77:23, 78:1, 130:9, 136:7, 186:17, 215:7, 227:25
**field** [1] - 227:14
**fight** [5] - 30:2, 71:1, 217:1, 217:2, 220:10
**fighting** [3] - 108:2, 108:8, 133:18
**figure** [3] - 17:19, 125:16, 140:23
**file** [12] - 6:25, 9:21, 27:2, 206:15, 207:6, 207:23, 215:11, 215:14, 218:14, 218:20, 222:5, 228:12
**filed** [23] - 5:3, 6:19, 10:10, 21:6, 23:8, 46:19, 47:21, 48:23, 63:22, 86:17, 88:2, 179:25, 190:15, 206:22, 207:2, 207:8, 207:13, 209:25, 214:24, 219:3, 220:16, 223:3, 228:11
**files** [1] - 217:12
**filing** [1] - 229:16
**findings** [1] - 215:14
**fine** [7] - 37:11, 37:15, 61:23, 123:22, 146:18, 181:13, 191:2
**finish** [5] - 60:13, 186:3, 199:8, 201:6, 203:24
**finished** [1] - 7:23
**finishing** [1] - 186:18
**firearm** [2] - 41:5, 42:20
**firearms** [8] - 37:4, 41:21, 42:10, 110:17, 222:6, 222:13, 222:15, 222:25
**firing** [1] - 42:15
**first** [48] - 6:3, 11:20, 17:22, 20:1, 20:5, 24:2, 31:15, 55:16, 56:3, 56:6, 56:7, 58:22, 67:5, 69:4, 69:16, 73:9, 76:11, 76:16, 77:14, 77:18, 88:17, 97:21, 103:21, 104:17, 104:20, 106:19, 119:20, 132:1, 132:6, 134:20,

140:11, 155:15, 165:11, 166:12, 167:15, 171:3, 171:6, 171:12, 172:19, 174:22, 174:25, 178:18, 179:4, 193:17, 215:21, 216:23, 224:25, 229:7
**fitness** [2] - 187:7, 187:10
**five** [45] - 59:7, 59:8, 61:5, 61:20, 65:24, 67:9, 67:10, 67:22, 68:2, 68:5, 68:8, 68:11, 68:20, 71:1, 71:2, 71:16, 72:20, 73:10, 73:22, 73:25, 74:4, 84:11, 84:12, 84:13, 84:16, 85:3, 98:18, 115:12, 127:8, 136:8, 144:7, 144:9, 144:19, 144:20, 144:22, 145:4, 183:4, 183:9, 184:5, 197:12, 197:16, 222:18, 225:15, 226:6
**five-second** [10] - 59:8, 61:5, 67:22, 71:2, 71:16, 144:7, 144:20, 144:22, 197:16, 225:15
**Flagler** [1] - 12:7
**flailing** [3] - 133:25, 163:14, 164:1
**flash** [7] - 17:24, 19:5, 21:1, 188:4, 189:7, 189:11, 190:4
**Flash** [1] - 189:14
**Flatt** [2] - 173:25, 222:17
**floor** [4] - 223:17, 223:21, 223:24, 224:14
**Florida** [11] - 9:4, 12:2, 12:8, 12:14, 13:2, 13:25, 14:3, 25:7, 178:3, 178:4, 178:5
**follow** [3] - 86:13, 103:7, 218:11
**following** [4] - 186:20, 186:25, 195:13, 218:3
**follows** [1] - 6:4
**FOR** [1] - 1:9
**force** [55] - 27:12, 27:15, 27:16, 27:17, 27:24, 28:5, 28:14, 28:16, 28:19, 30:20, 30:22, 31:3, 31:14, 31:20, 31:25, 32:4,

32:5, 32:8, 32:9, 32:11, 32:20, 32:25, 33:7, 36:14, 55:24, 63:10, 86:5, 87:1, 91:6, 92:4, 92:5, 100:12, 103:3, 103:7, 103:20, 110:15, 110:20, 111:16, 119:1, 122:21, 124:11, 124:14, 140:16, 140:18, 140:22, 140:24, 140:25, 141:2, 141:3, 142:11, 142:14, 154:10, 154:21, 158:11

**foregoing** [2] - 229:5, 229:11

**Form** [5] - 2:8, 2:12, 3:2, 155:15, 155:24

**form** [40] - 4:12, 4:17, 4:18, 4:19, 22:22, 23:19, 54:15, 55:5, 72:2, 73:11, 73:16, 94:9, 121:17, 121:19, 122:10, 122:18, 123:6, 123:19, 124:23, 130:1, 139:2, 140:20, 143:13, 146:17, 147:24, 149:21, 150:2, 150:22, 151:4, 151:24, 152:9, 155:23, 156:10, 156:11, 156:13, 159:21, 160:8, 200:13, 204:24, 229:15

**form......** [1] - 3:20

**form.....................** [21] - 3:21, 3:22, 3:24, 3:25, 4:1, 4:2, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:13, 4:14, 4:15, 4:16, 4:20, 4:23, 4:24

**forms** [1] - 23:2

**forth** [1] - 228:7

**forty** [2] - 60:7, 60:17

**forward** [2] - 133:21, 134:3

**four** [39] - 10:2, 13:18, 13:19, 13:20, 14:8, 24:19, 53:25, 57:19, 57:24, 58:20, 58:21, 58:23, 68:20, 70:21, 70:22, 71:3, 71:7, 71:8, 71:9, 98:17, 127:8, 143:6, 164:21, 165:8,

165:15, 166:4, 166:11, 166:23, 167:3, 167:19, 167:23, 169:11, 175:25, 176:1, 176:25, 177:14, 193:20, 193:21

**fourth** [7] - 161:14, 161:15, 162:13, 164:8, 164:17, 165:3, 166:5

**frame** [4] - 98:15, 216:12, 221:15, 225:20

**frames** [1] - 78:14

**free** [4] - 109:3, 113:24, 114:3, 114:15

**front** [10] - 29:21, 39:20, 39:21, 104:24, 105:1, 107:12, 107:16, 125:11, 156:18, 156:19

**full** [10] - 25:1, 25:4, 71:1, 71:3, 71:7, 71:23, 75:16, 84:11, 197:25, 229:11

**fully** [3] - 76:5, 81:17, 107:2

**functional** [1] - 81:18

**functioning** [1] - 76:5

**future** [1] - 213:22

## G

**gain** [4] - 95:11, 116:9, 124:12

**gallbladder** [1] - 221:3

**gas** [2] - 178:10, 178:11

**gears** [1] - 113:4

**general** [7] - 31:6, 31:21, 32:2, 36:5, 57:22, 140:8, 201:10

**General** [2] - 51:16, 126:12

**generalized** [1] - 103:5

**generally** [4] - 31:16, 31:17, 56:18, 56:20

**generated** [1] - 66:19

**gig** [1] - 213:16

**girl** [1] - 212:15

**given** [9] - 7:7, 63:24, 80:19, 181:25, 184:9, 185:14, 218:15, 218:22, 229:12

**glad** [2] - 119:17, 181:14

**GLASGOW** [1] - 1:11

**Glasgow** [65] - 3:2, 6:10, 6:14, 8:25, 11:12, 11:17, 13:1, 14:4, 14:6, 14:11, 15:12, 19:19, 33:19, 34:16, 34:23, 36:1, 37:6, 38:18, 41:6, 41:22, 42:4, 43:17, 44:1, 44:18, 44:21, 45:9, 48:7, 49:4, 66:17, 76:14, 76:18, 77:5, 79:14, 79:23, 80:5, 80:23, 89:10, 118:15, 137:7, 137:14, 174:17, 175:1, 176:9, 178:20, 179:5, 179:15, 180:1, 182:17, 185:9, 185:20, 185:25, 186:6, 186:7, 186:10, 186:22, 186:23, 186:24, 202:16, 204:4, 204:5, 218:4, 218:5, 218:17, 219:25

**got.** [1] - 222:20

**gotcha** [3] - 127:19, 127:25, 208:24

**grabbed** [2] - 131:10, 195:5

**graduate** [2] - 10:18, 10:22

**graduation** [1] - 10:17

**Grady** [1] - 21:19

**grass** [1] - 29:25

**great** [1] - 71:15

**greater** [1] - 203:17

**greatest** [1] - 120:19

**Green** [3] - 5:4, 5:16, 5:20

**GREEN** [2] - 1:2, 1:25

**groin** [7] - 57:2, 57:8, 202:1, 202:12, 203:2, 205:4, 206:12

**ground** [9] - 17:15, 20:15, 20:19, 29:25, 99:5, 99:7, 112:4, 133:22, 133:24

**group** [1] - 51:3

**Grove** [4] - 14:3, 81:2, 83:19, 83:25

**grunts** [1] - 112:15

**guess** [32] - 15:11, 32:4, 37:8, 37:13, 38:16, 41:11, 42:23, 44:7, 45:20, 50:8, 55:12, 55:15, 57:5, 59:16, 64:9, 66:4, 68:18, 70:13, 76:10, 94:19, 96:14, 116:1, 118:11, 122:6, 136:14, 143:15,

154:2, 179:10, 182:20, 207:23, 208:6, 208:25

**guessed** [1] - 141:8

**guidance** [1] - 55:24

**guide** [1] - 28:24

**guidelines** [1] - 86:13

**gun** [10] - 29:1, 30:21, 30:25, 37:5, 37:23, 39:5, 39:9, 42:3, 42:8, 105:24

**gun-looking** [1] - 37:23

**guns** [2] - 40:18, 41:11

**Guy** [4] - 6:9, 177:13, 179:13, 179:14

**GUY** [4] - 1:16, 5:2, 6:2, 229:5

**guy** [2] - 177:11, 187:24

**guys** [2] - 110:16, 161:7

**gym** [2] - 113:21, 114:7

## H

**half** [19] - 53:24, 57:11, 57:13, 57:15, 60:6, 60:16, 60:21, 61:20, 69:5, 128:11, 141:8, 141:9, 141:19, 141:20, 193:8, 193:10, 225:8, 225:10, 225:11

**halfway** [1] - 50:3

**hallucinating** [1] - 149:6

**hallucination** [1] - 146:12

**hallucinations** [2] - 145:25, 149:4

**hand** [32] - 28:3, 28:4, 28:10, 28:11, 28:13, 29:17, 29:18, 33:2, 33:6, 43:16, 43:25, 51:5, 79:4, 92:8, 92:11, 107:14, 107:18, 108:24, 109:17, 129:15, 129:20, 131:7, 131:8, 131:10, 135:17, 135:19, 135:20, 148:25, 195:7, 198:10

**Hand** [1] - 107:9

**hand-to-hand** [2] - 43:16, 43:25

**handcuff** [6] - 74:18, 109:1, 109:4,

149:15, 195:6, 195:7

**handcuffed** [11] - 34:5, 34:6, 100:17, 111:19, 112:3, 134:12, 154:23, 157:21, 158:2, 158:3, 194:10

**handcuffing** [1] - 164:12

**handcuffs** [4] - 34:1, 111:15, 163:24, 164:11

**handed** [1] - 224:4

**handgun** [2] - 38:19, 41:3

**handguns** [1] - 38:23

**handle** [2] - 95:22, 208:18

**handled** [1] - 63:14

**hands** [11] - 35:9, 74:17, 99:12, 133:12, 133:17, 133:20, 134:23, 164:7, 165:2, 194:10, 199:23

**hard** [7] - 28:4, 28:13, 33:6, 105:22, 108:24, 109:16, 188:22

**hard-hand** [1] - 108:24

**harm** [11] - 57:3, 121:16, 122:1, 122:8, 122:24, 123:4, 123:14, 123:15, 124:2, 124:3, 124:4

**hate** [1] - 23:14

**Hayden** [18] - 17:16, 18:19, 19:17, 19:18, 20:7, 20:8, 20:11, 111:25, 112:17, 112:19, 128:16, 157:4, 157:6, 157:13, 171:21, 195:6

**hayden** [1] - 20:9

**Hayden's** [1] - 18:24

**head** [16] - 3:16, 8:3, 57:1, 57:8, 69:3, 116:16, 132:13, 142:16, 154:25, 170:3, 170:4, 181:7, 201:25, 202:12, 205:3, 206:11

**health** [7] - 136:16, 136:20, 138:7, 138:9, 187:12, 203:18, 206:7

**hear** [7] - 132:7, 132:24, 141:16, 142:3, 149:1, 162:10, 183:25

**heard** [4] - 69:14, 132:5, 153:25, 162:9
**hearing** [2] - 203:12, 206:3
**heart** [10] - 100:22, 100:25, 195:17, 196:10, 196:11, 200:16, 202:10, 202:22, 202:25, 203:6
**heavy** [3] - 114:20, 114:24, 115:14
**held** [3] - 133:13, 133:14, 185:22
**help** [5] - 7:24, 8:3, 8:7, 12:23, 164:13
**helped** [1] - 14:16
**Henderson** [1] - 178:23
**her's** [1] - 224:7
**hereby** [1] - 229:4
**heretofore** [1] - 5:3
**herewith** [16] - 10:10, 21:6, 23:9, 46:19, 47:21, 48:23, 63:22, 86:17, 88:2, 190:15, 207:13, 209:25, 214:24, 219:3, 220:16, 223:3
**herself** [1] - 224:6
**hierarchy** [3] - 182:16, 184:12, 184:16
**high** [5] - 53:13, 94:13, 95:6, 129:25, 130:14
**Hill** [1] - 12:5
**himself** [1] - 133:16
**hip** [5] - 17:17, 18:20, 18:25, 109:21
**hired** [1] - 177:11
**hiring** [1] - 175:4
**hit** [2] - 79:9, 105:17
**hobble** [7] - 33:9, 34:10, 34:11, 34:12, 34:16, 34:21, 34:25
**HOBBLE** [1] - 35:1
**Hold** [1] - 62:11
**hold** [16] - 29:19, 54:6, 68:8, 85:14, 99:11, 99:16, 107:15, 131:11, 132:22, 154:1, 159:17, 164:10, 192:8, 198:11, 200:4
**Hold-Back** [1] - 62:11
**holding** [3] - 144:7, 145:1, 145:2
**holds** [1] - 154:7
**Holly** [1] - 12:5
**holster** [4] - 65:4, 65:5, 65:6, 65:13
**holstering** [1] - 74:16
**home** [1] - 6:13

**homeowner** [1] - 161:2
**hoodie** [1] - 170:2
**hormones** [2] - 200:16, 202:23
**Hospital** [1] - 174:6
**hospital** [2] - 157:7, 163:5
**hot** [3] - 82:17, 82:18, 82:21
**Houchens** [1] - 79:10
**hour** [3] - 61:20, 61:22, 219:14
**hour-and-a-half** [1] - 61:20
**hours** [4] - 36:6, 156:3, 160:12, 219:13
**house** [40] - 6:23, 53:15, 95:4, 101:2, 101:5, 103:24, 104:1, 104:2, 104:3, 104:4, 104:6, 104:8, 104:9, 104:14, 104:17, 104:21, 106:24, 106:25, 107:5, 116:20, 116:21, 117:2, 117:8, 117:11, 117:12, 117:13, 117:20, 118:1, 118:3, 118:5, 121:13, 128:5, 128:12, 128:23, 130:6, 139:12, 139:13, 148:9, 156:7
**houses** [1] - 128:11
**Howie** [6] - 177:11, 177:14, 179:13, 179:14, 208:25, 213:9
**hungry** [1] - 223:5
**hurt** [7] - 114:21, 114:25, 123:11, 130:16, 148:16, 148:17, 162:7
**Hutchison** [1] - 6:14
**hypothetical** [1] - 152:25
**hypothetically** [1] - 153:2

**I**

**I do not know** [1] - 66:12
**I don't know** [43] - 3:9, 3:10, 3:11, 7:17, 16:10, 23:13, 24:4, 65:17, 79:16, 82:5, 82:25, 88:7, 88:13, 90:15, 90:16, 90:18,

119:13, 119:15, 131:1, 136:5, 137:25, 138:4, 144:10, 145:19, 152:20, 161:1, 162:9, 168:15, 168:17, 168:24, 168:25, 169:12, 171:16, 176:19, 186:15, 192:11, 197:14, 208:9, 210:24, 214:11, 214:19, 218:9
**I don't recall** [16] - 43:15, 45:3, 78:2, 78:19, 78:25, 80:6, 111:12, 114:11, 120:17, 147:16, 147:19, 201:21, 202:6, 205:8, 205:11, 206:9
**I don't remember** [5] - 145:20, 200:18, 201:11, 203:12, 203:23
**I'm not sure** [5] - 78:2, 109:21, 116:3, 125:13, 205:11
**I's** [1] - 119:23
**I..** [2] - 137:23, 180:9
**ID** [2] - 126:21, 229:24
**idea** [5] - 28:19, 66:11, 97:19, 101:14, 120:10
**identified** [1] - 195:13
**identifies** [1] - 157:11
**identify** [1] - 18:5
**ignorance** [1] - 24:4
**ill** [1] - 212:22
**illicit** [1] - 137:22
**immediate** [1] - 197:9
**immediately** [5] - 129:7, 170:15, 170:17, 170:18, 218:10
**impact** [7] - 28:13, 33:4, 33:6, 109:6, 109:7, 109:9, 109:12
**Implemented** [1] - 86:24
**implemented** [3] - 87:6, 87:24, 89:21
**important** [2] - 180:13, 180:17
**impossible** [1] - 152:22
**in-between** [2] - 13:7, 226:7
**Inaudible** [6] - 88:23, 129:13, 132:15, 193:5, 209:18, 225:22
**inaudible** [12] - 25:18,

46:11, 60:12, 116:25, 129:20, 132:16, 135:22, 139:23, 159:11, 184:10, 198:10, 208:22
**incapacitate** [1] - 108:20
**incapacitated** [2] - 55:17, 55:23
**incapacitation** [1] - 51:9
**incapacity** [1] - 101:13
**inches** [2] - 98:17, 98:19
**incidence** [2] - 112:2, 219:24
**incident** [28] - 42:25, 50:7, 56:14, 56:17, 64:10, 74:24, 76:24, 79:17, 116:2, 116:17, 117:19, 120:4, 121:5, 121:21, 122:17, 126:19, 155:25, 156:3, 156:4, 164:16, 197:17, 207:18, 208:21, 208:23, 216:21, 223:25, 226:9
**include** [5] - 14:22, 27:15, 36:17, 37:1, 64:3
**including** [5] - 30:3, 122:1, 122:2, 200:11, 202:16
**increase** [13] - 55:3, 55:9, 55:20, 56:12, 56:21, 57:5, 93:6, 94:6, 200:11, 201:2, 201:24, 202:19, 204:5
**increased** [2] - 194:17, 197:9
**increasing** [1] - 205:7
**index** [1] - 35:21
**indicate** [2] - 111:10, 193:12
**indicates** [4] - 66:1, 91:10, 126:24, 192:16
**Indicating** [10] - 32:21, 47:16, 51:19, 56:4, 63:19, 91:21, 131:17, 137:24, 154:6, 171:23
**indication** [5] - 72:13, 72:16, 126:16, 130:7, 194:7
**individual** [16] - 19:15, 29:5, 30:11, 55:4, 55:10, 80:5, 80:12, 80:16, 93:6, 93:7,

93:10, 95:11, 96:2, 121:13, 129:24, 142:11
**individual's** [1] - 104:17
**individuals** [14] - 14:23, 41:19, 52:4, 54:9, 62:18, 76:13, 79:23, 91:7, 109:16, 118:16, 119:2, 136:15, 136:19, 202:18
**ineffective** [10] - 54:24, 55:3, 55:8, 55:19, 56:11, 56:20, 57:5, 72:25, 135:2, 135:6
**influence** [14] - 52:23, 52:24, 53:2, 53:9, 94:3, 95:1, 129:25, 137:21, 138:11, 139:18, 140:3, 140:14, 158:20, 194:22
**Information** [4] - 51:16, 51:17, 55:15, 62:10
**information** [17] - 9:20, 16:6, 24:16, 30:15, 51:12, 100:19, 103:25, 116:18, 116:23, 166:15, 167:1, 181:11, 201:9, 207:24, 211:3, 211:13, 228:6
**informational** [1] - 191:5
**initial** [3] - 24:21, 156:24, 157:16
**initial's** [1] - 156:19
**initials** [2] - 156:18, 156:21
**injury** [13] - 55:20, 56:13, 56:22, 57:6, 93:6, 94:7, 96:7, 96:24, 162:23, 163:2, 163:6, 174:7, 216:8
**input** [1] - 148:2
**inservice** [1] - 36:7
**inside** [11] - 53:15, 95:3, 101:5, 104:2, 104:3, 104:20, 117:11, 117:12, 128:23, 130:6, 148:9
**instance** [1] - 77:14, 77:18, 100:1, 100:7, 112:23, 115:22, 217:14
**instances** [3] - 32:1, 32:12, 222:5
**instead** [1] - 8:2, 8:6

Institute [1] - 9:3
instruction [2] - 47:25, 49:8
Instructor [2] - 2:13, 48:19
instructor [1] - 47:24
insubordinate [1] - 218:11
insubordination [1] - 218:3
intend [2] - 189:11, 189:23
intended [2] - 55:22, 188:16
intense [2] - 145:24, 146:11
interested [1] - 229:19
interim [6] - 12:17, 13:17, 185:22, 217:21, 218:8, 218:16
Interim [1] - 14:2
Interlachen [1] - 12:11
Internal [8] - 208:7, 208:9, 208:18, 208:20, 211:1, 213:16, 226:9, 226:11
internal [2] - 210:10, 226:21
internally [1] - 208:18
interpretation [1] - 227:18
interrupt [4] - 20:6, 67:15, 107:3, 141:14
interrupting [1] - 7:22
intervals [3] - 197:13, 197:16, 226:7
interview [3] - 173:22, 209:2, 209:6
intoxicated [2] - 52:17, 94:20
intoxication [1] - 93:8
introduce [1] - 47:13
investigated [1] - 208:21
Investigation [2] - 2:21, 2:23
investigation [10] - 208:6, 208:19, 208:21, 210:10, 211:1, 211:4, 211:12, 211:17, 213:18, 226:8
involuntary [1] - 83:11
involved [3] - 16:6, 105:9, 200:9
involving [5] - 136:21, 138:9, 179:23, 208:16, 223:9
issue [5] - 125:23, 126:3, 136:20, 203:7, 208:11

issued [12] - 33:14, 34:15, 37:5, 37:8, 38:3, 38:17, 41:11, 42:3, 45:4, 64:1, 78:4, 158:17
issues [10] - 75:14, 136:15, 137:16, 137:21, 138:8, 138:9, 185:18, 187:16, 187:23, 205:2
it'd [1] - 40:10
itself [6] - 51:2, 109:4, 141:3, 165:20, 168:13, 197:19
IV [1] - 102:20

## J

jacket [1] - 107:15
Jacksonville [2] - 12:14, 12:15
James [5] - 216:19, 217:8, 217:15, 217:23, 219:21
January [9] - 1:17, 5:5, 24:3, 215:21, 217:14, 217:21, 218:2, 218:9, 219:6
Jennifer [2] - 208:2, 208:25
Jeremy [14] - 17:8, 19:20, 29:11, 30:16, 31:21, 34:13, 38:13, 38:22, 45:7, 45:25, 50:6, 52:8, 52:22, 154:23
JEREMY [1] - 1:6
Jessie [2] - 47:24, 48:7
JOANNA [1] - 1:7
job [2] - 184:8, 217:24
jobs [1] - 13:7
John [2] - 191:16, 191:19
judgment [1] - 181:18
Julie [1] - 229:3
julie [1] - 189:10
JULIE [2] - 1:23, 229:23
July [6] - 24:3, 47:8, 77:14, 77:19, 78:19, 78:24
Justice [1] - 10:16
justice [1] - 8:20
justification [2] - 142:18, 197:9
justify [1] - 142:10
Justin [1] - 157:15
juvenile [2] - 207:23, 207:24

## K

keep [6] - 7:22, 35:10, 39:4, 39:15, 41:5, 124:6
keeps [2] - 35:5, 154:10
Kentucky [23] - 5:5, 6:14, 24:9, 24:11, 24:15, 24:19, 25:2, 25:3, 25:14, 25:19, 26:6, 26:14, 26:18, 126:13, 177:22, 178:18, 178:19, 178:22, 178:23, 179:1, 179:5, 229:4, 229:25
KENTUCKY [2] - 1:1, 229:1
kept [4] - 18:2, 39:9, 39:19, 114:13
KERRICK [2] - 5:3, 5:19
key [1] - 195:13
kick [2] - 35:9, 70:25
kicked [3] - 54:5, 54:19, 133:2
kicking [12] - 18:18, 20:22, 30:3, 35:10, 54:3, 98:10, 99:7, 99:8, 99:17, 149:18, 164:1, 198:9
kicks [1] - 109:17
kill [9] - 101:21, 105:4, 138:15, 148:12, 160:18, 160:22, 161:1, 161:4, 161:5
kin [1] - 229:17
kind [23] - 9:14, 22:13, 37:22, 62:23, 72:12, 75:16, 81:13, 95:1, 100:23, 102:22, 102:25, 105:4, 113:18, 117:20, 120:12, 130:23, 137:17, 138:18, 154:21, 159:2, 187:24, 191:5, 212:11
KLEC [1] - 36:9
knee [8] - 17:16, 18:25, 19:16, 20:11, 20:22, 109:21, 110:1, 164:9
kneeling [3] - 19:15, 112:4, 154:16
knees [1] - 109:17
knife [12] - 79:9, 80:13, 80:15, 102:6, 102:9, 105:15, 106:3, 106:11, 129:7, 129:18,

129:19, 131:21
knowing [1] - 198:2
knowledge [1] - 118:22
known [1] - 156:20
knows [1] - 10:8
Kreg [1] - 5:14
KY [3] - 1:25, 5:16, 5:20
KYBRS [1] - 23:20
KYIBRS [2] - 2:9, 159:22
KYNP [1] - 229:24

## L

labeled [2] - 89:8, 206:16
lack [1] - 118:15
lady's [2] - 103:24, 117:2
laid [1] - 187:24
land [1] - 30:1
laptop [1] - 125:11
Large [1] - 229:25
last [25] - 7:9, 10:23, 10:24, 11:10, 26:20, 32:11, 43:13, 45:1, 51:20, 62:6, 64:7, 68:23, 72:21, 73:6, 74:16, 76:24, 83:23, 84:2, 85:22, 164:8, 164:17, 165:3, 166:5, 190:19, 200:8
late [5] - 179:2, 186:17, 187:5, 222:6, 222:15
laterals [1] - 115:13
laugh [1] - 119:20
Law [1] - 9:3, 35:20
law [14] - 11:16, 11:21, 11:24, 13:5, 13:9, 13:13, 13:14, 23:24, 24:6, 24:19, 25:3, 26:18, 148:19, 178:6
lawful [1] - 197:3
Lawrence [2] - 178:1, 178:2
laws [1] - 36:5
lawsuit [2] - 216:23, 220:12
lawsuits [1] - 185:3
laying [1] - 154:24
lead [2] - 161:24, 162:1
leadership [1] - 15:10
leaf [1] - 159:2
least [57] - 12:25, 16:1, 16:23, 22:7, 24:6, 30:14, 36:6, 40:15, 40:19, 43:21, 47:8, 51:11, 59:9,

66:1, 68:16, 68:21, 69:4, 69:8, 69:18, 70:18, 71:14, 77:22, 79:12, 80:11, 100:6, 106:4, 106:15, 108:12, 109:24, 122:21, 124:11, 125:20, 128:21, 130:23, 134:20, 134:25, 138:23, 139:6, 141:23, 142:2, 142:23, 145:2, 148:11, 160:7, 163:17, 184:5, 192:20, 193:10, 204:21, 205:9, 212:6, 215:13, 215:24, 216:20, 217:4, 219:24, 228:8
leave [5] - 35:14, 210:19, 210:20, 210:21, 216:8
leaving [1] - 219:15
led [3] - 53:8, 94:25, 173:18
left [19] - 19:1, 19:11, 19:14, 39:16, 39:22, 40:13, 50:1, 59:23, 92:11, 107:14, 109:2, 109:5, 154:24, 163:1, 164:10, 171:19, 219:14, 219:22
leg [8] - 33:22, 33:25, 34:7, 115:1, 149:18, 163:24, 164:3, 198:11
legislation [1] - 26:18
legs [7] - 30:4, 54:6, 98:10, 133:25, 163:14, 169:22
length [1] - 195:24
less [8] - 37:16, 44:4, 91:15, 141:4, 141:16, 141:20, 143:6, 199:20
less-than-lethal-weapon [1] - 91:15
lethal [5] - 32:6, 32:10, 32:13, 32:14, 91:15
letters [1] - 185:13
letting [2] - 223:14, 223:20
level [9] - 92:4, 96:7, 96:12, 96:24, 97:6, 97:15, 103:3, 108:18, 111:16
lied [1] - 158:16
Lieutenant [2] - 209:1, 218:2
lieutenant [16] - 175:12, 176:5,

176:7, 177:1,
177:13, 179:11,
181:22, 182:1,
184:1, 184:14,
184:19, 184:20,
184:21, 184:23,
217:17
lieutenants [5] -
183:3, 183:9,
183:10, 183:11,
183:14
life [2] - 84:25, 178:3
lift [2] - 114:14, 132:15
lifted [1] - 114:3
lifting [2] - 113:22,
115:15
likelihood [2] - 93:6,
94:6
limit [1] - 122:6
limited [1] - 22:2
limiting [1] - 56:15
Lindsey [2] - 219:18,
219:19
line [6] - 61:16, 70:5,
98:16, 123:23,
126:23, 190:1
lines [1] - 24:12
liquid [1] - 107:24
list [3] - 118:16,
118:22, 119:2
listed [7] - 11:21, 49:5,
91:12, 106:16,
184:16, 200:12,
203:15
listen [2] - 180:12,
180:17
listen.. [1] - 223:14
listing [2] - 102:25,
143:8
listings [1] - 217:13
lists [1] - 110:11
literally [1] - 160:3
litigation [7] - 126:1,
126:3, 177:4, 177:9,
179:22, 179:25
lived [4] - 178:19,
178:22, 179:1,
215:10
lives [1] - 173:15
living [1] - 177:21
located [1] - 178:12
location [3] - 57:19,
57:24, 156:4
locations [1] - 13:21
log [24] - 2:15, 50:8,
63:25, 64:8, 66:13,
66:16, 67:1, 72:9,
77:3, 77:10, 116:25,
143:2, 143:3, 143:4,
143:16, 144:1,
144:9, 167:10,
167:24, 168:1,
169:5, 198:7, 225:23

longest [2] - 197:22,
199:11
look [22] - 3:13, 16:13,
18:4, 19:10, 22:6,
22:14, 23:12, 35:21,
55:15, 77:17, 86:20,
88:25, 89:2, 90:22,
90:23, 94:20,
125:20, 128:10,
129:24, 145:14,
209:21, 215:20
looked [13] - 15:20,
16:13, 16:23, 17:2,
20:3, 50:14, 109:25,
134:24, 142:22,
143:1, 155:5, 210:12
looking [34] - 9:5,
10:8, 17:25, 18:2,
22:4, 35:19, 36:20,
37:23, 67:4, 69:17,
70:5, 71:14, 89:6,
89:9, 91:24, 97:12,
102:19, 105:11,
105:12, 106:13,
110:25, 118:12,
147:1, 149:19,
150:12, 155:16,
155:23, 161:13,
166:24, 185:21,
201:18, 206:18,
210:7
looks [43] - 11:16,
11:20, 12:15, 20:14,
20:19, 35:20, 37:22,
47:23, 47:25, 48:1,
48:18, 48:25, 50:9,
63:25, 64:8, 65:21,
67:4, 67:5, 70:11,
72:19, 72:21, 73:4,
74:11, 74:19, 77:15,
77:18, 77:21, 77:24,
87:6, 102:20,
110:25, 127:4,
132:16, 165:7,
176:19, 191:4,
210:9, 210:16,
214:15, 214:25,
217:4, 218:15, 223:8
loop [2] - 18:1, 22:18
loosen [1] - 83:13
lose [2] - 116:9,
116:10
loud [5] - 8:2, 132:7,
132:24, 142:7,
162:19
louder [1] - 141:25
low [1] - 58:6
lower [14] - 57:17,
58:13, 59:21, 73:3,
75:24, 81:25, 98:2,
98:3, 114:17,
163:11, 180:20,
196:10, 196:14

lunch [2] - 222:15,
222:24

**M**

ma'am [1] - 35:2
Mace® [3] - 38:7,
38:8, 107:25
machine [1] - 115:7
maintain [6] - 95:11,
113:9, 113:13,
113:18, 116:7,
118:17
major [4] - 183:3,
183:7, 184:18,
184:21
Major [4] - 173:25,
219:18, 219:19,
222:17
male [4] - 160:16,
160:17, 160:20,
160:21
malfunction [1] -
171:13
malice [3] - 177:6,
177:8, 177:19
man [1] - 110:22
management [1] -
185:18
Manatee [1] - 9:2
manner [3] - 121:11,
151:22, 153:8
manual [1] - 35:15
manufacturer [1] -
191:24
March [6] - 10:3,
15:14, 15:15,
174:19, 174:23,
179:8
mark [1] - 10:7
marked [21] - 10:10,
21:6, 23:8, 29:12,
46:19, 46:21, 47:21,
48:23, 63:22, 63:24,
86:17, 88:2, 145:24,
146:11, 190:15,
207:13, 209:25,
214:24, 219:3,
220:16, 223:3
marks [1] - 72:10
Marr [122] - 17:8,
18:18, 19:20, 20:5,
20:14, 22:3, 29:11,
30:17, 31:21, 34:13,
38:13, 38:22, 40:9,
40:16, 41:1, 43:1,
45:7, 45:25, 47:6,
50:7, 52:8, 52:22,
53:10, 53:18, 57:16,
59:11, 61:6, 61:15,
63:4, 63:11, 64:4,
64:10, 64:14, 64:19,

67:11, 67:18, 69:5,
70:21, 71:22, 74:15,
74:24, 75:15, 76:6,
76:11, 79:18, 86:6,
87:2, 87:15, 92:13,
93:1, 93:15, 94:3,
94:25, 95:16, 95:22,
96:4, 96:15, 97:15,
97:20, 98:7, 100:20,
101:14, 105:9,
106:23, 108:25,
111:17, 111:24,
112:4, 112:14,
120:1, 121:6,
121:16, 121:20,
122:1, 122:6, 122:7,
122:20, 122:24,
123:5, 123:11,
124:2, 124:3,
127:13, 127:15,
138:11, 139:11,
139:18, 140:12,
140:13, 147:21,
152:6, 152:7, 153:2,
154:23, 156:5,
157:17, 157:23,
160:20, 161:12,
161:16, 161:25,
162:25, 163:11,
163:25, 164:1,
164:6, 165:1,
166:19, 169:23,
170:1, 170:5,
170:12, 170:17,
171:14, 172:1,
172:24, 175:20,
193:12, 193:22,
194:22, 205:23,
225:11
MARR [2] - 1:6, 1:7
Marr's [15] - 17:16,
18:20, 18:25, 23:13,
59:20, 60:19, 72:22,
73:3, 73:9, 74:17,
111:2, 164:10,
169:22, 170:2,
226:23
mask [1] - 127:22
mass [4] - 97:25, 98:4,
98:12, 98:17
Massachusetts [3] -
177:25, 178:1, 178:2
massive [1] - 226:25
massively [1] - 116:5
matching [1] - 198:6
material [1] - 191:6
materials [5] - 191:5,
192:11, 192:13,
205:17, 205:20
Matt [2] - 181:2,
209:21
matt [1] - 220:17
matter [5] - 29:3, 29:4,

37:13, 98:1, 151:13
mattered [3] - 151:10,
151:12, 153:18
Matthew [1] - 5:18
max [1] - 114:19
maximum [1] - 125:1
mayor [5] - 176:8,
176:10, 176:12,
176:13, 176:14
Mayor [1] - 176:17
mean [38] - 6:19, 20:7,
37:20, 54:11, 54:14,
58:14, 64:21, 68:5,
70:24, 73:12, 73:17,
96:25, 97:9, 97:10,
105:21, 107:2,
122:21, 141:19,
143:6, 143:17,
152:4, 153:1, 154:2,
158:13, 163:20,
166:4, 168:16,
169:12, 171:5,
184:9, 186:16,
196:8, 198:3,
200:25, 206:17,
217:11, 220:6
mean. [1] - 6:20
meaning [2] - 25:22,
165:15
means [4] - 44:3,
115:15, 132:8,
166:6, 172:9,
195:16, 198:25,
202:2, 221:24
meant [2] - 127:18,
216:24
measuring [1] - 66:3
med [2] - 172:4
media [4] - 17:6, 21:9,
21:25, 189:15
medical [22] - 52:15,
100:22, 100:24,
101:12, 112:21,
146:20, 146:25,
157:3, 163:7, 172:8,
172:10, 172:13,
174:9, 205:1, 227:3,
227:5, 227:6, 227:9,
227:11, 227:15,
227:20, 227:21
medication [9] -
94:12, 95:5, 130:15,
130:18, 131:3,
138:12, 138:25,
139:7, 139:8
medications [3] -
53:12, 138:21,
138:22
Memo [2] - 2:21, 2:23
memory [3] - 166:10,
166:16, 169:18
mental [9] - 101:13,
136:16, 136:19,

138:7, 138:9, 187:6, 187:9, 187:12, 212:9

**mentally** [1] - 212:22

**mention** [8] - 11:9, 38:17, 69:10, 102:4, 120:12, 163:8, 212:6, 212:15

**mentioned** [9] - 26:5, 35:24, 40:14, 69:12, 79:12, 80:11, 83:17, 102:2, 184:13

**mentions** [2] - 163:24, 192:14

**met** [2] - 96:9, 104:23

**methamphetamine** [1] - 226:25

**method** [1] - 187:8

**methods** [1] - 111:4

**middle** [1] - 158:8

**might** [13] - 9:19, 20:6, 120:1, 125:9, 130:22, 131:3, 139:6, 141:15, 159:8, 159:10, 172:15, 177:9, 210:13

**Miller** [2] - 66:19, 66:20

**milliamps** [1] - 75:13

**mind** [11] - 18:6, 52:3, 52:19, 88:25, 100:21, 130:24, 138:24, 139:3, 140:25, 194:16, 212:11

**mind-altering** [2] - 52:19, 212:11

**mind-body** [2] - 52:3, 194:16

**mine** [6] - 78:8, 78:21, 126:8, 126:10, 224:10, 224:12

**minimize** [2] - 93:9, 122:24

**minimum** [1] - 84:16

**minor** [2] - 186:14, 186:15

**minute** [17] - 16:17, 16:24, 60:6, 60:7, 60:10, 61:20, 69:15, 70:12, 70:13, 97:23, 105:7, 125:15, 126:18, 135:4, 159:3, 184:5, 189:17

**minute-and-23-second** [1] - 70:14

**minute-forty-second** [1] - 60:7

**minutes** [16] - 60:5, 60:17, 127:4, 136:7, 136:8, 142:25, 143:5, 143:6, 169:7, 186:17, 215:7,

222:14, 222:18, 222:19, 225:19, 227:25

**mislead** [2] - 73:12, 73:17

**miss** [1] - 150:24

**missed** [2] - 150:19, 150:21

**mistake** [2] - 166:6, 166:7

**mistaken** [3] - 33:22, 53:11, 100:15

**Mobiles** [1] - 178:10

**mode** [35] - 50:10, 50:24, 51:13, 51:22, 59:24, 60:18, 63:1, 65:19, 67:6, 67:18, 68:14, 68:15, 68:23, 70:11, 74:12, 82:9, 83:5, 83:7, 84:6, 84:9, 84:14, 85:2, 85:6, 85:7, 97:2, 98:24, 100:6, 100:8, 134:19, 134:20, 134:24, 141:10, 194:21

**Model** [1] - 62:11

**model** [1] - 66:18

**modes** [3] - 53:19, 60:2, 135:13

**moments** [1] - 117:9

**Monday** [1] - 5:5

**money** [1] - 13:8

**month** [1] - 227:12

**months** [8] - 12:21, 78:1, 114:13, 176:2, 225:3, 225:4

**Moore** [3] - 127:11, 127:16, 127:17

**morning** [1] - 147:22

**most** [5] - 70:22, 118:21, 119:23, 147:10, 182:19

**mostly** [2] - 109:19, 113:25

**mother** [1] - 179:3

**motion** [3] - 6:25, 134:4, 207:2

**moves** [1] - 208:19

**movies** [1] - 119:18

**moving** [2] - 64:9, 129:1

**MR** [518] - 3:9, 3:10, 3:11, 3:12, 3:13, 3:16, 3:17, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22,

4:23, 4:24, 6:7, 6:19, 6:21, 6:24, 7:3, 7:6, 7:10, 7:13, 9:10, 9:11, 9:12, 9:13, 10:6, 10:11, 10:14, 11:8, 15:25, 16:7, 16:8, 16:10, 16:15, 16:17, 16:21, 18:4, 18:6, 18:7, 18:8, 18:11, 18:12, 19:1, 19:3, 19:9, 19:10, 19:13, 20:6, 20:9, 20:10, 20:24, 20:25, 21:3, 21:4, 21:7, 21:9, 21:10, 21:11, 21:12, 21:14, 21:16, 21:18, 21:20, 21:22, 21:23, 22:22, 22:24, 22:25, 23:2, 23:4, 23:5, 23:10, 23:12, 23:17, 23:19, 23:21, 23:22, 25:19, 25:22, 25:24, 26:1, 26:3, 26:4, 31:12, 31:16, 31:17, 31:18, 34:3, 35:12, 35:18, 36:21, 36:23, 36:25, 37:16, 37:17, 37:18, 38:2, 41:23, 41:25, 44:6, 44:7, 44:8, 46:6, 46:7, 46:8, 46:9, 46:11, 46:13, 46:16, 46:20, 47:18, 47:22, 48:21, 48:24, 49:13, 49:14, 49:15, 49:16, 49:17, 49:18, 49:25, 50:1, 50:2, 50:3, 50:5, 50:21, 50:22, 54:15, 54:16, 54:22, 55:1, 55:5, 55:7, 55:11, 55:14, 56:6, 56:7, 56:9, 56:18, 56:19, 60:13, 60:15, 61:19, 61:22, 62:3, 62:8, 62:9, 63:18, 63:23, 66:4, 66:5, 66:24, 71:6, 72:2, 72:3, 73:18, 73:19, 73:20, 82:1, 82:7, 82:8, 82:10, 86:15, 86:19, 86:20, 86:22, 87:17, 87:18, 87:23, 87:24, 88:3, 88:12, 88:13, 88:15, 88:16, 88:18, 88:20, 88:25, 89:2, 89:3, 89:4, 89:5, 90:2, 90:4, 90:7, 90:15, 90:16, 90:18, 90:21, 90:22, 90:23, 91:1, 91:18, 91:20, 91:23, 92:20, 92:21, 94:2, 94:9, 94:14, 96:18, 96:20,

96:21, 97:4, 100:4, 110:6, 110:10, 110:21, 110:22, 110:23, 110:24, 112:9, 114:2, 115:19, 117:14, 118:13, 118:14, 119:24, 119:25, 120:22, 120:23, 121:17, 121:18, 121:19, 121:22, 122:4, 122:5, 122:10, 122:13, 122:14, 122:18, 122:23, 123:6, 123:7, 123:19, 123:20, 123:21, 123:22, 123:24, 124:16, 124:18, 124:19, 124:23, 125:4, 125:13, 125:15, 125:20, 126:2, 126:4, 126:6, 126:7, 126:10, 126:12, 126:14, 127:3, 127:18, 127:19, 127:21, 128:3, 128:14, 128:19, 129:4, 129:10, 129:16, 129:23, 130:1, 130:2, 130:13, 131:6, 131:17, 131:20, 131:25, 132:16, 133:5, 133:11, 134:9, 135:7, 135:10, 135:11, 136:2, 136:4, 136:7, 136:13, 137:2, 137:25, 138:1, 139:2, 139:5, 140:20, 140:21, 143:13, 143:14, 144:12, 144:14, 146:13, 146:14, 146:17, 146:22, 147:20, 147:24, 148:5, 149:2, 149:21, 149:24, 150:2, 150:4, 150:7, 150:9, 150:11, 150:22, 150:23, 150:25, 151:4, 151:6, 151:9, 151:24, 152:1, 152:9, 152:11, 152:14, 152:15, 152:17, 152:19, 152:20, 152:21, 152:24, 153:9, 153:11, 153:13, 153:23, 153:24,

154:12, 154:13, 155:8, 155:10, 155:12, 155:14, 156:18, 156:20, 156:23, 156:25, 157:2, 157:8, 159:5, 159:7, 159:13, 159:14, 160:1, 160:2, 160:5, 160:6, 166:20, 166:21, 166:22, 168:14, 170:19, 172:7, 174:4, 177:4, 177:7, 178:17, 180:3, 180:4, 180:9, 180:10, 180:14, 180:23, 181:6, 181:9, 181:10, 181:12, 181:14, 181:15, 181:17, 181:19, 181:21, 185:15, 185:16, 187:20, 188:1, 188:4, 188:6, 188:9, 188:11, 188:14, 188:15, 188:18, 188:20, 188:21, 188:22, 188:23, 189:1, 189:2, 189:3, 189:6, 189:7, 189:9, 189:10, 189:13, 189:14, 189:20, 189:23, 189:25, 190:2, 190:5, 190:6, 190:7, 190:8, 190:13, 190:16, 190:22, 190:23, 190:25, 191:1, 191:3, 191:22, 192:3, 192:6, 192:7, 192:8, 192:9, 199:4, 199:5, 199:9, 199:10, 200:13, 200:14, 200:25, 201:3, 204:16, 204:24, 205:5, 205:16, 206:14, 206:20, 206:23, 206:24, 206:25, 207:2, 207:4, 207:9, 207:10, 207:14, 209:21, 209:23, 210:2, 210:4, 210:7, 210:12, 210:13, 210:14, 210:15, 210:21, 210:24, 211:6, 211:7, 211:9, 211:11, 212:3, 212:4, 212:5, 212:18, 212:19, 214:17, 214:18, 214:22, 214:25, 215:3, 215:4, 215:5,

215:6, 216:5,
216:16, 219:4,
219:8, 219:9,
219:23, 220:17,
220:20, 220:22,
220:24, 222:16,
222:21, 222:23,
223:1, 223:4, 223:7,
223:18, 223:19,
227:25, 228:2,
228:5, 228:12,
228:13
**muffled** [1] - 142:8
**multiple** [4] - 77:21,
93:4, 94:5, 95:10
**MURELL** [1] - 19:8
**Murley** [3] - 5:14,
88:24, 209:19
**MURLEY** [315] - 3:9,
3:11, 3:12, 3:17, 6:7,
6:19, 6:24, 7:3, 7:6,
7:13, 9:10, 9:12,
9:13, 10:6, 10:11,
10:14, 11:8, 15:25,
16:8, 16:10, 16:17,
16:21, 18:6, 18:8,
18:12, 19:3, 19:9,
19:13, 20:9, 20:10,
20:25, 21:4, 21:7,
21:10, 21:12, 21:14,
21:16, 21:18, 21:20,
21:22, 21:23, 22:24,
23:2, 23:5, 23:10,
23:12, 23:19, 23:22,
25:22, 26:3, 26:4,
31:12, 31:17, 31:18,
34:3, 35:12, 35:18,
36:21, 36:25, 37:17,
37:18, 38:2, 41:25,
44:7, 44:8, 46:6,
46:9, 46:13, 46:16,
46:20, 47:18, 47:22,
48:21, 48:24, 49:14,
49:16, 49:18, 50:1,
50:3, 50:5, 50:21,
50:22, 54:16, 54:22,
55:1, 55:7, 55:14,
56:7, 56:9, 56:19,
60:15, 61:19, 62:3,
62:9, 63:18, 63:23,
66:5, 66:24, 71:6,
72:3, 73:19, 73:20,
82:1, 82:8, 82:10,
86:15, 86:20, 86:22,
87:18, 87:24, 88:3,
88:13, 88:16, 88:20,
88:25, 89:3, 89:5,
90:7, 90:15, 90:18,
90:21, 90:23, 91:1,
91:23, 92:20, 92:21,
94:2, 94:14, 96:20,
96:21, 97:4, 100:4,
110:6, 110:10,

110:22, 110:24,
112:9, 114:2,
115:19, 117:14,
118:13, 118:14,
119:25, 120:23,
121:18, 121:22,
122:5, 122:13,
122:14, 122:23,
123:7, 123:20,
123:22, 123:24,
124:16, 124:19,
125:4, 125:15,
125:20, 126:4,
126:7, 126:10,
126:14, 127:3,
127:19, 127:21,
128:3, 128:14,
128:19, 129:4,
129:10, 129:16,
129:23, 130:2,
130:13, 131:6,
131:17, 131:20,
131:25, 132:16,
133:5, 133:11,
134:9, 135:11,
136:2, 136:7,
136:13, 137:2,
138:1, 139:5,
140:21, 143:14,
144:14, 146:14,
146:22, 147:20,
148:5, 149:2,
149:24, 150:4,
150:9, 150:11,
150:23, 150:25,
151:9, 152:1,
152:14, 152:17,
152:20, 152:24,
153:11, 153:13,
153:24, 154:13,
155:8, 155:10,
155:12, 155:14,
156:20, 156:23,
157:2, 157:8, 159:5,
159:13, 159:14,
160:2, 160:6,
166:21, 166:22,
168:14, 170:19,
172:7, 174:4, 177:7,
178:17, 180:4,
180:10, 180:14,
180:23, 181:9,
181:12, 181:15,
181:19, 181:21,
185:15, 185:16,
187:20, 188:4,
188:15, 188:20,
188:22, 189:3,
189:7, 189:10,
189:14, 189:23,
190:2, 190:6, 190:8,
190:13, 190:16,
190:22, 191:1,

191:3, 191:22,
192:3, 192:7, 192:9,
199:5, 199:9,
199:10, 200:14,
201:3, 204:16,
205:5, 205:16,
206:14, 206:23,
206:25, 207:4,
207:10, 207:14,
209:21, 210:2,
210:7, 210:13,
210:15, 210:24,
211:7, 211:9,
211:11, 212:4,
212:5, 212:19,
214:18, 214:25,
215:4, 215:6, 216:5,
216:16, 219:8,
219:23, 220:17,
220:24, 222:16,
222:21, 222:23,
223:1, 223:4, 223:7,
223:18, 223:19,
227:25, 228:5,
228:13
**Murley**....... [1] - 2:2
**Murrell** [14] - 19:6,
19:8, 19:10, 20:13,
105:17, 109:22,
128:17, 157:11,
163:6, 164:14,
170:23, 171:18,
174:9, 195:7
**Murrell's** [1] - 19:14
**muscle** [4] - 51:3,
85:15, 135:24,
163:11
**muscles** [3] - 83:8,
83:10, 83:14
**must** [2] - 36:8, 92:7
**MY** [1] - 229:20

## N

**name** [7] - 6:8, 6:9,
21:13, 21:14, 66:18,
156:19, 192:5
**NARCAN®** [11] - 53:5,
93:14, 93:17,
158:10, 158:18,
170:24, 171:3,
171:6, 171:9, 173:5,
173:6
**narcotic** [5] - 93:24,
94:1, 94:4, 94:11,
140:3
**narcotics** [1] - 95:2
**narrative** [5] - 159:15,
159:16, 159:21,
160:8
**Narrative** [1] - 160:3
**Nautilus** [1] - 113:25

**Nebraska** [3] - 12:16,
12:18, 14:2
**necessary** [7] - 32:5,
95:10, 95:18, 96:9,
100:11, 124:11,
180:12
**need** [4] - 7:16, 23:13,
77:17, 220:18
**needed** [1] - 112:21
**needs** [1] - 151:20
**neutral** [1] - 122:16
**never** [11] - 32:14,
34:21, 82:5, 120:3,
120:6, 147:15,
177:21, 187:15,
212:15, 213:10,
222:2
**new** [9] - 25:10, 26:8,
26:16, 45:18, 45:19,
176:8, 177:11,
202:7, 228:6
**news** [1] - 201:13
**next** [7] - 14:20, 67:23,
76:20, 112:4, 115:7,
195:12, 196:16
**night** [1] - 131:22
**nine** [2] - 68:21, 176:2
**NO** [3] - 1:3, 3:6, 3:14
**nobody** [2] - 109:13,
110:12
**noise** [4] - 142:4,
142:5, 142:7, 142:8
**noises** [1] - 112:15
**non** [2] - 166:20,
166:21
**non-drive** [2] - 166:20,
166:21
**none** [2] - 52:12,
187:14
**nonlethal** [1] - 32:19
**normal** [1] - 226:6
**North** [2] - 12:1
**nostril** [1] - 171:19
**not..** [1] - 205:7
**Notary** [2] - 229:3,
229:24
**NOTARY** [1] - 229:23
**note** [4] - 3:10, 90:17,
216:11, 219:15
**Note** [1] - 194:15
**notes** [1] - 146:4
**nothing** [4] - 100:24,
115:16, 223:11,
229:8
**Notice** [3] - 2:24, 3:1,
214:13
**notice** [2] - 5:3, 94:25
**noticed** [7] - 111:23,
112:1, 112:12,
113:2, 134:10,
169:23, 216:22
**notices** [1] - 215:13

**notification** [1] -
119:14
**notified** [1] - 164:15
**november** [1] - 182:11
**November** [6] - 48:13,
49:1, 175:19,
182:10, 182:12,
182:13
**number** [32] - 35:19,
46:10, 46:14, 46:22,
48:2, 48:21, 63:20,
63:24, 64:8, 66:17,
67:7, 73:5, 73:18,
73:19, 73:21, 73:24,
86:23, 89:7, 92:22,
93:4, 93:10, 97:12,
110:25, 117:8,
126:21, 126:25,
144:2, 144:11,
144:16, 159:22,
207:5, 207:20
**numbers** [8] - 3:17,
73:5, 115:20, 118:1,
126:23, 128:10,
128:12, 181:7
**numerous** [3] - 120:5,
162:6, 162:16

## O

**oath** [2] - 126:8,
126:10
**obese** [1] - 116:5
**object** [54] - 3:20,
3:21, 3:22, 3:24,
3:25, 4:1, 4:2, 4:4,
4:5, 4:6, 4:7, 4:8,
4:9, 4:10, 4:11, 4:12,
4:13, 4:14, 4:15,
4:16, 4:17, 4:18,
4:19, 4:20, 4:23,
4:24, 22:22, 54:15,
55:5, 72:2, 94:9,
121:17, 121:19,
122:10, 122:18,
123:6, 123:18,
123:19, 124:23,
130:1, 139:2,
140:20, 143:13,
146:17, 147:24,
149:21, 150:2,
150:22, 151:4,
151:24, 152:9,
152:15, 200:13,
204:24
**objection** [6] - 55:11,
122:4, 123:21,
124:17, 153:9,
153:23
**objection**..................
.... [4] - 3:23, 4:3,
4:21, 4:22

**objections** [1] - 197:3
**objectively** [1] - 197:2
**objectives** [1] - 197:5
**objects** [2] - 146:2, 146:12
**observe** [1] - 94:10
**observed** [3] - 104:2, 104:3, 195:2
**obviously** [16] - 7:3, 17:22, 18:23, 25:12, 29:3, 31:23, 84:5, 94:17, 99:8, 110:11, 111:21, 128:21, 133:23, 195:5, 221:3, 226:1
**occasion** [1] - 17:5
**occur** [2] - 186:22, 194:20
**occurred** [3] - 22:8, 22:15, 191:14
**occurrence** [4] - 76:21, 79:21, 79:22, 86:11
**October** [6] - 176:24, 176:25, 181:23, 182:12, 210:11, 210:25
**OF** [5] - 1:1, 1:6, 1:11, 229:1, 229:2
**of..** [1] - 201:2
**Off-the-record** [35] - 15:24, 16:16, 16:18, 35:17, 38:1, 46:17, 66:23, 71:5, 78:22, 85:13, 90:6, 97:3, 100:3, 110:5, 112:8, 114:1, 115:18, 117:4, 125:17, 126:11, 127:2, 128:1, 129:9, 172:6, 178:16, 181:20, 192:2, 204:15, 205:15, 207:11, 216:4, 216:15, 219:1, 220:14, 223:6
**offense** [1] - 103:19
**offering** [1] - 227:17
**office** [4] - 119:21, 174:5, 176:17, 177:17
**Office** [1] - 226:10
**Officer** [33] - 9:4, 17:16, 18:24, 19:17, 19:18, 20:7, 69:9, 79:10, 105:16, 109:3, 109:20, 110:1, 111:25, 157:13, 157:15, 157:24, 162:24, 163:1, 163:23, 164:2, 164:8, 164:13, 169:24, 169:25, 170:20,

171:21, 171:22, 172:18, 174:1, 189:20, 191:16, 223:25
**officer** [39] - 12:1, 13:3, 13:5, 13:10, 18:23, 23:24, 28:1, 28:6, 36:4, 76:17, 94:16, 95:25, 96:8, 97:11, 98:22, 99:4, 99:14, 99:15, 103:19, 108:19, 110:12, 112:3, 112:12, 113:5, 113:10, 118:23, 120:19, 128:16, 136:16, 149:16, 149:17, 163:5, 172:12, 187:7, 187:10, 187:23, 191:18, 208:16, 208:22
**officer's** [1] - 98:21
**officers** [38] - 17:15, 19:19, 24:6, 24:7, 30:3, 30:9, 35:10, 45:15, 54:5, 54:21, 93:9, 93:20, 95:9, 95:15, 95:22, 99:3, 99:5, 99:11, 99:19, 105:9, 107:21, 108:24, 109:7, 109:9, 111:4, 118:11, 118:17, 118:18, 118:22, 120:4, 120:13, 120:16, 122:2, 122:20, 128:15, 134:5, 149:13, 153:16
**offices** [1] - 5:3
**officially** [2] - 187:18, 187:22
**often** [3] - 41:17, 44:15, 76:21
**old** [3] - 116:11, 173:16, 205:3
**on..** [1] - 41:18
**once** [26] - 37:3, 37:4, 67:21, 68:7, 78:16, 79:9, 81:1, 84:23, 85:2, 97:15, 97:18, 105:10, 105:13, 108:1, 111:19, 112:2, 115:6, 134:12, 145:3, 149:15, 166:11, 170:5, 176:8, 208:20
**one** [115] - 7:10, 16:10, 18:24, 20:22, 23:17, 26:16, 26:18, 26:19, 28:2, 32:1, 33:14, 33:16, 38:11, 49:13,

54:13, 54:20, 56:24, 59:3, 59:4, 62:4, 68:4, 68:16, 68:20, 69:8, 69:11, 70:5, 71:20, 72:21, 78:2, 78:14, 79:4, 79:5, 79:12, 80:11, 81:24, 82:7, 82:15, 83:17, 83:20, 83:24, 83:25, 84:21, 85:5, 85:6, 86:15, 86:18, 87:6, 88:16, 88:17, 88:19, 88:21, 89:8, 93:19, 95:25, 101:18, 109:1, 111:25, 115:6, 116:8, 121:6, 125:21, 126:16, 140:24, 144:24, 149:16, 155:16, 159:9, 159:12, 159:17, 164:5, 166:12, 168:2, 171:10, 171:12, 171:18, 177:21, 185:10, 185:12, 188:6, 188:12, 188:24, 189:1, 189:17, 191:15, 193:18, 193:24, 195:4, 195:7, 197:19, 198:1, 198:15, 198:16, 199:1, 199:11, 209:13, 209:22, 210:12, 210:14, 210:15, 210:17, 210:18, 211:9, 217:23, 220:17, 220:18, 222:14, 226:2, 227:1
**ones** [4] - 71:11, 78:10, 88:8, 217:23
**ongoing** [3] - 43:6, 44:12, 180:7
**online** [4] - 11:2, 11:3, 11:7, 12:24
**open** [7] - 126:2, 164:11, 183:13, 194:5, 195:6, 206:21, 208:18
**open-ended** [1] - 194:5
**opening** [1] - 175:3
**operate** [1] - 55:22
**operating** [4] - 86:3, 86:8, 97:11, 134:16
**operation** [1] - 75:14
**operational** [1] - 76:5
**operator** [1] - 221:2
**opinion** [5] - 121:4, 147:21, 150:7, 150:12, 227:17
**opportunity** [1] -

80:19
**opposed** [1] - 30:22
**option** [3] - 40:8, 92:4, 108:10
**options** [2] - 32:24, 55:24
**order** [1] - 218:16
**orders** [4] - 107:6, 164:7, 165:2, 218:4
**original** [1] - 229:15
**originally** [1] - 177:24
**outcome** [1] - 229:19
**outfitted** [1] - 45:15
**outside** [2] - 66:9, 117:12
**overall** [1] - 195:24
**overdose** [1] - 171:2
**owed** [4] - 122:7, 123:17, 124:4, 124:6
**own** [2] - 149:14, 172:2

### P

**P.M** [1] - 228:15
**p.m** [4] - 5:6, 136:10, 228:4
**p.m.)** [1] - 228:4
**pack** [1] - 224:8
**package** [1] - 171:16
**page** [35] - 9:24, 11:15, 35:21, 35:23, 49:16, 50:3, 64:7, 91:16, 97:12, 101:6, 102:20, 147:9, 156:18, 156:19, 158:9, 158:22, 159:4, 159:6, 159:7, 160:1, 160:2, 190:19, 190:25, 191:2, 192:15, 195:12, 196:16, 200:8, 210:8, 210:16, 211:5, 211:9, 212:3, 215:21
**PAGE** [1] - 2:1
**pages** [3] - 10:2, 11:10, 106:18
**pain** [13] - 51:3, 51:8, 51:10, 51:13, 52:3, 81:15, 81:18, 83:9, 141:5, 141:7, 165:21, 194:15, 194:17
**pain's** [1] - 51:7
**painful** [4] - 81:9, 81:14, 83:1, 83:2
**pan** [3] - 82:17, 82:18, 82:21
**paper** [2] - 31:24, 216:13
**paperwork** [4] - 49:10,

211:20, 211:23, 215:1
**paragraph** [9] - 51:20, 51:23, 55:16, 62:6, 161:14, 161:15, 162:13, 164:4, 164:5
**paranoia** [3] - 145:25, 146:11, 149:8
**paranoid** [7] - 130:21, 148:15, 149:4, 161:17, 161:21, 161:23, 162:1
**parent** [1] - 191:23
**part** [21] - 25:18, 48:18, 49:8, 93:4, 98:8, 98:13, 112:5, 114:3, 124:6, 157:17, 163:15, 165:11, 188:7, 192:10, 202:7, 203:11, 203:23, 208:24, 215:11, 226:13, 228:10
**partial** [2] - 71:11, 71:13
**participate** [1] - 35:24
**particular** [7] - 98:1, 103:20, 114:19, 123:23, 189:16, 199:1, 201:9
**particularly** [1] - 95:9
**parties** [1] - 229:18
**parts** [1] - 49:21
**party** [1] - 122:16
**pass** [3] - 46:12, 119:11, 119:13
**pass-on** [2] - 119:11, 119:13
**passed** [11] - 42:19, 71:22, 75:6, 75:11, 81:4, 83:2, 84:9, 128:8, 128:15, 178:14, 225:16
**passenger** [2] - 40:4, 40:13
**passerby** [3] - 17:7, 109:25, 188:25
**Passes** [1] - 9:6, 16:15, 36:21, 46:12, 47:18, 110:21, 206:19, 209:22, 218:25, 220:13, 223:1
**passively** [1] - 92:23
**past** [1] - 118:11
**patrol** [14] - 29:22, 35:11, 40:4, 40:11, 42:24, 104:21, 104:24, 105:2, 105:14, 106:21, 107:7, 107:12, 107:16, 131:12
**patrolman** [10] -

175:13, 175:21,
176:20, 177:1,
179:12, 179:23,
181:23, 183:19,
184:2, 184:14
**patrolmen** [2] - 183:5,
183:18
**pause** [1] - 127:5
**pavement** [1] - 30:1
**pdf** [1] - 229:15
**peo** [1] - 35:9
**people** [28] - 18:5,
52:17, 77:2, 94:15,
94:21, 101:21,
116:4, 116:7, 116:9,
119:14, 120:20,
137:17, 137:20,
138:6, 138:9,
138:15, 146:2,
146:12, 148:12,
149:7, 149:14,
152:25, 160:21,
162:6, 162:16,
212:9, 212:21
**pepper** [11] - 38:3,
38:6, 39:17, 40:18,
44:9, 44:10, 44:13,
44:16, 44:20, 45:2,
108:1
**per** [5] - 95:6, 126:2,
160:18, 161:5, 217:9
**percentage** [1] - 67:3
**perform** [1] - 113:6
**period** [8] - 14:7,
25:14, 60:7, 63:2,
117:21, 181:16,
217:9, 219:22
**permission** [1] - 104:1
**person** [26] - 27:11,
27:15, 27:18, 27:20,
30:21, 32:25, 39:4,
42:25, 45:6, 45:24,
53:13, 57:16, 59:20,
72:14, 96:3, 96:12,
97:14, 99:13, 103:3,
117:1, 124:21,
189:18, 203:15,
205:2, 212:16,
213:12
**person's** [2] - 104:1,
203:18
**personally** [1] -
113:12
**personnel** [5] -
206:15, 207:6,
207:23, 215:11,
228:12
**persons** [4] - 52:2,
121:7, 212:7, 212:12
**Persons** [1] - 211:19
**Phillips** [22] - 20:7,
20:8, 20:9, 20:11,
69:9, 105:16, 109:3,

109:20, 110:1,
157:13, 162:24,
163:1, 163:5, 164:9,
164:13, 169:24,
169:25, 170:20,
172:12, 172:18,
174:1, 174:5
**Phillips'** [2] - 163:24,
164:3
**phone** [2] - 217:7,
217:8
**physical** [15] - 43:16,
101:20, 102:11,
105:8, 105:19,
113:6, 113:10,
113:14, 113:19,
142:24, 170:3,
187:6, 187:9,
187:12, 226:23
**physically** [2] -
105:21, 196:19
**physiologic/**
**metabolic** [2] -
200:9, 201:11
**pick** [1] - 37:14
**picture** [1] - 19:25
**pictures** [1] - 119:21
**piece** [1] - 74:4
**pinned** [2] - 133:22,
133:24
**pinpoint** [11] - 51:3,
51:7, 82:13, 82:15,
82:16, 82:21, 82:22,
135:17, 141:5,
165:20, 197:25
**place** [9] - 65:10,
123:15, 124:12,
153:5, 158:12,
164:7, 165:2,
207:18, 229:6
**placed** [4] - 107:14,
109:1, 153:21,
163:25
**places** [1] - 62:25
**Plaintiff** [1] - 6:2
**PLAINTIFF** [1] - 1:9
**Plaintiffs** [1] - 5:14
**PLAINTIFFS** [1] - 1:6
**play** [3] - 18:16,
126:17, 177:22
**Playing** [21] - 18:17,
127:20, 128:2,
128:13, 128:18,
129:3, 129:12,
129:22, 130:12,
131:5, 131:14,
131:24, 132:10,
132:14, 132:17,
132:21, 132:23,
133:1, 133:4,
133:10, 134:8
**pleasant** [2] - 81:11,
81:12

**plunged** [1] - 171:19
**plunger** [1] - 171:17
**plus** [1] - 107:24
**pocket** [5] - 39:14,
102:7, 129:15,
129:17, 129:20
**pocketknife** [2] - 39:1,
102:3
**point** [24] - 10:2,
20:15, 20:21, 22:14,
26:3, 29:23, 51:18,
54:23, 62:5, 81:13,
83:1, 93:19, 97:6,
101:18, 105:8,
133:2, 133:22,
136:5, 138:17,
140:11, 154:17,
159:13, 176:23,
208:19
**pointing** [1] - 56:1
**pole** [1] - 184:25
**Police** [48] - 3:2, 6:10,
11:12, 12:5, 12:7,
12:10, 13:1, 13:22,
14:3, 14:4, 14:11,
15:13, 34:23, 37:6,
38:18, 41:6, 41:22,
42:4, 44:1, 45:9,
49:4, 66:17, 76:14,
76:18, 77:5, 79:14,
79:23, 80:5, 80:23,
89:11, 118:15,
137:7, 137:14,
174:14, 174:17,
175:1, 179:6, 185:9,
185:21, 185:25,
186:6, 202:16,
204:5, 216:19,
218:5, 218:18,
219:25
**police** [50] - 12:1,
12:12, 12:17, 13:17,
14:2, 14:24, 19:19,
23:23, 24:1, 24:6,
25:9, 26:16, 28:1,
28:6, 29:12, 33:17,
36:1, 76:17, 83:17,
83:20, 94:16, 97:10,
113:5, 113:10,
118:23, 119:1,
120:2, 120:19,
121:4, 122:15,
136:16, 160:15,
173:19, 175:2,
175:6, 175:23,
176:9, 176:12,
177:12, 178:20,
182:16, 187:7,
187:10, 187:23,
208:10, 208:13,
208:17, 218:17,
224:20, 226:20
**policies** [11] - 86:7,

86:12, 87:9, 88:5,
186:20, 187:1,
212:12, 213:20,
213:24, 215:20,
218:11
**Policy** [6] - 2:17, 2:18,
35:19, 86:23, 89:7,
211:18
**policy** [36] - 35:15,
86:4, 86:25, 87:14,
87:22, 89:10, 89:15,
89:21, 89:23, 90:9,
90:10, 90:11, 91:2,
91:3, 91:9, 91:13,
93:8, 96:22, 102:19,
111:2, 187:3, 187:5,
212:7, 212:18,
212:20, 212:21,
213:3, 213:5, 213:7,
213:11, 214:1,
214:7, 215:24,
218:4, 219:25, 220:2
**political** [1] - 176:11
**politics** [2] - 177:22,
177:23
**POP** [4] - 24:7, 24:14,
25:1, 25:4
**Port** [2] - 12:1, 12:2
**portion** [2] - 22:2,
228:9
**portions** [2] - 206:15,
207:6
**position** [15] - 10:3,
11:21, 92:9, 94:22,
175:4, 176:8,
176:11, 182:2,
182:3, 184:10,
184:16, 185:4,
217:19, 217:24,
226:3
**positional** [4] -
153:25, 154:3,
154:14, 154:15
**positionally** [1] -
182:17
**positions** [2] - 179:15,
185:22
**possibility** [2] -
150:14, 203:21
**possible** [13] - 71:10,
93:11, 121:11,
122:21, 123:1,
133:12, 134:1,
145:16, 145:17,
153:1, 171:2,
201:25, 206:10
**possibly** [10] - 28:12,
54:1, 63:2, 71:3,
72:11, 94:22, 138:6,
147:6, 192:5
**post** [3] - 21:5,
111:18, 119:21
**post-restraint** [1] -

111:18
**posted** [1] - 17:6
**poster** [1] - 119:4
**posting** [1] - 189:15
**potential** [3] - 71:21,
203:17, 206:10
**potentially** [2] - 64:24,
228:6
**pounds** [3] - 115:12,
115:13, 115:16
**PowerPoint** [1] - 2:20
**practicable** [1] - 62:13
**Precautions** [1] -
51:16
**preferred** [3] - 97:24,
98:6, 100:11
**pregnant** [2] - 205:3,
206:11
**presence** [9] - 28:1,
28:7, 29:3, 29:12,
30:24, 33:2, 162:8,
190:6, 229:10
**Presence** [1] - 106:18
**present** [3] - 107:21,
110:13, 212:22
**Presentation** [1] -
2:20
**presented** [2] - 29:9,
135:14
**press** [4] - 18:16,
114:16, 114:23,
115:1
**pressing** [1] - 145:3
**pressure** [5] - 200:15,
202:11, 202:22,
202:24, 203:5
**pretty** [3] - 11:16,
13:4, 161:22
**previous** [3] - 80:12,
83:17, 111:2
**previously** [6] - 11:22,
120:2, 120:14,
130:3, 203:6, 211:15
**primarily** [1] - 50:10
**primary** [1] - 41:3
**print** [3] - 3:12, 90:20
**private** [2] - 6:15, 6:17
**probe** [4] - 79:4,
83:15, 140:18
**probes** [5] - 58:13,
59:14, 59:16, 83:14
**problem** [3] - 21:13,
49:17, 89:4
**procedure** [6] - 86:3,
88:9, 97:11, 102:20,
113:1, 134:17
**Procedure** [1] - 5:7
**procedures** [4] -
186:20, 187:1,
218:4, 218:12
**process** [1] - 208:13
**produce** [3] - 200:10,
200:24, 201:1,

201:23, 203:9
**produced** [8] - 18:9,
66:15, 86:1, 86:7,
125:22, 190:18,
206:15, 207:21
**producing** [2] - 202:3,
205:6
**Professional** [1] -
8:25
**Profile** [1] - 9:1
**program** [2] - 24:9,
89:24
**prohibits** [1] - 100:5
**prolonged** [5] - 62:12,
62:17, 225:24,
226:3, 226:4
**promise** [2] - 105:7,
121:2
**promoted** [4] -
175:14, 175:18,
182:8, 182:13
**promotion** [1] - 184:7
**prong** [1] - 79:9
**prongs** [7] - 58:21,
58:25, 59:6, 59:14,
166:11, 166:18,
169:9
**proper** [1] - 124:20
**property** [2] - 121:7,
218:17
**prosecutor** [1] -
226:19
**Prosecutor's** [1] -
226:10
**protect** [7] - 120:20,
121:7, 121:12,
121:15, 121:25,
122:8, 122:16
**protest** [5] - 216:22,
220:5, 220:7, 220:8,
221:8
**provide** [1] - 199:16
**provided** [7] - 16:24,
35:15, 44:13,
100:19, 103:25,
166:16, 199:22
**provides** [1] - 107:13
**providing** [1] - 48:12
**provisions** [1] - 91:3
**proximity** [2] - 30:10,
107:22
**PSC** [2] - 5:4, 5:19
**psychologically** [1] -
196:19
**psychotic** [2] -
138:18, 194:16
**public** [1] - 228:10
**Public** [2] - 229:3,
229:24
**PUBLIC** [1] - 229:23
**pull** [23] - 58:16,
58:22, 59:6, 72:20,
73:9, 73:21, 73:24,

74:16, 74:17, 84:17,
99:12, 106:11,
109:20, 133:20,
134:4, 134:5,
143:20, 144:9,
149:16, 170:1,
190:20, 191:1, 195:7
**pulled** [8] - 35:5, 35:7,
35:8, 104:4, 131:23,
143:9, 164:11
**pulling** [7] - 61:2,
68:11, 71:16, 72:16,
133:21, 142:3, 144:3
**pulls** [5] - 58:17,
58:20, 58:21, 73:6,
74:2
**pumping** [5] - 53:17,
95:7, 130:4, 130:5,
148:8
**punch** [1] - 105:18
**pupils** [1] - 140:4
**purport** [1] - 227:13
**purpose** [1] - 229:6
**purposes** [4] - 9:24,
19:3, 189:10, 193:21
**pursuant** [1] - 5:2
**push** [5] - 51:2, 98:24,
107:12, 107:16
**pushed** [1] - 165:20
**pushing** [1] - 144:22
**put** [27] - 27:21, 29:18,
30:2, 34:2, 34:7,
56:24, 60:23, 70:21,
74:11, 125:11,
126:4, 127:24,
129:5, 129:20,
131:8, 131:10,
133:12, 133:16,
134:23, 148:25,
194:9, 199:23,
201:12, 206:21,
207:3, 217:21, 224:7
**puts** [1] - 83:13
**putting** [5] - 127:22,
158:19, 189:20,
202:20

### Q

**qualification** [1] - 37:1
**qualify** [2] - 37:3, 37:4
**questioned** [2] -
187:22, 208:22
**questioning** [2] -
61:16, 123:23
**questions** [29] - 10:12,
16:2, 16:25, 21:8,
52:14, 76:8, 77:16,
94:16, 95:5, 97:23,
105:3, 125:10,
130:20, 136:3,
138:20, 144:10,

146:24, 148:1,
152:25, 159:3,
159:19, 189:23,
205:13, 211:25,
214:15, 214:19,
228:5, 228:8
**QUESTIONS** [1] - 6:7
**Questions** [1] - 2:2
**quicker** [1] - 9:20
**quickly** [1] - 170:8
**quite** [1] - 77:23

### R

**radio** [3] - 101:1,
116:25, 117:22
**radioed** [1] - 169:20
**range** [3] - 42:15,
116:8, 125:1
**rank** [1] - 183:23
**rare** [1] - 76:21
**rarely** [1] - 40:6
**rate** [5] - 200:16,
202:10, 202:22,
202:25, 203:6
**rattled** [1] - 174:17
**re** [3] - 2:20, 122:12,
205:15
**reach** [3] - 97:15,
102:6, 133:16
**reached** [2] - 96:12,
129:8
**reaching** [2] - 97:5,
129:17
**react** [1] - 83:14
**reacting** [1] - 140:9
**read** [14] - 31:24,
49:19, 50:14, 51:23,
58:14, 73:13, 99:16,
146:8, 159:9,
159:10, 159:11,
195:15, 215:7,
229:13
**reading** [11] - 10:8,
28:18, 56:2, 103:16,
146:1, 190:1, 190:2,
207:15, 227:5,
227:15, 227:20
**ready** [3] - 65:7,
171:10, 210:3
**real** [2] - 174:20, 223:4
**realize** [1] - 156:23
**really** [17] - 14:10,
45:22, 51:9, 121:12,
121:15, 121:24,
124:4, 146:23,
152:3, 169:6, 173:8,
192:12, 198:2,
206:17, 211:10,
211:25, 220:18
**reason** [13] - 30:7,
45:11, 66:25, 93:22,

140:13, 149:3,
156:16, 174:21,
176:4, 181:25,
186:16, 196:21,
199:6
**reasonable** [2] -
100:12, 197:3
**reasoning** [4] - 182:6,
184:6, 184:10,
186:12
**reasons** [1] - 41:12
**reassess** [1] - 199:15
**reattached** [2] - 58:11,
73:2
**rebuilt** [1] - 113:21
**receive** [3] - 44:9,
45:23, 136:14
**received** [44] - 9:20,
10:10, 11:12, 21:6,
23:8, 24:14, 24:24,
26:13, 26:21, 30:15,
35:22, 42:10, 43:3,
45:2, 46:3, 46:19,
46:23, 47:4, 47:11,
47:15, 47:21, 48:23,
49:9, 63:22, 80:20,
86:17, 88:2, 89:14,
117:19, 136:18,
145:8, 147:15,
147:16, 175:4,
190:15, 192:10,
202:15, 207:13,
209:25, 214:24,
219:3, 220:16,
221:22, 223:3
**recently** [1] - 113:20
**recertify** [1] - 24:11
**recited** [1] - 48:6
**recognizes** [1] - 95:8
**recollection** [2] -
203:8, 204:3
**recommend** [1] - 96:8
**recommended** [2] -
98:23, 99:15
**recommends** [1] -
100:6
**record** [66] - 6:8, 6:18,
6:21, 6:25, 7:4, 9:24,
15:24, 16:16, 16:17,
16:18, 16:20, 17:25,
19:3, 35:17, 38:1,
46:17, 61:24, 62:2,
66:23, 71:5, 78:22,
85:13, 90:6, 97:3,
100:3, 110:5, 112:8,
114:1, 115:18,
117:4, 125:15,
125:17, 125:19,
125:23, 125:24,
126:2, 126:5,
126:11, 127:2,
128:1, 129:9, 136:9,
136:12, 172:6,

178:16, 181:20,
189:4, 189:9,
189:10, 189:22,
190:1, 190:3,
190:21, 192:2,
204:15, 205:15,
206:21, 207:8,
207:11, 216:4,
216:15, 219:1,
220:14, 223:6,
228:3, 228:14
**records** [1] - 166:10
**recounting** [1] -
173:17
**recruit** [2] - 25:10,
26:8
**red** [2] - 118:4
**redacted** [4] - 10:1,
23:10, 23:11, 206:17
**REDBIRD** [1] - 1:24
**redeploy** [1] - 55:23
**reduced** [1] - 229:9
**refer** [4] - 10:11,
37:10, 37:12, 119:3
**reference** [32] - 24:19,
95:5, 117:22,
117:24, 121:9,
121:10, 123:12,
137:9, 138:6,
138:22, 141:3,
160:15, 163:6,
167:14, 169:21,
171:2, 194:25,
200:20, 201:5,
201:11, 202:9,
203:15, 205:2,
206:10, 210:18,
210:20, 211:2,
211:20, 212:14,
216:7, 222:13,
223:25
**referring** [5] - 16:4,
45:19, 92:1, 92:13,
164:22
**refresh** [1] - 25:2
**refused** [4] - 30:2,
107:13, 163:6, 174:9
**refusing** [1] - 153:15
**regard** [1] - 57:3
**region** [1] - 163:11
**regular** [1] - 36:4
**reholster** [1] - 74:14
**reholstered** [1] - 74:13
**related** [6] - 43:7,
63:3, 64:9, 80:11,
138:4, 195:14
**relates** [3] - 41:2,
44:12, 136:18
**relation** [1] - 136:15
**relayed** [2] - 116:19,
116:23
**Release** [2] - 2:14,
48:20

released [1] - 68:7, 207:25
relieved [1] - 173:25
remain [1] - 179:15
remained [1] - 175:8
remaining [1] - 67:4
remember [20] - 26:14, 26:19, 45:1, 79:2, 90:25, 100:13, 101:1, 101:3, 117:5, 117:6, 117:10, 117:21, 118:3, 202:24, 203:1, 204:4, 206:2, 207:17, 207:18, 218:21
remembering [1] - 206:3
remove [7] - 65:2, 65:4, 65:5, 65:9, 65:13, 65:14, 224:6
removed [2] - 224:3, 224:5
removing [1] - 65:10
repeat [9] - 28:6, 55:6, 192:15, 192:21, 193:11, 193:15, 193:19, 193:25, 194:4
repeated [8] - 52:4, 54:9, 61:8, 62:12, 62:17, 196:17, 225:24, 226:2
repeating [1] - 199:16
rephrase [2] - 82:20, 122:12
Report [4] - 2:9, 3:4, 223:9, 223:13
report [18] - 15:23, 16:4, 16:9, 23:20, 66:19, 159:8, 159:11, 159:22, 186:18, 217:4, 217:5, 222:7, 223:10, 226:22, 227:5, 227:16, 227:19, 227:20
reported [3] - 222:9, 222:12, 224:16
REPORTER [61] - 1:24, 11:6, 16:19, 19:7, 23:16, 31:10, 33:24, 34:25, 35:3, 35:7, 46:15, 50:18, 61:24, 62:1, 81:23, 92:17, 93:25, 110:9, 118:7, 118:9, 125:18, 126:9, 129:14, 132:12, 132:19, 135:4, 135:9, 135:23, 136:1, 136:9, 136:11, 136:25,

147:18, 148:25, 155:9, 155:11, 157:5, 159:6, 159:10, 168:9, 170:16, 170:18, 174:2, 180:16, 180:19, 180:22, 185:11, 187:19, 188:3, 188:8, 188:10, 188:12, 190:12, 191:18, 191:20, 210:20, 219:5, 222:11, 223:15, 228:3, 228:14
reports [5] - 16:23, 17:3, 155:5, 158:24, 174:10
representing [1] - 180:24
reprimand [5] - 215:25, 216:20, 218:16, 218:22, 219:25
Reprimand [1] - 216:18
reprimanded [1] - 221:9
REQUEST [2] - 3:6, 3:14
request [2] - 126:2, 229:12
requesting [1] - 160:15
requests [2] - 27:11, 27:21
require [1] - 157:3
required [7] - 26:15, 42:16, 92:25, 126:7, 126:9, 137:11
rescheduled [1] - 221:4
resided [1] - 179:5
residence [4] - 117:10, 128:22, 160:16, 160:22
residual [1] - 81:18
resigned [1] - 177:15
Resistance [8] - 2:8, 2:17, 2:18, 23:17, 86:5, 86:24, 155:15, 155:24
resistance [11] - 87:1, 87:15, 89:11, 92:24, 93:2, 96:10, 96:17, 108:18, 135:16, 157:10, 158:4
resistant [1] - 92:24
resisted [1] - 105:15
resisting [11] - 95:20, 97:1, 98:21, 99:21, 133:18, 133:20, 134:3, 157:23,

164:6, 165:1, 170:3
resolved [1] - 181:17
respiration [3] - 200:15, 202:22, 203:6
respirations [1] - 202:24
respiratory [1] - 202:11
respond [4] - 15:4, 20:1, 52:3, 136:20
responded [10] - 14:13, 14:21, 14:25, 19:20, 94:12, 104:17, 121:6, 174:1, 174:5, 174:15
responder [1] - 172:19
responding [3] - 14:11, 53:19, 135:1
response [13] - 8:4, 40:17, 66:10, 76:15, 87:1, 87:15, 89:11, 120:21, 138:14, 157:10, 158:4, 192:16, 198:13
Response [8] - 2:8, 2:17, 2:18, 23:17, 86:4, 86:23, 155:15, 155:24
responsibility [2] - 36:4, 120:19
rest [4] - 84:20, 107:6, 183:4, 211:10
restrain [6] - 97:16, 109:19, 111:20, 122:22, 123:12, 153:5
restrained [7] - 111:17, 111:21, 111:23, 151:8, 151:20, 151:21, 213:2
restraining [1] - 154:9
restraint [9] - 33:10, 34:10, 34:11, 34:12, 34:16, 34:21, 35:4, 93:22, 111:18
restraints [3] - 33:22, 33:25, 34:7
restrict [2] - 111:7, 154:19
restricted [1] - 111:3
restricting [1] - 154:20
result [1] - 209:9
results [1] - 227:19
Resume/CV [1] - 2:5
resumé [2] - 8:23, 21:11
retained [2] - 3:8, 90:13
retrieve [1] - 105:15
retrospect [1] - 165:16
return [2] - 216:11,

218:17
returning [1] - 222:24
review [2] - 89:25, 90:10
reviewed [6] - 15:17, 15:21, 155:19, 162:20, 190:3, 213:18
Reviews [44] - 9:1, 9:7, 9:16, 35:14, 36:24, 46:3, 46:11, 47:18, 48:3, 49:12, 49:24, 50:4, 51:15, 56:5, 61:18, 62:7, 88:18, 91:17, 91:21, 97:13, 99:20, 101:6, 103:11, 103:15, 155:13, 155:23, 159:18, 159:22, 159:24, 161:11, 163:4, 163:8, 169:20, 173:10, 173:17, 185:2, 187:25, 192:19, 206:14, 206:20, 210:1, 210:6, 214:11, 218:24
revive [1] - 172:9, 172:24
rhythm [3] - 200:16, 202:22, 202:25
Richmond [4] - 25:19, 25:20, 25:22, 26:6
ricocheted [1] - 79:5
Risk [2] - 2:13, 48:19
risk [23] - 55:3, 55:9, 55:20, 56:12, 56:21, 57:6, 63:5, 123:4, 195:21, 196:3, 196:4, 196:10, 200:9, 200:11, 201:2, 201:22, 201:24, 202:19, 203:9, 204:5, 204:12, 204:17, 205:7
risks [4] - 62:16, 195:14, 201:11, 201:20
Risks [1] - 195:12
Ritter [4] - 7:24, 10:6, 229:3, 229:23
RITTER [2] - 1:23, 229:23
road [1] - 14:10
Road [1] - 6:14
Role [1] - 35:20
role [1] - 121:4
roll [2] - 112:6, 112:18
rolled [2] - 170:1, 170:5
Romney [5] - 5:14, 88:24, 209:19

ROMNEY [9] - 9:11, 21:3, 46:7, 46:11, 88:18, 188:23, 189:2, 190:23, 219:9
roof [1] - 79:5
room [1] - 77:1
Room [2] - 80:18, 174:6
roughly [6] - 60:3, 70:20, 72:21, 177:14, 199:19, 225:19
route [1] - 105:13
Rules [1] - 5:7
run [4] - 105:13, 105:20, 179:19, 207:1
running [3] - 12:12, 123:21, 123:23

S

S-O-P [1] - 218:5
s/Julie [1] - 229:23
safe [2] - 65:19, 74:11
safest [1] - 121:11
Safety [4] - 51:15, 51:17, 55:15, 62:10
safety [7] - 42:14, 49:7, 51:11, 64:23, 65:6, 78:16, 84:19
sake [1] - 56:25
Sampson [1] - 174:5
Samson [1] - 80:18
Sarasota [1] - 178:13
save [1] - 84:25
saw [5] - 64:23, 60:7, 128:23, 218:14, 226:9
scene [21] - 40:12, 40:20, 42:24, 42:25, 106:19, 109:8, 109:14, 110:12, 118:6, 118:8, 121:5, 121:25, 122:2, 122:9, 122:16, 127:10, 163:7, 169:21, 173:25, 174:10, 174:15
schizophrenic [1] - 130:22
school [3] - 10:24, 178:25, 227:11
science [1] - 10:15
scientist [1] - 56:24
screen [2] - 19:10, 125:14
se [1] - 95:6
seal [3] - 206:22, 207:3, 228:11
SEALED [6] - 2:21, 2:23, 2:24, 3:1, 3:2,

3:4

**sealed** [2] - 207:8, 207:21

**search** [4] - 105:14, 131:15, 131:18, 131:22

**seat** [1] - 107:13

**second** [54] - 19:4, 20:6, 42:8, 45:10, 45:11, 45:20, 47:17, 49:19, 51:23, 56:6, 56:7, 59:8, 60:7, 60:17, 61:5, 67:22, 67:25, 68:4, 71:1, 71:2, 71:16, 78:14, 86:21, 89:1, 99:16, 113:4, 117:7, 128:6, 128:8, 144:7, 144:20, 144:22, 158:9, 159:2, 159:18, 162:14, 171:4, 171:9, 173:7, 183:25, 184:20, 184:24, 188:15, 192:15, 193:14, 193:18, 197:13, 197:16, 210:8, 210:13, 210:16, 219:9, 225:15, 228:1

**Seconds** [1] - 144:15

**seconds** [64] - 17:13, 22:5, 22:6, 22:7, 59:7, 60:1, 65:22, 65:23, 65:24, 67:9, 67:10, 67:24, 68:3, 68:5, 68:8, 68:11, 69:19, 69:23, 70:1, 70:3, 70:13, 70:18, 70:20, 71:21, 72:20, 72:21, 73:10, 73:22, 73:25, 74:4, 74:6, 78:14, 82:19, 84:11, 84:12, 84:13, 84:16, 84:21, 85:3, 112:2, 130:9, 142:25, 144:2, 144:20, 144:25, 145:4, 154:25, 169:8, 197:8, 197:11, 197:18, 197:20, 197:23, 198:19, 199:1, 199:2, 199:7, 199:19, 200:5, 225:19, 226:6

**secured** [7] - 93:18, 112:3, 134:12, 157:25, 158:1, 158:14, 173:24

**see** [78] - 3:13, 9:1, 9:5, 16:3, 16:12, 16:13, 17:5, 18:13, 18:14, 18:18, 22:9, 35:13, 36:18, 49:1, 174:9

**sergeant** [7] - 19:7, 20:13, 117:23, 184:1, 184:3, 184:19, 184:23

**sergeants** [3] - 183:4, 183:16, 183:17

**serial** [1] - 66:17

**serious** [10] - 55:20, 56:12, 56:21, 57:6, 93:6, 94:6, 96:6, 96:24, 103:19, 124:10

**serve** [1] - 120:20

**served** [2] - 13:16, 177:13

**service** [2] - 15:4, 185:8

**set** [6] - 59:3, 59:4, 68:5, 75:24, 112:16, 115:23

**sets** [1] - 222:19

**setting** [1] - 75:25

**seven** [6] - 12:21, 17:13, 67:3, 68:21, 125:3, 125:5

**several** [25] - 41:12, 44:2, 44:3, 44:7, 44:17, 54:6, 60:1, 104:7, 104:13, 107:11, 112:1, 114:12, 117:9, 120:4, 140:4, 154:25, 163:11, 164:9, 165:12, 178:14, 182:18, 217:11, 219:21

**several..** [1] - 104:12

**severe** [1] - 40:10

**shackled** [1] - 169:22

**shaking** [1] - 8:3

**shall** [3] - 36:6, 92:23, 92:25

**shallow** [8] - 93:19, 111:23, 112:1, 112:13, 112:19, 134:11, 158:15, 170:6

**shape** [1] - 114:13

**sharp** [1] - 82:14

**sheriff** [1] - 179:19

**shift** [1] - 213:23

**shifts** [1] - 119:13

**shirt** [1] - 170:2

**shock** [1] - 82:14

**shoes** [1] - 129:5

**shoot** [1] - 57:1

**shooting** [1] - 42:14

**shoots** [1] - 57:1

**Short** [1] - 61:25, 136:10, 228:4

**shorter** [1] - 196:10

**shortest** [1] - 197:1

**shorthand** [1] - 229:9

**shot** [12] - 57:8, 73:2, 81:20, 83:7, 166:12, 201:25, 202:11, 223:16, 223:17, 223:21, 224:13

**shoulder** [7] - 29:18, 81:24, 89:2, 107:15, 113:20, 114:12, 131:10

**show** [7] - 29:1, 48:1, 51:4, 60:8, 149:6, 168:11, 206:18

**showed** [8] - 93:18, 157:16, 157:20, 157:24, 168:8, 222:17, 224:7, 226:22

**showing** [3] - 46:21, 144:2, 144:4

**shown** [2] - 2:7, 72:24

**shows** [6] - 47:7, 58:16, 131:12, 169:2, 169:10

**shuts** [1] - 78:16

**sic** [1] - 171:13

**sick** [7] - 210:19, 210:20, 210:21, 210:23, 216:8, 217:9, 221:19

**side** [21] - 17:14, 22:8, 39:6, 39:7, 39:16, 39:22, 40:4, 40:13, 59:23, 66:1, 67:3, 92:8, 92:11, 92:19, 112:7, 112:19, 129:21, 155:1, 155:3, 164:10, 195:16

**sign** [6] - 49:10, 97:5, 149:8, 220:6, 220:8, 229:13

**Signature** [1] - 216:18

**SIGNATURE** [1] - 229:20

**signature** [2] - 49:2, 156:15

**signed** [6] - 48:17, 48:25, 125:25, 216:22, 220:5, 221:8

**signs** [5] - 93:19, 94:19, 145:8, 145:16, 145:17

**silence** [1] - 117:22

**single** [2] - 96:2, 120:19

**singular** [1] - 198:16

**sit** [4] - 107:12, 112:7, 168:20, 175:15

**sitting** [5] - 85:19, 85:20, 107:7, 224:9, 224:10

**situation** [16] - 27:13, 174:9

**27:19, 28:17, 30:19,**

27:19, 28:17, 30:19, 31:5, 31:7, 80:11, 124:7, 139:4, 139:15, 139:17, 148:1, 149:10, 149:11, 208:15, 220:9

**situations** [3] - 31:15, 57:4, 119:12

**six** [15] - 17:13, 67:25, 68:6, 68:20, 71:20, 98:19, 144:24, 183:3, 183:4, 183:9, 183:16, 184:5, 184:6, 197:23, 199:12

**six-second** [1] - 67:25

**slide** [1] - 201:18

**slot** [1] - 183:13

**small** [9] - 58:4, 60:18, 61:3, 68:24, 72:22, 73:9, 98:15, 177:22

**smaller** [1] - 37:22

**smart** [1] - 125:13

**smell** [3] - 53:13, 139:22, 140:1

**smoothly** [1] - 7:22

**so..** [12] - 6:23, 9:15, 41:16, 88:14, 98:19, 108:3, 141:7, 167:25, 173:9, 193:19, 194:6, 220:21

**social** [4] - 17:6, 21:9, 21:25, 189:15

**soft** [7] - 28:3, 28:10, 28:11, 29:17, 33:2, 107:18, 131:7

**Soft** [1] - 107:8

**soft-hand** [1] - 131:7

**solid** [1] - 132:22

**someone** [8] - 30:22, 30:25, 54:11, 77:7, 78:24, 94:20, 145:15, 156:16

**sometime** [1] - 119:18

**sometimes** [2] - 8:14, 32:7

**somewhat** [1] - 8:14

**somewhere** [1] - 85:23

**Sons** [1] - 178:10

**SOP** [2] - 86:2, 92:6

**sorry** [44] - 6:16, 20:8, 23:14, 31:10, 33:24, 35:11, 43:11, 56:2, 58:24, 60:14, 65:22, 67:15, 77:15, 77:25, 80:16, 89:3, 90:3, 92:16, 103:9, 103:16, 127:14, 129:14, 132:19, 135:10, 141:14,

51:12, 51:14, 52:6, 53:8, 55:17, 55:25, 58:23, 60:8, 62:14, 67:7, 67:25, 73:22, 78:10, 78:13, 84:20, 85:10, 90:22, 90:24, 91:16, 91:24, 93:12, 94:10, 95:13, 98:25, 102:1, 103:8, 103:12, 108:21, 111:7, 112:10, 117:8, 118:1, 119:18, 128:11, 129:10, 129:11, 129:15, 146:1, 146:3, 146:4, 148:13, 149:5, 154:6, 156:1, 156:15, 158:18, 159:3, 169:25, 191:11, 192:18, 192:19, 193:25, 196:11, 206:19, 207:25, 208:17, 209:3, 209:4, 211:4, 211:20, 217:22, 218:6, 225:18, 225:24

**seeing** [5] - 84:24, 90:25, 201:12, 201:21, 202:6

**seem** [2] - 22:16, 222:7

**self** [1] - 212:23

**send** [1] - 181:12

**sending** [2] - 59:5, 169:21

**sensation** [1] - 83:6

**sense** [23] - 7:18, 7:24, 8:13, 8:17, 22:17, 24:12, 31:22, 47:15, 58:2, 72:4, 87:12, 92:14, 105:12, 118:18, 119:10, 119:15, 122:11, 166:17, 169:19, 205:24, 214:20, 214:21, 222:4

**sent** [2] - 13:1, 18:10

**sentence** [5] - 56:3, 56:6, 56:7, 62:6, 162:14

**separate** [5] - 58:25, 128:21, 140:18, 140:24, 207:4

**separated** [1] - 165:17

**September** [3] - 11:20, 77:24, 77:25

**Sergeant** [8] - 19:6, 109:22, 157:11, 163:6, 164:14, 170:10, 170:23,

150:23, 155:2, 155:25, 160:2, 161:13, 163:9, 174:2, 186:4, 193:16, 197:5, 201:1, 201:7, 209:22, 210:16, 211:22, 215:16, 216:2, 223:5
**sought** [1] - 179:15
**sound** [4] - 25:3, 141:23, 143:3, 147:5
**sounds** [4] - 142:2, 169:23, 177:8, 213:25
**source** [1] - 100:20
**Southern** [2] - 10:16, 10:25
**span** [2] - 142:22, 169:8
**spasms** [1] - 85:15
**speaking** [2] - 15:19, 140:17
**Special** [1] - 226:10
**special** [1] - 226:19
**specific** [14] - 45:24, 52:14, 91:11, 136:17, 138:2, 159:3, 169:7, 174:20, 200:4, 200:21, 214:14, 214:18, 215:18, 226:15
**specifically** [9] - 49:23, 91:12, 101:23, 109:12, 113:13, 137:19, 162:10, 198:3, 211:19
**speculation** [2] - 151:4, 151:24
**Speculation** [1] - 152:11
**speculation..........** [2] - 4:18, 4:19
**speculative** [2] - 31:8, 31:11
**speed** [2] - 3:17, 181:9
**spite** [3] - 177:6, 177:8, 177:19
**spray** [23] - 28:4, 28:12, 30:5, 38:3, 38:4, 38:6, 39:17, 40:18, 44:9, 44:10, 44:13, 44:16, 44:20, 45:2, 92:5, 107:19, 107:21, 107:24, 107:25, 108:1, 108:6, 109:14
**spraying** [1] - 108:4
**sprays** [1] - 109:13
**SS** [1] - 229:1
**stab** [1] - 106:11

**stamp** [2] - 126:17, 143:18
**standard** [7] - 81:7, 86:3, 88:8, 97:11, 112:25, 113:11, 134:16
**standards** [1] - 36:9
**standing** [3] - 17:14, 18:19, 19:15
**start** [6] - 15:13, 28:22, 29:8, 29:10, 82:8, 199:8
**started** [14] - 43:21, 53:5, 69:18, 158:15, 167:15, 170:14, 170:15, 170:17, 170:20, 174:16, 174:22, 216:23, 217:22, 221:25
**starting** [4] - 11:12, 64:8, 96:5, 227:12
**starts** [3] - 73:4, 129:1, 164:5
**STATE** [1] - 229:1
**State** [8] - 5:4, 5:19, 9:4, 126:13, 174:14, 226:11, 229:4, 229:25
**state** [9] - 6:8, 24:12, 24:15, 100:21, 145:24, 146:11, 147:3, 162:2, 226:20
**statement** [10] - 54:8, 56:10, 56:16, 57:7, 157:10, 162:20, 169:11, 209:7, 213:8, 213:19
**statements** [1] - 101:17
**STATES** [1] - 1:1
**states** [1] - 24:5
**stating** [4] - 95:6, 101:1, 200:23, 220:2
**station** [1] - 219:13
**stations** [2] - 178:10, 178:11
**staying** [1] - 219:14
**step** [2] - 125:7, 228:1
**stepped** [5] - 58:12, 176:6, 176:7, 176:16, 179:11
**steps** [1] - 103:5
**Stick** [1] - 2:7
**still** [22] - 15:4, 29:23, 30:2, 63:11, 95:18, 103:16, 108:2, 109:4, 114:7, 114:13, 124:4, 133:16, 133:25, 139:4, 151:17, 152:7, 161:24, 162:13, 164:6, 165:1, 203:11,

224:12
**stint** [1] - 12:16
**stipulate** [1] - 124:18
**stop** [2] - 124:16, 133:18
**stopped** [9] - 93:20, 93:23, 111:20, 112:14, 113:3, 134:3, 170:12, 194:24, 199:25
**straight** [2] - 155:1, 155:4
**straight-faced** [2] - 155:1, 155:4
**Street** [3] - 5:4, 5:15, 5:19
**street** [4] - 17:14, 118:10, 128:7, 128:10
**strength** [1] - 75:16
**stress** [2] - 200:16, 202:23
**stressful** [1] - 196:19
**strike** [3] - 109:21, 132:4, 149:17
**strikes** [8] - 17:16, 18:19, 18:25, 19:16, 20:12, 109:17, 110:1, 164:9
**striking** [1] - 205:3
**stripped** [1] - 219:10
**struck** [4] - 105:16, 109:3, 149:16, 163:1
**struggle** [1] - 97:20
**struggled** [1] - 109:2
**studies** [1] - 96:8
**stuff** [13] - 8:24, 22:4, 54:13, 62:24, 75:16, 99:7, 100:23, 105:4, 117:20, 119:19, 137:17, 212:11, 219:15
**stun** [77] - 18:19, 50:10, 50:24, 51:1, 51:13, 51:22, 52:1, 53:19, 54:12, 54:18, 57:11, 58:5, 58:11, 59:24, 60:2, 60:18, 63:1, 65:11, 67:6, 67:15, 67:16, 67:18, 68:14, 68:15, 68:23, 69:18, 70:11, 81:19, 82:7, 82:8, 82:11, 83:4, 83:5, 83:9, 84:6, 84:9, 85:6, 85:19, 96:5, 97:2, 98:24, 100:6, 100:8, 100:15, 132:3, 134:19, 135:13, 135:18, 140:17, 141:3, 141:4, 141:10, 143:25, 163:10, 164:9,

165:13, 165:17, 165:24, 166:1, 166:20, 166:21, 167:12, 168:2, 168:6, 168:8, 168:11, 168:12, 168:21, 193:14, 193:17, 193:18, 193:24, 194:21, 194:25, 195:10, 197:25, 199:14
**stunned** [5] - 54:20, 85:10, 163:23, 164:2, 194:8
**stunning** [1] - 54:25
**stuns** [18] - 50:16, 50:19, 52:4, 53:22, 54:9, 72:24, 110:3, 192:15, 192:21, 193:2, 193:12, 193:22, 193:25, 194:1, 194:4, 194:12, 194:13, 225:7
**subdual** [1] - 111:3
**subdue** [2] - 33:1, 108:25
**subdued** [5] - 15:2, 53:6, 97:16, 97:18, 157:18
**subduing** [3] - 14:22, 26:21, 27:14
**subject** [25] - 52:19, 55:17, 55:21, 55:22, 56:13, 56:22, 76:25, 79:3, 92:24, 96:9, 98:20, 101:4, 108:18, 108:20, 117:11, 124:12, 145:9, 177:4, 177:9, 179:22, 192:16, 192:22, 207:7, 207:21, 228:6
**subject's** [5] - 96:7, 96:24, 97:25, 98:4, 199:15
**submit** [1] - 90:1
**submitted** [2] - 49:10, 89:24
**submitting** [1] - 135:17
**substance** [2] - 137:16, 137:21
**substantiate** [1] - 211:13
**successfully** [2] - 171:4, 171:19
**successive** [3] - 93:9, 189:17, 193:25
**sudden** [15] - 200:11, 201:24, 202:3, 202:6, 202:19, 203:9, 203:11,

203:12, 203:21, 204:6, 204:8, 204:10, 205:6, 206:4, 206:9
**suffering** [3] - 93:7, 101:12, 101:15
**suggest** [2] - 168:15, 213:22
**suicide** [2] - 212:14, 212:15
**summary** [2] - 158:22, 181:17
**supplying** [1] - 24:15
**supposed** [9] - 27:17, 28:22, 30:20, 103:2, 103:7, 103:21, 124:21, 199:24, 221:12
**supposedly** [3] - 187:3, 212:16, 222:14
**supreme** [1] - 180:11
**surgery** [2] - 114:12, 221:3
**surmised** [1] - 93:22
**Suspect** [2] - 158:8, 158:13
**suspect** [4] - 26:21, 27:14, 121:9, 124:9
**suspected** [2] - 103:20, 138:23
**suspects** [5] - 35:10, 76:13, 119:7, 119:8, 119:9
**suspended** [1] - 222:13
**sustain** [1] - 213:17
**sustained** [4] - 209:14, 211:14, 213:6, 216:7
**sweater** [2] - 29:19, 131:11
**sweating** [1] - 140:6
**sweatshirt** [1] - 102:7
**swinging** [1] - 133:3
**switch** [1] - 84:19
**switching** [1] - 113:4
**sworn** [2] - 6:3, 229:8
**symptoms** [2] - 93:7, 94:19
**synopsis** [1] - 159:25
**Synopsis** [2] - 160:3

---

## T

**T.J** [3] - 80:17, 174:1, 174:5
**table** [2] - 224:9, 224:12
**tackled** [1] - 79:10
**tactic** [1] - 91:16
**talks** [1] - 210:25

**taped** [6] - 81:20,
81:23, 81:24, 83:8,
85:16, 173:24
**target** [1] - 98:1
**targeted** [1] - 98:7
**targeting** [2] - 97:24,
98:6
**tase** [1] - 58:3
**tased** [27] - 53:6,
58:12, 69:12, 80:19,
80:21, 80:22, 80:25,
81:15, 81:17, 82:2,
82:3, 82:4, 82:5,
82:6, 83:22, 84:2,
84:10, 85:5, 85:7,
85:8, 85:23, 98:16,
100:16, 141:6,
203:1, 205:2, 224:13
**Taser** [1] - 2:20
**TASER** [11] - 195:14,
195:21, 196:9,
196:18, 197:2,
200:10, 200:23,
201:23, 202:17,
203:16, 204:6
**taser** [208] - 28:4,
28:12, 30:14, 30:16,
37:2, 37:3, 37:8,
37:9, 37:14, 37:19,
39:15, 40:18, 45:4,
45:5, 45:6, 45:8,
45:10, 45:11, 45:18,
45:19, 45:20, 45:24,
46:24, 48:1, 49:9,
50:6, 50:8, 50:20,
50:25, 51:1, 51:2,
55:3, 55:9, 56:11,
56:20, 56:24, 57:5,
59:4, 60:18, 60:24,
61:14, 62:17, 63:1,
63:4, 63:25, 64:13,
64:17, 64:21, 64:23,
65:14, 65:15, 65:17,
65:19, 65:20, 66:9,
66:16, 66:17, 66:18,
67:1, 67:6, 68:10,
68:22, 72:13, 73:2,
74:13, 74:14, 74:16,
74:17, 74:24, 75:6,
75:15, 75:21, 75:25,
76:2, 76:4, 76:12,
76:22, 76:23, 76:25,
77:3, 77:4, 77:5,
77:6, 77:12, 78:3,
78:6, 78:23, 79:2,
79:13, 79:22, 79:25,
80:1, 80:4, 80:8,
81:8, 84:17, 84:23,
91:10, 91:12, 92:1,
94:4, 95:19, 95:23,
96:4, 96:16, 97:2,
97:20, 100:14,
109:10, 109:11,

112:6, 112:24,
113:1, 124:22,
124:25, 125:1,
125:2, 125:7, 132:1,
134:15, 134:16,
134:17, 135:15,
135:20, 140:12,
140:23, 141:4,
141:10, 141:17,
141:24, 142:18,
142:23, 142:25,
143:2, 143:3, 143:4,
143:19, 143:21,
143:25, 144:3,
151:22, 152:6,
152:7, 153:7, 164:8,
164:16, 164:17,
164:22, 165:4,
165:5, 165:6, 165:8,
165:16, 165:17,
165:18, 165:20,
165:24, 166:11,
167:16, 167:24,
168:1, 168:13,
169:9, 191:15,
191:24, 193:1,
194:21, 195:3,
195:23, 195:24,
196:17, 197:16,
198:12, 198:16,
200:9, 202:1,
202:10, 202:15,
203:6, 203:21,
204:18, 204:21,
205:1, 223:9,
223:16, 223:17,
223:21, 223:23,
224:2, 224:3, 224:4,
224:7, 224:9,
224:16, 224:22,
224:25, 225:2,
225:5, 225:23,
226:24
**taser's** [2] - 37:15,
55:12
**tasers** [3] - 45:12,
45:15, 142:21
**TASER®** [2] - 2:10,
2:12, 2:13, 2:15,
191:25, 192:6
**tasing** [2] - 84:6
**tear** [3] - 41:14, 41:20,
45:13
**Technical** [1] - 9:2
**technician** [2] - 66:21,
74:22
**technique** [5] - 28:3,
28:4, 28:10, 29:18,
131:7
**techniques** [3] - 27:4,
27:7, 111:3
**temperature** [2] -
66:3, 66:8

**temporarily** [2] -
12:23, 108:20
**ten** [14] - 12:10, 44:4,
47:8, 47:13, 68:21,
70:3, 115:12, 118:7,
119:24, 125:3,
125:5, 127:4,
189:17, 225:4
**ten-minute** [1] -
189:17
**tenths** [1] - 65:22
**tenure** [3] - 15:11,
175:6, 175:23
**term** [4] - 101:12,
118:16, 153:25,
154:3
**terminology** [2] -
146:20, 204:7
**terms** [1] - 228:12
**test** [8] - 89:25, 90:11,
103:8, 103:10,
103:22, 221:2,
224:11
**testified** [1] - 42:23
**testimony** [1] - 28:19
**testing** [2] - 78:11,
84:19
**tests** [4] - 3:8, 3:9,
90:13, 90:15
**Tharp** [2] - 173:12,
173:13
**Tharp's** [1] - 173:18
**that'd** [5] - 3:17, 3:17,
67:24, 181:8, 181:9
**that'll** [4] - 7:21, 7:24,
8:3, 8:7
**that..............** [2] -
4:12, 4:17
**THE** [1] - 228:15
**the..** [6] - 51:18, 143:1,
161:13, 166:25,
188:20, 201:4
**theirs** [1] - 25:7
**then..** [1] - 18:16
**therefore** [1] - 211:14
**they've** [4] - 23:10,
181:15, 183:13,
208:12
**thigh** [1] - 85:10
**thing's** [1] - 214:17
**think's** [1] - 225:19
**thinking** [4] - 71:12,
205:12, 218:9,
224:11
**third** [4] - 9:24, 28:7,
42:1, 164:4
**this'll** [1] - 9:14
**threat** [4] - 105:8,
105:19, 197:9,
212:22
**threatening** [4] - 77:2,
98:22, 99:14, 99:15
**threats** [1] - 6:22

**Three** [1] - 60:6
**three** [67] - 11:10,
19:19, 19:22, 19:23,
19:24, 19:25, 20:1,
24:18, 41:24, 58:7,
58:10, 58:14, 58:15,
58:17, 58:23, 59:10,
59:11, 60:4, 60:6,
60:10, 60:16, 60:17,
65:21, 65:22, 65:23,
68:20, 68:24, 71:3,
71:8, 71:9, 73:6,
80:21, 85:8, 95:22,
98:17, 103:8,
103:10, 103:22,
113:21, 114:7,
128:20, 128:25,
142:25, 143:5,
166:1, 166:8,
166:12, 166:24,
167:2, 167:5,
167:16, 167:18,
167:23, 168:16,
168:21, 169:7,
171:22, 176:1,
183:12, 183:13,
195:4, 222:19,
225:12, 225:18,
226:14, 226:16
**Three-and-a-half** [1] -
60:6
**three-and-a-half** [1] -
60:16
**three-factor** [3] -
103:8, 103:10,
103:22
**three-minute** [1] -
60:10
**three-minutes-and-
forty-second** [1] -
60:17
**throughout** [4] -
14:20, 44:17, 45:8,
218:7
**ticks** [1] - 140:5
**tight** [2] - 35:5, 35:7
**timeframe** [9] - 60:10,
60:17, 70:14, 77:11,
79:17, 87:5, 97:21,
113:2, 219:12
**timing** [1] - 78:13
**today** [9] - 16:2, 30:23,
63:12, 162:21,
168:20, 175:15,
189:4, 189:8, 228:9
**together** [4] - 46:9,
56:24, 215:15,
215:17
**tolerance** [1] - 194:17
**tomorrow** [1] - 219:17
**took** [24] - 7:10, 10:3,
16:22, 65:19,
107:14, 107:15,

117:9, 131:11,
158:12, 162:25,
172:5, 172:8,
172:13, 173:2,
176:17, 191:25,
213:20, 217:19,
217:24, 218:10,
219:6, 224:6, 224:8,
224:10
**top** [12] - 3:16, 107:14,
119:24, 144:15,
156:3, 159:25,
163:9, 164:5, 170:3,
170:4, 181:7, 211:4
**total** [3] - 70:13, 74:6
**totally** [1] - 214:5
**totem** [1] - 184:25
**touch** [2] - 82:18,
82:21
**touched** [1] - 82:17
**touching** [3] - 67:12,
67:13, 125:7
**towards** [4] - 129:1,
146:2, 146:12,
149:13
**town** [2] - 177:22,
177:23
**traffic** [2] - 14:16,
101:1
**TRAIL** [1] - 1:24
**train** [2] - 26:22,
137:20
**trained** [29] - 32:19,
33:9, 43:14, 44:15,
52:16, 54:13, 56:25,
89:23, 90:9, 97:10,
172:19, 196:15,
200:17, 200:19,
200:20, 201:4,
201:8, 201:23,
202:4, 202:17,
203:5, 203:16,
203:20, 204:17,
204:25, 205:21,
205:22, 206:6, 206:8
**training** [87] - 10:2,
10:4, 11:10, 11:11,
24:15, 24:24, 25:6,
26:2, 26:5, 26:11,
26:13, 26:21, 27:5,
32:16, 35:25, 36:7,
36:9, 36:11, 36:14,
42:11, 42:13, 43:3,
43:6, 43:16, 43:25,
44:9, 44:12, 44:20,
45:2, 45:23, 46:3,
46:23, 47:4, 47:9,
47:13, 47:15, 48:13,
49:9, 56:25, 80:20,
89:14, 93:8, 112:6,
114:17, 114:19,
115:3, 115:5, 115:6,
136:14, 136:18,

DEPOSITION OF GUY TURCOTTE TAKEN ON JANUARY 9, 2023

137:8, 137:10,
137:19, 138:2,
138:6, 138:8, 145:8,
145:10, 145:11,
147:15, 147:16,
191:5, 191:16,
192:11, 192:13,
192:20, 202:14,
204:4, 204:8,
205:17, 205:20,
221:1, 221:4,
221:10, 221:11,
221:13, 221:21,
221:22, 221:25,
222:2, 222:6, 222:7,
222:10, 222:13,
222:15, 222:25

**Training** [3] - 2:10,
137:1, 191:10
**trainings** [4] - 36:10,
191:13, 192:4, 228:7
**transcript** [1] - 229:11
**transfer** [1] - 24:12
**transferred** [2] -
108:2, 178:19
**transferring** [1] - 24:5
**trauma** [1] - 226:23
**treated** [1] - 174:6
**treatment** [2] - 157:3,
163:7
**trick** [1] - 121:2
**tried** [10] - 34:4, 34:7,
98:1, 105:17,
105:18, 123:13,
123:16, 149:15,
210:24
**trigger** [30] - 58:16,
58:17, 58:20, 58:21,
58:22, 59:6, 61:2,
65:23, 68:8, 68:11,
71:17, 72:17, 72:20,
73:6, 73:9, 73:21,
73:24, 74:2, 84:17,
85:3, 142:4, 143:9,
143:20, 144:3,
144:6, 144:8,
144:23, 145:1,
145:2, 165:23
**Trigger** [1] - 62:11
**trigger's** [2] - 67:21,
68:7
**trouble** [1] - 128:4
**true** [2] - 158:18,
229:11
**truth** [5] - 94:15,
105:23, 229:8, 229:9
**try** [9] - 7:22, 27:10,
34:2, 58:3, 122:22,
122:24, 123:10,
124:9, 124:11
**trying** [56] - 8:16, 9:18,
17:18, 27:10, 31:13,
31:23, 32:25, 54:3,

54:6, 70:25, 72:5,
72:6, 82:20, 83:13,
99:18, 102:16,
109:19, 111:20,
117:20, 117:25,
119:3, 123:3, 123:9,
123:11, 123:15,
124:2, 124:3,
127:23, 128:5,
128:10, 133:19,
134:4, 134:5,
134:22, 138:15,
140:23, 147:7,
148:2, 148:12,
148:16, 152:19,
154:19, 158:12,
160:22, 161:1,
162:11, 183:6,
198:9, 198:11,
198:13, 206:25,
215:2, 216:12
**TURCOTTE** [4] - 1:16,
5:2, 6:2, 229:5
**Turcotte** [37] - 2:5,
2:5, 2:6, 2:8, 2:10,
2:11, 2:13, 2:15,
2:16, 2:18, 2:19,
2:21, 2:22, 2:24,
2:25, 3:2, 3:3, 6:9,
10:9, 21:5, 23:7,
46:18, 47:20, 48:22,
63:21, 86:16, 88:1,
178:10, 190:14,
207:12, 209:1,
209:24, 214:23,
218:2, 219:2,
220:15, 223:2
**Turcotte's** [1] - 189:21
**turn** [4] - 64:7, 78:16,
84:18, 84:24
**turned** [3] - 64:23,
117:24, 223:10
**turning** [2] - 11:15,
84:18
**turns** [1] - 85:4
**twelve** [1] - 69:19
**twenty** [2] - 115:12,
169:8
**twenty-five** [1] -
115:12
**twice** [1] - 42:7
**two** [42] - 7:12, 12:6,
16:23, 17:3, 17:15,
23:2, 28:2, 30:9,
38:23, 44:4, 58:12,
59:21, 61:8, 68:20,
78:14, 81:1, 83:17,
83:25, 84:21, 86:7,
88:4, 95:15, 118:11,
126:16, 141:4,
165:25, 180:3,
180:5, 183:3, 183:8,
183:9, 183:10,

183:11, 188:23,
188:24, 189:11,
190:10, 195:4,
222:14, 222:19
**two-dash** [1] - 188:24
**type** [24] - 22:11,
27:17, 30:20, 30:22,
31:14, 37:22, 53:12,
83:9, 93:21, 93:24,
93:25, 94:4, 100:11,
106:4, 106:5,
115:10, 131:3,
138:21, 158:17,
187:3, 203:14,
205:1, 221:21
**types** [4] - 31:3, 32:25,
114:15, 114:18

## U

**unable** [3] - 163:13,
163:18, 224:5
**unachieved** [1] - 52:5
**unavailable** [1] -
95:10
**uncommon** [1] - 79:21
**under** [42] - 12:4, 12:6,
14:8, 49:23, 51:15,
52:19, 52:22, 52:24,
53:1, 53:9, 93:23,
93:25, 94:3, 94:11,
95:1, 129:25, 134:4,
137:21, 138:11,
139:18, 140:2,
140:13, 153:2,
153:5, 153:21,
158:20, 175:25,
176:1, 177:13,
192:5, 194:22,
195:15, 204:22,
206:21, 207:3,
216:22, 220:5,
220:7, 220:8, 221:8,
228:11
**undermine** [1] -
217:18
**underneath** [1] - 56:3
**understood** [1] - 8:10
**uneffective** [1] -
194:24
**unfounded** [1] -
209:12
**uniform** [2] - 29:13,
106:21
**unit** [8] - 29:12, 47:1,
47:4, 112:25, 172:4,
172:5, 172:8, 172:10
**UNITED** [1] - 1:1
**university** [1] - 25:25
**University** [4] - 10:16,
10:25, 24:10, 25:14
**Unknown** [1] - 158:9

**unknown** [1] - 160:16
**unless** [3] - 17:20,
144:7, 195:15
**unlikely** [4] - 192:17,
193:13, 194:3, 194:6
**unreasonable** [1] -
123:4
**unsuccessful** [1] -
171:3
**untruthful** [2] - 209:1,
209:6
**up** [40] - 3:17, 10:2,
18:18, 18:19, 18:21,
18:23, 20:22, 29:1,
30:2, 35:5, 35:7,
35:8, 72:5, 83:13,
85:14, 104:4, 107:1,
108:4, 112:7,
112:16, 127:7,
127:10, 132:15,
146:21, 157:16,
157:20, 157:24,
170:2, 181:9, 187:2,
189:4, 193:8,
193:10, 195:10,
198:6, 198:11,
208:12, 208:18,
213:15
**update** [2] - 87:5, 87:8
**Update** [1] - 191:8
**updated** [3] - 86:10,
87:11, 87:21
**updates** [2] - 117:15,
117:18
**upgrade** [1] - 45:17
**upper** [1] - 114:17
**upward** [1] - 198:12
**usage** [3] - 77:10,
77:12, 200:9
**User** [3] - 2:12, 2:13,
48:19
**user** [3] - 55:21,
56:13, 56:22
**uses** [1] - 142:11
**usual** [3] - 119:7,
119:8, 119:9
**utilized** [1] - 79:13

## V

**vague** [1] - 196:7
**vantage** [1] - 22:14
**vehicle** [1] - 131:9
**Verbal** [2] - 106:22,
216:17
**verbal** [12] - 27:9,
27:10, 28:2, 28:7,
28:8, 29:4, 29:15,
33:2, 106:25,
121:20, 215:25,
220:25
**verbally** [1] - 216:20

**verbiage** [1] - 162:4
**Version** [1] - 191:10
**version** [1] - 173:18
**versions** [2] - 87:10,
88:6
**versus** [4] - 65:11,
167:2, 167:23,
168:16
**versus..** [1] - 167:13
**vest** [2] - 39:12, 39:14
**via** [1] - 172:9
**victim** [3] - 121:8,
121:13, 173:13
**video** [63] - 15:21,
16:2, 17:5, 17:19,
18:17, 20:16, 21:9,
21:24, 96:14, 97:18,
100:13, 105:6,
109:24, 125:10,
127:20, 128:2,
128:13, 128:18,
129:3, 129:12,
129:22, 130:12,
131:5, 131:12,
131:14, 131:24,
132:10, 132:14,
132:17, 132:21,
132:23, 133:1,
133:4, 133:10,
134:8, 138:10,
141:14, 141:15,
141:23, 156:8,
167:4, 167:5, 167:6,
167:9, 167:19,
167:21, 168:7,
168:9, 168:10,
169:1, 169:2,
169:10, 169:13,
173:23, 188:2,
188:5, 188:25,
189:16, 189:21,
198:4, 198:5, 198:9
**videos** [6] - 2:7, 25:16,
125:21, 188:23,
188:24, 189:18
**view** [1] - 17:7
**views** [1] - 177:20
**violate** [2] - 213:23,
215:19
**violated** [8] - 211:18,
212:7, 213:5, 213:7,
213:11, 213:19,
214:7, 220:2
**violating** [2] - 218:16,
219:25
**violation** [4] - 187:3,
187:5, 211:14, 214:1
**violations** [3] -
214:14, 215:19,
215:24
**violence** [2] - 146:2,
146:12
**violent** [6] - 95:21,

147:4, 149:13,
151:8, 151:12,
153:16
**violently** [1] - 54:20
**visible** [1] - 20:18
**vol** [1] - 176:6
**volt** [1] - 145:4
**volts** [6] - 75:7, 75:8,
75:11, 75:18, 75:23,
81:3
**voluntarily** [5] - 176:6,
176:7, 176:16,
224:18, 224:19
**VS** [1] - 1:9

## W

**wait** [2] - 135:4, 184:5
**waited** [1] - 219:13
**waiting** [1] - 117:25
**walk** [2] - 11:19,
107:11
**walked** [5] - 29:21,
104:21, 104:23,
107:15, 131:11
**walking** [1] - 107:6
**wants** [2] - 208:17,
210:22
**warned** [2] - 100:14,
221:9
**Warning** [1] - 48:19
**warning** [3] - 100:10,
132:2, 221:1
**Warnings** [1] - 2:13
**warnings** [1] - 49:7
**WARREN** [1] - 229:2
**Warren** [1] - 5:4
**WAS** [1] - 228:15
**watch** [13] - 69:14,
96:14, 96:23, 97:18,
100:13, 105:6,
125:9, 127:6,
188:17, 222:17,
222:18, 222:19,
222:20
**watched** [12] - 109:24,
138:10, 156:7,
188:6, 188:18,
188:24, 189:1,
189:4, 189:8,
189:15, 189:16,
198:8
**watches** [2] - 119:12,
222:21
**watching** [4] - 141:14,
141:15, 167:6, 198:5
**water** [5] - 51:5, 51:6,
82:22, 135:18,
135:21
**watts** [1] - 75:5
**ways** [1] - 140:4
**weak** [3] - 92:8, 92:11

**weak-hand** [1] - 92:8
**Weapon** [2] - 195:14,
195:21
**weapon** [25] - 28:13,
29:6, 33:4, 33:5,
33:6, 33:7, 39:3,
41:2, 41:14, 42:11,
42:17, 91:15,
101:24, 102:1,
106:4, 106:5, 109:4,
109:9, 196:9,
196:17, 196:18,
197:2, 201:23,
202:17, 203:17
**weapon-wise** [1] -
39:3
**weapons** [12] - 37:2,
38:16, 42:14, 102:5,
109:6, 109:7,
109:12, 109:13,
129:6, 200:10,
200:24, 204:6
**wear** [4] - 41:14,
41:20, 45:13, 92:18
**wear-and-tear** [2] -
41:14, 41:20
**wearing** [1] - 39:11
**website** [1] - 147:1
**week** [2] - 113:21,
114:7
**weigh** [2] - 115:25,
116:11
**weighed** [2] - 116:13,
116:14
**weight** [12] - 40:6,
114:18, 114:19,
114:22, 115:6,
115:10, 116:7,
116:8, 116:9, 116:10
**weightlifting** [1] -
114:15
**weights** [8] - 113:22,
113:24, 114:3,
114:14, 114:15,
114:20, 114:24,
115:14
**well..** [1] - 152:21
**WESTERN** [1] - 1:1
**whatsoever** [1] -
141:17
**WHEREUPON** [1] -
228:15
**whoever's** [3] -
176:12, 190:1, 190:2
**whole** [5] - 188:18,
201:17, 214:17,
216:9, 229:8
**wider** [1] - 141:6
**window** [1] - 40:7
**windows** [1] - 35:11
**wise** [3] - 39:3, 79:8,
229:19
**wish** [1] - 81:16

**with..** [1] - 173:10
**WITNESS** [132] - 3:11,
6:22, 7:2, 7:5, 7:12,
10:13, 11:7, 16:9,
19:2, 19:6, 19:8,
19:12, 20:8, 21:13,
21:15, 21:17, 21:19,
21:21, 23:1, 23:11,
25:18, 25:21, 25:25,
26:2, 31:9, 31:11,
33:25, 35:2, 35:4,
35:8, 36:24, 41:24,
50:4, 50:19, 54:17,
54:23, 55:6, 55:12,
56:8, 60:14, 81:24,
86:18, 88:19, 88:22,
90:3, 90:5, 90:19,
91:19, 91:21, 92:18,
94:1, 94:10, 117:5,
118:8, 118:10,
121:20, 122:11,
122:19, 124:25,
129:13, 129:15,
129:19, 131:15,
131:18, 132:11,
132:13, 132:15,
132:18, 132:20,
132:22, 132:24,
133:2, 135:6, 135:8,
135:24, 137:1,
137:24, 139:3,
144:13, 146:19,
147:19, 147:25,
149:22, 150:3,
150:5, 150:10,
150:24, 151:5,
151:7, 151:25,
152:10, 152:12,
152:22, 153:10,
153:12, 155:7,
155:13, 156:19,
156:22, 157:1,
157:6, 159:8,
159:11, 168:10,
170:17, 177:6,
180:11, 180:17,
180:20, 181:11,
185:12, 189:19,
191:19, 191:21,
199:6, 201:1,
204:25, 210:1,
210:6, 210:18,
210:22, 211:8,
219:6, 219:10,
220:21, 222:12,
222:17, 222:22,
222:24, 223:5,
223:16, 229:20
**Witness** [6] - 51:25,
69:3, 116:16,
132:13, 142:16,
144:13
**witness** [5] - 157:9,

158:4, 229:7,
229:10, 229:13
**witnessing** [1] - 131:2
**word** [5] - 59:15,
206:3, 206:7, 206:9,
226:23
**words** [1] - 37:16
**workout** [3] - 114:4,
114:12, 115:11
**workouts** [1] - 113:18
**works** [3] - 65:17,
176:10, 176:13
**worn** [1] - 92:7
**worry** [1] - 8:1
**wraps** [1] - 35:4
**wrestled** [1] - 29:24
**wrist** [2] - 109:2, 109:5
**write** [4] - 54:15,
156:22, 183:6,
197:14
**writing** [2] - 106:15,
229:10
**written** [10] - 3:8,
15:23, 16:4, 90:11,
90:13, 92:6, 187:2,
218:15, 218:22,
219:24
**wrongdoing** [6] -
226:13, 226:14,
226:18, 226:20,
226:21
**wrote** [5] - 14:16,
146:8, 160:7,
174:18, 223:10

## X

**X-2-6** [2] - 48:1, 48:13
**X-2-6-P** [1] - 66:18
**X-26** [1] - 37:24,
46:25, 47:3
**X1200CM7A** [1] -
66:18

## Y

**year** [11] - 10:23,
10:24, 12:4, 15:13,
26:22, 35:25, 36:13,
37:3, 37:4, 42:17,
179:2
**yearly** [2] - 42:12,
137:12
**years** [20] - 7:11, 7:12,
7:20, 12:6, 12:10,
13:15, 13:19, 14:8,
17:9, 24:25, 83:25,
116:11, 173:16,
175:25, 176:1,
176:25, 177:14,
178:14, 205:25

**yelling** [2] - 101:3,
117:3
**you-all** [11] - 19:19,
19:23, 22:3, 35:22,
96:17, 104:4,
134:10, 148:16,
172:1, 172:16,
177:20
**you..** [1] - 26:15
**young** [1] - 205:3
**your-all's** [1] - 20:4
**yourself** [3] - 25:3,
108:4, 113:12

## Z

**Z9G00320** [1] - 126:20



*Guy J. Turcotte*

## Professional Profile

Progressively responsible law enforcement professional of over twenty years, six of which were as Chief of Police. Experience covers all aspects of supervisory and management in law enforcement, including all phases of crime prevention, operations, responsible budgeting, and police administration. Maintained exceptional results in crime prevention, highway safety enforcement, community involvement, police officer training & recruitment.

| | |
|---|---|
| Criminal Justice Administration | Recruitment & Retention |
| Community Policing Strategies | Chief Executive Operational Management |
| Anti-Crime Strategies | Threat & Risk Assessment Management |
| Effective & Responsible Budgeting | Exceptional Grant Writing Skills |
| Creative Funding – Cost Recovery | Community Focused |
| Successful Training & Management Skills | Professionalism, Integrity & Compassion |

## Professional Experience

**Turcotte Enterprise's Police & Security Consultant**, Parker, Florida             September 2009 – Present

Responsibilities:
Establish Administrative Management and Organizational Structure
Analysis of Patrol Functions and Workload Distribution
Create Alternative Methods for Delivery of Police and Security Services
Establish Community Policing programs
Establish relationships with Officials, Community Groups and Media.

**Police Officer – Auxiliary**, Cottondale, Florida             May 2010 - Present

**Interim Chief of Police**, Crawford, Nebraska             May 2009 – January 2010

Achievements:
Re-established trust with the police department in the community utilizing community policing programs.
Created a Standard Operating Procedure for the Police Department & a Standard Operating Procedure for evidence collection & storage reducing police liability.
Modernized the police department & patrol units while reducing spending.

Responsibilities:
Manage budget of $190,000 supervising 3 sworn and 2 non-sworn personnel.
Evaluate law enforcement procedures, train officers, & make recommendations for improvement in the delivery of police services.
Conduct day-to-day police duties
Implement community policing programs
Deputy Chief of Police from September 2009 until January 1, 2010 for consulting purposes.

**Chief of Police**, Town of Cedar Grove, Cedar Grove, Florida             April 2006 – October 2008

Achievements:
Reduced crime rate by 49% in first year in office.
Established Community Policing Program.
Established Standard Operational Procedures & Hurricane Operational Plan.
Established an Investigative Cost Recovery Program with grants contributed in excess of $90,000 to the department's budget in 2008.
Established an up-to-date computer & report writing system.
Nominee for the Jefferson Award for Public Service 2007.



EXHIBIT 1
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

*Guy J. Turcotte*

**Responsibilities:**
Managed budget of $585,000 supervising 28 sworn and 4 non-sworn personnel.
Organized & improved public safety operations.
Planned, organized, & directed the work of the department & exercised general supervision over all department activities.
Prepared & administered the budget for the Police Department.
Enforced the Departments & City's General Orders & Standard Operating Procedures.
Worked as a member of the City's Management Team & cooperated with all departments in regards to inter-departmental operations.

**Chief of Police** (Elected Office), Baldwin Police Department, Baldwin, Florida         **January 2002 – April 2006**

**Achievements:**
Reduced crime rate by 46% first year in office.
Negotiated & implemented new automation software systems including CrimeStar RMS Mobile Digital Communications & TRACs.
Developed new Standard Operating Procedures.
Established a Communications Public Safety Answering Point saving 33% of department's budget.
Established a Community Advisory Board for the Police Department.

**Responsibilities:**
Managed budget of $565,000 supervising 22 sworn and 7 non-sworn personnel.
Planned, organized & directed the work of the department & exercised general supervision over all department activities.
Enforced the Departments & City's General Orders & Standard Operating Procedures.
Prepared & administered the budget for the Police Department.
Trained personnel in proper procedures, public safety methods, techniques & practices of law enforcement.
Implemented community policing programs & department goals.

**Police Officer**, Flagler Beach Police Department, Flagler Beach, Florida         **November 1993 – January 2002**

**Achievements:**
Mayor's Certificate of Appreciation 1998
Judge, Flagler County Teen Court.
Team Leader, Flagler County Search & Rescue
Established Bicycle Patrol Unit for special events & crime prevention
Special Chiefs Award for Outstanding Performance of Duty

**Responsibilities:**
Patrol assigned area to protect life & property.
Answer calls for service & citizens complaints.
Conduct investigations at crime & accident scenes.
Appeared in court as a witness or arresting officer.

**Police Officer (Part-Time)**, Holly Hill Police Department, Holly Hill, Florida  September 1991 – October 1992

**Achievements:**
Member of Volusia County DUI Task Force.
Implemented Bicycle Patrol Unit.

**Responsibilities:**
Answer calls and patrol assigned areas.
Conduct investigations at crime & accident scenes.
Appeared in court as a witness or arresting officer.
Supervised Code Enforcement Program and trained Code Enforcement Officers.

*Guy J. Turcotte*

**Education:**

Graduate:
Manatee Technical Institute, Certificate of Compliance Law Enforcement Officers, State of Florida 07/1989

Graduate:
Florida Criminal Justice Executive Institute, Executive Leadership Program, State of Florida 08/2004

Bachelor of Science, Criminal Justice Administration
Southern University, Orange Beach, Alabama
Anticipated graduation date: December 2011

(See attached State Certified Training Classes.)

**Professional References:**

Pamela J. Koller, Assistant Attorney General, State of Florida, Criminal Division
Office of the Attorney General
444 Seabreeze Blvd., 5th Floor
Daytona Beach, Florida 32118

Dorene Thomas, Chief of Police
Pinellas Park Police Department
7700 – 59th Street North
Pinellas Park, Florida 33781

Chris Burnham, Service and Parts Director
Bill Bird KIA

William V. Husfelt III, Superintendent
Bay County District Schools

Ken Siders, Owner of Capstone Construction

Tina Lynn Campbell, Community Association Manager
Burg Management Company

## *Guy J. Turcotte*



### State Certified Specialized Training

**Agency/Training Center: Northeast Florida Criminal Justice Training and Education Center**
04/29/05 FDLE/CMS General Instructor Techniques
05/20/05 FDLE/CMS Driving Instructor
06/03/05 FDLE/CMS Firearms Instructor

**Agency/Training Center: Florida Criminal Justice Executive Institute**
05/16/2004 – 08/19/2004 Chief Executive Seminar

**Agency/Training Center: State of Florida Commission on Criminal Justice Standards and Training**
11/15/1991 Radar Operations Training Course
05/19/1995 Case Preparation and Court Presentation Training
10/17/1997 Field Training Officer Certification

**Agency/Training Center: Daytona Beach Community College**
02/20/1992 Interactive Communication Skills for Police Officers, Phase I
04/13/1992 Interactive Communication Skills for Police Officers, Phase II
10/21/1992 Search and Seizure Training
09/29/1995 Preparing and Executing Search Warrants
11/03/1995 Interviews and Interrogations
04/03/1998 Management Skills Training
04/24/1998 Intermediate Management Skills Training
03/23/1999 Human and Cultural Diversity: Professionalism, Ethics/Sexual Harassment
03/24/1999 Domestic Violence Training
03/25/1999 Juvenile Sex Offender Training
04/29/1999 First Response Negotiations
03/22/2002 Narcotics Identification and Investigation

**Agency/Training Center: Flagler County Sheriff's Department**
03/25/1994 Domestic Violence Training
04/19/1994 Bloodbourne Pathogens Training
06/07/1994 Civil Liabilities Course
08/26/1994 Intoxilyzer 5000 Training Course
05/07/1997 Violent Street Gangs/Ritual Crimes Training

**Agency/Training Center: St. Augustine Technical Center**
03/25/1994 Domestic Intervention
07/24/1994 Human Diversity Training

**Guy J. Turcotte**                              Page 2

**Agency/Training Center: National Academy for Professional Driving**
03/27/1992 Tactical Police Driving

**Agency/Training Center: The Police Law Institute**
08/24/1995 Florida Monthly Legal Update and Review
08/22/1996 Florida Monthly Legal Update and Review
07/31/1997 Florida Monthly Legal Update and Review
07/31/1998 Florida Monthly Legal Update and Review
07/31/1999 Florida Monthly Legal Update and Review
10/31/2000 Florida Monthly Legal Update and Review
10/31/2001 Florida Monthly Legal Update and Review

**Agency/Training Center: National Association for Search and Rescue**
11/24/1996 Fundamentals of Search and Rescue
02/02/1997 Search and Rescue Technician II

**Agency/Training Center: National Wildfire Coordinating Group (NWCG)**
03/15/98 Basic Incident Command Systems IS-200 (IS-300)

**Agency/Training Center: Federal Emergency Management Agency, Department of Homeland Security**
09/27/05 National Incident Management Systems IS-700

**Agency/Training Center: Bureau of Justice Standards**
01/27/2003 Rave/Club Drugs Awareness Training

**Agency/Training Center: Calibre Press, Incorporated**
02/23/05 Street Survival, Tactical Edge Seminar

**Agency/Training Center: CareerTrack**
01/15/2005 Criticism and Discipline Skills for Managers

**Agency/Training Center: St. Johns River Community College**
04/21/2004 Laser Speed Measurement
11/29/2004 Emergency Response to Terrorism

**Agency/Training Center: Northeast Florida Criminal Justice Training and Education Center**
03/21/2004 Urban Rifle I Training
06/11/2004 Florida First Responder Awareness Course
11/03/2004 Dignitary Protection Operations
11/10/2004 Kinesics Interviews Training

**Agency/Training Center: Taser International, Incorporated**
01/24/2005 Advanced Taser M26 Certification
02/02/2008 Advanced Taser M26 Certification

Guy J. Turcotte                                    Page 3

**Agency/Training Center: St. Petersburg College, Florida Regional Community Policing Institute**
11/23/2005 Franklin Covey's Habits for Public Safety Officials

**Agency/Training Center: Florida Department of Law Enforcement (FDLE)**
12/05/2007 Uniform Crime Report and Hate Crimes Training

**Agency/Training Center: Glock Professionals, Incorporated**
09/19/2007 Glock Armorer's Course

**Agency/Training Center: U.S. Department of Housing and Urban Development**
05/25/2006 Faith Based Grant Writing Training

**Agency/Training Center: Florida Police Chief's Association**
01/09/2005 to 01/12/2005 Leadership, Preparing for Media Relations, Public Safety Technology I and II, Integrated Criminal History, Franklin Covey's Seven Habits for Law Enforcement, and Data Sharing Consortium

06/26/2005 to 06/30/2005 Risk Management Leadership, Persons with Mental Illness and the Community, Public Safety Technology I and II, Hurricanes/Lessons Learned, and Fatal Police Shootings/What Went Wrong.

06/24/2006 to 06/29/2006 Understanding Islamist Militant Terrorism, AED's, Proactive and Prevention Strategies for Islamic Terrorism, 21st Century Crime and Terrorism, Public Safety Technology I and II, Violent Crime Control Council, the Bullet Proof Mind I and II.

05/23/2007 Domestic Violence, Human Diversity, Juvenile Sex Offenders, and Discriminatory Profiling.

01/16/2008 Communication is a Leadership Imperative

**Agency/Training Center: Department of Homeland Security / Texas A&M University**
10/28/2009 Threat and Risk Assessment Management



Ex 2



## RESPONSE TO RESISTANCE FORM

CASE # 20F16737

DATE OF INCIDENT 04 / 14 / 2020

INCIDENT LOCATION 1009 Cleveland Avenue

TIME OF INCIDENT 0741 hours

* **SUPERVISOR** IS TO REVIEW THIS FORM IN DETAIL
* ATTACH **COPY** OF COMPLETED **INCIDENT REPORT** (IF APPLICABLE)
* ATTACH **COPY** OF COMPLETED **CITATION**
* FORWARD **ORIGINAL** (W/ATTACHMENTS) TO THE **CHIEF'S OFFICE** VIA CHAIN OF COMMAND

### OFFICER/EMPLOYEE INFORMATION (FORM COMPILED FOR EACH OFFICER USING FORCE)

NAME: Guy Turcotte                                    ID# 21

MEDICAL TREATMENT REQUIRED: ☐ YES*   ☒ NO   ☐ INJURY/WORK COMP. PAPERWORK COMPLETED

*DESCRIBE INJURY: NONE

☐ TRANSPORTED   ☐ ADMITTED TO HOSPITAL   ☐ TREATED-RELEASED   ☐ EMS   ☐ OTHER

MEDICAL FACILITY/TREATING PHYSICIAN: N/A

☐ PHOTOGRAPHS TAKEN:

☐ DUTY STATUS: ROAD PATROL

### SUBJECT/SUSPECT INFORMATION

NAME: JEREMY SCOTT MARR

D.O.B.: ▮▮▮▮▮▮        RACE: WHITE        SEX: MALE

CRIMINAL CHARGE(S): Burglary 2nd. Degree, Assault (Police Officer) 3rd. Degree X two (2) counts.

☐ NO INJURY   ☐ COMPLAINT OF INJURY   ☐ VISIBLE INJURY   ☐ MEDICAL ATTENTION   ☐ REFUSED

*DESCRIBE INJURY Two taser probes left side middle back region.

☒ TRANSPORTED   ☐ ADMITTED TO HOSPITAL   ☐ TREATED/RELEASED   ☒ EMS   ☐ OTHER

☐ PHOTOGRAPHS TAKEN

DID ANYONE WITNESS THE RESPONSE TO RESISTANCE?   ☒ YES   ☐ NO

STATEMENT(S) TAKEN:   ☒ YES   ☐ NO   (INDICATE ON WITNESS LINE FOR EACH TAKEN)

IDENTIFY NAME, ADDRESS, PHONE

WITNESS #1: Sgt. Cameron Murrell

WITNESS #2: Ofc. Haiden Phillips

WITNESS #3: Ofc. Justin Claywell

1



EXHIBIT 3
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

| RESISTANCE | | RESPONSE | |
|---|---|---|---|
| ☒ 1 VERBAL | | ☒ 1 PRESENCE | |
| ☒ 2 PASSIVE PHYSICAL | | ☒ 2 COMMUNICATION | |
| ☒ 3 ACTIVE PHYSICAL | | ☒ 3 PHYSICAL CONTROL | |
| ☒ 4 AGGRESSIVE PHYSICAL | | ☐ 4 INTERMEDIATE WEAPONS | |
| ☒ 5 AGGRAVATED PHYSICAL | | ☒ 5 INCAPACITATION | |
| | | ☐ 6 DEADLY FORCE | |

### SUSPECT FACTORS

| SEX: MALE | DRUG ☐YES ☐NO | SUSPECT WEAPONS | | | |
|---|---|---|---|---|---|
| HEIGHT: 5'11" | ALCOHOL ☐YES ☐NO | ☒ HANDS | | ☐ FIREARM | |
| WEIGHT: 178 | UNKNOWN DRUG/ALCOHOL | ☒ FEET | | ☐ VEHICLE | |
| AGE: 35 | ☒YES ☐NO | ☐ IMPACT | | ☐ CHEMICAL | |
| | | ☐ EDGED | | ☒ OTHER | |

### OFFICER RESPONSES (CHECK ALL THAT APPLY)

| ☒ COMMAND PRESENCE | ☒ VERBAL COMMANDS | ☒ SOFT EMPTY HAND CONTROL | |
|---|---|---|---|

| RESTRAINT DEVICES | ESCORTS | TAKE DOWNS | STRIKES |
|---|---|---|---|
| ☒ HANDCUFFS | ☐ FIELD | ☐ ARM BAR | ☐ PUNCH |
| ☐ CHECK-FIT | ☐ BENT WRIST | ☐ BENT WRIST | ☐ PALM HEEL |
| ☐ DOUBLE-LOCK | ☐ PRESSURE POINT | ☐ FINGER LOCK | ☐ HAMMER FIST |
| ☒ LEG IRONS | ☐ FINGER LOCK | ☐ SHOULDER LOCK | ☐ FORE ARM |
| ☐ HOBBLE | ☐ SHOULDER LOCK | ☐ HAMMER LOCK | ☐ ELBOW |
| | ☐ HAMMER LOCK | ☐ CALF STRIKE PULL DOWN | ☐ KNEE STRIKE |
| | | | ☐ LEG KICK |

| BATON | CHEMICAL (OC OR OTHER) (CIRCLE APPROPRIATE DEVICE) | BEAN BAG OR COMPATIBLE |
|---|---|---|
| ☐ FORE HAND STRIKE | ☐ FULL INCAPACITATION | ☐ FULL INCAPACITATION  # ROUNDS _____ |
| ☐ REVERSE STRIKE | ☐ PARTIAL INCAPACITATION | ☐ PARTIAL INCAPACITATION |
| ☐ CLOSED BATON STRIKE | ☐ NO APPARENT EFFECT | ☐ NO EFFECT     DISTANCE _____ FEET |

### X26 TASER DISCHARGED OR POINTED

☐ POINTED ONLY

☒ DEPLOYED    ☒ DRIVE STUN

DEPLOYMENT DISTANCE ___7'___ FEET

NUMBER OF CYCLES 7-STUN/4-De

☐ EFFECTIVE    ☒ NON-EFFECTIVE

X26 SERIAL # X1200CM78

CARTRIDGES(S) SERIAL #
C410R818
_____

### FIREARM DISCHARGED OR POINTED

☐ PISTOL    ☐ SHOTGUN    ☐ LONG GUN

☐ POINTED ONLY    COMPLIANCE: ☐YES    ☐NO

☐ DISCHARGED

NUMBER OF SHOTS _____

NUMBER OF HITS TO TARGET _____

SHOTS ACCOUNTED FOR _____

SHOTS UNACCOUNTED FOR _____

WEAPON SERIAL # _____

2

**NARRATIVE (ARTICULATE SERIOUSNESS OF OFFENSE SUPPORTED AS THE FORCE WAS USED) PHYSICAL THREAT TO OFFICER OR OTHERS & SUBJECT'S ACTIVE RESISTANCE OR ATTEMPT TO FLEE)**

On 04/14/2020 at 0741 hours, I was dispatched to 1009 Cleveland Avenue in reference to a caller who was requesting the police because of an unknown male had entered her residence. The caller further stated that the male was telling her not to let them kill him.

Upon my arrival at 0749 hours, I observed the south east side front door of the above residence partially open with a W/M standing inside the residence. The W/M was wearing a dark colored hoodie jacket, white shirt, blue jeans, and a black baseball cap. I advised the unknown W/M three (3) times to come to me while I was standing in the driveway. The W/M stated, "Wait, don't hurt me man!", "Don't let nobody do nothing to me!". At this point, when the W/M started to approach me I observed he was holding a pair of "Slides" (foot wear) in front of his chest. I then advised the W/M to put his shoes on.

At this time, I asked the W/M if he had any weapons on him and he replied, "No Sir, I have a knife in my pocket." The W/M then reached into his front pocket at which time I told him not to pull out his knife. The W/M then stated that his name was Jeremy Marr and that he was not out to do nothing, that he was not high, and people were out to get him. He continued to say "please don't let them hurt me" as he started to move toward U.S. 31 while looking around in what appeared to me that he was looking for an escape route. I asked Mr. Marr if he was on any kind of medication which he said he was not, I then asked him who was out to get him, he refused to say. At this point I advised Mr. Marr to walk over and sit on the front of the push bumper of my patrol vehicle. He refused to comply, I then advised him to walk over to the front of my patrol vehicle and he still refused to comply. At this point, I placed my left hand on his right shoulder and took a hold of his jacket, I then escorted him over to the front of my patrol vehicle.

During my contact with Mr. Marr he appeared to be erratic, agitated, and paranoid. I attempted to calm him by advising him numerous times that the people he believed to be after him would not be able to hurt him while in our presence. At this point, I started to search Mr. Marr to retrieve the knife he stated that he had concealed on his person. Sergeant (Sgt.) Murrell and Officer (Ofc.) Phillips had arrived on scene by this time, Sgt. Murrell then ordered Mr. Marr to place his hands on the hood of my patrol unit, when Mr. Marr did not comply Sgt. Murrell's order, he placed Mr. Marr's hands on the patrol unit's hood.

During my search of Mr. Marr, he became more agitated and aggressive, he started to jerk around and attempt to pull away from the officers on scene. At this point, because of his erratic and combative behavior, I attempted to handcuff Mr. Marr. I was able to place one handcuff on Mr. Marr's left wrist and I attempted to move his left arm behind his back to secure his right wrist. Mr. Marr suddenly andaggressively attempted to pull away. Mr. Marr was still armed with a knife at this time as he had stated previously and he had one loose handcuff on his left wrist. As Sgt. Murrell, Ofc. Phillip, and myself attempted to gain control of Mr. Marr during his physical struggle to escape, I advised the other officers to place Mr. Marr on the ground. Mr. Marr slipped the grip of Ofc. Phillips hold, he then took his right elbow and struck Ofc. Phillips in his left eye causing an injury. Mr. Marr then attempted to strike Sgt. Murrell in his face, but he (Marr) was only able to land a glancing blow to Sgt. Murrell's right jaw area.As we attempted to place Mr. Marr on this stomach on the (grass area) ground he was advised several times to place his hands behind his back, which he did not comply and was still attempting to physically resist and escape. Ofc. Phillips was able to get on top of Mr. Marr, who was on his right side at the time as I attempted to hold down Mr. Marr's legs as he was kicking and struggling; Sgt. Murrell was attempting to secure Mr. Marr's right arm.

Mr. Marr was actively resisting during this entire incident and refused to comply with the officer's orders. Mr. Marr attempted to bridge (place his hands and knees on the ground in an upright position) his body several times and kick his legs around in an attempt to escape. After several moments of struggling with Mr. Marr and him not complying with our orders, I announced that I was going to drive stun him with my X26 Taser, at this point I unholster my Taser and removed the Taser cartridge. I then attempted to drive stun Mr. Marr in the muscle region of his lower back several times with little or no effect, due to the fact I was unable to get a good constant contact on his body from him (Marr) flailing his legs and body. At one point, due to Mr. Marr's violent flailing, I accidently drive stunned Ofc. Phillips leg during the struggle. At this time, I disengaged drive stunning Mr. Marr and reattached my taser cartridge to my X26 Taser, I then announced that I would now be deployingmy taser, at which time I deployed my taser and the two probes struck Mr. Marr in his left middle back region.

Glasgow Police Communicationsradioed to check on our (officers) status, I responded that we were actively fighting with Mr. Marr. At which time Communications dispatched additional police officers, Ofc. Britt and Ofc. Claywell, to assist the officers already on scene.

Mr. Marr still was resisting and would not comply with orders to place his hands behind his back, after the fourth and last activation of my taser, Ofc. Phillips attempted several knee stun strikes to Mr. Marr's left side; I was then able to get a hold of the open end of my handcuff on Mr. Marr's left wrist and pull his arm behind his back, I which time Sgt. Murrell and I were able to complete handcuffing his (Marr) hands behind his back.I then notified communications that I had deployed my taser during this incident.

(Page 1 of 2 Narrative)

3

(Page 2 of 2 Narrative)

Once we had Mr. Marr handcuffed, I shackled his ankles to prevent him from further kicking and escaping. Communications then radioed to confirm in reference to sending EMS to the scene since a taser deployment occurred, Ofc. Claywell confirmed the request to send EMS to the scene.

It was at this time I noticed that Mr. Marr was not making any sounds, I then advised Ofc. Phillips to check on Mr. Marr to make sure he was breathing. Ofc. Phillips then rolled Mr. Marr over on his back and attempted to pull back Mr. Marr's hoodie and shirt, which bunched up over the top of his head during his physical resisting. Once Mr. Marr was rolled over on his back it was found that he was shallow breathing,at this time, Communications was advised to have EMS respond quickly. At this time, it appeared to me that Mr. Marr stop breathing, I immediately started CPR chest compressions and Ofc. Phillips and Ofc. Britt started to give air by airway bagging. At this point I advised Sgt. Murrell to get me his Narcan, I then attempted to administer two Narcan's in the nose of Mr. Marr in reference to a possible drug overdose, the first Narcan was unsuccessful, the second Narcan was successfully administered. Medic Unit's 504 and506 arrived on scene, at which time they took over medical procedures on Mr. Marr.The Medic Unit then transported Mr. Marr to TJ Samson Hospital for treatment.

At this time, I was able to speak with the (88 years old) elderly victim, W/F Evie Tharp who lives alone at 1009 Cleveland Avenue. Ms. Tharp advised me the W/M (Marr) that she does not know, broke into her residence through the front south east side door(converted garage) which she said she keeps locked; Ms. Tharp went on to say she was eating her breakfast when she heard a loud "horrible" noise in her adjoining room and when she got up to investigate the noise she found Mr. Marr had opened a second door (unlocked) and was standing on the steps that leads into her dining room, she further stated that Mr. Marr told her not to call  and don't kill him. Ms. Tharp then said that she told Mr. Marr not to enter her dining room in her residence, at which time Mr. Marr entered the dining room anyway and broke a glass top flower pot holderinside by the second door. Ms. Tharp advised me that she was unable to write a written statement in reference to this incident since she had suffered a stroke in the past.

I then checked the area around the residence and examined the outside door for possible damage.First, I observed the broken glass on the dining room floor inside by the second interior door, I then checked the outside door and noticed no major damage to the door jam or door, but I did observe that the door jamb latch holder was shallow and had a dark scrape across the face plate, it appears to me that the outside door could possibly be pushed open with a little force without causing major damage to the door or door jam.I then checked the spin lock on the door and it appeared to be in the open position at that time.

At this point, I taped off and secured the scene until I was relieved by Major Flatt.

Ofc. Phillips responded to T.J. Samson Hospital Emergency Room where he was treated for his eye injury. Sgt. Murrell refused any medical attention at the scene. (Refer to Sgt. Murrell's and Ofc. Phillips reports that are attached to this report.)

Kentucky State Police will conduct the investigation to this incident.

My body camera was activated and recording prior to arriving and during this incident.
No further information at this time.

# RESPONSE TO RESISTANCE

CASE # 20F16737

DATE OF INCIDENT 04 / 14 / 2020

---

### CIRCLE THE AREA(S) OF IMPACT AND/OR INJURY

PHOTOGRAPHS OF INJURIES  ☒ YES  ☐ NO  BY WHOM: INVESTIGATIONS



**SUSPECT**

**OFFICER**

---

| VIDEO REVIEW |
|---|
| ☒ VIDEO AVAILABLE |
| ☐ VIDEO REVIEWED BY: |
| ☐ VIDEO PRESERVED: |

---

| REVIEWED BY/SIGNATURE/COMMENTS | ID# | DATE |
|---|---|---|
| SUPERVISOR: | | |
| ON-SCENE:  ☐ YES  ☐ NO | | |
| COMMENTS: | | |

4

**TRAINING OFFICER:**

COMMENTS:

**CHIEF OF POLICE:**

COMMENTS:

**OTHER:**

COMMENTS:

# KYIBRS REPORT
## COMMONWEALTH OF KENTUCKY

| AGENCY ORI/NAME **0050100 GLASGOW POLICE DEPARTMENT** | | | | INCIDENT NUMBER **KY 20F16737** | | | |
|---|---|---|---|---|---|---|---|
| INCIDENT DATE/TIME **4/14/2020 07:39** | EXACT / ESTIMATE **ESTIMATE** | REPORT DATE **4/14/2020** | RECEIVED **07:39** | DISPATCHED **07:41** | ARRIVED **07:49** | CLEARED **12:47** |
| REPORTED BY: **THARP, EVIE H.** | | | | | HOW REPORTED **PHONE** | |
| LICENSE/ID STATE: **KY** | LICENSE/ID NUMBER: **T91120842** | | | | | |
| ADDRESS: **1009 CLEVELAND AVE** | | | | | | |
| CITY: **GLASGOW** | STATE: **KY** | ZIP CODE: **42141** | PHONE NUMBER: | | | |

| EXACT LOCATION OF OFFENSE | **1009 CLEVELAND AVE** | | | SECTOR NO: | |
|---|---|---|---|---|---|
| | ADDRESS **1009 CLEVELAND AVE** | | | | |
| | CITY **GLASGOW** | | STATE: **KY** | ZIP CODE: **42141** | |
| | COUNTY **BARREN** | LATITUDE **36 DEG  59.360 MIN** | LONGITUDE **85 DEG  55.936 MIN** | | |

| SEQUENCE # **1 OF 2** | LOCATION TYPE: **RESIDENCE, HOME** | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|
| OFFENSE DESCRIPTION: **BURGLARY, 2ND DEGREE** | | **1-UNKNOWN** | |
| OFFENSE CODE: **22081** ASCF CODE: **0** KRS CODE: **511.030** | CLASS: **C** DEGREE: **F** COUNTS: **1** | | |
| BIAS MOTIVATION: **NONE (NO BIAS)** | METHOD ENTRY: **FORCE** NUMBER PREMISES: **0** | | |
| SCHOOL NAME: | SCHOOL TYPE: | CAMPUS? | |
| OFFENDER SUSPECTED OF USING: **DRUGS/NARCOTICS** | | COURT ORDER TYPE: | |

| SEQUENCE # **2 OF 2** | LOCATION TYPE: **RESIDENCE, HOME** | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|
| OFFENSE DESCRIPTION: **ASSAULT 3RD DEGREE-POLICE OFFICER OR PROB OFFICER** | | **1-PERSONAL WEAPONS** | **1-NONE/UNKNOWN** |
| OFFENSE CODE: **13113** ASCF CODE: **0** KRS CODE: **508.025** | CLASS: **D** DEGREE: **F** COUNTS: **1** | | |
| BIAS MOTIVATION: **NONE (NO BIAS)** | METHOD ENTRY: NUMBER PREMISES: **0** | | |
| SCHOOL NAME: | SCHOOL TYPE: | CAMPUS? | |
| OFFENDER SUSPECTED OF USING: **DRUGS/NARCOTICS** | | COURT ORDER TYPE: | |

| SEQUENCE # **OF** | LOCATION TYPE: | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|
| OFFENSE DESCRIPTION: | | | |
| OFFENSE CODE: ASCF CODE: KRS CODE: | CLASS: DEGREE: COUNTS: | | |
| BIAS MOTIVATION: | METHOD ENTRY: NUMBER PREMISES: | | |
| SCHOOL NAME: | SCHOOL TYPE: ☐ Res Hall ☐ Separate Campus CAMPUS? | | ☐ Public Property ☐ Non-Campus Property |
| OFFENDER SUSPECTED OF USING: | ☐ VAWA ☐ Title IX COURT ORDER TYPE: | | |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| **1** | | **NONE** | | | | |
| | PROPERTY DESCRIPTION | | | | | |
| | OWNER APPLED NUMBER | | SERIAL NUMBER | | | |
| | MAKE | | | MODEL | | OWNER **Victim 1** |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| | PROPERTY DESCRIPTION | | | | | |
| | OWNER APPLED NUMBER | | SERIAL NUMBER | | | |
| | MAKE | | | MODEL | | |

EXHIBIT 4
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

| TOTAL STOLEN VALUE: | TOTAL RECOVERED VALUE: | | TOTAL VEHICLES STOLEN: | | TOTAL VEHICLES RECOVERED: | |
|---|---|---|---|---|---|---|
| INCIDENT STATUS **CLOSED** | CLOSED DATE **4/14/2020** | CLEARANCE TYPE **EXCEPTIONALLY CLEARED** | CLEARED EXCEPTIONALLY **DEATH** | EX. CLEARANCE DATE **4/14/2020** | UCR REPORTING FOR OTHER AGENCY ☐ YES | |
| ORIGINATING OFFICER **Turcotte, Guy** | ASSIGNED TO **Turcotte, Guy** | UNIT/BADGE # **2232** | REVIEWED BY **Fields, Steven** | SUPPLEMENTED BY | | |

# KYIBRS REPORT
## COMMONWEALTH OF KENTUCKY

| VICTIM SEQUENCE | | VICTIM NAME | | PHONE |
|---|---|---|---|---|
| 1 of 3 | THARP, EVIE N. | | | |

| LICENSE/ID STATE: | KY | LICENSE/ID NUMBER: | T91120842 | |
|---|---|---|---|---|

☐ Address Unknown  ADDRESS: 1009 CLEVELAND AVE    VICTIM TYPE: INDIVIDUAL

| CITY: GLASGOW | STATE: KY | ZIP CODE: 42141 | KY RESIDENT: RESIDENT |
|---|---|---|---|

| DATE OF BIRTH | SSN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | 5'04" | 100 lbs | BLUE | BLOND OR STRAWBERRY |

| GENDER | RACE | ETHNIC ORIGIN | PEACE OFFICER? |
|---|---|---|---|
| FEMALE | WHITE | NOT HISPANIC | ☐ YES |

| NBR | OFFENDER | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | OFFENDER | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | INJURY TYPE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | STRANGER | | | | | |

| VICTIM OF OFFENSE(S) | AGG ASSAULT/ HOMICIDE CIRC | ADDTL JUSTIFIABLE HOMICIDE CIRC |
|---|---|---|
| 22061 | | |

| LEOKA ASSIGNMENT | LEOKA ACTIVITY |
|---|---|

| SUSPECT SEQ. # | NAME: MARR, JEREMY S. | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|
| 1 of 1 | ALIAS: | | ☐ YES | |

| LICENSE/ID STATE: | KY | LICENSE/ID NUMBER: | M02807199 | | |
|---|---|---|---|---|---|

| ADDRESS 99 KENTWHD CT | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|

| CITY: GLASGOW | STATE: KY | ZIP CODE: 42141 | ▮▮▮▮ |
|---|---|---|---|

| SSN: ▮▮▮▮ | SEX MALE | RACE WHITE | ETHNIC ORIGIN NOT HISPANIC | HEIGHT 5'11" | WEIGHT 178 lbs | EYE COLOR HAZEL | HAIR COLOR BROWN |
|---|---|---|---|---|---|---|---|

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | RELATED CITATION NUMBERS | | |
|---|---|---|---|---|---|
| of | | | 1 | 4 | 8 |
| | ARRESTEE ARMED WITH | | 2 | 5 | 7 |
| | | | 3 | 6 | 9 |

| SUSPECT SEQ. # | NAME: | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|
| | ALIAS: | | ☐ YES | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | |
|---|---|---|---|

| ADDRESS | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|

| CITY: | STATE: | ZIP CODE: |
|---|---|---|

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | RELATED CITATION NUMBERS | | |
|---|---|---|---|---|---|
| of | | | 1 | 4 | 7 |
| | ARRESTEE ARMED WITH | | 2 | 5 | 8 |
| | | | 3 | 6 | 9 |

| WITNESS/OTHER SEQ | WITNESS NAME | PHONE |
|---|---|---|
| 1 of 2 | CLAYWELL, JUSTIN (POLICE OFFICER) | 270-651-5151 |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| ADDRESS: 101 PIN OAK (GLASGOW POLICE DEPARTMENT) LN | | DATE OF BIRTH |
|---|---|---|

| CITY: GLASGOW | STATE: KY | ZIP CODE: 42141 | SSN: |
|---|---|---|---|

age 2 of 7    Incident Number: 20F16737    Agency ORI: 0050100    Badge #: 2232

# KYIBRS REPORT: VICTIM SUPPLEMENT
## COMMONWEALTH OF KENTUCKY

| VICTIM SEQUENCE | VICTIM NAME | | PHONE |
|---|---|---|---|
| **2** of **3** | **PHILLIPS, HAYDEN (POLICE OFFICER)** | | **270-651-5151** |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: |
|---|---|
| ☐ Address Unknown  ADDRESS: **101 PIN OAK (GLASGOW POLICE DEPARTMENT) LN** | VICTIM TYPE: **INDIVIDUAL** |

| CITY: **GLASGOW** | STATE: **KY** | ZIP CODE: **42141** | KY RESIDENT: **RESIDENT** |
|---|---|---|---|

| DATE OF BIRTH | SSN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|
| ▬▬▬ | | | | | |

| GENDER | RACE | ETHNIC ORIGIN | PEACE OFFICER? |
|---|---|---|---|
| **MALE** | **WHITE** | **NOT HISPANIC** | ☑ YES |

| NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | INJURY TYPE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | STRANGER | | | | 1 | APPARENT MINOR INJURY |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| VICTIM OF OFFENSE(S) | AGG ASSAULT/ HOMICIDE CIRC | ADDTL JUSTIFIABLE HOMICIDE CIRC |
|---|---|---|
| 13113 | 1. OTHER FELONY INVOLVED | |

| LEOKA ASSIGNMENT | LEOKA ACTIVITY |
|---|---|
| ONE-MAN VEHICLE ALONE | DETECTIVE OR SPCL ASSIGNMENT ALONE |

| VICTIM SEQUENCE | VICTIM NAME | | PHONE |
|---|---|---|---|
| **3** of **3** | **MURRELL, CAMERON (POLICE SERGEANT)** | | **270-651-5151** |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: |
|---|---|
| ☐ Address Unknown  ADDRESS: **101 PIN OAK (GLASGOW POLICE DEPARTMENT) LN** | VICTIM TYPE: **INDIVIDUAL** |

| CITY: **GLASGOW** | STATE: **KY** | ZIP CODE: **42141** | KY RESIDENT: **RESIDENT** |
|---|---|---|---|

| DATE OF BIRTH | SSN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|
| ▬▬▬ | | | | | |

| GENDER | RACE | ETHNIC ORIGIN | PEACE OFFICER? |
|---|---|---|---|
| **MALE** | **WHITE** | **NOT HISPANIC** | ☑ YES |

| NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | INJURY TYPE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | STRANGER | | | | 1 | APPARENT MINOR INJURY |
| | | | | | | | |
| | | | | | | | |

| VICTIM OF OFFENSE(S) | AGG ASSAULT/ HOMICIDE CIRC | ADDTL JUSTIFIABLE HOMICIDE CIRC |
|---|---|---|
| 13113 | 2. OTHER CIRCUMSTANCES | |

| LEOKA ASSIGNMENT | LEOKA ACTIVITY |
|---|---|
| ONE-MAN VEHICLE ALONE | DETECTIVE OR SPCL ASSIGNMENT ALONE |

# KYIBRS REPORT: WITNESS SUPPLEMENT
## COMMONWEALTH OF KENTUCKY

| WITNESS/OTHER SEQ | | WITNESS NAME | | | | | | PHONE |
|---|---|---|---|---|---|---|---|---|
| 2 of 2 | BRITT, TAMMY (POLICE OFFICER) | | | | | | | 270-651-8151 |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: 101 PIN OAK (GLASGOW POLICE DEPARTMENT) LN | | | | | | | | DATE OF BIRTH |
| CITY: GLASGOW | | | | STATE: KY | ZIP CODE: 42141 | | SSN: | Unknown |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |
| WITNESS/OTHER SEQ of | | WITNESS/OTHER NAME | | | | | | PHONE |
| LICENSE/ID STATE: | | LICENSE/ID NUMBER: | | | | | | |
| ADDRESS: | | | | | | | | DATE OF BIRTH |
| CITY: | | | | STATE: | ZIP CODE: | | SSN: | |

WITNESS AND/OR. OTHER DATA



## KYLERS REPORT: NARRATIVE
### COMMONWEALTH OF KENTUCKY

## SYNOPSIS:

On 04/14/2020 at 0741 hours, I was dispatched to 1009 Cleveland Avenue in reference to a caller who was requesting the police because of an unknown male had entered her residence. The caller further stated that the male was telling her not to let them kill him per dispatch.

## INVESTIGATION:

On 04/14/2020 at 0741 hours, I was dispatched to 1009 Cleveland Avenue in reference to a caller who was requesting the police because of an unknown male had entered her residence. The caller further stated that the male was telling her not to let them kill him per dispatch.

Upon my arrival at 0749 hours, I observed the south east side front door of the above residence partially open with a W/M standing inside the residence. The W/M was wearing a dark colored hoodie jacket, white shirt, blue jeans, and a black baseball cap. I advised the unknown W/M three (3) times to come to me while I was standing in the driveway. The W/M stated, "Wait, don't hurt me man!", "Don't let nobody do nothing to me!". At this point, when the W/M started to approach me I observed he was holding a pair of "Slides" (foot wear) in front of his chest. I then advised the W/M to put his shoes on.

At this time, I asked the W/M if he had any weapons on him and he replied, "No Sir, I have a knife in my pocket." The W/M then reached into his front pocket at which time I told him not to pull out his knife. The W/M then stated that his name was Jeremy Marr and that he was not out to do nothing, that he was not high, and people were out to get him. He continued to say "please don't let them hurt me" as he started to move toward U.S. 31 while looking around in what appeared to me that he was looking for an escape route. I asked Mr. Marr if he was on any kind of medication which he said he was not, I then asked him who was out to get him, he refused to say. At this point I advised Mr. Marr to walk over and sit on the front of the push bumper of my patrol vehicle. He refused to comply, I then advised him to walk over to the front of my patrol vehicle and he still refused to comply. At this point, I placed my left hand on his right shoulder and took a hold of his jacket, I then escorted him over to the front of my patrol vehicle.

During my contact with Mr. Marr he appeared to be erratic, agitated, and paranoid. I attempted to calm him by advising him numerous times that the people he believed to be after him would not be able to hurt him while in our presence. At this point, I started to search Mr. Marr to retrieve the knife he stated that he had concealed on his person. Sergeant (Sgt.) Murrell and Officer (Ofc.) Phillips had arrived on scene by this time, Sgt. Murrell then ordered Mr. Marr to place his hands on the hood of my patrol unit, when Mr. Marr did not comply Sgt. Murrell's order, he placed Mr. Marr's hands on the patrol unit's hood. During my search of Mr. Marr, he became more agitated and aggressive, he started to jerk around and attempt to pull away from the officers on scene. At this point, because of his erratic and combative behavior, I attempted to handcuff Mr. Marr. I was able to place one handcuff on Mr. Marr's left wrist and I attempted to move his left arm behind his back to secure his right wrist. Mr. Marr suddenly and aggressively attempted to pull away, Mr. Marr was still armed with a knife at this time as he had stated previously and he had one loose handcuff on his left wrist. As Sgt. Murrell, Ofc..Phillip, and myself attempted to gain control of Mr. Marr during his physical struggle to escape, I advised the other officers to place Mr. Marr on the ground. Mr. Marr slipped the grip of Ofc. Phillips hold, he then took his right elbow and struck Ofc. Phillips in his left eye causing an injury. Mr. Marr then attempted to strike Sgt. Murrell in his face, but he (Marr) was only able to land a glancing blow to Sgt. Murrell's right jaw area. As we attempted to place Mr. Marr on this stomach on the (grass area) ground he was advised several times to place his hands behind his back, which he did not comply and was still attempting to physically resist and escape. Ofc. Phillips was able to get on top of Mr. Marr, who was on his right side at the time as I attempted to hold down Mr. Marr's legs as he was kicking and struggling; Sgt. Murrell was attempting to secure Mr. Marr's right arm.

Mr. Marr was actively resisting during this entire incident and refused to comply with the officer's orders. Mr. Marr attempted to bridge (place his hands and knees on the ground in an upright position) his body several times and kick his legs around in an attempt to escape. After several moments of struggling with Mr. Marr and him not complying with our orders, I announced that I was going to drive stun him with my X26 Taser, at this point I unholster my Taser and removed the Taser cartridge. I then



# KYLERS REPORT: NARRATIVE
## COMMONWEALTH OF KENTUCKY

attempted to drive stun Mr. Marr in the muscle region of his lower back several times with little or no effect, due to the fact I was unable to get a good constant contact on his body from him (Marr) flailing his legs and body. At one point, due to Mr. Marr's violent flailing, I accidently drive stunned Ofc. Phillips leg during the struggle. At this time, I disengaged drive stunning Mr. Marr and reattached my taser cartridge to my X26 Taser, I then announced that I would now be deployingmy taser, at which time I deployed my taser and the two probes struck Mr. Marr in his left middle back region.

Glasgow Police Communicationsradioed to check on our (officers) status, I responded that we were actively fighting with Mr. Marr. At which time Communications dispatched additional police officers, Ofc. Britt and Ofc. Claywell to assist the officers already on scene.

Mr. Marr still was resisting and would not comply with orders to place his hands behind his back, after the fourth and last activation of my taser, Ofc. Phillips attempted several knee stun strikes to Mr. Marr's left side; I was then able to get a hold of the open end of my handcuff on Mr. Marr's left wrist and pull his arm behind his back, I which time Sgt. Murrell and I were able to complete handcuffing his (Marr) hands behind his back.I then notified communications that I had deployed my taser during this incident.

Once we had Mr. Marr handcuffed, I shackled his ankles to prevent him from further kicking and escaping. Communications then radioed to confirm in reference to sending EMS to the scene since a taser deployment occurred, Ofc. Claywell confirmed the request to send EMS to the scene.

It was at this time I noticed that Mr. Marr was not making any sounds, I then advised Ofc. Phillips to check on Mr. Marr to make sure he was breathing. Ofc. Phillips then rolled Mr. Marr over on his back and attempted to pull back Mr. Marr's hoodie and shirt, which bunched up over the top of his head during his physical resisting. Once Mr. Marr was rolled over on his back it was found that he was shallow breathing,at this time, Communications was advised to have EMS respond quickly. At this time, it appeared to me that Mr. Marr stop breathing, I immediately started CPR chest compressions and Ofc. Phillips and Ofc. Britt started to give air by airway bagging. At this point I advised Sgt. Murrell to get me his Narcan, I then attempted to administer two Narcan's in the nose of Mr. Marr in reference to a possible drug overdose, the first Narcan was unsuccessful, the second Narcan was successfully administered. Medic Unit's 504 and506 arrived on scene, at which time they took over medical procedures on Mr. Marr.The Medic Unit then transported Mr. Marr to TJ Samson Hospital for treatment.

At this time, I was able to speak with the (88 years old) elderly victim, W/F Evie Tharp who lives alone at 1009 Cleveland Avenue. Ms. Tharp advised me the W/M (Marr) that she does not know, broke into her residence through the front south east side door(converted garage) which she said she keeps locked; Ms. Tharp went on to say she was eating her breakfast when she heard a loud "horrible" noise in her adjoining room and when she got up to investigate the noise she found Mr. Marr had opened a second door (unlocked) and was standing on the steps that leads into her dining room, she further stated that Mr. Marr told her not to call and don't kill him. Ms. Tharp then said that she told Mr. Marr not to enter her dining room in her residence, at which time Mr. Marr entered the dining room anyway and broke a glass top flower pot holderinside by the second door. Ms. Tharp advised me that she was unable to write a written statement in reference to this incident since she had suffered a stroke in the past.

then checked the area around the residence and examined the outside door for possible damage.First, I observed the broken glass on the dining room floor inside by the second interior door, I then checked the outside door and noticed no major damage to the door jam or door, but I did observe that the door jamb latch holder was shallow and had a dark scrape across the face plate, it appears to me that the outside door could possibly be pushed open with a little force without causing major damage to the door or door jam.I then checked the spin lock on the door and it appeared to be in the open position at that time.

At this point, I taped off and secured the scene until I was relieved by Major Flatt.

Ofc. Phillips responded to T.J. Samson Hospital Emergency Room where he was treated for his eye injury. Sgt. Murrell refused any medical attention at the scene. (Refer to Sgt. Murrell's and Ofc. Phillips reports that are attached to this report.)

Kentucky State Police will conduct the investigation to this incident.



## KYLEAS REPORT: NARRATIVE
**COMMONWEALTH OF KENTUCKY**

My body camera was activated and recording prior to arriving and during this incident.

No further information at this time.

## ATTACHMENTS:

## METHODS OF OPERATION:

Point of Entry - Door - Front



# TASER
## TRAINING ACADEMY

**TASER X26®**

**Chief Guy Turcotte**

*Certified User*

*This Certifies that*

**Guy Turcotte**

*is trained in the proper and safe use of the TASER® X26 Electronic Control Device and has passed the requirements of the Glasgow Police Dept. TASER X26 training program under the supervision of a Certified Instructor.*

*In Witness Whereof, Certified Instructor*

**Jason T. Morgan**

*has certified the successful completion of the training requirements this day:*

**11 July 2011**

*Certified Instructor:*

*Certified Instructor ID:*

09110306459141287134 6c

© 2010 TASER International, Inc. TASER®, Shaped Pulse™ and the Globe & Lightning Bolt Logo, are trademarks of TASER® International, Inc.

**EXHIBIT 5**
**TURCOTTE**
**JAN 9, 2023**
Julie Ritter, Court Reporter



# TASER
## TRAINING ACADEMY

**TASER® CEW End-User Applicant Certification Form**

PRINT LEGIBLY AND CLEARLY PLEASE!

Which CEWs were you certified on (Check all that apply):   ☐ M26  ☑ X26  ☐ X26P  ☐ X2  ☐ X3

Rank: _LT. COLONEL_     Name: _Guy TURCOTTE_

Agency: _GLASGOW P.D._     Email: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Phone: _270-651-5151_

Address/State/Zip: _101 PIN OAK LANE_
_GLASGOW, KY 42141_

New Certification: ☐   Annual Recertification: ☑

By signing below, I hereby acknowledge receipt of TASER's Version 20 Product Warnings. I understand that I must read and understand these warnings PRIOR to participating in any hands-on CEW drills required by the certification course.

Student Signature: *(REQUIRED)* _Lt. Col Turcotte_ ③

## TASER Instructor Use Only

Instructor is required to verify that applicant has successfully completed all CEW User Certification/Recertification requirements.

Number of answers correct on written exam: _____ out of 50 for the X26, X26P, X2, and X3 (90% minimum)
_____ out of 45 for the M26 (90% minimum)

✓ Review entire Version 20 End-Use Certification Course PowerPoint Presentation(s).

✓ Demonstrate safe handling of CEW and cartridges and proper finger positions for safe handling, aiming, and firing.

✓ Safely control TASER CEW adequately when commanded "Arm - Spark - Safe" at random.

✓ Demonstrate the ability to safely load and unload the TASER CEW under stress.

✓ Remove and reinstall battery in TASER CEW correctly.

✓ Deploy a minimum of 2 live cartridges, placing both probes in preferred target zones.

_____ (X2 and X3 only) Utilize the ARC switch to re-energize deployed probes and give a warning arc.

> **EXHIBIT 6**
> **TURCOTTE**
> **JAN 9, 2023**
> Julie Ritter, Court Reporter

I hereby certify that the above named applicant has satisfactorily completed all components of the TASER End-User Certification, or Annual Re-Certification, training program and is hereby certified as a user of this system for one year.

Attested by Certifying Instructor: _Jessie Barton_ _____
                                    (Print Name)              (Signature)

Date: _11-1-2016_     Location of Training: _GFD Training Center_

### Do Not Send this Form to TASER International
### Keep this Form for Department Training Records

M26, X2, X26, and X26P are trademarks of TASER International, Inc., and TASER, X3, and the 'Bolt within Circle' logo are trademarks of TASER International, Inc., registered in the US and other countries. For more information, visit www.TASER.com/legal. All rights reserved.
© 2015 TASER International, Inc.



**EXHIBIT 7**

TURCOTTE

JAN 9, 2023

Julie Ritter, Court Reporter



**Instructor and User:**
**Warnings, Risks & Release Agreement**
*(For Use Only When Taking a TASER CEW Exposure)*



increased when using a CEW in drive-stun mode. Increased skin irritation, abrasion, mark, burning, or scarring may occur with a CEW with multiple cartridge bays when used in drive-stun or three-point deployment modes.

**⚠WARNING** **Penetration Injury.** The TASER probe has a small dart point which may cause a penetration injury to a blood vessel or internal organ, including lung, bone, or nerve. The probe or dart point (which may detach or break) can puncture or become embedded into a bone, organ, or tissue, which may require immediate medical care, surgical removal, or may result in scarring, infection, or other serious injury.

**SAFETY INFORMATION: CEW DEPLOYMENT AND USE**

**⚠WARNING** CEWs and cartridges are weapons, and as with any weapon follow safe weapon-handling practices and store your CEW securely. Significant differences exist between different TASER CEW models. Before using any CEW, including a multi-shot CEW, ensure you understand the functioning and effects of that model. Follow practices in TASER's warnings and training materials and any additional requirements in your agency's Guidance. Failure to follow the warnings may result in death or serious injury to the user or others.

**⚠WARNING** **Confusing Handgun with CEW.** Confusing a handgun with a CEW could result in death or serious injury. Learn the differences in the physical feel and holstering characteristics between your CEW and your handgun to help avoid confusion. Always follow your agency's Guidance and training.

**⚠WARNING** **Trigger Hold-Back Model Differences.** If the trigger is held back, most CEWs will continue to discharge until the trigger is released or the power source is expended. With an APPM installed, the X2 and X26P can be programmed to stop a CEW discharge at 5 seconds *even if the user continues to hold back the trigger*, requiring a deliberate action to re-energize the deployed cartridge. Know your model and how it works. Avoid repeated, prolonged, or continuous CEW applications when practicable.

**SAFETY INFORMATION: CEW EFFECTIVENESS**

**⚠WARNING** **Subject Not Incapacitated.** An ineffective CEW application could increase the risk of death or serious injury to the user, the subject, or others. If a CEW does not operate as intended or if subject is not incapacitated, disengage, redeploy the CEW, or use other force options in accordance with agency Guidance. A CEW's effects may be limited by many factors, including absence of delivered electrical charge due to misses, clothing disconnect, intermittent connection, or wire breakage; probe locations or spread; subject's muscle mass; or movement. Some of the factors that may influence the effectiveness of CEW use in effecting or achieving control of a subject include:

**Subject may not be fully incapacitated.** Even though a subject may be affected by a CEW in one part of his body, the subject may maintain full muscle control of other portions of his body. Control and restrain a subject as soon as possible, and be prepared in case the subject is not fully incapacitated.

**Subject may recover immediately.** A subject receiving a CEW discharge may immediately regain physical or cognitive abilities upon cessation of the delivered CEW discharge. Control and restrain a subject as soon as possible, and be prepared in case the subject immediately recovers.

**Drive-stun mode for pain compliance only.** The use of a handheld CEW in drive-stun mode is painful, but generally does not cause incapacitation. Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect. Avoid using repeated drive-stuns on such individuals if compliance is not achieved.

**SAFETY INFORMATION: GENERAL PRECAUTIONS**

**⚠WARNING** **Unintentional CEW Deployment or Discharge Hazard.** Unintentional CEW activation or unexpected cartridge discharge could result in death or serious injury to the user, subject, or others.

**Avoid static electricity.** Keep cartridge away from sources of static electricity. Static electricity can cause a CEW or X26, X26P, or M26 cartridge to discharge unexpectedly, possibly resulting in serious injury.

**Keep body parts away from front of CEW or cartridge.** Always keep your hands and body parts away from the front of the CEW and cartridge. If the CEW discharges unexpectedly you could be injured.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IF YOU HAVE A CONDITION OR PRE-EXISTING INJURY THAT COULD BE AGGRAVATED BY A TASER CEW EXPOSURE, NOTIFY YOUR INSTRUCTOR AND DO NOT PARTICIPATE.**

Please check the appropriate box:

☑ I do not have injuries, physical or mental conditions that could be aggravated by TASER CEW exposure.

☐ I have pre-existing injuries or conditions that could be aggravated by TASER CEW exposure.

**LIABILITY RELEASE AGREEMENT**

I acknowledge and agree as follows:

I have read, fully understand and accept the risks. I have read, fully understand, and accept the risks as stated in this document and TASER's current warnings ("Risks") and that these Risks exist whether or not I have pre-existing injuries. With full knowledge of the Risks, I voluntarily agree to receive a TASER CEW exposure.

**TASER does not require a CEW Exposure.** I understand that TASER does not require a CEW exposure as part of Instructor or User training. It is up to each agency to determine whether its instructors and users experience a CEW exposure as part of training and it is exclusively my decision to voluntarily experience a CEW exposure.

**I accept the Risks.** Understanding the Risks, I assume all Risks inherent in the CEW exposure, whether known or unknown, foreseen or unforeseen.

**Release and hold harmless.** I release and hold harmless TASER, its agents, officers, directors, employees, and distributors, my instructor, my law enforcement agency, and the host agency (collectively "Released Parties"), from any and all claims, including but not limited to, claims for strict liability, breach of warranty, failure to warn, or any other theory of liability whatsoever even if due to the NEGLIGENCE or GROSS NEGLIGENCE of the Released Parties. I specifically waive any statutory rights I may have regarding the release of unknown claims.

**I agree no one will sue Released Parties.** I promise that neither I nor anyone on my behalf will ever sue or bring any other legal action or claim against the Released Parties for anything related to my TASER CEW exposure.

**Workers' Compensation Rights.** This release does not waive any rights I may have under Workers' Compensation Laws. I agree that any recovery under Workers' Compensation Laws does not change, extend or enlarge the waivers and protections inherent in this agreement.

**This agreement supersedes any other representation.** This release supersedes any other statement, agreement or representation, written or oral, concerning my TASER CEW exposure. I affirm that this is my entire agreement with TASER and I am not relying on any representation by my instructor or agency inconsistent with TASER's warnings and the Risks set forth in this document or in TASER's training materials.

**This agreement is a binding contract.** I intend this form be legally binding upon me, my heirs, executors, administrators, attorneys and assigns. This agreement is contractual and not a mere recital. If any part of this agreement is held vague, invalid, or otherwise unenforceable, the rest of the agreement will continue in full force and effect.

**I am competent to be bound by this agreement.** I affirm that I am competent to enter into and be bound by this agreement; that I have read and understand this Liability Release Agreement in its entirety; that I have not been induced to sign this agreement by any promise or representation; and that I sign it voluntarily and of my own free will. By signing below I understand that I am giving up certain legal rights, including the right to recover damages in case of injury.

Date _11/01/16_  Signed _Lt. Col. G.J. Turcotte_

Printed Name _LT. COL. G.J. TURCOTTE_

Agency _GLASGOW POLICE DEPT._

This signed, completed form shall be retained by the agency or employer for the duration of the student's employment with the organization.
Agencies or employers may opt to retain the form longer than this time frame as deemed necessary.
Questions should be directed to legal@taser.com

---



**EVIDENCE⊘SYNC**™

| TASER Information | | Report Generated by | |
|---|---|---|---|
| **Dept.** | Glasgow Police Dept. | **Name** | Miller, Amanda |
| **Serial** | X1200CM7A | **Badge ID** | amiller |
| **Model** | TASER X26P | **Local Timezone** | Central Standard Time (UTC -0500) |
| **Firmware Version** | Rev. 04.037 | **Generated On** | 14 Apr 2020 10:37:20 |
| **Device Name** | X1200CM7A | | |
| **Health** | Good | | |

**EXHIBIT 8**
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

## Device (X26P)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1 | 07 Jul 2019 18:57:22 | Power Magazine Change | Manufacturing  S/N: XXXXX6   Battery capacity: 100% | | |
| 2 | 07 Jul 2019 18:57:22 | Firmware Update | FW Bundle, Rev. 04.037, 12/27/2017 | | |
| 3 | 07 Jul 2019 18:57:22 | Firmware Update | MC, Rev. 04.037, 12/27/2017 | | |
| 4 | 07 Jul 2019 18:57:22 | Firmware Update | LDR, Rev. 04.025, 7/20/2016 | | |
| 5 | 07 Jul 2019 18:57:22 | Firmware Update | CAM, Rev. 01.027, 3/28/2017 | | |
| 6 | 07 Jul 2019 18:57:22 | Armed | | 29 | 100 |
| 7 | 07 Jul 2019 18:57:31 | Safe | 9 | 30 | 99 |
| 8 | 07 Jul 2019 18:57:37 | Power Magazine Change | Manufacturing  S/N: DP"    Battery capacity: 100% | | |
| 9 | 07 Jul 2019 18:57:37 | Armed | | 29 | 100 |
| 10 | 07 Jul 2019 18:57:49 | Safe | 12 | 30 | 99 |
| 11 | 07 Jul 2019 19:00:18 | Power Magazine Change | Manufacturing  S/N: XXXXX6   Battery capacity: 99% | | |
| 12 | 07 Jul 2019 19:00:18 | Armed | | 28 | 99 |
| 13 | 07 Jul 2019 19:00:22 | Trigger | 5 | | 99 |
| 14 | 07 Jul 2019 19:01:40 | Trigger | 5 | | 99 |
| 15 | 07 Jul 2019 19:01:47 | Trigger | 5 | | 99 |
| 16 | 07 Jul 2019 19:01:53 | Trigger | 5 | | 99 |
| 17 | 07 Jul 2019 19:02:00 | Trigger | 5 | | 99 |
| 18 | 07 Jul 2019 19:02:07 | Trigger | 5 | | 99 |
| 19 | 07 Jul 2019 19:02:13 | Trigger | 5 | | 99 |

| Seq # | Local Time [Dd:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 20 | 07 Jul 2019 19:02:19 | Trigger | 5 | | 99 |
| 21 | 07 Jul 2019 19:02:25 | Trigger | 5 | | 99 |
| 22 | 07 Jul 2019 19:02:31 | Trigger | 5 | | 99 |
| 23 | 07 Jul 2019 19:02:37 | Trigger | 5 | | 99 |
| 24 | 07 Jul 2019 19:02:44 | Trigger | 5 | | 99 |
| 25 | 07 Jul 2019 19:03:14 | Trigger | 5 | | 99 |
| 26 | 07 Jul 2019 19:03:20 | Safe | 182 | 39 | 99 |
| 27 | 07 Jul 2019 19:03:26 | Power Magazine Change | Standard    S/N: 128KMV   Battery capacity: 90% | | |
| 28 | 07 Jul 2019 19:03:26 | Armed | | 39 | 90 |
| 29 | 07 Jul 2019 19:03:29 | Safe | 3 | 39 | 90 |
| 30 | 07 Jul 2019 19:04:05 | USB Connected | | | |
| 31 | 07 Jul 2019 19:04:34 | Firmware Update | MC, Rev. 04.037, 12/27/2017 | | |
| 32 | 07 Jul 2019 19:04:34 | Firmware Update | LDR, Rev. 04.025, 7/20/2016 | | |
| 33 | 07 Jul 2019 19:04:34 | Firmware Update | CAM, Rev. 01.027, 3/28/2017 | | |
| 34 | 07 Jul 2019 19:04:36 | Time Sync | 07 Jul 2019 19:04:36 to 07 Jul 2019 19:04:36 | | |
| 35 | 07 Jul 2019 19:15:46 | Power Magazine Change | Standard    S/N: 128KN9   Battery capacity: 52% | | |
| 36 | 07 Jul 2019 19:15:46 | Armed | | 32 | 52 |
| 37 | 07 Jul 2019 19:15:47 | Trigger | 5 | | 52 |
| 38 | 07 Jul 2019 19:15:55 | Trigger | 5 | | 51 |
| 39 | 07 Jul 2019 19:16:01 | Safe | 15 | 33 | 51 |
| 40 | 02 Aug 2019 15:55:10 | Power Magazine Change | Standard    S/N: 12APAR   Battery capacity: 100% | | |
| 41 | 02 Aug 2019 15:55:10 | Armed | | 25 | 100 |
| 42 | 02 Aug 2019 15:55:10 | Safe | 0 | 24 | 100 |
| 43 | 04 Sep 2019 07:54:57 | Armed | | 25 | 98 |
| 44 | 04 Sep 2019 07:54:59 | Safe | 2 | 26 | 98 |
| 45 | 04 Sep 2019 07:55:00 | Armed | | 26 | 98 |
| 46 | 04 Sep 2019 07:55:03 | Trigger | 1 | | 98 |
| 47 | 04 Sep 2019 07:55:04 | Safe | 4 | 26 | 98 |
| 48 | 04 Sep 2019 07:55:11 | Armed | | 26 | 98 |
| 49 | 04 Sep 2019 07:55:13 | Safe | 2 | 26 | 98 |

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 50 | 04 Sep 2019 10:34:07 | Armed | | 27 | 98 |
| 51 | 04 Sep 2019 10:34:09 | Safe | 2 | 27 | 98 |
| 52 | 04 Sep 2019 10:35:05 | Armed | | 27 | 98 |
| 53 | 04 Sep 2019 10:35:08 | Safe | 3 | 28 | 98 |
| 54 | 04 Sep 2019 10:35:13 | Configuration | | | |
| 55 | 04 Sep 2019 10:35:23 | Configuration Exit | | | |
| 56 | 04 Sep 2019 10:35:23 | Armed | | 28 | 98 |
| 57 | 04 Sep 2019 10:35:24 | Safe | 1 | 28 | 98 |
| 58 | 04 Sep 2019 11:20:19 | Armed | | 28 | 98 |
| 59 | 04 Sep 2019 11:20:20 | Safe | 1 | 28 | 98 |
| 60 | 04 Sep 2019 11:20:31 | Armed | | 28 | 98 |
| 61 | 04 Sep 2019 11:20:37 | Safe | 6 | 28 | 98 |
| 62 | 04 Sep 2019 11:20:45 | Armed | | 28 | 98 |
| 63 | 04 Sep 2019 11:20:47 | Safe | 2 | 28 | 98 |
| 64 | 04 Sep 2019 11:20:50 | Armed | | 29 | 98 |
| 65 | 04 Sep 2019 11:20:56 | Safe | 6 | 29 | 98 |
| 66 | 04 Sep 2019 11:23:08 | Armed | | 29 | 98 |
| 67 | 04 Sep 2019 11:23:12 | Safe | 4 | 29 | 98 |
| 68 | 04 Sep 2019 11:31:27 | Armed | | 29 | 98 |
| 69 | 04 Sep 2019 11:31:32 | Trigger | 5 | | 98 |
| 70 | 04 Sep 2019 11:32:16 | Safe | 49 | 33 | 98 |
| 71 | 16 Sep 2019 08:11:00 | Armed | | 25 | 97 |
| 72 | 16 Sep 2019 08:11:03 | Safe | 3 | 24 | 97 |
| 73 | 20 Oct 2019 06:05:28 | Armed | | 23 | 95 |
| 74 | 20 Oct 2019 06:05:33 | Trigger | 1 | | 95 |
| 75 | 20 Oct 2019 06:05:33 | Safe | 5 | 23 | 95 |
| 76 | 22 Nov 2019 06:27:49 | Armed | | 26 | 94 |
| 77 | 22 Nov 2019 06:27:52 | Trigger | 1 | | 94 |
| 78 | 22 Nov 2019 06:27:52 | Safe | 3 | 26 | 94 |
| 79 | 01 Dec 2019 09:07:37 | Armed | | 26 | 93 |

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 80 | 01 Dec 2019 09:07:38 | Trigger | 1 | | 93 |
| 81 | 01 Dec 2019 09:07:39 | Safe | 2 | 25 | 93 |
| 82 | 27 Feb 2020 13:46:18 | Armed | | 21 | 89 |
| 83 | 27 Feb 2020 13:46:21 | Trigger | 1 | | 89 |
| 84 | 27 Feb 2020 13:46:21 | Safe | 3 | 20 | 89 |
| 85 | 27 Feb 2020 13:46:22 | Armed | | 21 | 89 |
| 86 | 27 Feb 2020 13:46:27 | Safe | 5 | 21 | 89 |
| 87 | 14 Apr 2020 07:53:57 | Armed | | 25 | 87 |
| 88 | 14 Apr 2020 07:54:00 | Trigger | 5 | | 87 |
| 89 | 14 Apr 2020 07:54:12 | Trigger | 6 | | 87 |
| 90 | 14 Apr 2020 07:54:26 | Trigger | 5 | | 87 |
| 91 | 14 Apr 2020 07:54:39 | Trigger | 5 | | 86 |
| 92 | 14 Apr 2020 07:54:49 | Trigger | 5 | | 86 |
| 93 | 14 Apr 2020 07:54:58 | Trigger | 5 | | 86 |
| 94 | 14 Apr 2020 07:55:05 | Trigger | 5 | | 86 |
| 95 | 14 Apr 2020 07:55:23 | Trigger | 5 | | 85 |
| 96 | 14 Apr 2020 07:55:39 | Trigger | 5 | | 85 |
| 97 | 14 Apr 2020 07:56:20 | Trigger | 5 | | 85 |
| 98 | 14 Apr 2020 07:56:44 | Trigger | 5 | | 85 |
| 99 | 14 Apr 2020 07:58:15 | Safe | 258 | 28 | 84 |
| 100 | 14 Apr 2020 10:12:19 | Armed | | 18 | 84 |
| 101 | 14 Apr 2020 10:12:20 | Safe | 1 | 18 | 84 |
| 102 | 14 Apr 2020 10:40:13 | USB Connected | | | |
| 103 | 14 Apr 2020 10:37:02 | Time Sync | 14 Apr 2020 10:40:33 to 14 Apr 2020 10:37:02 | | |

| Policy # 1.11<br><br>**Response to Resistance** | Related Policies: |
|---|---|
| *This policy is for internal use only and does not enlarge an employee's civil liability in any way. The policy should not be construed as creating a higher duty of care, in an evidentiary sense, with respect to third party civil claims against employees. A violation of this policy, if proven, can only for the basis of a complaint by this department for non-judicial administrative action in accordance with the laws governing employee discipline.* | |
| Applicable State Statutes: K.R.S. 503.090 | |
| KACP Accreditation Standard: **1.3, 1.8, 1.11** | |
| Date Implemented:  09/15/2016 | Review Date: |

I. **Purpose:**  The purpose of this policy is to direct officer in the appropriate use of force.

II. **Policy:** The policy of this department is to protect and serve all citizens while at the same time respecting the rights of suspects and balancing the need for officer safety in use of force events.   It is the policy of this department that officer will use only reasonable force to bring an incident or event under control.   Reasonable force is only that force which is necessary to accomplish lawful objectives.  All uses of force must be objectively reasonable.

III. **Definitions:**

   A. **Deadly Force:**  The Federal Courts have defined deadly force as any force which creates a substantial likelihood of death or serious bodily harm.  The Kentucky Legislature has further defined deadly force in K.R.S. 503.010: "Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury.

   B. **Non-Deadly Force:** All uses of force other than those that create a substantial likelihood of serious bodily harm or death.

   C. **Imminent:** Impending or about to occur.

   D. **Objectively Reasonable:** The amount of force that would be used by other reasonable and well-trained officer when faced with the circumstances that the officer using the force is presented with.

   E. **Reasonable Belief:** Reasonable belief means that the person concerned, acting as a reasonable person believes that the prescribed facts exist.

   F. **Serious Physical Injury:** "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ"

   G. **Electronic Control Device:** Electronic Control Devices, TASER, ™ or stun-guns (electronic control weapons) that disrupt the central nervous system of the body



EXHIBIT 9
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

49

H. **Active resistance:** a subject actively resists when they take affirmative action to defeat an officer's ability to take them into custody.

I. **Physical force:** Use of any part of an officer body, such as joint manipulation, leverage, pain compliance, take-down maneuvers or neck restraint holds.

J. **Chemical agents:** Use of any chemical agent to overcome subject resistance.

K. **Impact tools/strikes:** Use of any tools, object or body part to strike a subject

L. **Electronic tools:** Use of any electronic equipment on a subject being controlled

M. **Injury or complained of injury:** Any time the subject being controlled is injured or complains of injury.

N. **Pointing of Firearms:** Any time an officer points a firearm at an individual, notwithstanding the fact that deadly force is not ultimately deployed. This does not include drawing a firearm and maintaining at the low-ready position.

O. **Firearms discharges:** Any discharge of a firearm other than at the range or during qualification whether unintentional, for animal dispatch, or whether a subject is hit or not will be reported in a separate manner consistent with these policies.

P. **Canine use:** Use of a police canine will be reported on a special form to capture any form of use whether there is contact with a subject or not.

IV. **Procedure:**

A. In determining the appropriate level of force officer should apply the levels of force under the department's trained use of force continuum along with the following three factor test:

    a. How serious is the offense the officer suspected at the time the particular force used?

    b. What was the physical threat to the officer or others?

    c. Was the subject actively resisting or attempting to evade arrest by flight?

B. **Force Options:** Officer have several force options that will be dictated by the actions of the suspect upon the appearance of the police officer. Officer may be limited in their options due to the circumstances and actions of the subject. For example, an officer who immediately observes a subject with a firearm unjustifiably threatening another may immediately respond with deadly force without considering other force options.

    a. **Command Presence:** Visual appearance of officer where it is obvious to the subject due to the officer's uniform or identification that the officer has the authority of law.

    b. **Verbal Commands:** Words spoken by the officer directing the subject as to the officer expectations.

    c. **Soft Empty Hand Control:** Officers use of hands on the subject to direct the subject's movement; Techniques that have a low potential of injury to the subject.

    d. **Chemical Spray:** Where subject exhibits some level of active resistance/active aggression, officer may use chemical spray to temporary incapacitate the subject.

    e. **Electronic Control Devices:** Where subject exhibits some level of active resistance/active aggression an officer may use an electronic control device to temporarily incapacitate the subject.

50

f. **Hard Hand Control:** Punches and other physical strikes, including knees, kicks and elbow strikes that have the possibility of creating mental stunning and/or motor dysfunction.

g. **Impact Weapons:** Batons, ASP/Expandable Baton may be utilized in cases where the officer believes the use of these weapons would be reasonable to bring the event under control. Examples would be where other options have been utilized and failed or where based on the officer perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

h. **Canine:** Use of canine to bite and hold subject to prevent escape or to gain control of a subject who is actively aggressing toward officer(s). Prior to deployment of a canine, a warning in the form of an announcement shall be made.

i. **Deadly Force:** The Federal Courts have defined deadly force as any force when employed may bring about serious bodily injury or death. The Kentucky Legislature has further defined deadly force in K.R.S. 503.010: "Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury

C. **Deadly Force:** The use of deadly force is objectively reasonable when the officer is faced with an imminent threat of serious physical injury or death to him/herself, or some other person who is present, or;

D. Kentucky statutory law provides:

    a. The use of physical force by an officer upon another person is justifiable when the officer, acting under official authority, is making or assisting in making an arrest, and he:

        1) Believes that such force is necessary to affect the arrest;

        2) Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and

        3) Believes the arrest to be lawful.

    b. The use of deadly physical force by a defendant upon another person is justifiable only when:

        1) The officer, in effecting the arrest, is authorized to act as a peace officer; **and**

        2) The arrest is for a felony involving the use or threatened use of physical force likely to cause death or serious physical injury; **and**

        3) The officer believes that the person to be arrested is likely to endanger human life unless apprehended without delay.

E. In all deadly force events, officer should warn the subject prior to using deadly force where feasible.

F. Once the subject's active resistance has ceased and control has been gained an officer is no longer authorized to use force. Officer should immediately provide any necessary medical assistance to the subject to the degree to which they are trained and provide for emergency medical response where needed.

G. Discharge of Firearms Restrictions:

    a. Warning Shots are prohibited

51

b. Discharge of firearms is prohibited when the officer is presented with an unreasonable risk to innocent third parties.

c. When a moving vehicle is involved, use of deadly force by discharging a firearm is dangerous, can be ineffective, and should not occur when there is an unreasonable risk to the safety of persons other than the subject. Whenever possible, officer should avoid placing themselves in a position where use of deadly force is the only alternative.

d. Even when deadly force is justified, firearms shall not be discharged at a vehicle unless:

  1) The officer has a reasonable belief that an occupant of the vehicle poses an imminent threat of death or serious physical injury to the officer /deputy or another person, or

  2) The officer has a reasonable belief that an occupant is using the vehicle in a manner that poses an imminent threat of death or serious physical injury to the officer or another person, and there is no avenue of escape.

H. **Less-Lethal Weapons/Tactics:** Prior to deployment of any less-lethal weapon, officer must be trained and certified through this agency or the manufacturer in a recognized training program covering the proper use of the weapon from both the technical and legal aspects. All deployments must be consistent with departmental use of force training and policy.

a. **Chemical Spray:**

  1) Chemical Spray shall not be deployed as a compliance technique for a person who is passively or verbally non-compliant. Active resistance/active aggression shall be required.

  2) Chemical Spray shall never be used as a punitive measure.

  3) Officer should never spray from a pressurized can directly into a subject's eyes from a close distance due to the potential for eye injury as a result of the pressurized stream. Officer should never spray directly into a subject's eyes from closer than three feet or the distance recommended by the manufacturer of the spray (whichever is shorter) unless deadly force would be justified.

  4) Officer shall consider alternatives to chemical spray when attempting to control a subject in a crowded-enclosed area due to the innocent over-spray that may cause the onset of panic.

  5) Officer shall consider alternatives to chemical spray when the event is inside a building, particularly where the building has a closed-ventilation system due to the potential impact on innocent persons who may have to be evacuated (temporarily) from the locations.

  6) Once control is gained, officer should immediately provide for the decontamination of the subject.

  7) If the person shows any signs of physical distress or does not recover in a reasonable amount of time, officer should immediately direct an emergency medical response and render first-aid at the degree for which they are trained.

b. **Electronic Control Devices**

  1) An electronic control device as a force option is the same level of force as chemical spray.

  2) Electronic Control Device must be worn on the weak-side in either a weak-hand

52

draw or cross-draw position.

3) Electronic Control Device deployment shall not be considered for the passively resistant subject. Active resistance or active aggression shall be required.

(a) Flight from an officer, standing alone, is not a justification for the use of an electronic control device. Officers should consider the nature of the offense suspected the level of suspicion with respect to the person fleeing, and the risk of danger to others if the person is not apprehended immediately. Additionally, officers should consider the type of area, i.e. asphalt, railroad tracks, grass etc.

(b) Officers must be trained concerning ability of electrical charge to act as an ignition for combustible materials. (Note: Officers have been seriously injured and or killed after deploying an Electronic Control Device in the presence of open natural gas during suicidal person call)

(c) Multiple Electronic Control Device deployments against an individual may increase the likelihood of serious injury where the individual is suffering from other symptoms such as cocaine intoxication. Policy and training should encourage officers to minimize the successive number of discharges against an individual where possible.

(d) The agency recognizes however, particularly where back-up officers are unavailable, that multiple applications may be necessary to gain or maintain control of a combative individual.

(e) No more than one officer should deploy an electronic control device against a single individual at the same time.

(f) A contributing factor to serious injury or death is the level of a subject's exhaustion. Studies recommend that when an officer believes that control of a subject will be necessary and met with resistance, deployment of the Electronic Control Device should be considered early on in the event so that the person has not reached a level of exhaustion prior to the Electronic Control Device's use.

(g) In cases where subject is actively resisting an officer's attempt to take them into custody but not threatening the officer with an assault-it is recommended that the Electronic Control Device be used in the "push [drive] stun mode."

(h) The preferred targeting is the center mass of the subject's back, however it is recognized that it is not always possible to get behind the subject.

(i) Where back-targeting is not possible, frontal targeting should be lower center mass, intentional deployments to the chest shall be avoided where possible.

(j) Officers who are aware that a female subject is pregnant shall not use the Electronic Control Device unless deadly force would be justified due to the danger created by the secondary impact or the possibility of muscle contractions leading to premature birth.

(k) Officers shall make all reasonable efforts to avoid striking persons in the head, neck, eyes or genitals.

(l) Officers are prohibited from using the device as punitive measure.

(m) Electronic Control Devices shall not be used against person who is in physical

53

control of a vehicle in motion unless deadly force would be justified based on an existing imminent threat.

(n) A warning prior to discharge is preferred but not always necessary for this type of force to be considered reasonable, model policies as well as courts have noted that giving a subject, who is assaultive toward the officer, a warning may enhance the danger to the officer and the subject by giving the subject time to avoid the deployment. See: Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).

(o) Officers shall make all efforts to warn other officers that a deployment is about to occur.

(p) The device shall never be used on a handcuffed person to force compliance unless the subject is actively resistant and control cannot be otherwise accomplished.

(q) Officers should consider the location and environment of the subject. i.e. Is the subject at the top of a stairwell such that when incapacitated by the Electronic Control Device-they fall down the stairs causing a collateral injury. Officers shall avoid using Electronic Control Device in cases where the subject is elevated i.e. roof, fire escape, tree, bridge, stairwell, etc. etc. such that the secondary impact may cause serious injury.

(r) Officers should be aware that a subject's heavy clothing may impact the effectiveness of the electronic control device.

(s) Officers should consider whether the subject has been exposed to combustible elements that may be on their person such as gasoline. The use of an Electronic Control Device on such persons may cause an ignition and fire.

(t) Officers should consider the particular subject and any vulnerability they may have such as: a person who is small in stature or very frail will be more dramatically impacted; some agencies have been criticized as well as sued for use on pregnant women, the very young and the elderly.

(u) Alternative tactics shall be utilized where the officer has prior information that the subject suffers from a disability which would increase the danger to that person by using the Electronic Restraint Device. i.e. A person at the scene tells an officer that the subject has a heart condition.

(v) Deployed probes that have been removed from a suspect should be treated as a bio-hazard.

(w) Where EMS is available, their services may be utilized for the removal of darts that have penetrated the skin as long as such removal can be accomplished without causing further injury or pain to the subject.

(x) All persons who have been the subject of an Electronic Control Device deployment shall be monitored for a period of time with a focus on symptoms of physical distress. Any person, who appears to be having any form of physical distress following the deployment of an ECD, shall be transported to a medical facility for a medical examination. It should be noted that studies indicate that persons who suffer from excited delirium may not be immediately impacted and the onset of difficulty may occur a period of time after the police control event.

54

**(y)** Mandatory Medical Clearance at Hospital:

    **(i)** Persons struck in a sensitive area-eyes, head, genitals, female breasts.

    **(ii)** Where the probes have penetrated the skin and Officers/EMS cannot safely remove darts in accord with this policy.

    **(iii)** Persons who do not appear to have fully recovered after a short period of time (Model Policies use a ten-minute time limit however officers who observe unusual physical distress should immediately call for medical assistance and should not wait the ten-minute recovery period recommended by some of the model policies)

    **(iv)** Persons who fall into one of the vulnerable classes such as juveniles, pregnant women, persons who are small in stature, persons who officers become aware have a pre-existing medical condition that increases danger and the elderly.

    **(v)** Subject who request medical assistance.

**(z)** Documentation:

    **(i)** All deployments of an Electronic Control Device shall be documented including those cases where a subject complies once threatened with such a device. By documenting the non-discharge uses, an agency establishes officer judgment and control as well as the deterrent effect of this tool.

    **(ii)** Photographs of the affected area shall be taken following the removal of darts from the subject to document any injury. Where the push-stun method has been used, photographs are extremely important due to the increased potential for this method to cause scarring.

    **(iii)** Supervisory personnel shall be notified and review all Electronic Control Device deployment for consistency with policy and training.

    **(iv)** Darts/Cartridges shall be properly stored and maintained as evidence following a discharge.

    **(v)** Officers are required to complete a "use of force/response to active resistance form" which shall be reviewed by a supervisor following the ECD use.

    **(vi)** All deployments shall be reviewed by the agency as well as training personnel.

    **(vii)** Where there is any indication of lasting injury, claim or complaint internal data from device shall be maintained.

    **(viii)** All ECD units will be audited monthly to ensure that all deployment/activations have been reported as required.

**c.** Impact Weapons: Batons, ASP/Expandable Baton/ Bean bag (type) projectiles

    **1)** Impact weapons may be utilized in cases where the officer believes the use of these weapons would be reasonable to bring the event under control.

2) Examples would be where other options have been utilized and failed or where based on the officer perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

3) Officer shall not intentionally strike a person in the head with an impact weapon unless deadly force would be justified.

## V.   Reporting Control to Active Resistance:

A. **Purpose (Reporting):**  It is the purpose of this policy to provide police employees and supervisors with guidelines for reporting control to active resistance. The department will develop a Report to Active Resistance (RAR) form to capture all required information described in this policy.

B. **Policy (Reporting):**  Police officers are given the authority to use force to overcome a subject's resistance to the officer order to comply, affect arrest, defend against assault, and prohibit flight.  It is incumbent that officer be held accountable to safeguard the rights of members of the public.  This policy mandates that members of the Department accurately, completely and timely report subject control of active resistance and a supervisor conducts a prompt investigation and reports these investigation findings.

C. **Procedures (Reporting):**

a. Officer who become involved in an incident that requires any degree of force are required to immediately notify their supervisor.  The involved officer will provide a detailed documentation of the use of force utilized in the official police report prepared for the incident involved.  In cases where no supervisor is working the officer will also be responsible for completing the RAR report identified below prior to the end of their shift.

b. A Report to Active Resistance (RAR) form shall be prepared by a supervisor whenever an officer of this agency utilizes reportable force, as described in the definition of this policy, in the performance of their duties.

c. The RCAR form will be completed in detail including a narrative account of the following:

1) The actions of the subject that necessitated that use of force as a response to overcome the active resistance of the subject.

2) The reasons why force was required and the type of force the officer utilized in overcoming the resistant subject.

3) Any injuries or complaint of injuries of either the subject or the officer and any medical treatment received.

D. **Supervisory Responsibilities:**  Once notified of an incident in which an officer has utilized force, the supervisor will immediately respond to the scene to investigate the incident. If the involved officer supervisor is not available to respond, another supervisor will be dispatched to complete the RAR.  The supervisor will accomplish the following investigative steps in conducting the investigation:

56

a.  Interview the involved subject if they are cooperative, to determine their account of the incident and if they wish to file a complaint. If they do have a complaint the supervisor shall complete an Administrative Report. If they have any type of injury, Operations Commander will be notified. Additionally, should the supervisor determine that unreasonable force was utilized; he/she shall notify the Operations Commander.

b.  If a crime scene exists; or police equipment exists, which may contain forensic evidence, the supervisor shall ensure that the scene and evidence is processed, photographed and preserved.

c.  Take photographs of the involved officer(s) and subject(s) depicting any potential injuries or documenting the lack of any injuries to the parties involved.

d.  Interview, preferably audio-recorded/audio-visual recorded, all witnesses to the incident and document their description of the event.

e.  Ensure that a qualified health care provider handles any injuries or other medical condition being experienced by the involved person.

f.  The supervisor shall review any video recording of the incident, if available, prior to the completion of the RAR and the approval of the officer reports

g.  The supervisor investigating the use of reportable force shall be responsible for the review and approval of the officer reports of the incident, when practicable

h.  The supervisor will complete the RAR prior to completing their shift and submit it along with the officer report to their chain of command for review.

i.  **Exceptions: The following do not require the completion of a RAR unless otherwise required by the above policy:**

   1)  Handcuffing or escorting a compliant, cooperative subject.

   2)  Physical removal of peaceful demonstrators whom do not resist.

| Policy # 1.11 | Related Policies: |
|---|---|
| **Response to Resistance** | Duty to Intervene, Ethics |

| *This policy is for internal use only and does not enlarge an employee's civil liability in any way. The policy should not be construed as creating a higher duty of care, in an evidentiary sense, with respect to third party civil claims against employees. A violation of this policy, if proven, can only form the basis of a complaint by this department for non-judicial administrative action in accordance with the laws governing employee discipline.* |
|---|
| Applicable Kentucky Statutes: K.R.S. 503.090 |
| KACP Accreditation Standards: 1.3,1.8,1.9,1.10,1.11,1.12, 1.1 |

| Date Implemented:<br>08/17/2020 | Review Date:<br>07/08/2020 |
|---|---|

I.  **Purpose:**  The purpose of this policy is to direct officers in the appropriate response to resistance.

II.  **Policy:** The policy of this department is to protect and serve all citizens while at the same time respecting the rights of suspects and balancing the need for officer safety in response to resistance events.   It is the policy of this department that officers will use only reasonable force to bring an incident or event under control.   Reasonable force is only that force which is necessary to accomplish lawful objectives.  All responses to resistance must be objectively reasonable. The agency and all officers recognize that the sanctity of human life serves as the guiding principle in response to resistance decisions.

III.  **Definitions:**

A.  **Deadly Physical Force:**  The Federal Courts have defined deadly force as any force which creates a substantial likelihood of death or serious bodily harm.  The Kentucky Legislature has further defined deadly force in K.R.S. 503.010: "Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury.

B.  **Imminent:** Has a broader meaning than immediate or instantaneous, the concept of imminent should be understood to be elastic, involving an ongoing period of time depending on the circumstances rather than a moment in time under the definition of immediate.

C.  **Immediate means:** That the officer is faced with an instantaneous, or presently occurring threat of serious bodily harm or death.

D.  **Chokehold:**  means applying any direct pressure to the throat, windpipe, or airway of another with the intent to reduce or prevent the intake of air. "Chokehold" does not include any holding involving contact with the neck that is not intended to reduce the intake of air.



EXHIBIT 10
TURCOTTE
JAN 9, 2023
Julie Ritter, Court Reporter

E. **Neck Restraint:** A method of rendering a person unconscious by restricting the flow of blood to the brain by compressing the sides of the neck where the carotid arteries are located.

F. **Intervene:** To come between, whether verbally or physically, to change the course of events that clearly violate the law or agency policy.

G. **De-escalation.** Reduce the intensity of a conflict or potentially violent situation

H. **Objectively Reasonable:** The amount of force that would be used by other reasonable and well-trained officers when faced with the circumstances that the officer using the force is presented with.

I. **Reasonable Belief:** Reasonable belief means that the person concerned, acting as a reasonable person believes that the prescribed facts exist.

J. **Serious Physical Injury:** "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ"

K. **Physical Injury:** Substantial physical pain or any impairment of a physical condition.

L. **Electronic Control Device:** Electronic Control Devices, TASER, ™ or stun-guns (electronic control weapons) that disrupt the central nervous system of the body.

M. **Active resistance:** a subject actively resists when they take affirmative action to defeat an officer's ability to take them into custody.

N. **Active Aggression:** verbal or physical behavior that creates an imminent risk of physical injury to a subject, officer, or third party, but would not lead a reasonable officer to perceive a risk of serious physical injury or death.

O. **Excessive Force:** is force that is not objectively reasonable from the perspective of a reasonable officer in similar circumstances. Excessive force will not be tolerated.

P. **Physical force:** force used upon or directed toward the body of another including confinement.

Q. **Chemical spray:** any chemical agent deployed to overcome subject resistance.

R. **Impact tools/strikes:** any tools, object or body part to strike a subject

S. **Electronic tools:** any electronic equipment on a subject being controlled

IV. **Procedure:**

A. In determining the appropriate level of force officers should apply the levels of force under the department's trained force options along with the following three factor test:

a. How serious is the offense the officer/deputy suspected at the time the particular force used?

b. What was the physical threat to the officer or others?

c. Was the subject actively resisting or attempting to evade arrest by flight?

**B.** Officers may sometimes be required to take custody or otherwise control an individual who is a danger to themselves or others due to a medical or mental health emergency. In these cases, an officer may be required to use objectively reasonable force. In determining whether force is appropriate and the proper under the department's trained response to resistance options, the officer should consider the following three factor test:

   **1)** Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?

   **2)** Was some degree of force reasonably necessary to ameliorate or reduce the immediate threat?

   **3)** Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

**C. Force Options:** Officers have several force options that will be dictated by the actions of the suspect upon the appearance of the police officer. Officers may be limited in their options due to the circumstances and actions of the subject. For example, an officer who immediately observes a subject with a firearm unjustifiably threatening another may immediately respond with deadly force without considering other force options.

   **a. Command Presence:** Visual appearance of officer where it is obvious to the subject due to the officer's deputy's uniform or identification that the officer has the authority of law.

   **b. Verbal Commands:** Words spoken by the officer directing the subject as to the officer's expectations.

   **c. Soft Empty Hand Control:** Officer's use of hands on the subject to direct the subject's movement; Techniques that have a low potential of injury to the subject.

   **d. Chemical Spray:** Where subject exhibits some level of active resistance/active aggression, officers may use chemical spray to temporary incapacitate the subject.

   **e. Electronic Control Devices:** Where subject exhibits some level of active resistance/active aggression an officer may use an electronic control device to temporarily incapacitate the subject.

   **f. Hard Hand Control:** Punches and other physical strikes, including knees, kicks and elbow strikes that have the possibility of creating mental stunning and/or motor dysfunction.

   **g. Impact Weapons:** Batons, ASP/Expandable Baton may be utilized in cases where the officers believe the use of these weapons would be reasonable to bring the event under control. Examples would be where other options have been utilized and failed or where based on the officer's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

h. **Canine:** Use of canine to bite and hold subject to prevent escape or to gain control of a subject who is actively aggressing toward officer(s).   Prior to deployment of a canine, a warning in the form of an announcement shall be made.

i. **Deadly Force:** The Federal Courts have defined deadly force as any force when employed may bring about serious bodily injury or death. The Kentucky Legislature has further defined deadly force in K.R.S. 503.010: "Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury.

**D. Deadly Force:** The use of deadly force is objectively reasonable when the officer is faced with an immediate threat of serious physical injury or death to him/herself, or some other person who is present, or;

**E.** Kentucky statutory law provides:

a. The use of physical force by an officer upon another person is justifiable when the officer, acting under official authority, is making or assisting in making an arrest, and he:

1) Believes that such force is necessary to effect the arrest;

2) Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and

3) Believes the arrest to be lawful.

b. The use of deadly physical force by a defendant upon another person is justifiable only when:

1) The officer, in effecting the arrest, is authorized to act as a peace officer; **and**

2) The arrest is for a felony involving the use or threatened use of physical force likely to cause death or serious physical injury; **and**

3) The officer believes that the person to be arrested is likely to endanger human life unless apprehended without delay.

**F.** In all deadly force events, officers should warn the subject prior to using deadly force where feasible.

**G.** Once the subject's active resistance has ceased and control has been gained an officer is no longer authorized to use force.  If any person is injured and requires medical attention, officers of this agency shall request medical assistance and may render aid in accordance with their training.

**H.** Discharge of Firearms Restrictions:

a. Warning Shots are prohibited

b. Discharge of firearms is prohibited when the officer is presented with an unreasonable risk to innocent third parties.

c. When a moving vehicle is involved, use of deadly force by discharging a firearm is dangerous, can be ineffective, and should not occur when there is an

unreasonable risk to the safety of persons other than the subject. Whenever possible, officers should avoid placing themselves in a position where use of deadly force is the only alternative.

**d.** Even when deadly force is justified, firearms shall not be discharged at a vehicle unless:

**1)** The officer has a reasonable belief that an occupant of the vehicle poses an imminent threat of death or serious physical injury to the officer or another person, or

**2)** The officer has a reasonable belief that an occupant is using the vehicle in a manner that poses an imminent threat of death or serious physical injury to the officer or another person, and there is no avenue of escape.

**I.** **Chokeholds & Neck Restraints:** An officer shall not use a chokehold or neck restraint in the performance of his or her duties, **unless deadly force is justified.**

**1)** Officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. Officers shall not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted for the purpose of seizing evidence or preventing the destruction of evidence by ingestion.

**J.** **Post-Restraint:**

**1)** Officers restraining a subject should be cognizant of and avoid positional asphyxia. This agency prohibits prolonged face-down prone restraint.

**2)** As soon as practicable after the subject stops resisting, monitor the subject's condition. If the subject has difficulty breathing, exhibits other obvious signs of medical distress identifiable by any layperson, or requests medical assistance, officers of this agency shall request medical assistance and may render aid in accordance with their training.

**3)** If the subject is being lodged in a correctional facility or taken to a medical facility, advise the intake personnel that the subject was rendered unconscious or subjected to a chokehold (deadly force) during restraint.

**K.** **Less-Lethal Weapons/Tactics:** Prior to deployment of any less-lethal weapon, officers/deputies must be trained and certified through this agency or the manufacturer in a recognized training program covering the proper use of the weapon from both the technical and legal aspects. All deployments must be consistent with departmental response to resistance training and policy.

**a.** **Chemical Spray:**

**1)** Chemical Spray shall not be deployed as a compliance technique for a person who is passively or verbally non-compliant. Active resistance/active aggression shall be required.

**2)** Chemical Spray shall never be used as a punitive measure.

**3)** Officers should never spray from a pressurized can directly into a subject's eyes from a close distance due to the potential for eye injury as a result of

the pressurized stream. Officers should never spray directly into a subject's eyes from closer than three feet or the distance recommended by the manufacturer of the spray (whichever is shorter) unless deadly force would be justified.

4) Officers shall consider alternatives to chemical spray when attempting to control a subject in a crowded-enclosed area due to the innocent over-spray that may cause the onset of panic.

5) Officers shall consider alternatives to chemical spray when the event is inside a building, particularly where the building has a closed-ventilation system due to the potential impact on innocent persons who may have to be evacuated (temporarily) from the locations.

6) Once control is gained, officers should as soon as practicable provide for the decontamination of the subject.

7) If the person shows any signs of physical distress or does not recover in a reasonable amount of time, officers should immediately direct an emergency medical response and render first-aid at the degree for which they are trained.

b. **Electronic Control Devices**

1) An electronic control device as a force option is the same level of force as chemical spray.

2) Electronic Control Device must be worn on the weak-side in either a weak-hand draw or cross-draw position.

3) Electronic Control Device deployment shall not be considered for the passively resistant subject. Active resistance or active aggression shall be required.

(a) Flight from an officer, standing alone, is not a justification for the use of an electronic control device. Officers should consider the nature of the offense suspected the level of suspicion with respect to the person fleeing, and the risk of danger to others if the person is not apprehended immediately. Additionally, officers should consider the type of area, i.e. asphalt, railroad tracks, grass etc.

(b) Officers must be trained concerning ability of electrical charge to act as an ignition for combustible materials. (Note: Officers have been seriously injured and or killed after deploying an Electronic Control Device in the presence of open natural gas during suicidal person call)

(c) Multiple Electronic Control Device deployments against an individual may increase the likelihood of serious injury where the individual is suffering from other symptoms such as cocaine intoxication. Policy and training should encourage officers to minimize the successive number of discharges against an individual where possible.

(d) The agency recognizes however, particularly where back-up officers are unavailable, that multiple applications may be necessary to gain or maintain control of a combative individual.

(e) No more than one officer should deploy an electronic control device

against a single individual at the same time.

(f) A contributing factor to serious injury or death is the level of a subject's exhaustion. Studies recommend that when an officer believes that control of a subject will be necessary and met with resistance, deployment of the Electronic Control Device should be considered early on in the event so that the person has not reached a level of exhaustion prior to the Electronic Control Device's use.

(g) In cases where subject is actively resisting an officer's attempt to take them into custody but not threatening the officer with an assault-it is recommended that the Electronic Control Device be used in the "push [drive] stun mode."

(h) The preferred targeting is the center mass of the subject's back; however it is recognized that it is not always possible to get behind the subject.

(i) Where back-targeting is not possible, frontal targeting should be lower center mass, intentional deployments to the chest shall be avoided where possible.

(j) Officers who are aware that a female subject is pregnant shall not use the Electronic Control Device unless deadly force would be justified due to the danger created by the secondary impact or the possibility of muscle contractions leading to premature birth.

(k) Officers shall make all reasonable efforts to avoid striking persons in the head, neck, eyes or genitals.

(l) Officers are prohibited from using the device as punitive measure.

(m) Electronic Control Devices shall not be used against person who is in physical control of a vehicle in motion unless deadly force would be justified based on an existing imminent threat.

(n) A warning prior to discharge is preferred but not always necessary for this type of force to be considered reasonable, model policies as well as courts have noted that giving a subject, who is assaultive toward the officer, a warning may enhance the danger to the officer and the subject by giving the subject time to avoid the deployment. See: Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).

(o) Officers shall make all efforts to warn other officers that a deployment is about to occur.

(p) The device shall never be used on a handcuffed person to force compliance unless the subject is actively resistant, and control cannot be otherwise accomplished.

(q) Officers should consider the location and environment of the subject. I.e. Is the subject at the top of a stairwell such that when incapacitated by the Electronic Control Device-they fall down the stairs causing a collateral injury. Officers shall avoid using Electronic Control Device in cases where the subject is elevated i.e. roof, fire escape, tree, bridge, stairwell, etc. etc. such that the secondary impact may cause serious

injury.

(r) Officers should be aware that a subject's heavy clothing may impact the effectiveness of the electronic control device.

(s) Officers should consider whether the subject has been exposed to combustible elements that may be on their person such as gasoline. The use of an Electronic Control Device on such persons may cause an ignition and fire.

(t) Officers should consider the particular subject and any vulnerabilities they may have such as: a person who is small in stature or very frail will be more dramatically impacted; some agencies have been criticized as well as sued for use on pregnant women, the very young and the elderly.

(u) Alternative tactics shall be utilized where the officer has prior information that the subject suffers from a disability which would increase the danger to that person by using the Electronic Restraint Device. i.e. A person at the scene tells an officer that the subject has a heart condition.

(v) Deployed probes that have been removed from a suspect should be treated as a biohazard.

(w) Where EMS is available, their services may be utilized for the removal of darts that have penetrated the skin as such removal can be accomplished without causing further injury or pain to the subject.

(x) All persons who have been the subject of an Electronic Control Device deployment shall be monitored for a period of time with a focus on symptoms of physical distress.  Any person who appears to be having any form of physical distress following the deployment of an ECD, shall be transported to a medical facility for a medical examination. It should be noted that studies indicate that persons who suffer from excited delirium may not be immediately impacted and the onset of difficulty may occur a period of time after the police control event.

(y) Mandatory Medical Clearance at Hospital:

   (i) Persons struck in a sensitive area-eyes, head, genitals, female breasts.

   (ii) Where the probes have penetrated the skin and Officers/EMS cannot safely remove darts in accord with this policy.

   (iii) Persons who do not appear to have fully recovered after a short period of time (Model Policies use a ten-minute time limit however officers who observe unusual physical distress should immediately call for medical assistance and should not wait the ten-minute recovery period recommended by some of the model policies)

   (iv) Persons who fall into one of the vulnerable classes such as juveniles, pregnant women, persons who are small in stature, persons who officers become aware have a pre-existing

medical condition that increases danger and the elderly.

    (v)  Subject who request medical assistance.

**(z)** Documentation:

    (i)  All deployments of an Electronic Control Device shall be documented including those cases where a subject complies once threatened with such a device.  By documenting the non-discharge uses, an agency establishes officer judgment and control as well as the deterrent effect of this tool.

    (ii)  Photographs of the affected area shall be taken following the removal of darts from the subject to document any injury. Where the push-stun method has been used, photographs are extremely important due to the increased potential for this method to cause scarring.

    (iii)  Supervisory personnel shall be notified and review all Electronic Control Device deployment for consistency with policy and training.

    (iv)  Darts/Cartridges shall be properly stored and maintained as evidence following a discharge.

    (v)  Officers are required to complete a "response to active resistance form" which shall be reviewed by a supervisor following the ECD use.

    (vi)  All deployments shall be reviewed by the agency as well as training personnel.

    (vii) Where there is any indication of lasting injury, claim or complaint internal data from device shall be maintained.

    (viii) All ECD units will be audited monthly to ensure that all deployment/activations have been reported as required.

**c.**  **Impact Weapons:** Batons, ASP/Expandable Baton

    **1)**  Impact weapons may be utilized in cases where the officers believe the use of these weapons would be reasonable to bring the event under control.

    **2)**  Examples would be where other options have been utilized and failed or where based on the officer's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

    **3)**  Officers shall not intentionally strike a person in the head with an impact weapon unless deadly force would be justified.

**V.**  **Duty to Intervene:**

In accordance with the agency's Duty to Intervene policy, officers of this agency have an affirmative duty to intervene if they witness a response to resistance that is clearly unreasonable. Any officer present and observing another officer using force that is clearly beyond that which is reasonable under the circumstances shall, when in a position to safely do so, intervene to prevent the use of unreasonable force. An officer who observes another employee's response to resistance that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

**VI. Reporting Control to Active Resistance:**

**A. Purpose (Reporting):** It is the purpose of this policy to provide police employees and supervisors with guidelines for reporting control to active resistance. The department will develop a Report to Control Active Resistance (RCAR) form to capture all required information described in this policy.

**B. Policy (Reporting):** Police officers are given the authority to use force to overcome a subject's resistance to the officer's order to comply, effect arrest, defend against assault, and prohibit flight. It is incumbent that officers be held accountable to safeguard the rights of members of the public. This policy mandates that members of the Department accurately, completely and timely report subject control of active resistance and a supervisor conducts a prompt investigation and reports this investigation findings.

**C. Procedures (Reporting):**

    a. Officers who become involved in an incident that requires reportable force are required to immediately notify their supervisor. The involved officer will provide a detailed documentation of the response to resistance utilized in the official police report prepared for the incident involved. In cases where no supervisor is working the officer will also be responsible for completing the RCAR report identified below prior to the end of their shift.

    b. A Report to Control Active Resistance (RCAR) form shall be prepared by a supervisor whenever an officer of this agency utilizes reportable force, as described in the definition of this policy, in the performance of their duties.

    c. The RCAR form will be completed in detail including a narrative account of the following:

        1) The actions of the subject that necessitated that force as a response to overcome the active resistance of the subject.

        2) The reasons why force was required and the type of force the officer utilized in overcoming the resistant subject.

        3) Any injuries or complaint of injuries of either the subject or the officer and any medical treatment received.

**D. Supervisory Responsibilities:** Once notified of an incident in which an officer has utilized force, the supervisor will immediately respond to the scene to investigate the incident. If the involved officer's supervisor is not available to respond, another supervisor will be dispatched to complete the RCAR. The supervisor will accomplish the following investigative steps in conducting the investigation:

    a. Interview the involved subject if they are cooperative, to determine their account of the incident and if they have a complaint. If they do have a complaint the supervisor shall complete a Administrative Report. If they have any type of injury, Operations Commander will be notified. Additionally, should the supervisor determine that unreasonable force was utilized, he/she shall notify the Operations Commander.

b. If a crime scene exists; or police equipment exists, which may contain forensic evidence, the supervisor shall ensure that the scene and evidence is processed, photographed and preserved.

c. Take photographs of the involved officer(s) and subject(s) depicting any potential injuries or documenting the lack of any injuries to the parties involved.

d. Interview, preferably audio-recorded/audio-visual recorded, all witnesses to the incident and document their description of the event.

e. Ensure that a qualified health care provider handles any injuries or other medical condition being experienced by the involved person.

f. The supervisor shall review any video recording of the incident, if available, prior to the completion of the RAR and the approval of the officer's reports

g. The supervisor investigating the use of reportable force shall be responsible for the review and approval of the officer's reports of the incident, when practicable

h. The supervisor will complete the RAR prior to completing their shift and submit it along with the officer's report to their chain of command for review.

i. **Exceptions: The following do not require the completion of a RAR unless otherwise required by the above policy:**

   1) Handcuffing or escorting a compliant, cooperative subject.

   2) Physical removal of peaceful demonstrators whom do not resist.



© 2022 Axon Enterprise, Inc.



# ⚡ AXON

# TASER ENERGY WEAPON
# ANNUAL OPERATOR UPDATE - 2022

Axon Training

Version 22 - Effective February 1, 2022

EXHIBIT 11
**TURCOTTE**
JAN 9, 2023
Julie Ritter, Court Reporter



# SMART USE CONSIDERATIONS

When objectively reasonable and as practicable



**Avoid using drive stuns except:**

- 3 or 4-point contact to complete circuit or increase probe spread
- "break-contact" or distraction tactic to create reactionary distance
- brief application to attempt pain compliance



Do not repeat drive stuns if subject's response indicates compliance is unlikely



Note: Pain compliance may not be effective due to mind-body disconnect (psychotic episode) or increased pain tolerance (drugs/alcohol)

© 2022 Axon Enterprise, Inc.

© 2022 Axon Enterprise, Inc.

# CARDIAC RISKS

Experts have identified the following key factors related to TASER Energy Weapon cardiac risks:

 Dart-to-heart distance

Duration of delivered electrical charge

**The further the TASER energy weapon dart is away from the heart and the shorter the exposure, the lower the risk of affecting the heart**

## AVOID REPEATED OR EXTENDED TASER ENERGY WEAPON DURATIONS

Minimize the number and duration of TASER energy weapon exposures

TASER energy weapon exposure is a physically and psychologically stressful event

Use the shortest duration of TASER energy weapon exposure objectively reasonable to accomplish lawful objectives

Avoid continuous exposures beyond 15 seconds absent an immediate threat and increased justification

Reassess the subject's behavior before repeating or continuing the exposure, and provide time for compliance

© 2022 Axon Enterprise, Inc.

© 2022 Axon Enterprise, Inc.

# PHYSIOLOGIC/ METABOLIC RISKS

TASER energy weapons may produce effects that could increase the risk of sudden death, including changes in:

 Blood chemistry

 Blood pressure

 Respiration

Heart rate and rhythm

Adrenaline and stress hormones

**The longer the TASER energy weapon exposure, the greater the potential effects**

SEALED EXHIBITS 12 - 17