UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:21-CV-00050-GNS-HBB

ESTATE OF JEREMY MARR,                                          PLAINTIFFS
by and through its Administrator,
JOANNA MARR et al.

v.

CITY OF GLASGOW et al.                                          DEFENDANTS

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter is before the Court on Defendants' Motions for Summary Judgment (DN 45, 48) and Defendants' Motions to Exclude (DN 61, 62, 63). The motions are ripe for adjudication.

## I.    <u>BACKGROUND</u>

On the morning of April 14, 2020, officers from the Glasgow Police Department ("GPD") responded to a 911 call reporting a home break-in of an occupied residence. (Compl. ¶¶ 12-24, DN 1; Tharp Dep. 5:8-7:19, 12:1-22, July 10, 2023, DN 53). GPD Officers Guy Joseph Turcotte ("Turcotte"), Hayden Phillips ("Phillips"), and Cameron Murrell ("Murrell") (jointly, the "Officers") responded to the call at the home of Evie Tharp ("Tharp") and arrived to find Jeremy Marr ("Marr") exiting the residence. (Turcotte Dep. 17:18-22:25, 104:3-105:13, Jan. 9, 2023, DN 49).

Upon encountering Marr, he told the Officers that someone was trying to hurt him and that he did not want to die. (Turcotte Dep. 100:19-104:3; Turcotte Bodycam 1, at 3:20-4:15, DN 46). When asked whether he had any weapons on him, Marr revealed he had a knife on his person and initially reached into his pocket to turn it over, but stopped after being ordered to do so. (Turcotte Dep. 101:19-102:14; Turcotte Bodycam 1, at 3:25-3:35). The Officers noted that Marr was in a state of mental distress, possibly under the influence of methamphetamine, and Turcotte stated

1

Marr made him nervous because he was "acting squirrelly." (Turcotte Dep. 101:19-110:20; Turcotte Bodycam 1, at 5:00-5:10; Turcotte Bodycam 2, at 0:00-0:20, DN 46).

After walking him to the police car, the Officers attempted to handcuff Marr but only managed to cuff one hand before Marr resisted. (Turcotte Bodycam 1, at 5:00-5:25). The Officers pushed Marr to the ground, restraining his arms, and straddling him. (Turcotte Dep. 29:10-30:26, 109:1-110:25; Turcotte Bodycam 1, at 5:00-5:26). A struggle continued between Marr and the Officers for roughly four minutes, during which Marr was repeatedly ordered to stop resisting but he refused to comply.[1] (Turcotte Dep. 109:16-112:7; Turcotte Bodycam 1, at 5:20-9:20). As Marr continued to resist, the Officers tased Marr eight to ten times in his back, and he was struck by an officer's knee in his side or some portion of his lower body while the Officers ordered him to put his hands behind his back and to stop moving. (Turcotte Bodycam 1, at 6:07-10:00). When Marr was finally subdued, no other force was applied by the Officers. (Turcotte Bodycam 1, at 9:10-9:35). The bodycam footage is unclear at times as to which officer performed particular actions, but all three Officers were involved in the struggle.

When Marr was rolled onto his back after being subdued, his breathing was shallow and he later became unresponsive. (Turcotte Dep. 170:5-172:25; Turcotte Bodycam 2, at 1:10-3:40). An ambulance was called, and Marr was transported to the hospital where he was pronounced dead on arrival. (Turcotte Dep. 170:5-172:25).

Plaintiffs Joanna Marr, as Administrator of the Estate of Jeremy Marr, individually, and on behalf of Marr's minor child (collectively, "Plaintiffs"), filed this wrongful death action alleging the officers used excessive force against Marr and asserting federal and state law claims against

---

[1] A nine-second portion of the encounter was also filmed by a bystander. (Bystander Facebook Video, DN 46).

the GPD; the City of Glasgow ("City"); and Turcotte, Phillips, and Murrell in their official and individual capacities. (Compl. ¶¶ 3-9, 15-18, 38-71). After the Court granted in part Defendants' motion to dismiss,[2] Plaintiffs' remaining causes of action are: a federal claim under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment; and state law claims for battery, negligence, wrongful death, loss of spousal and parental consortium, and negligent hiring, retention, supervision, and training. (Compl. ¶¶ 38-58, 100-13; Mem. Op. & Order 2-12).

Defendants move for summary judgment on Plaintiffs' remaining claims against them. (Defs.' Mot. Summ. J., DN 45, Def.'s Mot. Summ. J., DN 48). Defendants also move to exclude the testimony of Plaintiffs' experts. (Defs.' Mot. Exclude Test. George Kirkham, DN 61; Defs.' Mot. Exclude Test. Joseph Stidham, DN 62; Defs.' Mot. Exclude Test. John Hunsaker, DN 63).

## II.    <u>JURISDICTION</u>

Jurisdiction for the federal law claims is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the state law claims through supplemental jurisdiction under 28 U.S.C. § 1367(a).

## III.    <u>STANDARD OF REVIEW</u>

A court may only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party initially meets the burden by stating both a basis in the record and providing evidence to demonstrate there is no dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party meets this burden, the burden then shifts to the nonmoving party to produce specific evidence to show there are indeed disputed factual issues suited for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The

---

[2] The Court also dismissed the claims asserted against the GPD. (Mem. Op. & Order 2-3, DN 14).

mere existence of a scintilla of evidence" will not meet this standard; it must be enough so that a jury could reasonably find for the nonmoving party. *Id.* at 252. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Id.* (citation omitted). While the evidence must be viewed in the light most favorable to the nonmoving party, the nonmoving party must still show specific facts to demonstrate there is still a genuine dispute of material fact by citing to particular portions of the record or "the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(B).

The bodycam footage in this case is material to the Court's review. If the video shows facts so clearly that a reasonable jury would be able to view these facts in only one way, the Court should view the facts in the light depicted by the video. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). When the facts shown in the bodycam footage can be interpreted in multiple ways or if the footage does not reveal the salient facts, the facts must be viewed in the light most favorable to the nonmoving party. *See Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). Where the video footage has "gaps or uncertainties," factual uncertainties and any reasonable inferences must be viewed in the light most favorable to the nonmoving party. *See LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022).

## IV.    DISCUSSION

### A.    Defendants' Motions for Summary Judgment

Defendants contend that they are entitled to summary judgment on Plaintiffs' federal claims, which Plaintiffs understandably oppose. (Defs.' Mot. Summ. J. 12-25; Def.'s Mot. Summ. J. 8-16; Pls.' Resp. Def.'s Mot. Summ. J. 6-14, DN 70; Pls.' Resp. Defs.' Mot. Summ. J. 12-26, DN 71).

1.    *42 U.S.C. § 1983*

a.    **Excessive Force**

In seeking summary judgment on Plaintiffs' Section 1983 claim for excessive force, the Officers contend that the force used was reasonable and that the defense of qualified immunity applies to defeat this claim. (Defs.' Mot. Summ. J. 12-23). Section 1983 does not provide substantive rights to a plaintiff but creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right. *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). A plaintiff has the burden of showing a defendant is not entitled to qualified immunity when the defendant raises the initial qualified immunity defense. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted).

The Sixth Circuit has explained the nature of the qualified immunity defense and when it applies:

> Qualified immunity shields government officials from civil liability in the performance of their duties so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Such immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful. The qualified immunity analysis is a two-step inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order. The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (internal quotation marks omitted) (internal citations omitted) (citation omitted). The salient question in determining the application of qualified immunity is whether the defendants had "fair warning that their conduct was unconstitutional." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (internal quotation marks omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2022)). In asserting this defense, a defendant

must first provide facts showing that the actions taken were within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). A plaintiff then has the burden of showing the defendant is not entitled to qualified immunity. *See Johnson*, 790 F.3d at 653 (citation omitted).

In resolving whether qualified immunity applies in the context of excessive force claims, each defendant's liability must be evaluated individually. *See Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015). "[A] plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force in order to hold an office liable for excessive force." *Id.* (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). Plaintiffs have sufficiently shown the participation of the Officers who do not dispute their involvement in Marr's arrest for purposes of qualified immunity. (Turcotte Dep. 17:18-22:25, 104:3-105:13; Turcotte Bodycam 1, at 4:25-9:00; Bystander Facebook Video; Defs.' Mot. Summ. J. 11-13). The Officers assert, however, that Plaintiffs cannot demonstrate the violation of a clearly established right. (Defs.' Mot. Summ. J. 11-13).

### i.     Constitutional Violation

This analysis begins by identifying which constitutional rights are implicated in the case and the extent of the potential violation. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted). In particular, Plaintiffs base their claims on the alleged excessive use of force in detaining Marr in violation of the Fourth Amendment.[3] (Compl. ¶ 41).

---

[3] Although the Complaint initially asserted a Section 1983 claim based on an Eighth Amendment violation, Plaintiffs conceded that the Eighth Amendment did not apply to Marr, and the Eighth

1/31/2025 10:53 AM

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. These Fourth Amendment protections include a safeguard against police using excessive force during an arrest or stop. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). Under the Fourth Amendment:

> "a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit a crime." Probable cause necessary to justify an arrest is defined as "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." A reviewing court must assess the existence of probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (alterations in original) (internal citations omitted) (citation omitted). A court utilizes the "objective reasonableness" standard when evaluating such an excessive force claim. *See Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396). This analysis entails a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation omitted). It requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

When examining these factors, a court must identify the seizure and whether "the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore ex rel. Rohm v. Lubelan*, 476

---

Amendment claim was dismissed. (Pls.' Resp. Defs.' Mot. Dismiss 19, DN 12; Mem. Op. & Order 4).

F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).  As the Supreme Court has explained:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*"

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989).  Each defendant's liability must be evaluated separately when there are multiple defendants.  *See Pollard*, 780 F.3d at 402 (citing *Binay*, 601 F.3d at 650).  Though the facts and bodycam footage indicate that the Officers acted in concert with one another, the Sixth Circuit has cautioned district courts that an individualized analysis of liability is still necessary even when such an analysis is obvious or may not be determinative of the case.  *See id.* (citing *Binay*, 601 F.3d at 650).

In considering the severity of a crime, a series of factors are pertinent to determine if the crime is severe such as whether an offense is a misdemeanor or felony, the individual was suspected of being involved in an underlying felony or the officer was responding to an emergency call, and the suspect's conduct implicates public safety concerns.  *See Shumate v. City of Adrian*, 44 F.4th 427, 441-42 (6th Cir. 2022).

Marr's initial actions in this instance constituted a significant crime despite the fact the Officers were not present when the crime first occurred.  (Turcotte Dep. 101:19-110:20; Murrell Dep. 93:7-95:3, Feb. 2, 2023, DN 51; Phillips Dep. 65:19-74:19, DN 50; Tharp Dep. 5:8-7:19, 12:1-22); KRS 511.030 (second-degree burglary); KRS 511.060 (first-degree, criminal trespass).  The Officers were responding to an emergency call from Marr's entry into an elderly woman's

home[4] by breaking a window, and they caught Marr as he was exiting the residence.  (Turcotte Dep. 101:19-110:20; Tharp Dep. 5:8-7:19, 12:1-22).   Tharp understandably feared Marr, a complete stranger, who smashed a window to enter at 7:30 AM, repeatedly yelling that he did not want to be killed.  (Tharp Dep. 5:8-7:19, 12:1-22; Turcotte Bodycam 1, at 8:00-9:30).  The Officers encountered Marr in an agitated mental state, and they noted their concern with Marr's behavior.  (Turcotte Dep. 101:19-102:14, Turcotte Bodycam 1, at 3:30-3:36, 5:00-5:10).   Under these circumstances, the first factor favors the Officers.

The second factor—whether Marr posed an immediate threat—also favors the Officers.  The Officers initially arrived on scene, expecting to encounter a potentially dangerous situation of a reported break-in to an occupied residence.  (Tharp Dep. 5:8-7:19, 12:1-22).  Marr's erratic behavior added to this elevated concern.  (Turcotte Bodycam 1, at 3:30-3:36).  Turcotte noted that Marr was "acting squirrelly" and made the Officers nervous when they encountered the suspect.  (Turcotte Bodycam 1, at 5:00-5:10).   One of the Officers noted that Marr "was on meth or something" after Marr was subdued.  (Turcotte Dep. 101:19-110:20; Turcotte Bodycam 2, at 0:00-0:20).

In assessing the immediacy of the threat, it does not appear that the decision to handcuff Marr was unreasonable.  (Turcotte Bodycam 1, at 3:20-9:30).  When the Officers arrived at Tharp's residence, Marr was coming out of the house with a pair of flipflops in his hands.  He immediately urged the Officers not to hurt him and insisted repeatedly that someone was trying to kill him.  Given that Marr was caught red-handed leaving the house he had just broken into, the Officers clearly had probable cause to arrest him.  *See Dean v. Earle*, 866 F. Supp. 336, 339, (W.D. Ky.

---

[4] Defendants indicate Tharp was 89 years old without citation to the record.  (Defs.' Mot. Summ. J. 1).  Turcotte's bodycam footage bears out the victim's relative age.  (Turcotte Bodycam 2, at 9:20-9:35).

1994) ("Probable cause for a warrantless arrest and subsequent detention exists when circumstances are 'sufficient to warrant a reasonable and prudent man to believe that a suspect had committed or was committing an offense.'" (quoting *United States v. Steele*, 727 F.2d 580, 588 (6th Cir. 1984))); *see also Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ("Probable cause requires only the probability of criminal activity not some type of 'prima facie' showing." (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983))); *United States v. Stiff*, No. 3:24-CR-22, 2025 WL 92941, at *3 (W.D. Ky. Jan. 14, 2025) ("An 'arrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law,' and the arrest occurs in public." (quoting *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998))). Despite multiple assurances from Turcotte, Marr persisted to gesture about and express fear for his safety. The Officers believed Marr was a flight risk as he continued to glance around expressing fear of people who were "after" him. (Turcotte Bodycam 1, at 3:30-5:05; Turcotte Dep. 105:11-15). After refusing Turcotte's invitation to simply sit on the bumper of his patrol car, Marr was then led over to the car and his hands were placed on the hood. (Turcotte Bodycam 1, at 3:30-5:05; Turcotte Dep. 105:13-15). When Marr's agitation continued and he took one of his hands off the car hood, Turcotte determined that Marr should be handcuffed. (Turcotte Bodycam 1, at 4:30-5:10). Viewing the situation objectively, it cannot be said that Turcotte's decision was unreasonable. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." (citation omitted)).

Under the third *Graham* factor, Turcotte's bodycam footage reflects that Marr resisted the Officers' attempts to place handcuffs on him. After allowing one hand to be secured, Marr began

to resist and continued to struggle with the Officers for over four minutes.  (Turcotte Bodycam 1, at 5:00-9:30).  Thus, this factor strongly favors the reasonableness of the Officers' actions.

The individualized analysis of the actions of the Officers clearly shows Turcotte, Phillips, and Murrell actively used reasonable force in effecting Marr's arrest.  Turcotte explained that he used "soft hand technique" to walk Marr to his patrol car initially, and he tased Marr several times in the lower back once the struggle ensued.  (Turcotte Dep. 29:17-30:4, 53:18-54:2).  Phillips admitted that he straddled Marr's center mass, struck Marr in the "brachial triplex area" with his hand, and used a knee strike on the back of Marr's leg during the struggle.  (Phillips Dep. 92:10-23, 111:11-21, 113:2-12).  Murrell assisted Turcotte and Phillips by restraining Marr's hands with a wrist lock and attempted to use a knee strike on him.  (See Murrell Dep. 57:10-18).  Once Marr was restrained and the struggle ended, however, the use of force stopped.

Overall, the *Graham* factors warrant a finding that the Officers' actions were reasonable under the totality of the circumstances.  The Officers have satisfied the first prong of the qualified immunity defense.

### ii.    Clearly Established

The second prong of qualified immunity analysis examines whether the right as clearly established.  *See Getz*, 833 F.3d at 652 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Assuming arguendo that Plaintiffs had established that the Officers violated Marr's rights, Plaintiffs have not met their burden as to this prong.

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted)

(internal citation omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (alteration in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).  As the Supreme Court has noted, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* (quoting *Mullenix*, 577 U.S. at 13).  "The critical question is whether the case law has put the officer on notice that his conduct is clearly unlawful." *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005), *abrogated on other grounds as recognized by Marvin v. City of Taylor*, 509 F.3d 234, 246 n.6 (6th Cir. 2007).

Sixth Circuit precedent divides circumstances involving the use of a taser during an arrest into two categories:  (i) the use of a taser when a suspect is "actively resisting arrest by physically struggling with, threatening, or disobeying officers"; and (ii) the use of a taser on a suspect "who has done nothing to resist arrest or is already detained." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495-96 (6th Cir. 2012).  When an individual resists arrest, the Sixth Circuit has concluded either that no constitutional violation occurred or that the right not to be tased while resisting arrest was not clearly established at the time of the incident. *See Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (internal quotation marks omitted) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)).  In cases involving non-resistance, there is a violation of a clearly established right and a plaintiff may utilize a Section 1983 excessive force claim since there is a clearly established "right to be free from physical force when one is not

12

resisting . . . ." *Id.*; *see also Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (holding that multiple uses of a taser against a subdued suspect lying face-down in swamp water violated clearly established law when the incident occurred in 2004); *Williams v. Sandel*, 433 F. App'x 353, 363 (6th Cir. 2011) (holding there was not excessive force when tasing the suspect thirty-seven times along with using physical force and pepper spray because he was actively resisting arrest). Active resistance can be "physically struggling with, threatening, or disobeying officers" or refusing to be handcuffed by an officer if done along with another act of disobedience or defiance. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012); *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96-97 (6th Cir. 2012); *see Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015).

In this instance, the issue is whether an individual in a state of mental distress who had broken into a stranger's residence and subsequently resisted being handcuffed had a clearly established right not to be tased and kneed repeatedly while resisting. Based on binding precedent, this answer is no. The Sixth Circuit reviewed a case with similar facts in *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012), in which a man under the influence of crack cocaine caused a disturbance at his house, prompting a police response. *See id.* at 507. The police ordered the man to stop multiple times, proceeded to tackle him to the ground, and shocked him with a taser several times in order to get handcuffs and shackles on him. *See id.* The man later lost consciousness and died. *See id.* The Sixth Circuit reversed the district court's denial of summary judgment and held that the officers were entitled to qualified immunity under those circumstances, noting a suspect's active resistance distinguishes reasonable tasing from

unreasonable tasing. *See id.* at 510-11. The suspect was acting "out of control" and resisted arrest, supporting the conclusion that the use of force by the police did not violate established law. *See id.* at 510-11; *see also Roell v. Hamilton Cnty.*, 870 F.3d 471, (6th Cir. 2017) (holding the conduct of officers who physically subdued and tried to tase a man acting aggressively towards the officers was not excessive force).

The circumstances of Marr's arrest align with *Hagans* and fall into the Sixth Circuit's line of cases in which police employ tasers upon suspects resisting arrest. The Officers recognized Marr was in a state of excited delirium and under mental distress when they arrived at the site of the break-in. (Turcotte Dep. 101:19-110:20; Turcotte Bodycam 1, at 5:00-5:10; Turcotte Bodycam 2, at 0:00-0:20, DN 46). When they tried to put him in handcuffs, Marr resisted and struggled with the Officers for several minutes. (Turcotte Dep. 109:16-112:7; Turcotte Bodycam 1, at 4:25-9:00). During this period, the Officers tased and struck Marr numerous times, but only until Marr was handcuffed. (Turcotte Bodycam 1, at 6:07-9:35).

Plaintiffs point to the number of times Marr was kneed and tased by the Officers while he was on the ground, citing *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013). (Pls.' Resp. Defs.' Mot. Summ. J. 3; Turcotte Bodycam 1, at 4:25-9:00). In *Martin*, the officers used body strikes and physical compression to subdue a mentally unstable individual who jogged away from officers while naked, unarmed, and under the influence of drugs. *See id.* at 954-55. The present case, however, is materially different because the suspect in *Martin* "put his hands behind his back to allow [the officer] to handcuff him." *Id.* at 958. Further, the Sixth Circuit noted that "[e]ven after Martin was handcuffed and subdued, . . . [the officers] used their arms to keep Martin in a face-down position, and did not roll Martin onto his side until he made a 'gurgling' noise." *Id.* at 959.

The Sixth Circuit and sister courts have recognized a clearly established right "to be free from being forcibly kneed in the back while not actively resisting arrest and lying on [one's] stomach on the ground not resisting arrest." *Sanders v. City of Pembroke*, No. 5:19-CV-23-TBR, 2020 WL 4572360, at *9 (W.D. Ky. Aug. 7, 2020) (quoting *Sweatt v. Doxtader*, 986 F. Supp. 2d 886, 898 (E.D. Mich. 2013)); *see also Champion*, 380 F.3d at 903 ("[I]t [is] also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."). In this instance, however, Turcotte's bodycam footage reflects that all physical force against Marr occurred while he actively resisted being handcuffed and the use of force ceased once Marr was restrained. (Turcotte Bodycam 1, at 5:55-9:20). Thus, there was no clearly established right prohibiting the use of the force under the circumstances of this case.[5]

In evaluating the application of qualified immunity to excessive force claims, any inclination to play "Monday morning quarterback" must be resisted. The test is reasonableness at the time the force was used, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). As the Sixth Circuit has recognized, "police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) (internal quotation marks omitted) (citation omitted). The present circumstances fully support this deference: there was no way to predict what Marr would

---

[5] Even if the Officers were mistaken in their belief that Marr was resisting arrest, the Sixth Circuit has held that "[q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Chappell*, 585 F.3d at 907 (citing *Pearson*, 555 U.S. at 231). Thus, the Officers had not been put on notice that their conduct was unlawful or violated a clearly established right.

do next given his highly agitated state and apparent paranoid belief that he was being pursued by people who were trying to kill him.  Thus, "it is inappropriate, 'in the quietude of our chambers, to second-guess standard police procedure and [] on-the-scene judgment.'"  *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (alteration in original) (citation omitted).

Based on the evidence in the record, the Officers are entitled to qualified immunity on Plaintiffs' Section 1983 claim as a matter of law.  *See Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) ("[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991))).  Accordingly, the motion for summary judgment on behalf of the Officers is granted as to Plaintiffs' 1983 claim for excessive force.

### b.    *Monell*/Respondeat Superior Liability

The City contends that it is entitled to summary judgment because Plaintiffs have failed to prove an underlying constitutional violation by one of the Officers, which precludes the imposition of *Monell* liability.  (Def.'s Mot. Summ. J. 8-14).  As the Sixth Circuit has explained:

> Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law.  42 U.S.C. § 1983.  To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).  However, "[t]here can be no liability under *Monell* without an underlying constitutional violation."  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)).

16

As outlined above, Plaintiffs have failed to prove a constitutional violation by the Officers. Accordingly, Plaintiffs' *Monell* claim fails as a matter of law, and the City is entitled to summary judgment on this claim.

### 2.    *State Law Claims*

#### a.    **Claims Against the Officers**

Plaintiffs have also asserted state law claims of battery, loss of consortium, and negligence against the Officers. (Compl. ¶¶ 49-68). The Officers seek summary judgment on these claims as well. (Defs.' Mot. Summ. J. 23-25).

#### i.    **Battery**

The Officers seek summary judgment on Plaintiffs' claim for battery on the basis that their Section 1983 excessive force claim must also fail as a matter of law. (Defs.' Mot. Summ. J. 23). The Sixth Circuit has held that a state law battery claim fails as a matter of law when the actions of officers are reasonable under Section 1983. *See Atwell v. Hart Cnty.*, 122 F. App'x 215, 219 (6th Cir. 2005) (citing *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003)). Because the record reflects that the actions of the Officers were reasonable and the excessive force claim was dismissed, the Officers are entitled to summary judgment on the battery claim.

#### ii.    **Negligence**

The Officers also seek dismissal of the negligence claim against them based upon qualified official immunity under Kentucky law. (Defs.' Mot. Summ. J. 24-25). In Kentucky, public officials and employees have qualified official immunity from tort liability for: "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Qualified official immunity protects officials who must exercise judgment and

17

discretion from personal liability for damages in order to encourage the full performance of their necessary duties.  *See New v. Louisville Metro Gov't*, No. 3:15-CV-653-DJH, 2016 WL 1268299, at *4 (W.D. Ky. Mar. 31, 2016) (citing *Haney v. Monsky*, 311 S.W.3d 235, 245 (Ky. 2010)).  A defendant relying on the defense of qualified official immunity defense must prove the good faith subjective element.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 816-18 (1982); *Howell*, 668 F.3d at 355 (citing *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006)).

Kentucky courts have held that "the determination of the amount of force required to effect the investigatory stop or arrest is [] a discretionary act within the scope of a peace officer's authority."  *Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. App. 2016) (citing *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014)); *see also Reich v. City of Elizabethtown*, No. 3:16-CV-00429-RGJ, 2018 WL 6028719, at *11 (W.D. Ky. Nov. 16, 2018) (holding that the officers' use of force was a discretionary act) (citations omitted); *Guarnieri v. Garyantes*, No. 3:16-CV-80-DJH-CHL, 2017 WL 4077019, at *4 (W.D. Ky. Sept. 14, 2017) ("It is undisputed that Garyantes's decision to arrest Guarnieri, as well as any use of force in making the arrest, was discretionary."  (citation omitted)).  Here, the Officers were acting within their authority as law enforcement officers when they responded to Tharp's residence and in applying the force against Marr as he resisted arrest.  Thus, both the first and third prongs of qualified official immunity are met.

As to the requirement of good faith, "[t]his inquiry is resolved by determining 'whether the official has behaved with permissible intentions.'"  *Howell*, 668 F.3d at 356 (quoting *Bryant v. Pulaski Cnty. Det. Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011)).  While Plaintiffs argue that the Officers have not shown good faith because there was a constitutional violation, that argument lacks merit in light of the holding above that Plaintiffs have failed to prove a constitutional violation to support

their Section 1983 claim. (Pls.' Resp. Defs.' Mot. Summ. J. 25-26). Plaintiffs otherwise do not point to any facts, disputed or not, that the Officers did not act in good faith, and the record otherwise lacks evidence to support a finding in Plaintiffs' favor on this prong. Accordingly, the Officers have met their burden, and Plaintiffs' negligence claim against them is barred by qualified official immunity relating to their use of force. *See Howell*, 668 F.3d at 356 ("Here, none of the facts on the record support a finding that Sanders did not honestly believe in the purpose of the actions he was taking."). Plaintiffs' negligence claims against the Officers are dismissed.

### iii.    Loss of Consortium Claims

Finally, the Officers seek dismissal of Plaintiffs' claims for loss of consortium. (Defs.' Mot. Summ. J. 25). Under Kentucky law, a loss of consortium claim is a separate cause of action but is derivative of the underlying claim. *See Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 685 (E.D. Ky. 2013) (citations omitted) (applying Kentucky law). Thus, to the extent that a plaintiff fails to prove the underlying claim on its merits, the loss of consortium of claim likewise must be dismissed. *See Terry v. Ethicon, Inc.*, No. 1:19-CV-00175-GNS, 2022 WL 468051, at *4 (W.D. Ky. Feb. 15, 2022). Because Plaintiffs have failed to prove their underlying claims against the Officers on the merits, the Officers are also entitled to summary judgment on Plaintiffs' loss of consortium claims. *See Monak v. Ford Motor Co.*, 95 F. App'x 758, 768 (6th Cir. 2004) (citation omitted).

### b.    *Claims Against the City*

In the Complaint, Plaintiffs assert the following state law claims against the City: (i) battery; (ii) negligence and wrongful death; (iii) loss of consortium; and (iv) negligent hiring,

1/31/2025 10:53 AM

retention, supervision, and training.  (Compl. ¶¶ 49-71).  The City seeks summary judgment on all of these claims.  (Def.'s Mot. Summ. J. 14-16).

### i.      Respondeat Superior

The City argues that it is entitled to summary judgment on Plaintiffs' respondeat superior claim because Plaintiffs have failed to prove any state law tort committed by the Officers.  (Def.'s Mot. Summ. J. 14-15).  Because the battery and negligence claims against the Officers are barred by qualified official immunity, Plaintiffs cannot prove a respondeat superior claim as a matter of law, and summary judgment is granted for the City on the battery and negligence claims.  *See Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. App. 2007) ("Indeed, vicarious liability is not possible without primary liability." (citing *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980))).

### ii.      Negligent Hiring, Retention, Supervision, and Training

The City also seeks summary judgment on Plaintiffs' negligent hiring, retention, supervision, and training claims Kentucky law.  (Def.'s Mot. Summ. J. 15-16).  As the Kentucky Supreme Court has noted, "'respondeat superior' is based upon the employer/employee relationship and imposes strict liability, whereas claims of negligent hiring/retention focus on the direct negligence of the employer which permitted an otherwise avoidable circumstance to occur." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009).  "Under Kentucky law, negligent hiring and retention and negligent training and supervision are separate torts with different elements, but they each require proof that the employer knew or should have known of the risk the employee created." *Fields v. Hopson*, No. 1:23-CV-00015-GNS, 2024 WL 55566, at *4 (W.D. Ky. Jan. 4, 2024) (citing *Ritchie v. Turner*, 559 S.W.3d 822, 842 (Ky. 2018)).

In this instance, the City contends that there is no proof to put it on notice of the risk posed by the Officers in this case.  (Def.'s Mot. Summ. J. 15-16).  It notes that the Officers were properly trained, and the record is devoid of evidence of prior incidents of misconduct by the Officers to put the City on notice that the Officers were prone to use excessive force.  (Def.'s Mot. Summ. J. 15-16).  In their response, Plaintiffs assert:

> The City puts all of its eggs in one basket here, attempting to undercut each of these claims by arguing that the Plaintiffs must "prove" past negligent acts that pre-date the events in controversy.  To succeed at trial, yes, that is the case. Here, the Plaintiffs need only demonstrate that there is a factual basis for a jury to conclude that such is the case, which they have done.

(Pls.' Resp. Def.'s Mot. Summ. J. 14).  Plaintiffs otherwise fail to point to any evidence in the record to defeat summary judgment on this issue.[6]  *See Turner-Meadows v. Gen. Motors, LLC*, 786 F. App'x 592, 596 (6th Cir. 2019) ("[T]he non-moving party must present evidence upon which a reasonable jury could find in [their] favor."  (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012))).  Accordingly, the City is entitled to summary judgment on these claims.

### B.    **Defendants' Motions to Exclude**

As noted above, Defendants move to exclude the expert testimony of Plaintiffs' expert witnesses.  Because Plaintiffs' claims fail as a matter of law, it is unnecessary to address the merits of these motions, which are denied as moot.[7]

---

[6] Plaintiffs respond with a list of prior lawsuits filed against the City obtained during discovery and note that one of the lawsuits was settled. (Pls.' Resp. Def.'s Mot. Summ. J. 9).  If this discovery is in the record, Plaintiffs have not cited to it.  Plaintiffs otherwise fail to explain how these prior lawsuits put the City on notice of particular instances of malfeasance relating to the Officers.

[7] In particular, Defendants seek exclusion of the testimony of Dr. John Hunsaker ("Dr. Hunsaker") as to the cause of Marr's death.  (Defs.' Mot. Exclude Test. John Hunsaker 1-9).  Dr. Hunsaker relies on the "Weeden hypothesis" in reference to an article entitled "Prone Restraint Cardiac Arrest in Custody and Arrest-Related Deaths."  (Hunsaker Dep. 59:2-65:17, Oct. 13, 2023, DN 66).  This article discusses a study featuring *two* cases of a restrained subject being tased during a

1/31/2025 10:53 AM

## V.    <u>**CONCLUSION**</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendants' Motions for Summary Judgment (DN 45, 48) are **GRANTED**, and the Complaint is **DISMISSED WITH PREJUDICE**.

2.    Defendants' Motions to Exclude (DN 61, 62, 63) are **DENIED AS MOOT**.

3.    The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

January 31, 2025

cc:    counsel of record

---

law enforcement stop, analyzing how prone restraint can interfere with breathing and gas exchange to cause cardiac arrest. (Hunsaker Dep. 59:2-65:17). Dr. Hunsaker departed from the article because Marr's case included methamphetamine toxicity and taser applications, and Dr. Hunsaker conceded that Marr's circumstances were materially different than the cases in the Weeden study. (Hunsaker Dep. 62:4-65:17). Even if Dr. Hunsaker arrived at a different conclusion, the Weeden study is an invalid foundation, providing statistically unsound methodologies consisting of a pair of isolated instances of anecdotal evidence. (Hunsaker Dep. 59:2-65:17). This study's lack of trustworthiness clearly fails the threshold set forth by Fed. R. Evid. 702. Dr. Hunsaker also concluded the methamphetamine in Marr's system contributed to his death but in an unquantifiable way, providing no help to a jury's ultimate resolution of the case. (Hunsaker Dep. 59:2-65:17). Thus, Dr. Hunsaker's report would not be competent evidence that the Officers caused Marr's death.

1/31/2025 10:53 AM